# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JACK FEINTUCH, Derivatively on Behalf of Nominal Defendant EXELON CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER M. CRANE, ANTHONY K. ANDERSON, ANN C. BERZIN, LAURIE BRLAS, YVES C. DE BALMANN, NICHOLAS DEBENEDICTIS, LINDA JOJO, PAUL L. JOSKOW, ROBERT J. LAWLESS, RICHARD W. MIES, JOHN M. RICHARDSON, MAYO A. SHATTUCK III, STEPHEN D. STEINOUR, JOHN F. YOUNG, JOSEPH NIGRO, JOSEPH DOMINGUEZ, JEANNE M. JONES, and ANNE PRAMAGGIORE, <br><br> Defendants, <br><br> and <br><br> EXELON CORPORATION, <br><br> Nominal Defendant. | Case No. |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff, Jack Feintuch ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Exelon Corporation ("Exelon" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, gross mismanagement, and violations of Sections 14(a), 10(b), 20(a) of the Securities Exchange Act of

1

1934 (the "Exchange Act"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Exelon with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.      NATURE AND SUMMARY OF THE ACTION

1.      Exelon is a utility services holding company that engages in the energy generation and delivery businesses in U.S. and Canada. It owns various "utility registrants" that are regulated by state utility commissions. One such registrant that Exelon owns is Commonwealth Edison ("ComEd"), which is the largest electric utility in Illinois and the sole electric provider for much of Northern Illinois.

2.      Exelon's Code of Business Conduct prohibits employees and contractors from lobbying unless they obtain authorization from the Company. Multiple committees of the Board are tasked with oversight of and compliance with regulations, including with respect to lobbying. In public filings, Exelon maintained that its disclosure controls and procedures were effective. However, the Company failed to accurately disclose its lobbying activities and its compliance with applicable regulations.

3.      Unbeknownst to Exelon shareholders, since as early as May 2019, Exelon's and ComEd's lobbying practices have been subject to a federal investigation related to payments to Illinois state senator Martin Sandoval and to a former political operative for Illinois House Speaker Michael Madigan.

4.     The truth began to emerge on July 15, 2019 when the Company finally disclosed that Exelon and ComEd had received a grand jury subpoena to produce information regarding their lobbying activities in Illinois.

5.     On this news, the Company's stock price fell $0.18 per share, or 0.37%, to close at $48.88 per share on July 15, 2019.

6.     The bad news kept coming.  On October 9, 2019, the Company disclosed that Exelon and ComEd had previously received a second grand jury subpoena to produce "records of any communications with certain individuals and entities, including Illinois State Senator Martin Sandoval."

7.     On October 15, 2019, Exelon announced the abrupt resignation of Anne Pramaggiore, the CEO of Exelon Utilities and former President/CEO of ComEd.  Analysts immediately identified the criminal subpoenas and Pramaggiore's abrupt resignation as "being directly related to each other."

8.     On this news, the Company's stock price fell $2.15 per share, or nearly 5%, to close at $44.91 per share on October 16, 2019.

9.     On October 31, 2019, Exelon disclosed that the SEC had opened an investigation into Exelon and ComEd regarding their lobbying activities.

10.    On this news, Exelon's stock price fell $1.17 per share, or nearly 3%, to close at $45.49 per share on October 31, 2019.

11.    On November 1, 2019, the *Chicago Tribune* reported that "[a] source with knowledge of the case in Chicago" confirmed that "Pramaggiore is one focus of the ongoing federal investigation" and that the "ComEd lobbying investigation dates to at least mid-May."

12.     On this news, the Company's stock price fell $0.15 per share to close at $45.34 per share on November 1, 2019, representing a decline of 3% since Exelon first disclosed the SEC investigation.

13.     On January 28, 2020, Illinois state Senator Martin Sandoval pleaded guilty to federal bribery and tax evasion charges.

14.     These revelations precipitated the filing of a securities class action in the U.S. District Court for the Northern District of Illinois against Exelon and certain of its officers, *Flynn v. Exelon Corporation, et al.*, 1:19-cv-08209 (the "Securities Class Action").

15.     Plaintiff did not make a litigation demand prior to filing this action because such demand would have been futile based upon the composition of the Board and the actions taken by the Board. The Board is currently composed of fourteen directors, all of whom are named in this action. As alleged herein, at least ten directors allowed misleading statements to be disseminated: the ten directors on the Company's Finance and Risk Committee failed to mitigate the Company's risks with respect to lobbying activities. Further, the five members of the Exelon Audit Committee failed to require the review and reporting of the undisclosed wrongful lobbying. Thus, more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.     JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District,

and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.   PARTIES

**Plaintiff**

18.     Jack Feintuch purchased Exelon stock in January 2014 and has continuously owned his Exelon stock since that date.

**Nominal Defendant**

19.     Exelon is a Pennsylvania corporation with its principal executive offices located at 10 South Dearborn Street, Chicago, Illinois 60603.  The Company stock trades on the NASDAQ stock exchange under the symbol "EXC."

**Defendants**

20.     Christopher M. Crane ("Crane") has served as Exelon's Chief Executive Officer ("CEO"), President and a director since 2012.  He is a member of the Generation Oversight and Investment Oversight Committees.  Crane's total compensation in 2018 was $15,643,000.

21.     Anthony K. Anderson ("Anderson") has served as a director of Exelon since 2013. He is the Chair of the Audit Committee, a member of the Finance and Risk Committee, and a member of the Generation Oversight Committee.

22.     Ann C. Berzin ("Berzin") has served as a director of Exelon since 2012.  She is the Chair of the Finance and Risk Committee and a member of the Audit Committee.

23.     Laurie Brlas ("Brlas") has served as a director of Exelon since 2018. She is a member of the Audit and Finance and Risk Committees.

24.     Yves C. de Balmann ("Balmann") has served as a director of Exelon since 2012. He is the Chair of the Compensation and Leadership Development Committee.  He is also a member of the Corporate Governance and Finance and Risk Committees.

25.     Nicholas DeBenedictis ("DeBenedictis") has served as a director of Exelon since 2002. He is a member of the Corporate Governance, Finance and Risk, and Generation Oversight Committees.

26.     Linda Jojo ("Jojo") has served as a director of Exelon since 2015. She is a member of the Compensation and Leadership Development Committee, as well as the Finance and Risk Committee.

27.     Paul L. Joskow ("Joskow") has served as a director of Exelon since 2007. He is a member of the Audit, Finance and Risk, and Investment Oversight Committees.

28.     Robert J. Lawless ("Lawless") has served as a director of Exelon since 2012. He is the Chair of the Corporate Governance Committee and a member of the Compensation and Leadership Development Committee.

29.     Richard W. Mies ("Mies") has served as a director since 2009. He is the Chair of the Generation Oversight Committee and a member of the Audit as well as Finance and Risk Committees.

30.     John M. Richardson ("Richardson") has served as a director since September 2019.

31.     Mayo A. Shattuck III ("Shattuck") has served as a director since 2012. Shattuck was the former CEO of Constellation Energy prior to negotiating its sale to Exelon in a $7.9 billion acquisition from which Shattuck received more than $9.3 million in stock options. He is a former Chairman of the Exelon Board and presently a member of the Investment Oversight Committee. Shattuck received more than $606,000 in compensation last year – far more than any other purportedly independent director.

32.     Stephen D. Steinour ("Steinour") has served as a director since 2007.  He is a member of the Finance and Risk as well as Compensation and Leadership Development Committees.

33.     John F. Young ("Young") has served as a director since 2018.  He is a member of the Finance and Risk and Generation Oversight Committees.

34.     Joseph Nigro ("Nigro") has served as Exelon's Chief Financial Officer ("CFO") and Senior Executive Vice President since May 2018. In 2018, Nigro's total compensation was $6,530,000.

35.     Joseph Dominguez ("Dominguez") has served as ComEd's CEO since August 2018.

36.     Jeanne M. Jones ("Jones") has served as ComEd's Senior Vice President, CFO, and Treasurer since June 2018.

37.     Anne Pramaggiore ("Pramaggiore") served as CEO of Exelon Utilities, which oversees ComEd, from May 2018 to October 2019 and served as President and CEO of ComEd from 2012 to May 2018.  In 2018, Pramaggiore's total compensation was $5,914,000.

38.     The defendants named in ¶¶ 20-37 are sometimes referred to hereinafter as the "Individual Defendants."  The defendants named in ¶¶ 20-33 are sometimes referred to hereinafter as the "Director Defendants."  The defendants named in ¶¶ 20 and 34-37 are sometimes referred to hereinafter as the "Management Defendants."

IV.     **DUTIES OF THE INDIVIDUAL DEFENDANTS**

        A.      **FIDUCIARY DUTIES**

39.     By reason of their positions as officers, directors, and/or fiduciaries of Exelon and because of their ability to control the business and corporate affairs of Exelon, at all relevant times, the Individual Defendants owed Exelon and its shareholders fiduciary obligations of good faith,

7

loyalty, and candor, and were required to use their utmost ability to control and manage Exelon in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Exelon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Exelon and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

40.     All of the Individual Defendants were required to prevent known illegal activity by Exelon's management and board and to report such activity once it became known.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Exelon, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Exelon, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

42.     To discharge their duties, the officers and directors of Exelon were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Exelon were required to, among other things:

> (a)     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> (b)     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

8

    (c)      Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

    (d)      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.    Code of Business Conduct**

43.    Exelon has a Code of Business Conduct that defines objectives, expectations and responsibilities of all employees. The Company's investor relations website provides the most recent version of the code, as revised effective March 23, 2016.

44.    Regarding lobbying, the Code of Business Conduct states:

Exelon, like many other companies, advocates for legislation we believe will enhance value for our customers, communities, employees and shareholders. Those of us who have regular contact with legislators, regulators, executive branch officials or their staffs may be involved in lobbying, and must take care to comply with the laws applicable to these activities.

Only Exelon employees or contractors approved by Government and Regulatory Affairs or the Legal Department may engage in lobbying activities.

45.    Each of the Individual Defendants were required to adhere to the conduct outlined in the Code of Business Conduct.

**C.    Audit Committee Charter**

46.    Exelon's Audit Committee is responsible for overseeing and reviewing: "(a) the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, (b) the independent auditor's qualifications and independence, and (c) the performance of the Company's internal audit function and the independent auditor."

47.    The Audit Committee charter provides, among other things, that its members review compliance with applicable regulations. Specifically, the charter posted on the Company's investor relations website states:

Officers' and Directors' Expenses, Code of Business Conduct and Legal and Regulatory Compliance

24. Periodically review policies and procedures with respect to officers' and directors' expense accounts and perquisites, including their use of corporate assets; and consider the results of the reviews of officers and directors expenses and perquisites by the internal auditor or the independent auditor.

25. Review policies and procedures with respect to prevention of illegal payments, conflicts of interest, or other questionable practices; and consider the results of monitoring of compliance with the Code of Business Conduct, particularly by officers and directors.

26. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

27. Oversee the Company's policies and procedures for compliance with applicable laws and regulations and related risk assessments.

**D.      Finance and Risk Committee**

48.      Exelon's Finance and Risk Committee is responsible for, among other things, Company-wide risk management strategy. According to its charter, the Finance and Risk Committee is "responsible for ensuring that there is a Risk Management Program within the Company and its subsidiaries that measures, prioritizes, monitors and responds to risks and monitors and evaluates compliance with risk management policies. The management level Risk Management Committee shall report periodically to the Finance and Risk Committee on the Company's Risk Management Program."

49.      With respect to risk management, the Finance and Risk Committee charter provides:

Risk Assessment and Management

1.      Oversee the policies and processes established by management to assess, monitor, manage and control the Company's material financial and other risk exposures, including operational, business, financial and commodity market (including marketing and trading of energy and energy-related products and

10

hedging of generation portfolio obligations), strategic, credit, liquidity and reputation risks.

2.      Oversee the development of Company policies and processes relating to risk assessment, management and reporting, including limits and tolerances, risk roles and responsibilities, risk mitigation decisions and risk-related assumptions.

3.      Advise and assist the Audit Committee in its review of the processes by which management and the Finance and Risk Committee assess and manage the Company's exposure to risk.

4.      Act on behalf of the Board of Directors in approving consistent with the Delegation of Authority approved by the Board/Company policies and procedures that allow financial speculation (transacting in commodities or financial products for the sole purpose of generating financial gain) or the use of financial derivatives for any purpose and approve all policies and limits relating to hedging and trading activities.

5.      Oversee the steps management has taken to address failures in compliance with established risk management policies and procedures.

6.      Advise and assist the Compensation and Leadership Development Committee in its consideration of the Company's financial and operational risks as they relate to the Company's compensation policies and practices.

7.      Oversee the Company's insurance program and make recommendations to the Board of Directors and management regarding insurance, including directors' and officers' liability insurance.

8.      Review significant legal matters and the Company's use of outside counsel to provide legal services and the fees for those services.

## V.      SUBSTANTIVE ALLEGATIONS

### A.      Background

50.      Exelon is a utility services holding company that engages in the energy generation and delivery businesses in U.S. and Canada. It owns various "utility registrants" that are regulated by state utility commissions.  Commonwealth Edison ("ComEd") is one such registrant, the largest electric utility in Illinois, and the sole electric provider for much of Northern Illinois.

11

51.     Since as early as May 2019, Exelon's and ComEd's lobbying practices have been subject to a federal investigation related to payments to Illinois state senator Martin Sandoval and to a former political operative for Illinois House Speaker Michael Madigan.

**B.      Individual Defendants Issue False And Misleading Statements**

52.     On February 8, 2019, the Director Defendants caused Exelon to file its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"). For ComEd, the 2018 10-K reported operating revenues of $5.88 billion, operating income of approximately $1.15 billion, and net income of $664 million, compared to operating revenues of approximately $5.54 billion, operating income of $1.32 billion, and net income of $567 million for 2017.

53.     The 2018 10-K touted both Exelon's and ComEd's adherence to the Code of Business Conduct, which was appended as Exhibit 14 to the 2018 10-K, and further stated that Exelon's and ComEd's disclosure controls and procedures were effective as of December 31, 2018.

54.     In connection with the 2018 10-K, Crane and Nigro signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting that: "(i) the [2018 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of Exelon Corporation."  Similarly, defendants Dominguez and Jones signed SOX certifications that: "(i) the [2018 10-K] fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and (ii) the information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of Commonwealth Edison Company."

55. The above statements in ¶¶ 53-54 were materially misleading because they failed to disclose that: (i) Exelon and/or its employees were engaged in unauthorized lobbying activities; and (ii) as a result, the Company was reasonably likely to face regulatory scrutiny and criminal investigations.

56. On March 20, 2019, Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on April 30, 2019. In the 2019 proxy statement, these thirteen Individual Defendants solicited stockholder votes in favor of three management proposals, including: (i) a proposal to elect Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young to new terms as directors; (ii) a proposal to approve compensation for Exelon's named executive officers; and (iii) reappointment of Exelon's independent auditor.

57. The proxy statement affirmatively stated that the Board had determined that defendant Crane was not an independent director. With respect to risk management, the proxy statement stated:

> The Board regularly reviews management's systematic approach to identifying and assessing risks faced by Exelon and each business unit, taking into account emerging trends and developments and in connection with capital investments and business opportunities.
>
> Our Finance and Risk Committee oversees Exelon's risk management strategy, policies and practices, financial condition and risk exposures.
>
> The Company and its business units/operating companies also have Risk Management Committees composed of select senior officers including the chief executive officers of those business units/operating companies and the Exelon CEO, who meet regularly to discuss matters related to enterprise risk management generally, risks associated with new developments or proposed transactions under consideration, and ensure that processes are in place to identify and assess risks within the business as well as measure and manage risk exposures in accordance with Exelon's policies, programs, strategies, and risk appetite as approved by the Exelon Board.

58. The 2019 proxy statement also sought approval for executive compensation for Exelon's named executive officers, including Crane, Nigro, and Pramaggiore.

59. The 2019 proxy statement was materially misleading because it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties. A reasonable shareholder would have found the truth to be material when deciding whether to vote for or against these proposals.

60. On May 2, 2019, the Director Defendants caused Exelon to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"). For ComEd's first quarter 2019 financial results, the 1Q19 10-Q reported operating revenues of approximately $1.41 billion, operating income of $276 million, and net income of $157 million, compared to operating revenues of $1.51 billion, operating income of $292 million, and net income of $165 million for the same quarter the year prior.

61. The 1Q19 10-Q stated that Exelon's and ComEd's disclosure controls and procedures, though effective as of March 31, 2019, were subject to "inherent limitations," such as "circumvent[ion] by the individual acts of some persons or by collusion of two or more people."

62. In connection with the 1Q19 10-Q, Crane, Nigro, Dominguez, and Jones signed SOX certifications substantially similar to those identified in ¶ 52.

63. On May 3, 2019, Exelon filed with the SEC a Form 8-K disclosing the results from the votes on the proposals in the 2019 proxy statement. In particular, were reelected to terms as directors. The reelection of these directors based on the misleading statements in the 2019 proxy statement and other public filings was a fundamental link in these directors' continued breaches of fiduciary duties and the continued enrichment of defendants at the expense of the Company's unaffiliated stockholders.

64. The above statements in ¶¶ 58-60 were materially misleading because they failed to disclose that: (i) Exelon and/or its employees were engaged in unauthorized lobbying activities; and (ii) as a result, the Company was reasonably likely to face regulatory scrutiny and criminal investigations.

**C. The Truth Begins to Emerge**

65. On July 15, 2019, during pre-market hours, Exelon filed a Current Report on Form 8-K with the SEC which disclosed that Exelon and ComEd had "received a grand jury subpoena from the U.S. Attorney's Office for the Northern District of Illinois requiring production of information concerning their lobbying activities in the State of Illinois."

66. On this news, Exelon's stock price fell $0.18 per share, or 0.37%, to close at $48.88 per share on July 15, 2019.

67. Four months later, Exelon disclosed that it had received a second grand subpoena. On October 9, 2019, during pre-market hours, Exelon filed a Current Report on Form 8-K with the SEC, which disclosed that on October 4, 2019, Exelon and ComEd "received a second grand jury subpoena from the U.S. Attorney's Office for the Northern District of Illinois that requires production of records of any communications with certain individuals and entities, including Illinois State Senator Martin Sandoval."

68. Moreover, Exelon revealed that "[o]n June 21, 2019, the Exelon Corporation Board formed a Special Oversight Committee, consisting solely of independent directors, to oversee [Exelon and ComEd's] cooperation and compliance with the subpoena, any further action taken by the U.S. Attorney and any resulting actions that may be required or recommended." Despite refusing to do so for many months, Exelon revealed the identity of the Special Oversight Committee on March 18, 2020. The Special Oversight Committee included defendants Shattuck, Anderson, de Balmann, and Lawless.

69.     On October 15, 2019, shortly before the market closed, Exelon issued a press release announcing the abrupt departure of Pramaggiore, who served as CEO of Exelon Utilities, and former President/CEO of ComEd.  Analysts immediately identified the criminal subpoenas and Pramaggiore's abrupt resignation as "being directly related to each other."

70.     On this news, Exelon's stock price fell $2.15 per share, or nearly 5%, to close at $44.91 per share on October 16, 2019.

71.     Then, on October 31, 2019, Exelon disclosed that the SEC was investigating Exelon and ComEd regarding their lobbying activities.  In the Company's quarterly report on Form 10-Q for the period ended September 30, 2019, Exelon reported that it had been notified of the investigation on October 22, 2019.  Specifically, the report disclosed the investigation, without noting the involvement of several U.S. politicians, the FBI in mid-May earlier that year, and Pramaggiore role, stating in relevant part:

> ***Subpoenas (Exelon and ComEd).*** Exelon and ComEd received a grand jury subpoena in the second quarter of 2019 from the U.S. Attorney's Office for the Northern District of Illinois requiring production of information concerning their lobbying activities in the State of Illinois. On October 4, 2019, Exelon and ComEd received a second grand jury subpoena from the U.S. Attorney's Office for the Northern District of Illinois requiring production of records of any communications with certain individuals and entities. On October 22, 2019, the SEC notified Exelon and ComEd that it has also opened an investigation into their lobbying activities. Exelon and ComEd have cooperated fully and intend to continue to cooperate fully and expeditiously with the U.S. Attorney's Office and the SEC. Exelon and ComEd cannot predict the outcome of the subpoenas or the SEC investigation.

72.     On this news, Exelon's stock price fell $1.17 per share, or nearly 3%, to close at $45.49 per share on October 31, 2019.

73.     Finally, on November 1, 2019, after the market opened, the *Chicago Tribune* reported that "[a] source with knowledge of the case in Chicago" confirmed that "Pramaggiore is one focus of the ongoing federal investigation."  According to the same article, "[t]he ComEd lobbying investigation dates to ***at least mid-May***, when the FBI executed search warrants at the

16

homes of former lobbyist Mike McClain of Quincy, a longtime confidant of House Speaker Michael Madigan, and of former 23rd Ward Ald. Michael Zalewski." (Emphasis added.) Additionally, "[t]he information sought by the FBI included records of communications among Madigan, McClain and Zalewski about attempts to obtain ComEd lobbying work for Zalewski."

74.      On this news, Exelon's stock price fell $0.15 per share to close at $45.34 per share on November 1, 2019, representing a decline of 3% since Exelon first disclosed the SEC investigation.

## VI.    DAMAGES TO THE COMPANY

75.      As a direct and proximate result of the Individual Defendants' conduct, Exelon has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

    a)      Legal fees incurred in connection with the criminal investigation, the SEC investigation, and the Securities Class Action;

    b)      Any funds paid to settle the Securities Class Action;

    c)      Any fines or penalties in connection with the criminal and/or SEC investigations; and

    d)      Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Exelon.

76.      In addition, Exelon's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

77.      The actions complained of herein have irreparably damaged Exelon's corporate image and goodwill.  For at least the foreseeable future, Exelon will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal

behavior and have misled the investing public, such that Exelon's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

78.    Plaintiff brings this action derivatively in the right and for the benefit of Exelon to redress injuries suffered, and to be suffered, by Exelon as a direct result of breaches of fiduciary duty by the Individual Defendants, gross mismanagement, and violations of Section 10(b), 14(a), and 20(a) of the Exchange Act.  Exelon is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

79.    Plaintiff will adequately and fairly represent the interests of Exelon in enforcing and prosecuting its rights.

80.    Plaintiff has continuously been a shareholder of Exelon at times relevant to the wrongdoing complained of and is a current Exelon shareholder.

81.    When this action was filed, Exelon's Board of Directors consisted of Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Richardson, Shattuck, Steinour, and Young. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

### Defendant Crane

82.    Crane serves as Exelon's CEO.  As such, he is primarily employed by the Company and admittedly does not meet the standard of independence.  Moreover, Crane purportedly meets with the Risk Management Committees of Exelon's business units/operating segments, including with respect to lobbying activities and the risks therefrom.  He is a defendant in the Securities Class Action for issuing the misleading public statements with respect to Exelon's lobbying

activities.  Crane could not disinterestedly consider a demand to investigate his own wrongdoing, thus demand is excused as to him.

**Defendants Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Mies, Steinour, and Young**

83.     According to the 2019 proxy statement, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Mies, Steinour, and Young served as members of the Company's Finance and Risk Committee during 2018.  Their express duties as members of that committee require them to take action if lobbying activity was not within the confines of law.  They are also responsible for identifying and mitigating risks that the Company faces and periodically reviewing the adequacy of Exelon's risk management policies, including compliance with laws concerning lobbying.  As alleged herein, Exelon's lobbying activities presented a risk of legal liability, regulatory scrutiny and possible fines.  Their actions failed to mitigate these risks, thus, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Steinour, and Young breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Anderson, Berzin, Brlas, Joskow, and Mies**

84.     Anderson, Berzin, Brlas, Joskow and Mies served as members of the Company's Audit Committee.   As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. Moreover, they are responsible for monitoring compliance by officer and directors with the Code of Business Conduct, including lobbying activities.  As alleged herein, Anderson, Berzin, Brlas, Joskow and Mies failed to ensure the integrity of the Company's internal controls, allowing the misleading statements to be disseminated in the Company's SEC filings and other disclosures. Thus, Anderson, Berzin, Brlas, Joskow and Mies breached their fiduciary duties and are not disinterested, and demand is excused as to them.

19

**Defendants Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young**

85.     Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young could not disinterestedly consider a demand to action in connection with the misleading proxy statement issued in March 2019.  These thirteen directors issued the proxy statement knowing that the representations made in the Company's public filings were misleading as to Exelon's lobbying activities and its risk management policies, and they did not disclose the same prior to the issuance of the proxy statement or the shareholder vote in April 2019.  Had these thirteen directors truthfully and completely revealed the misleading nature of the Company's public statements and of subsequent disclosures, Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young would not have been re-elected as directors.  As a result, Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young would be interested in a demand regarding the misleading proxy statement, and demand is excused as to them on that basis as well.

## COUNT I

### Against Individual Defendants for Breach of Fiduciary Duty

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Exelon's business and affairs, particularly with respect to issues as fundamental as public disclosures.

88.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants

intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Exelon.

89.     In breach of their fiduciary duties owed to Exelon, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

90.     In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

91.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Exelon has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

### COUNT II

**Against the Director Defendants for Gross Mismanagement**

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.     By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a  publicly held corporation.

94.     As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

95. Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

### COUNT III
### (Derivative Claim for Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against the Management Defendants)

96. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97. This Count is asserted on behalf of the Company against Defendants Crane, Nigro, Dominguez, Jones, and Pramaggiore for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and contribution under Section 21D of the Exchange Act.

98. Management Defendants, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made or disseminated various false and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made or disseminated, in light of the circumstances under which they were made or disseminated, not misleading; made or disseminated the above statements intentionally or with a deliberately reckless disregard for the truth; and employed devices and artifices to defraud in connection with the misleading disclosures, which were intended to, and did deceive the Company, regarding: (i) Exelon and/or its employees were engaged in unauthorized lobbying activities; and (ii) as a result, the Company was reasonably likely to face regulatory scrutiny and criminal investigations.

99. Management Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that he (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with the misleading disclosures.

100. As alleged herein, Management Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Management Defendants, by virtue of their receipt of information reflecting the true facts regarding Exelon, their control over, and/or receipt and/or modification of Exelon's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Exelon, participated in the fraudulent scheme alleged herein.

101. As a result of Management Defendants' misconduct, Exelon the Company is suffering litigation expense and reputational harm in the marketplace in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5.

102. Further, Management Defendants are liable under Section 21D of the Exchange Act, 15 U.S.C. Section 78u-4(f), which governs any right of contribution asserted pursuant to the Exchange Act. Hence, Management Defendants damaged Exelon and are liable to the Company for contribution.

103. Plaintiff brought this claim within two years of its discovery of the facts constituting the violation and within five years of the violation.

### COUNT IV
### (Derivative Claim for Violations of Section 20(a) of the Exchange Act
### Against The Management Defendants)

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    This Count is asserted on behalf of the Company against Defendants Crane, Nigro, Dominguez, Jones, and Pramaggiore for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

106.    During their tenure as executive officers, the Management Defendants were controlling persons within the meaning of Section 20(a) of the Exchange Act.  By reason of their absolute control, the Management Defendants had the power and authority to direct the management and activities of the other executive employees, to hire and fire other executive employees at whim, and to cause other executive employees to engage in the wrongful conduct complained of herein.  The Management Defendants were able to and did control, directly or indirectly, the content of the public statements made by all other executive employees at all relevant times, including the materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

107.    In their capacity as the senior executives, the Management Defendants had direct involvement in and oversight over the day-to-day operations of the executive employees and the Company's employees, who would not act unless the Management Defendants agreed with their course of conduct.

108.    As set forth above, the Management Defendants violated Section 10(b) of the Exchange Act by his acts and omissions as alleged herein.  To the extent that the Management Defendants are not the makers or disseminators of a specific false or misleading statement made

24

by the Company, the Management Defendants are liable pursuant to Section 20(a) of the Exchange Act.

109.    As a direct and proximate result of their conduct, the Company suffered damages in connection with its misleading disclosures.

<b><u>COUNT V</u></b>
<b><u>(Violations of Section 14 of the Securities Exchange Act of 1934 Against The Director Defendants Other Than Defendant Richardson)</u></b>

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Specifically, the Company's proxy statement filed on March 20, 2019 violated § 14(a) and Rule 14a-9 because it misrepresented the Board's actual activities with respect to risk management while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties.

112.    In the exercise of reasonable care, thirteen Director Defendants (Crane, Anderson, Berzin, Brlas, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young) should have known that the statements contained in the proxy statement were materially false and misleading.

113.    The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement. The 2019 proxy statement solicited and obtained shareholder votes for: (i) director nominees; (ii) ratification of the appointment of the Company's independent auditor; and (iii) executive compensation. The proxy statement was an

25

essential link the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

114. The Company was damaged as a result of the thirteen Director Defendants' material misrepresentations and omissions in the proxy statement.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Exelon, demands judgment as follows:

A. Declaring that plaintiff may maintain this action on behalf of Exelon and that plaintiff is an adequate representative of the Company;

B. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C. Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Exelon;

D. Directing Exelon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Exelon and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over lobbying activities and the reporting of such activities;

2. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Exelon's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Exelon to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Exelon has an effective remedy;

F.      Awarding to Exelon restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: April 10, 2020              By:  s/*Marvin A. Miller*
                                 Marvin A. Miller
                                 Andrew Szot
                                 **MILLER LAW LLC**
                                 115 S. LaSalle St., Suite 2910
                                 Chicago, Illinois 60603
                                 Tel: 312-332-3400
                                 E-mail: mmiller@millerlawllc.com
                                           aszot@millerlawllc.com

Matthew M. Houston
Benjamin I. Sachs-Michaels
**GLANCY PRONGAY & MURRAY LLP**
712 Fifth Avenue
New York, New York 10019
Telephone:  (212) 935-7400
E-mail: mhouston@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
E-mail:  rprongay@glancylaw.com

*Attorneys for Plaintiff Jack Feintuch*