UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| JOSHUA FLYNN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No.: 1:19-cv-08209 |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | Honorable Virginia M. Kendall |
| vs. | ) ) | |
| EXELON CORPORATION, et al., | ) ) | |
| Defendants. | ) ) ) | |

PLAINTIFF'S OPPOSITION TO BOTH THE JOINT DEFENDANTS' AND DEFENDANT
PRAMAGGIORE'S MOTIONS TO DISMISS THE CONSOLIDATED COMPLAINT

4834-8468-8854.v1

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND ...................................................................................................2

    A. The Bribery Scheme ..................................................................................2

    B. The Investigation, Indictments, and Admissions .....................................4

III. ARGUMENT.........................................................................................................5

    A. Legal Standards.........................................................................................5

    B. The Complaint Adequately Alleges False and Misleading Statements by Each Defendant .........................................................................................6

        1. Legal Standards for Pleading Falsity ............................................6

        2. The Complaint Identifies the Specific Defendant Who Made Each Alleged False and Misleading Statement......................................6

        3. The Complaint Does Not Allege a "Freestanding" Duty to Disclose the Bribery .......................................................................8

        4. The Code of Conduct, Political Contributions, and Compliance Statements Are Adequately Alleged as Misleading...................10

        5. Lobbying and Risk Warning Statements Are Adequately Pled.................14

        6. Statements About the Benefits of Legislation and Sources of Revenues Are Adequately Pled .................................................18

        7. Statements About Government Investigations and Ochoa's Appointment Are Adequately Pled...........................................19

    C. The Totality of Factors Supports a Strong Inference of Scienter as to Each Defendant.......................................................................................21

        1. Scienter Allegations Applicable to All Defendants ...................22

            a. Defendants Had Motive to Conceal the Bribery Scheme .............22

            b. Defendants' False Statements and Senior Positions Contribute to a Strong Inference of Scienter ...............................23

            c. The Core Operations Doctrine Supports Scienter........................24

**Page**

d. The Scope and Length of the Bribery Scheme Supports an Inference of Scienter ...................................................................25

2. Each Defendant's Direct Participation Contributes to the Strong Inference of Scienter .................................................................25

a. Pramaggiore ...............................................................26

b. Crane ..........................................................................26

c. Dominguez...................................................................28

d. Von Hoene ..................................................................28

3. Corporate Scienter Is Adequately Alleged ................................29

D. Control Person Liability Under §20(a) Is Adequately Pled...................................30

IV. CONCLUSION............................................................................................................30

4834-8468-8854.v1

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Adams v. Kinder-Morgan, Inc.,*
    340 F.3d 1083 (10th Cir. 2003) ....................................................................................21

*Albert Fadem Tr. v. Am. Elec. Power Co.,*
    334 F. Supp. 2d 985 (S.D. Ohio 2004) ........................................................................30

*Anderson v. Abbott Laboratories,*
    140 F. Supp. 2d 894 (N.D. Ill. 2001) ...........................................................................16

*Asher v. Baxter Int'l, Inc.,*
    2005 WL 331572 (N.D. Ill. Feb. 3, 2005) ....................................................................24

*Berson v. Applied Signal Tech., Inc.,*
    527 F.3d 982 (9th Cir. 2008) .................................................................................18, 25

*Cambridge Ret. Sys. v. JELD-WEN Holding, Inc.,*
    2020 WL 6270482 (E.D. Va. Oct. 26, 2020) ...............................................................16

*Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.,*
    2018 WL 1071442 (N.D. Ill. Feb. 27, 2018) .....................................................15, 22, 26

*Chill v. Gen. Elec. Co.,*
    101 F. 3d 263 (2d. Cir. 1996) .......................................................................................30

*City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.,*
    2012 WL 607578 (N.D. Ill. Jan. 23, 2012) ..........................................................6, 10, 24

*Construction Workers Pension Fund-Lake County and*
    *Vicinity v. Navistar International Corp.,*
    114 F. Supp. 3d 633 (N.D. Ill. 2015) ...........................................................................16

*Crespo v. Colvin,*
    824 F.3d 667 (7th Cir. 2016) .......................................................................................10

*Desai v. Gen. Growth Props., Inc.,*
    654 F. Supp. 2d 836 (N.D. Ill. 2009) ...........................................................................24

*Dow Corning Corp. v. BB & T Corp.,*
    2010 WL 4860354 (D.N.J. Nov. 23, 2010) .....................................................................8

*Eli Lilly & Co. v. Roussel Corp.,*
    23 F. Supp. 2d 460 (D.N.J. 1998) ..................................................................................8

4834-8468-8854.v1

**Page**

*Garden City Emps' Ret. Sys. v. Anixter Int'l, Inc.,*
    2012 WL 1068761 (N.D. Ill. Mar. 29, 2012)................................................................16

*Glickenhaus & Co. v. Household Int'l, Inc.,*
    787 F.3d 408 (7th Cir. 2015) ......................................................................................7

*Holwill v. AbbVie Inc.,*
    2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .................................................... *passim*

*In re Braskem S.A. Sec. Litig.,*
    246 F. Supp. 3d 731 (S.D.N.Y. 2017).............................................................. *passim*

*In re CenturyLink Sales Practices & Sec. Litig.,*
    403 F. Supp. 3d 712 (D. Minn. 2019)..............................................9, 12, 19, 24

*In re Citigroup Securities Litigation,*
    330 F. Supp. 2d 367 (S.D.N.Y. 2004).......................................................................19

*In re Cognizant Tech. Sols. Corp. Sec. Litig.,*
    2018 WL 3772675 (D.N.J. Aug. 8, 2018) ........................................................ *passim*

*In re Grupo Televisa Sec. Litig.,*
    368 F. Supp. 3d 711 (S.D.N.Y. 2019).............................................8, 11, 19, 30

*In re Harley-Davidson, Inc. Securities Litigation,*
    660 F. Supp. 2d 969 (E.D. Wis. 2009).......................................................................16

*In re Moody's Corp. Sec. Litig.,*
    599 F. Supp. 2d 493 (S.D.N.Y. 2009).......................................................................12

*In re Motorola Sec. Litig.,*
    2004 WL 2032769 (N.D. Ill. Sept. 9, 2004) ...........................................................24

*In re Neopharm, Inc. Sec. Litig.,*
    2003 WL 262369 (N.D. Ill. Feb. 7, 2003) ...............................................................20

*In re Par Pharm., Inc. Sec. Litig.,*
    733 F. Supp. 668 (S.D.N.Y. 1990) .............................................................................2

*In re Sears, Roebuck & Co. Sec. Litig.,*
    291 F. Supp. 2d 722 (N.D. Ill. 2003) .......................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.,*
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)...........................................................12

4834-8468-8854.v1

**Page**

*In re Spiegel, Inc. Sec. Litig.,*
382 F. Supp. 2d 989 (N.D. Ill. 2004) ...........................................................................30

*In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.,*
604 F. Supp. 2d 1188 (N.D. Ill. 2009) .........................................................................17

*In re Van der Moolen Holding N.V. Sec. Litig.,*
405 F. Supp. 2d 388 (S.D.N.Y. 2005).....................................................................17, 18

*Indep. Tr. Corp. v. Stewart Info. Servs. Corp.,*
665 F. 3d 930 (7th Cir. 2012) .........................................................................................2

*Institutional Inv'rs Grp. v. Avaya, Inc.,*
564 F.3d 242 (3d Cir. 2009)..........................................................................................22

*Jackson Nat'l Life Ins. Co. v. Ligator,*
949 F. Supp. 200 (S.D.N.Y. 1996) .................................................................................8

*Janus Capital Grp., Inc. v. First Derivative Traders,*
564 U.S. 135 (2011).........................................................................................................7

*Jones v. Corus Bankshares, Inc.,*
701 F. Supp. 2d 1014 (N.D. Ill. 2010) .........................................................................25

*Kelsey v. Allin,*
2016 WL 825236 (N.D. Ill. Mar. 2, 2016)...................................................................21

*Lindblom v. Mobile Telecomms. Techs. Corp.,*
985 F. Supp. 161 (D.D.C. 1997) ....................................................................................8

*Lindelow v. Hill,*
2001 WL 830956 (N.D. Ill. July 20, 2001)..............................................................14, 25

*Luellen v. City of E. Chi.,*
350 F.3d 604 (7th Cir. 2003) ........................................................................................29

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
437 F.3d 588 (7th Cir. 2006), *rev'd in part on other grounds,*
551 U.S. 308 (2007).................................................................................................5, 23

*Makor Issues & Rights, Ltd. v. Tellabs Inc.,*
513 F.3d 702 (7th Cir. 2008) ...............................................................................5, 25, 28

*Maverick Fund, L.D.C. v. Lender Processing Servs. Inc.,*
2015 WL 5559761 (M.D. Fla. Sept. 21, 2015)............................................................20

4834-8468-8854.v1

**Page**

*Michel v. Credit Protection Ass'n L.P.*,
 2017 WL 3620809 (N.D. Ill. Aug. 23, 2017) ...............................................................10

*Multi-Ad Servs., Inc. v. Nat'l Labor Relations Bd.*,
 255 F.3d 363 (7th Cir. 2001) ......................................................................................10

*Norfolk Cnty. Ret. Sys. v. Ustian*,
 2009 WL 2386156 (N.D. Ill. July 28, 2009)................................................................22

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund
 v. Allscripts-Misys Healthcare Sols., Inc.*,
 778 F. Supp. 2d 858 (N.D. Ill. 2011) ..............................................................6, 20, 21

*Pugh v. Tribune Co.*,
 521 F. 3d 686 (7th Cir. 2008) .....................................................................................30

*Rehm v. Eagle Fin. Corp.*,
 954 F. Supp. 1246 (N.D. Ill. 1997) .............................................................................25

*City of Sterling Heights Gen. Emps' Ret. Sys. v. Hospira, Inc.*,
 2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...........................................................22, 23

*Ross v. Career Educ. Corp.*,
 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)............................................................ *passim*

*Rubinstein v. Gonzalez*,
 241 F. Supp. 3d 841 (N.D. Ill. 2017) ..........................................................................22

*Schleicher v. Wendt*,
 529 F. Supp. 2d 959 (S.D. Ind. 2007) ..........................................................................23

*Schlifke v. Seafirst Corp.*,
 866 F.2d 935 (7th Cir. 1989) ......................................................................................14

*SEC v. e-Smart Techs., Inc.*,
 31 F. Supp. 3d 69 (D.D.C. 2014)...............................................................................7, 13

*Silverman v. Motorola, Inc.*,
 2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) ..............................................................24

*Singer v. Reali*,
 883 F.3d 425 (4th Cir. 2018) ......................................................................................14

*Societe Generale Sec. Servs., GbmH v. Caterpillar, Inc.*,
 2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ..............................................................21

4834-8468-8854.v1

**Page**

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)............................................................................................5, 6, 22, 29

*Twin Master Fund, Ltd. v. Akorn, Inc.,*
    2020 WL 564222 (N.D. Ill. Feb. 5, 2020) .............................................................9, 17, 26, 29

*United States v. McClain,*
    No. 1:20-CR-00812 (N.D. Ill. Nov. 18, 2020)........................................................................2

*Zhengyu He v. China Zenix Auto Int'l Ltd.,*
    2020 WL 3169506 (D.N.J. June 12, 2020)...........................................................................20

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78j(b)............................................................................................................... *passim*

Federal Rules of Civil Procedure
    Rule 9(b) ...............................................................................................................22
    Rule 10b-5...........................................................................................................5, 10

17 CFR
    §240.12b-23 ..............................................................................................................13

4834-8468-8854.v1

## I.   INTRODUCTION[1]

This case arises because Defendants made false and misleading statements that concealed an eight-year bribery scheme being carried out to secure passage of favorable legislation.  For years, Exelon and its controlled subsidiary, ComEd (collectively the "Company"), complained of Illinois' refusal to pass favorable legislation that was needed to, among other things, charge Illinois citizens higher utility rates.  ¶¶47-51.  Media and certain Defendants attributed these failures to Public Official A, known as the most powerful politician in Illinois, blocking those efforts.  *See* ¶¶45, 50, 185.  To reverse the legislative failures, the Company used lobbyists close to Public Official A to begin paying bribes to influence his official actions.  The bribes included paying Public Official A's associates more than $1.3 million as "subcontractors," even if they did little or no work, and appointing another associate to ComEd's Board of Directors.  ¶¶56-71, 218.  Whereas prior legitimate lobbying efforts had failed, Defendants' bribery scheme was a success, resulting in passage of legislation worth hundreds of millions of dollars to the Company.  ¶¶8, 72-86.

During the Class Period, rather than reveal the bribery scheme, Defendants made misleading statements attributing the newfound legislative successes to improved lobbying efforts, claiming they "never" paid bribes and bragging about the financial boost the Company was receiving from the favorable legislation.  *E.g.*, ¶¶97(a), 104(b)-(d).  These positive assessments of the business, while concealing the bribery scheme and its attendant risks, caused Exelon's stock to trade at inflated prices.  ¶¶221-223.  As the scheme was uncovered, Exelon's stock declined, causing investors hundreds of millions of dollars in losses.  *See* ¶¶138-158, 225-232.  The Company ultimately paid $200 million as part of a Deferred Prosecution Agreement ("DPA") with the U.S. Attorney's Office.

---

[1]     Defendant Pramaggiore filed a motion to dismiss, *see* ECF No. 76 ("Pramaggiore Br."), and all other Defendants (Exelon, ComEd, Crane, Dominguez, and Von Hoene, collectively the "Joint Defendants") filed a joint motion to dismiss, *see* ECF No. 77 ("Def. Br.").  This opposition responds to both motions.  *See* ECF No. 84.  Citations to "¶__" or "¶¶__" refer to paragraphs of Lead Plaintiff's Complaint, ECF No. 65.  Citations are omitted and emphasis is added herein unless otherwise indicated.

4834-8468-8854.v1

¶¶163-166. The securities laws were passed to allow investors to recover losses caused by defendants' false and misleading statements, and concealing a bribery scheme is an all too common fact pattern. *See Holwill v. AbbVie Inc.*, 2020 WL 5235005, at \*1, \*3 (N.D. Ill. Sept. 1, 2020) (Norgle, J.) (denying motion to dismiss where defendants touted marketing success as cause of product sales while concealing kickback scheme); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677-78 (S.D.N.Y. 1990) (same, where defendants touted company's "competitive advantage in obtaining speedy FDA approvals" and resulting earnings while concealing bribery scheme).

Defendant Pramaggiore has separate counsel and filed her own motion because of her role in the bribery scheme, which the Company admitted after firing her and for which she has since been indicted.[2] ¶¶167, 216. The Company admissions, DPA, emails, and other publicly-disclosed information doom her motion to dismiss. Both the misleading nature of her public statements and her scienter are readily established, at least at this preliminary stage. As for the Joint Defendants, the DPA and Pramaggiore's liability force them to essentially concede ComEd's liability (Def. Br. at 1) yet Exelon and the remaining individuals fail in their attempt to make Pramaggiore the scapegoat to distance themselves from the scheme. Each of them also made misrepresentations, had compensation tied to legislative successes advanced by the bribery scheme, and directly participated in efforts to influence Public Official A through lobbying, fundraisers, and donations for Public Official A. *See* §III.C. Thus, both motions to dismiss should be denied.

## II.    BACKGROUND

### A.    The Bribery Scheme

Exelon is one of the largest electric companies in the United States. ¶34. ComEd is a controlled subsidiary of Exelon and is responsible for delivering electricity to customers in northern

---

[2]    *See* Indictment, *United States v. McClain*, No. 1:20-CR-00812 (N.D. Ill. Nov. 18, 2020), ECF No. 1. The Court may take judicial notice of the indictment. *See Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F. 3d 930, 943 (7th Cir. 2012).

- 2 -

Illinois. ¶¶24, 35. The Company operates in a highly-regulated industry and depends upon the continual passage of favorable legislation. ¶¶36-44. For example, in their SEC filings, Exelon and ComEd[3] acknowledged that "[s]ubstantially all aspects of [their] businesses" are subject to government regulation and legislation, and their businesses are "profoundly affected by decisions of elected and appointed government officials." ¶¶5, 103(b). That includes the Illinois General Assembly, which passes legislation that impacts the rates ComEd can charge its customers and whether Exelon's nuclear power plants in Illinois can receive subsidies. ¶¶42-44.

Before the bribery scheme, the Company faced opposition from Public Official A, who had rejected proposed rate increases for ComEd. ¶¶6, 48. Public Official A claimed the rates allowed for "exorbitant gains for their executives and shareholders – at the expense of working families, senior citizens and those on fixed incomes." *Id.* Defendant Von Hoene (an Exelon executive) admitted that "[w]e were in bad stead with [Public Official A] for a long time." ¶9. To remedy this opposition, ComEd began bribing Public Official A through more than $1.3 million of payments to his "political allies" to "influence and reward Public Official A's efforts . . . to assist ComEd with respect to legislation concerning ComEd and its business." ¶56. The bribery scheme lasted from 2011 into 2019 and also included, for example, making payments to a law firm favored by Public Official A, hiring interns from Public Official A's ward, and appointing a board member to ComEd's Board to please Public Official A. ¶¶57-71. In exchange, the Company received passage of favorable legislation that provided benefits "greater than $150,000,000," including EIMA, which Defendant Pramaggiore called a "game-changer," and FEJA, which would provide Exelon up to $2.35 billion in government-authorized subsidies. ¶¶8, 72-86. Financial analysts noted they were "impressed with the lobbying success [Exelon] has had." ¶11.

---

[3]       Although ComEd is consolidated into Exelon's SEC filings, ComEd also files because it issues securities. ¶4. Exelon and ComEd's SEC reports in this case are identical. ¶¶93, 112, 116, 119, 154, 161.

4834-8468-8854.v1

B.      The Investigation, Indictments, and Admissions

As a result of Defendants' false and misleading statements concealing the bribery scheme and its attendant risks from investors, Exelon's stock price traded at artificially inflated prices. ¶¶221-224.  However, that inflation dissipated as the bribery scheme was uncovered and revealed over a series of disclosures, including that Pramaggiore would be leaving the Company "effective immediately" after the Company received grand jury subpoenas, and that the SEC opened an investigation.  ¶¶15, 138-159, 225-232.

On July 17, 2020, both Exelon and ComEd publicly filed the DPA.  ¶163.  Under the DPA, it was agreed that "the USAO will file a single charge alleging that ComEd improperly gave and offered to give jobs, vendor subcontracts, and payments associated with those jobs and subcontracts for the benefit of the Speaker of the Illinois House of Representatives and the Speaker's associates, with the intent to influence the Speaker's action regarding legislation affecting ComEd's interests." *Id.*  The DPA was signed by David Glockner, Exelon's Executive VP for Compliance and Audit. ¶165.  The DPA was agreed to "pursuant to authority granted by the Board of Directors of Exelon" and the DPA was admitted to contain "true and accurate" facts.  ¶164.  Under the scheme, ComEd, for example, "arranged for various associates of Public Official A's, including [his] political allies and individuals who performed political work for Public Official A, to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd, even in instances where certain political allies and workers performed little or no work that they were purportedly hired to perform."  ¶56.

The DPA states that "certain senior executives and agents of ComEd" were "aware of the[] payments from their inception until they were discontinued in or around 2019," were "aware of the purpose of these payments . . . namely, that they were intended to influence and reward Public Official A in connection with Public Official A's official duties and to advance ComEd's business

- 4 -

interests," and had "designed the[] payment arrangements in part to conceal the size of payments made to Public Official A's associates." ¶57. Defendant Pramaggiore – who signed ComEd's public filings and was also one of Exelon's top senior executives – and Fidel Marquez, Jr. ("Marquez") – a former ComEd executive – were two senior executives directly involved in the scheme, and both have been criminally charged. ¶¶57, 93, 217-218; *supra* n.2.

## III.   ARGUMENT

While the criminal and SEC investigations are ongoing, ¶154, this lawsuit was brought on behalf of investors because the Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). As the Seventh Circuit has stated, "the modern securities laws were designed . . . to 'substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *rev'd in part on other grounds*, 551 U.S. 308 (2007). Here, the Complaint alleges violations of §10(b) of the Exchange Act and SEC Rule 10b-5. Defendants challenge only the first two elements (falsity and scienter), conceding the other four elements were adequately pled. *See* Def. Br. at 3-15; Pramaggiore Br. at 4-14. However, Defendants concealed the bribery scheme and failed to provide "'full disclosure'" or meet the "'high standard of business ethics'" that was required for executives and companies that choose to raise money from the public. *Tellabs I*, 437 F.3d at 595. Their motions to dismiss should be denied.

### A.   Legal Standards

In considering a motion to dismiss, "the court must treat the pleaded facts as true and 'draw all reasonable inferences in favor of the plaintiff.'" *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs III*"). And, in deciding if falsity and scienter have been

- 5 -

adequately pled, the Court may not parse allegations for individual analysis but must consider them "holistically" and "consider the complaint in its entirety." *Tellabs II*, 551 U.S. at 310, 326.

### B. The Complaint Adequately Alleges False and Misleading Statements by Each Defendant

#### 1. Legal Standards for Pleading Falsity

The Complaint need only allege a statement was false or misleading. *See, e.g.*, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 879 (N.D. Ill. 2011) (Castillo, J.) (holding that statement was misleading even though it was not false). This distinction is important because "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (Kennelly, J.). On a motion to dismiss, the Court need not "determine whether [defendants'] statements were in fact misleading, rather this Court need only determine that plaintiffs have alleged sufficient facts showing the circumstances which plaintiffs claim constitute fraud." *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, 2012 WL 607578, at *3 (N.D. Ill. Jan. 23, 2012) (Coleman, J.). Applying these standards, the Complaint adequately pleads false and misleading statements by each defendant.

#### 2. The Complaint Identifies the Specific Defendant Who Made Each Alleged False and Misleading Statement

The Joint Defendants' first, and supposedly best, argument is to accuse Plaintiff of "providing no indication of who actually made a challenged statement." Def. Br. at 5. They claim Plaintiff "hopes that the Court does not look too closely at who actually said what" because the Complaint "hopelessly muddled the allegations" in order "to attribute all class-period statements to all the Individual Defendants collectively." *Id.* at 1-4. This argument is easily refuted.

First, the Complaint does not allege "all" defendants made "all" the challenged statements. For statements made on conference calls, the Complaint specifies the Individual Defendant who

- 6 -

spoke, and therefore made, the statement. *E.g.*, ¶¶101-102, 111, 117-118; *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) (holding "'[o]ne "makes" a statement by stating it'"). Exelon and ComEd are liable for statements made by their executives and directors. *Id. at 426* (recognizing "long-standing rule that '[a] corporation is liable for statements by employees who have apparent authority to make them'"). And for statements in corporate filings, the Complaint specifies each Defendant who was a corporate filer or individual who signed the filing, and is therefore a maker of the statements therein. *See, e.g.*, ¶¶93-94, 103, 108-109, 112, 116, 119; *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 147 (2011) (holding corporate filer was maker of statements in SEC filing); *SEC v. e-Smart Techs., Inc.*, 31 F. Supp. 3d 69, 80 (D.D.C. 2014) ("Courts 'have consistently held that the signer of a corporate filing is its "maker"'"). The Joint Defendants' claim that it is "improper" to allege all signers are makers of those statements (Def. Br. at 4) is wrong. *Household*, 787 F.3d at 427 (noting that corporate filer and executives conceded they were the makers for SEC filings and holding that "[n]othing in *Janus* precludes a single statement from having multiple makers").

Second, Defendants provide no legal authority for their claim that they limited their liability within those filings to statements applying solely to the company they signed for.[4] In any event, the challenged statements are "about" or "relating" to ComEd and Exelon, and Defendants' attempt to treat them as "two different companies" that have "nothing" to do with each other fails. ComEd is a 99.9%-owned and completely controlled subsidiary of Exelon; each entity made identical SEC filings concerning both entities; the Chairman (Crane) and Vice Chairman (Pramaggiore) of ComEd were Exelon executives; ComEd's executives reported to Exelon executives; Exelon and ComEd executives were paid for the same legislative successes; and it was Exelon – not ComEd – that

---

[4]     The Joint Defendants cite no authority (Def. Br. at 4-5), and Pramaggiore cites an irrelevant case discussing an external auditor's liability for its own statements (Pramaggiore Br. at 8 n.4).

4834-8468-8854.v1

authorized and signed the DPA. ¶¶24-26, 93, 188, 197-199, 218; §III.C.[5]  Each Defendant who filed

or signed is accountable for the same statements made in the identical filings.  *E.g.*, *In re Grupo

Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 721 (S.D.N.Y. 2019) (holding "'we hold the rights to the

next three soccer World Cup's'" was misleading because "[e]ven if Televisa was not otherwise

obligated to disclose that it or its subsidiary participated in bribing FIFA officials, speaking about the

issue imposed a duty to do so").[6]

### 3.  The Complaint Does Not Allege a "Freestanding" Duty to Disclose the Bribery

Defendants' second "best" argument, based on order, is equally meritless.  They claim they

had no "freestanding" duty to disclose the bribery scheme.  Pramaggiore Br. at 5-6; Def. Br. at 5-6.

In support, Defendants cite cases for the proposition that "'[m]ere silence about even material

information is not fraudulent.'"  Def. Br. at 6; *see also* Pramaggiore Br. at 6.  But the Complaint

does not allege a freestanding duty, rather, it identifies specific statements that were misleading due

to the omission of the bribery scheme.  *See* §§III.B.4-7; *In re Braskem S.A. Sec. Litig.*, 246 F. Supp.

3d 731, 752, 759-61 (S.D.N.Y. 2017) (holding that while there was no "freestanding legal duty" to

disclose bribery scheme, statements that company purchased products "'at prices based on a variety

---

[5]  *See also, e.g.*, ¶173 (Crane stating that conduct admitted in DPA "has effect on all the entities"); ¶197 (proxy stating **Exelon** executives' pay increased based on "favorable Illinois legislation . . . providing reasonable returns on ComEd's equity"); ¶206 (Von Hoene – an Exelon executive – saying, "***[W]e*** were in bad stead with the speaker for a long time.  ***We've*** managed to crawl out of that hole"); ¶156 (Governor referring to Exelon as "under a federal microscope"); ¶157 (media describing SEC investigation as "[a]nother federal probe of Exelon"); ¶146 ("Exelon and ComEd employ one of the largest lobbying contingents . . . .").

[6]  Since both entities and their respective executives made statements, this case is distinguishable from the cases the Joint Defendants rely upon.  Def. Br. at 5.  *See also* ¶¶93-121; *cf., e.g.*, *Dow Corning Corp. v. BB & T Corp.*, 2010 WL 4860354, at *8-*9 (D.N.J. Nov. 23, 2010) (noting "[t]he only person specifically alleged to have made any misrepresentations or material omissions" was an employee of the subsidiary); *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 492 (D.N.J. 1998) (noting "the Complaint does not indicate who the speakers were"); *Lindblom v. Mobile Telecomms. Techs. Corp.*, 985 F. Supp. 161, 163-64 (D.D.C. 1997) (finding that "[a] wholly owned corporate subsidiary of a corporate parent is not liable for the deceitful statements of its parent corporation"); *Jackson Nat'l Life Ins. Co. v. Ligator*, 949 F. Supp. 200, 208 (S.D.N.Y. 1996) (dismissing claims for lack of standing and noting, in *dicta*, the plaintiffs' failure to distinguish among defendants as an example of prohibited "'group pleading'").

4834-8468-8854.v1

of factors,'" which "were not literally false," triggered duty to disclose the "elephant in the room" that one of the factors was a "bribery scheme"). By choosing to speak, Defendants had a duty to be truthful. *Id*. at 761.

In addition, Items 105 and 303 of SEC Regulation S-K also required disclosure of the bribery scheme in SEC filings as a significant factor making investment in Exelon speculative and risky (Item 105, ¶¶130-132) and a trend reasonably likely to have a negative impact on the Company's operations (Item 303, ¶¶128-129). The Joint Defendants ignore recent cases in this District and instead cite 20-year-old cases to claim that violations of these rules cannot give rise to a private claim. Def. Br. at 6 n.2. Although the Seventh Circuit has not decided the issue (*see also* Pramaggiore Br. at 12), recent decisions have upheld such a claim under similar facts. *See Twin Master Fund, Ltd. v. Akorn, Inc.*, 2020 WL 564222, at *6-*7 (N.D. Ill. Feb. 5, 2020) (Kennelly, J.) (upholding §10(b) claim where "silence regarding [the company's] regulatory noncompliance in its Forms 8-K and 10-Q violated Item 303's duty to disclose" because "noncompliance with FDA data integrity standards was a 'known trend'" that could "have 'reasonably' been expected to materially impact [the company's] revenues by compromising the approval of their [regulatory] applications or subjecting them to FDA fines or other sanctions"); *AbbVie*, 2020 WL 5235005, at *4 (upholding §10(b) claim based on Item 105 and Item 303 violations with regard to concealed kickback scheme); *see also In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 725-26 (D. Minn. 2019) (holding Item 303 required company "to disclose that its illegal sales practices were a material driver of its reported revenue").[7]

---

[7]     Contrary to Pramaggiore's claim, it was not "speculative" that an eight-year bribery scheme would have a "material adverse effect" that the Defendants could "reasonably expect." *See* ¶¶128, 145-175 (describing fallout from scheme and payment of $200 million fine). Unlike in the cases she cites, where the undisclosed conduct had "at best, a tangential relationship" to the company's "financial condition and operating results," Pramaggiore Br. at 13, the scheme here had a significant impact on finances and

- 9 -

### 4. The Code of Conduct, Political Contributions, and Compliance Statements Are Adequately Alleged as Misleading

Defendants' challenges to these statements (Exhibit A at Nos. 1-10) are waived because they are unsupported by any legal support or perfunctory. *See* Def. Br. at 10-12; Pramaggiore Br. at 9 n.7; *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (holding that "'perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived'").[8] Similarly, Defendant Von Hoene makes a perfunctory one-sentence argument that he was "the maker of just one class period statement," without disputing that one is all it takes, and then concludes in a parenthetical that "([the statement] is not actionable because it concerned the effect of the subpoenas on legislation unrelated to ComEd . . .)" (emphasis omitted). Def. Br. at 4. Such vague and unsupported arguments are waived, as Plaintiff cannot be compelled to develop the argument for Defendants and then respond to it. *Crespo*, 824 F.3d at 674. Since each Defendant has waived argument as to the falsity of one or more of their alleged misrepresentations (*see* §III.B.3; Exhibit A), this element of a §10(b) claim has been met and the Court can turn to the scienter arguments. It need not rule on all statements. *See, e.g.*, *Career Educ.*, 2012 WL 5363431, at \*8 (holding "because plaintiffs have, by the allegations already discussed, met their burden of alleging the first requirement of a Rule 10b-5 claim, the Court need not address the statements in the third category" of false statements); *Baxter*, 2012 WL 607578, at \*2-\*3 (denying motion to dismiss and addressing categories rather than each individual statement).

---

operations. *E.g.*, ¶¶8, 72-91. The alleged loss was "more than remote" so the allegations sufficiently plead violations of ASC 450. ¶136.

[8]    Defendants cannot provide authority for the first time on reply, as doing so would "'depriv[e] their opponent of the opportunity to respond.'" *Michel v. Credit Protection Ass'n L.P.*, 2017 WL 3620809, at \*7 (N.D. Ill. Aug. 23, 2017) (Dow, J.); *Multi-Ad Servs., Inc. v. Nat'l Labor Relations Bd.*, 255 F.3d 363, 370 (7th Cir. 2001) (striking arguments raised "for the first time in reply").

- 10 -

On the merits, Defendants' arguments also fail.  First, these statements are adequately alleged because omitting to disclose bribery payments is a common fact pattern that courts recognize renders similar statements false and misleading.  *See Grupo Televisa*, 368 F. Supp. 3d at 721-22 (finding statements misleading because they concealed the "participation in the years-long bribery scheme [which] is material because it exposed Televisa to potential civil and criminal liability").  For example, the Political Contribution Statements published by Exelon purported to list all political contributions, but did not include the bribes.  *E.g.*, ¶99(a)-(b).  The Code of Conduct statements claimed that the Company "never" paid bribes and assured compliance with the code of conduct.  *E.g.*, ¶97(a)-(c).  Examples in this category included:

- "*We never* request, *offer* or accept *any form of payment or incentive intended to improperly influence a decision.*"  ¶97(a) (Defendants Exelon, ComEd, Crane, Pramaggiore, and Dominguez);

- "*Never use a third party to make payments or offers that could be improper*."  ¶97(c) (Defendants Exelon, ComEd, Crane, Pramaggiore, and Dominguez );

- "*[P]olitical contributions during the reporting period were all made in accordance with its Corporate Political Contributions Guidelines*" and no contributions were to be made "*under any condition requiring confidentiality*" or "*in return for any Official Act*."  ¶¶98(a), 99(a) (Defendant Exelon).

The statements were not merely aspirational because they did not speak to "hopes" and "goals" but used definitive phrasing such as claiming we "never" pay bribes, the contributions "were all made in accordance" with policy, and "no" contribution will be given.  The statements collectively assured investors not that these were merely goals but that compliance was monitored and no such bribes had been made, and they are like statements upheld in similar cases.  *See In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2018 WL 3772675, at \*19 (D.N.J. Aug. 8, 2018) (finding statement in company filing that there were "'no incidents [of corruption] reported'" were misleading when government licenses were being secured through bribes because they were "not aspirational statements of company policy, but statements of fact . . . that are capable of falsity and

- 11 -

4834-8468-8854.v1

upon which a reasonable investor may rely").  Notably, use of the word "never" makes liability clear, and Defendants ignore that a court in this District recently rejected the argument that there is a "*per se* rule that statements in a business's ethics code cannot be actionable under §10(b)" because when such statements are "viewed in the light most favorable to Plaintiffs [they] are not inherently aspirational." *AbbVie*, 2020 WL 5235005, at *4 (finding Code of Conduct statement that "'[w]e never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices'" was misleading in light of concealed kickback scheme); *see also CenturyLink*, 403 F. Supp. 3d at 728 (stating company "presented the Code of Conduct as fact" by stating "that its directors, officers and employees were 'required' to abide by the Code of Conduct" and that the company "would never 'misstate facts or confuse or mislead consumers through Company advertisements or promotions' . . . and "any 'violations of the Code will not be tolerated'"); ¶¶38-41, 95-96.

As further example, statements that "***Exelon lobbyists are expected to follow both the letter and spirit of the lobbying laws***" and "***Exelon is committed to conducting its business with government agencies and officials consistent with the highest ethical standards***" were false and misleading because the Company retained lobbyists close to Public Official A to violate the lobbying laws through the eight-year bribery scheme.  ¶¶52-71, 103; *In re Signet Jewelers Ltd. Sec. Litig., 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018)* (finding statements that company based decisions solely on merit and employees who violated code of conduct would be disciplined were misleading in light of allegations of sexual harassment and retaliation for reporting it); *In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 507-09 (S.D.N.Y. 2009)* (finding statements about "specific steps that Moody's was taking to ensure its independence and ratings integrity" were actionable in light of allegations that Moody's was concealing improper ratings scheme).

- 12 -

Second, Defendant Pramaggiore claims that only Exelon's Board of Directors can be responsible for the Code of Conduct because they "[a]pproved" it. Pramaggiore Br. at 9. Defendant Dominguez makes a related argument that he only made statements about ComEd, not Exelon. Def. Br. at 5. *But see* §III.B.2. However, the claims in this case are not based on who "approved" the Code of Conduct, they are based upon the misleading statements made by, among others, Pramaggiore and Dominguez who signed SEC filings directing investors to the Code of Conduct that was attached and published on the Company website. ¶¶93-94; *see e-Smart Techs.*, 31 F. Supp. 3d at 80 (denying motion to dismiss and noting that "[c]ourts 'have consistently held that the signer of a corporate filing is its "maker"'"); 17 CFR §240.12b-23 (providing that documents may be incorporated by reference in SEC filings by attachment or description of specific location).

Third, the related argument that the Code of Conduct applied only to Exelon is refuted by the Code of Conduct itself, stating that it applied to all employees and all "subsidiaries," which included ComEd. ¶39. In addition, ComEd's Proxy Statement filed with the SEC directed investors to the Code of Conduct on the website and stated it "is the code of conduct applicable to ComEd," and the ComEd Form 10-K directed investors to the same Code of Conduct and website as the identical Exelon Form 10-K. ¶¶93-94, 108. On the flipside, Exelon and its executives cannot confine the misconduct to ComEd, as executives of both entities were enmeshed in the fundraising and lobbying efforts, and the legislative benefits achieved (and the later fallout) from the bribery scheme applied to both ComEd and Exelon. ¶¶52-86. For example, media reported that "[u]nder Pramaggiore, *ComEd also won* important benefits in the 2016 state law [FEJA] that *subsidized Exelon's* Illinois nukes." ¶184(c). In addition, the DPA made admissions on behalf of ComEd but was authorized by Exelon's Board and signed by an Exelon executive. *See* ¶¶164-165. Reference to Exelon and ComEd as the "Company" is fully appropriate. *See also* §III.B.2.

- 13 -

**5. Lobbying and Risk Warning Statements Are Adequately Pled**

Defendants argue their lobbying and risk statements (Exhibit A at Nos. 11-20) were true, in the sense that they did the lobbying activities stated and the risks they warned of existed. Def. Br. at 8; Pramaggiore Br. at 11-12. But, even if true, they were still misleading because Defendants omitted to disclose the bribery payments were the most critical aspect of their efforts to pass favorable legislation and the biggest risk the Company faced. *See* §II.B; *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 944 (7th Cir. 1989) (stating "incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements"); *Lindelow v. Hill*, 2001 WL 830956, at \*2-\*3 (N.D. Ill. July 20, 2001) (Holderman, J.) (holding that even "[t]hough some statements complained of by plaintiffs could be read as literally accurate, plaintiffs have sufficiently alleged that the statements were misleading in context").

Despite the ongoing bribery scheme, Defendants repeatedly assured investors that the Company was engaged in legitimate lobbying activities. For example, in responding to an analyst question about passing favorable legislation, Defendant Crane said:

- they were "***working with the coalitions as hard as we can to have something . . . that the legislature supports***." ¶111(c); and

- "***we're in the process right now of negotiating with all the bills so we can come together and provide the legislature with a coalition***," "***[m]eetings are constant***," "***I've met with the leadership of both the House and Senate, talking about what we need to do and them showing their support for us***," "***we're just going to keep working on it as we always do***," and they had "***been able to work with stakeholders to gain support and recognition***." ¶111(b).

By choosing to highlight legitimate lobbying activities, Defendants had a duty to disclose the bribes being paid to influence official action of Public Official A. *See Braskem*, 246 F. Supp. 3d at 760 (holding statements regarding factors affecting pricing were "classic half-truth" when defendants omitted to disclose the pricing was secured, in part, by an undisclosed bribery scheme); *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) (holding "by choosing to inform the market that it

- 14 -

was training surgeons on how to obtain reimbursements . . . the Company was obliged to further disclose its fraudulent reimbursement scheme, *i.e.*, its instructions to surgeons to unlawfully code"). Defendants' lobbying statements were misleading without disclosure of the bribery scheme just as the marketing statements in *AbbVie* were misleading without disclosure of the kickback scheme. 2020 WL 5235005, at *5 (finding statement that "'I don't want to get specifically on what our marketing programs are but they are geared primarily at the penetration in the marketplace'" was misleading due to omission of a kickback scheme).

Defendants' claim that they were not required "to accuse themselves of wrongdoing that had not yet been determined to be wrongdoing" is an illogical argument that bribery is not wrongdoing unless it is charged. Def. Br. at 8. Defendants' statements were not misleading because they failed to accuse themselves of crimes, they were misleading because when they chose to describe their legitimate lobbying activities they concealed the ongoing bribery payments. *See Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, 2018 WL 1071442, at *6 (N.D. Ill. Feb. 27, 2018) (Gettleman, J.) (rejecting "'fraud by hindsight'" argument because defendant's admissions "does not merely indicate" his statements "were incorrect in retrospect; it suggests that they were incorrect when made"). The years-long bribery scheme was the "'contradictory' information" that Defendants claim is missing. Def. Br. at 8.

Defendants' statements are similar to those upheld in *Braskem*. There, the court found statements that the company purchased "'the bulk of its naptha feedstock from Petrobas'" and that transactions were "'made on terms equivalent to the averages practiced with third parties'" to be misleading because pricing was "derived from a long running criminal scheme." *Braskem*, 246 F. Supp. 3d at 760. By omitting to disclose the bribes, the Court explained that, "[p]ut in journalistic terms," the defendants had "'buried the lead.'" *Id.* Even though Defendants had not been caught, the statements were misleading because investors "might have questioned whether Braskem's

- 15 -

business practice of securing better pricing through bribery left Braskem open to the risk of exposure, scandal, and instability." *Id.*; *see also Cambridge Ret. Sys. v. JELD-WEN Holding, Inc., 2020 WL 6270482, at \*1, \*3, \*5 (E.D. Va. Oct. 26, 2020)* (finding statements "crediting [the company's] pricing strategy and product quality for its success" while omitting involvement in an antitrust conspiracy to be "'utterly misleading'" because "once a party speaks on a topic, they have an obligation to tell the whole truth" and "[i]t makes no difference that the defendants implemented legal pricing strategies alongside their illegal behavior" because they "had an obligation to reveal both their legal and illegal behavior as it related to pricing").

Defendants cite to *Construction Workers Pension Fund-Lake County and Vicinity v. Navistar International Corp.*, 114 F. Supp. 3d 633 (N.D. Ill. 2015) (Ellis, J.), but it actually supports denial of their motion. In that case, the court found that the defendants' statement that their truck engines "'meet [the] emissions [standard] in the cylinder'" was misleading because it omitted to disclose that the company only met the standard by using emissions credits. *Id.* at 656-57. The court held that despite the statement being true (*i.e.*, the engines met the standard) it was misleading because in "context, a reasonable investor could have understood" the statement to mean "Navistar had an engine that met the . . . emission standard without the use of emission credits." *Id.* at 658. So too here, omission of the bribery scheme rendered the otherwise supposedly true lobbying statements and business risks misleading.[9]

---

[9]    Defendants cite other, distinguishable, cases such as *Garden City Employees' Retirement System v. Anixter International, Inc.*, 2012 WL 1068761, \*9 (N.D. Ill. Mar. 29, 2012), where the omitted information arose after the statements were made. Also, unlike the detailed allegations regarding the specific payments and conduct that comprised the bribery scheme here, in *In re Harley-Davidson, Inc. Securities Litigation*, 660 F. Supp. 2d 969, 985-91 (E.D. Wis. 2009), the court found allegations that the company was "channel stuffing" and "violat[ing] GAAP" were too conclusory and devoid of details to show the statements were misleading. Similarly, Defendants' reliance on *Anderson v. Abbott Laboratories*, 140 F. Supp. 2d 894, 902 (N.D. Ill. 2001), is misplaced because that court held that in light of the company's six-year history of receiving warnings from the FDA without any sanctions, the failure to disclose yet another FDA warning letter was "fairly inconsequential." There was no such prior history of bribery disclosures in this case.

Regarding the misleading risk statements, the same half-truth arguments above apply.  *See, e.g.*, *Akorn*, 240 F. Supp. 3d at 814 (rejecting argument that true statements about risks rendered statements not misleading because "'a misleading statement will not always lose its deceptive edge simply by joinder with others that are true'").  Here, Defendants emphasized to investors the importance of favorable legislation to their highly-regulated business (¶¶36-41) and then purported to identify the specific risks to those legislative outcomes.  Namely, they claimed that the fact that Exelon and ComEd "*have large consumer . . . bases*" could result in  "*public criticism*" and "*[a]dverse publicity*" that "*could render legislatures and other governing bodies . . . less likely to view energy companies such as Exelon and its subsidiaries in a favorable light*."  *E.g.*, ¶104(e). But they concealed the most significant risk of "public criticism," "[a]dverse publicity," and negative legislative outcomes was the undisclosed eight-year bribery scheme.  ¶¶104(e), 105(c), 130.  *See In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (holding that "cautionary statements concerning the risks associated with the misconduct of its employees [we]re actionable pursuant to Section 10(b)" because "at the time that [the company] was warning investors about regulatory risk, it knew or was recklessly ignorant of the fact that [a subsidiary's] employees were violating [stock exchange] rules").[10]

Finally, Defendants Dominguez and Pramaggiore's attempt to claim they disavowed in their SEC filings statements not "relating" to ComEd is unavailing because the lobbying and risk statements related to both ComEd and the other subsidiaries of Exelon.  *See, e.g.*, ¶104(e) (identifying risks to "Registrants"); ECF No. 78-1 at 9 of 683 (defining "Registrants" to include Exelon and ComEd); §III.B.3.  Defendants' attempt to argue alternative interpretations is premature.

---

[10]    Moreover, it is clear that investors were not aware of the risks from the bribery scheme because when the truth was disclosed the stock price dropped.  *See generally In re Ulta Salon, Cosmetics & Fragrance, Inc. Sec. Litig.*, 604 F. Supp. 2d 1188, 1196 (N.D. Ill. 2009) (Gettleman, J.) (holding "[t]he fact that the price of the stock plummeted shortly after disclosure demonstrates" materiality of the concealed information).

*See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (rejecting defendants' alternative interpretation of statements because "[w]hile this is a conceivable interpretation of this paragraph, it is hardly the only – or even the most plausible – one").

### 6. Statements About the Benefits of Legislation and Sources of Revenues Are Adequately Pled

Defendants claim that statements about the benefits of FEJA (Exhibit A at Nos. 21-25) were not misleading because even if "the passage of the FEJA resulted in part from a 'bribery scheme,'" Plaintiff did not allege "that Defendants inaccurately reported the revenue and improved operations that were attributable to the FEJA." Def. Br. at 9; *see also* Pramaggiore Br. at 9-10. This argument suffers from the same defect as the last – it ignores that statements can be literally true but also misleading. *Career Educ.*, 2012 WL 5363431, at *6 (holding that statements "even if literally true, could still be misleading to investors depending on the context and manner of their presentation"). Even if revenues and legislative benefits were accurately reported, by attributing them to legitimate lobbying and legislative victories, they concealed that the bribery scheme was a significant cause. *See Van der Moolen*, 405 F. Supp. 2d at 400-02 (finding statements touting company's profitability in "turbulent market circumstances" were misleading without disclosing profitability was attributable "at least in part, [to] trading practices that violated NYSE rules" because the statements "put the sources of . . . revenue at issue"); *AbbVie*, 2020 WL 5235005, at *3 (holding "statements attributing Humira's success to AbbVie's sales and marketing practices and programs implicated AbbVie's allegedly unlawful kickback scheme . . . and were thus misleading"). As further example, the statements by Defendants Exelon, ComEd, Crane, Pramaggiore, and Dominguez that the Company's "***nuclear plants were selected as the winning bidders through the [government] procurement event***" and resulted in "***recognizing revenue***" and subsidies were misleading because of the omission of the influence the bribery scheme had on that selection. *E.g.*, ¶¶104(b), 105(b).

- 18 -

All the statements in this category are similar to statements upheld in *Cognizant*. There, in a case also involving a parent and subsidiary, the court found the statement that "'[o]ur Indian subsidiaries . . . are eligible for certain income tax holiday benefits granted by the Indian government'" was misleading because defendants were "touting the benefits of SEZ licenses" which "put the underlying bribery [that secured the licenses] at play." 2018 WL 3772675, at *5, *17. As the court explained, "[a] reasonable investor would view these benefits differently if he was aware that they were obtained through illegal conduct that could subject [the company] to liability." *Id.* at *17; *see also Grupo Televisa*, 368 F. Supp. 3d at 721 (finding "'we hold the rights to the next three soccer World Cup's'" was misleading because "the revenue generated by the World Cup broadcasting rights was partly attributable to bribery").

Defendants' reliance upon *In re Citigroup Securities Litigation*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), is misplaced because plaintiff attempted to "argue that Citigroup's reporting of revenue figures implicitly represented that such results would continue." *Id.* at 378. Unlike in *Citigroup*, here, the statements did more than simply report revenues, they attributed them to legislative successes without disclosing the bribery scheme. ¶¶104(b)-(d), 112(d)-(e), 119(c)-(d); *see also AbbVie*, 2020 WL 5235005, at *3 (finding statement attributing drug sales to "AbbVie's strong commercial execution" misleading due to omission of "unlawful kickback scheme"); *CenturyLink*, 403 F. Supp. 3d at 724-25 (finding statements attributing revenues to legitimate activities misleading when illegal scheme was omitted).

### 7. Statements About Government Investigations and Ochoa's Appointment Are Adequately Pled

Defendants' statements about the receipt of a government subpoena (Exhibit A at Nos. 27-30) were misleading because they downplayed the risks, created the impression that information was being sought from the Company merely as a witness, and assured investors that their purportedly

- 19 -

legitimate lobbying activities continued unaffected.  *See* ¶121(a); *In re Neopharm, Inc. Sec. Litig.*, 2003 WL 262369, at *13 (N.D. Ill. Feb. 7, 2003)* (Lefkow, J.) (finding statements about drug clinical trials were misleading because they "downplayed" the problems); *Allscripts*, 778 F. Supp. 2d at 879-80 (holding statement that "'[w]e did a tremendous amount of work on [the installation] process to make sure that [installation] problems [do not] happen'" was actionable because it concealed there were such problems and "may have misled a reasonable investor into developing an overly rosy picture") (alterations in original).

For example, Defendant Von Hoene responded to an analyst's question about the impact of the subpoena on the Company's lobbying by stating "*[w]e're meeting regularly, we're doing the stakeholder outreach, we're trying to craft a package and educate members of legislature and the tendency of the grand jury and subpoenas [sic] had no impact on the level of activity or the intensity of the activity in that regard*."  ¶118(c).  However, far from "no impact" on their lobbying efforts, the subpoena caused them to cease the eight-year bribery scheme that was the source of the legislative successes in the past.  ¶¶121(a), 175; *see also Zhengyu He v. China Zenix Auto Int'l Ltd.*, 2020 WL 3169506, at *8 (D.N.J. June 12, 2020)* (holding that while "the Company disclosed the existence of the investigation and some attendant risk" it was misleading because it omitted to disclose that "the trading practices being investigated had in fact occurred; that they were in fact improper; and that the Company knew it").[11]  The statements succeeded in misleading investors, as analysts reported that the investigation was into others and that Exelon was not at risk, stating, "[w]e see support for the Clean Energy Progress Act (CEPA) unbowed despite a US Attorney Grand Jury

---

[11]     Defendant Von Hoene's attempt to characterize his statement as "*unrelated to* ComEd" (Def. Br. at 4 (emphasis in original)) fails for the reasons discussed herein.  *See* §III.B.2; ¶89; *see also Maverick Fund, L.D.C. v. Lender Processing Servs. Inc.*, 2015 WL 5559761, at *10-*11 n.11 (M.D. Fla. Sept. 21, 2015)* (finding disclosure of federal investigation of subsidiary could be read "to downplay problems that were indisputably much more serious than first disclosed" as it "did not disclose that [the company] knew the federal investigation was criminal in nature").

and FBI investigation *into* [the] Illinois House Speaker [Public Official A]." ¶124; *see also id.*

(analyst stating that media had "reported a federal investigation *into associates* of [Public Official

A]"). It was not until Pramaggiore's "sudden departure" that analysts understood "that ComEd/EXC

are not just being asked to supply information . . . but could also be under scrutiny for criminal

behavior." ¶147(a).[12]

Next, the statement announcing that "*the Board of Directors of ComEd appointed Mr. Juan*

*Ochoa to the Board to fill a vacancy created by an expansion of the size of the Board*" was

misleading as it implied an appointment in the ordinary course while omitting to disclose the Board

was expanded to create a spot for Mr. Ochoa as part of the bribery scheme. ¶¶66-67, 112(f), 114(e);

*see Kelsey v. Allin*, 2016 WL 825236, at \*4 (N.D. Ill. Mar. 2, 2016) (Gettleman, J.) (holding that

"[h]aving elected to disclose [the CEO]'s business experience . . . defendants had a duty to do so in a

manner that was not misleading" and the omission of work at a prior company where the CEO was

"involved with 'notorious convicted stock fraudsters'" was misleading).

### C. The Totality of Factors Supports a Strong Inference of Scienter as to Each Defendant

Defendants' analysis of scienter suffers from two flaws. First, Defendants try to heighten the

standard by arguing for direct evidence of knowledge (Def. Br. at 13), while ignoring that

circumstantial allegations showing "'reckless disregard of a substantial risk that the statement is

false'" is also sufficient. *Allscripts*, 778 F. Supp. 2d at 883; *see also Adams v. Kinder-Morgan, Inc.*,

340 F.3d 1083, 1101 (10th Cir. 2003) (plaintiffs do not need "evidence" because the "PSLRA did

---

[12] Defendants' statements implying they were continuing lobbying as usual and were merely subpoenaed as witnesses distinguish this case from those relied on by Defendants, such as *Societe Generale Securities Services, GbmH v. Caterpillar, Inc.*, 2018 WL 4616356, at \*6 (N.D. Ill. Sept. 26, 2018), where the company disclosed that their tax position was subject to investigation and warned investors.

4834-8468-8854.v1

not, however, purport to move up the trial to the pleadings stage").[13]  Second, they cite cases holding that an individual allegation alone did not create a strong inference of scienter.  *E.g.*, Def. Br. at 14 (arguing scienter cannot be inferred "'solely'" from senior position).  But, "courts must consider the complaint in its entirety" and ask "whether ***all*** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs II*, 551 U.S. at 322-23 (emphasis in original).[14]  Here, no single allegation must do the job alone, because the totality of allegations are sufficient to allege scienter, especially since the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even 'the most plausible of competing inferences.'"  *Tellabs II*, 551 U.S. at 324.

### 1.      Scienter Allegations Applicable to All Defendants

#### a.      Defendants Had Motive to Conceal the Bribery Scheme

Motive is not required because "there is little if any significance attributable to the absence of an allegation of a personal financial motive."  *See Career Educ.*, 2012 WL 5363431, at *11.  But, when present, "'motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference.'"  *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *16 (N.D. Ill. Feb. 13, 2013) (St. Eve, J.).  Here, Defendants could not continue the bribery scheme without concealing it, and it was worth hundreds of millions of dollars to the Company.  ¶¶8, 184(a), 194-196.  Each individual stood to gain so long as the

---

[13]      Defendants incorrectly suggest that "confidential witnesses" are required to plead scienter (Def. Br. at 1, 14) but many cases plead scienter without them.  *See, e.g.*, *Allstate*, 2018 WL 1071442, at *6 n.3; *Rubinstein v. Gonzalez*, 241 F. Supp. 3d 841, 857 (N.D. Ill. 2017).  Moreover, this case relies on company admissions and emails, eliminating any need for lower-level witnesses.

[14]      *See also Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 273 (3d Cir. 2009) (reversing dismissal for failure to allege scienter and rejecting defendants' argument that "'[t]he sum of several zeros . . . is still zero'" because the "inferential significance of any single allegation can be determined only by reference to all other allegations"); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *11 (N.D. Ill. July 28, 2009) (Gettleman, J.) (rejecting defendants' attempts at "'cherry picking' particular allegations that, standing alone, might not meet the heightened pleading standard under Rule 9(b) or the PSLRA").

4834-8468-8854.v1

scheme was concealed because the Company's executive compensation was tied to passage of favorable legislation. *See* ¶¶197-198. For example, during the bribery scheme, Defendant Crane's, Von Hoene's, and Pramaggiore's total compensation exceeded $120 million, $40 million, and $25 million, respectively. ¶199; *see also AbbVie*, 2020 WL 5235005, at \*5 (finding both "Defendants' motive for AbbVie to engage in the alleged unlawful kickback scheme" to "maximize sales of Humira" and executive "compensation [being] tied directly to" sales supported scienter).

### b. Defendants' False Statements and Senior Positions Contribute to a Strong Inference of Scienter

The Seventh Circuit has recognized that "'[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.'" *Tellabs I*, 437 F.3d at 603. In their roles as senior executives of Exelon and ComEd, each of the Individual Defendants oversaw the critically important lobbying activities, participated in fundraisers, had access to internal corporate documents and conversations with officers and employees, reviewed reports on the topics on which they spoke, and chose what to say. ¶¶176-187, 200-207. While Defendants cite cases to argue such allegations may not alone be sufficient to establish scienter, Def. Br. at 14, they can contribute to the ***inference***. *See Schleicher v. Wendt*, 529 F. Supp. 2d 959, 972 (S.D. Ind. 2007) (stating scienter supported "where the defendants either knew or had access to information showing that their public statements were not accurate"). Each Defendant either signed the public filings, attended and spoke at the conference calls, or both, and thereby made statements holding themselves out as knowledgeable about the lobbying, political contributions, and/or legislative and financial successes. *See* Exhibit A; *Hospira*, 2013 WL 566805, at \*25-\*26 (finding scienter adequately alleged and noting argument that it could be inferred that defendants "'knew of what they spoke'"); *Career Educ.*, 2012 WL 5363431, at \*10 (finding from CEO's statements about

- 23 -

the issue that "[o]ne may readily and reasonable [sic] infer from these facts that [the CEO] made it his business to look into" it).[15]

### c.     The Core Operations Doctrine Supports Scienter

Defendants say this factor alone is insufficient, but they cannot refute that "[o]fficers of a company can be assumed to know of facts 'critical to a business's core operations or to an important transaction that would affect a company's performance.'" *In re Sears, Roebuck & Co. Sec. Litig., 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003)* (Bucklo, J.); *see also Desai v. Gen. Growth Props., Inc., 654 F. Supp. 2d 836, 860 (N.D. Ill. 2009)* (Shadur, J.) ("While a Court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue.").

Here, Exelon spent more on lobbying than its peers, Defendants repeatedly acknowledged that legislative successes were essential to business success, the Company acknowledged a historically poor relationship with Public Official A that dramatically improved during the bribery scheme, the financial benefits procured during the bribery scheme were worth hundreds of millions of dollars, and ComEd was the largest of Exelon's utility companies. *See* ¶¶8, 35, 184(a), 194-196, 201-206; *CenturyLink, 403 F. Supp. 3d at 731* (finding scienter supported because it is "reasonable to assume top management [was] 'aware of matters central to that business's operation'").[16]  The

---

[15]     *See also AbbVie,* 2020 WL 5235005, at *5 (finding defendants' "numerous statements" on marketing practices "constitute strong circumstantial evidence that Defendants had detailed information regarding" those practices); *Baxter,* 2012 WL 607578, at *4 (finding scienter adequately pled where "by virtue of their positions the defendants had access to non-public and proprietary information concerning [the company's] operations, finances, and financial condition" and "a reasonable person could infer that [the CEO] and the other corporate officer defendants at least acted with deliberate recklessness"); *In re Motorola Sec. Litig.,* 2004 WL 2032769, at *31 (N.D. Ill. Sept. 9, 2004) (Pallmeyer, J.) (finding scienter alleged where "Company officials failed to check information they had a duty to monitor").

[16]     *See also, e.g., Silverman v. Motorola, Inc.,* 2008 WL 4360648, at *14 (N.D. Ill. Sept. 23, 2008) (Moran, J.) (holding "it is almost inconceivable that these defendants were not aware of the production problems faced by the significant new product launch"); *Asher v. Baxter Int'l, Inc.,* 2005 WL 331572, at *6 (N.D. Ill. Feb. 3, 2005) (Manning, J.) (finding the inference of knowledge for "'high-level managers'" is

4834-8468-8854.v1

competing inference that Defendants were just repeating lies fed to them is much less plausible. *See, e.g.*, *Tellabs III*, 513 F.3d at 709-11 (finding scienter adequately pled and stating "[i]s it conceivable that [the CEO] was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely"). Moreover, "it is strongly inferential that every officer or director . . . either had the knowledge" of such core matters "or, if not, that his failure to have such knowledge equated to reckless disregard." *Lindelow*, 2001 WL 830956, at *8.

### d. The Scope and Length of the Bribery Scheme Supports an Inference of Scienter

"The more serious the error, the less believable are defendants [sic] protests that they were completely unaware of [the truth] and the stronger is the inference that defendants must have known about the discrepancy." *Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) (Moran, J.). Here, far from being too minor to warrant Defendants' close attention and monitoring, the Company was working with close friends of Public Official A as lobbyists as part of an eight-year bribery scheme to influence Public Official A, who had singularly blocked favorable legislation. ¶¶203-206, 213-220; *see also Berson*, 527 F.3d at 987-89 (finding scienter could be inferred when the concealed facts would have a "devastating effect on the corporation's revenue" and "it would be 'absurd to suggest' that top management was unaware of them").

### 2. Each Defendant's Direct Participation Contributes to the Strong Inference of Scienter

In addition, the allegations specific to each Defendant's role in lobbying Public Official A supports an inference of scienter. *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1029 (N.D. Ill. 2010) (finding fact that CEO was "deeply involved" in company's lending process

---

"particularly strong where the specific problem" affects "'a significant source of income' or a 'core [business] operation'").

- 25 -

4834-8468-8854.v1

supported inference he was aware of undisclosed financial troubles); *Allstate*, 2018 WL 1071442, at *5 (finding defendant's "direct involvement" in plan to lower underwriting standards supported inference of scienter).

### a.    Pramaggiore

The admissions by the Company that Pramaggiore was involved in the bribery, her termination, her publicly disclosed emails in the DPA, and her indictment are more than enough to establish a strong inference of her scienter.  ¶167, 216, 218-220; *supra* n.1; *Cognizant*, 2018 WL 3772675, at *31 (finding any assumption that resignation was due to performance was "rebutted by [the company's] public admission that members of senior management participated in or failed to uncover the bribery"); *Akorn*, 240 F. Supp. 3d at 820 (holding that "reinforcing the case for scienter is the allegation that [the defendant] resigned in the wake of the restatement, before a replacement CFO was selected").  Media has also reported that she was "a key player in ComEd's success over the years in Springfield" and credited her for the legislative successes achieved during the bribery scheme.  ¶146.  Given the force of these allegations, it is unsurprising that Defendant Pramaggiore basically concedes scienter by devoting only a single, conclusory paragraph of her brief to arguing the matter.  Pramaggiore Br. at 14.

### b.    Crane

Crane hosted what media described as "big bucks" fundraisers for Public Official A with Pramaggiore, pressured employees to attend those fundraisers, controlled Exelon's political contributions and directed them to be made for the benefit of Public Official A, and admitted to being personally involved in lobbying activities including meeting with "the leadership of both the House and Senate" (*i.e.*, Public Official A).  *See* ¶¶69, 111(b), 180-183, 185.  In addition, Crane served on ComEd's Board with Pramaggiore and Dominguez, and the DPA admitted that the appointment of Ochoa to the Board was a central part of the bribery scheme.  ¶¶188-190.  That

- 26 -

appointment was highly suspicious as Pramaggiore had been pushing to appoint Ochoa for a year before he was eventually added, the Board had to agree to expand the number of directors to make room for Ochoa, the Board never bothered to consider other candidates, the proxy description for Ochoa lacked any business justification for his membership in contrast to other members, and when Ochoa resigned, the Board was reduced back to eight members proving the expansion served no legitimate purpose. ¶¶191-192. Crane's direct involvement in this sham appointment supports a strong inference of scienter. The failure to claw back compensation from Pramaggiore and to instead reward her with $7.5 million in benefits upon her departure supports an inference that the clawback could not be enforced because of her superior's (Crane's) approval of her actions. ¶209.

Additional allegations supporting, at a minimum, Crane's reckless disregard, is his admission that the scheme was so big that it "shouldn't have gone undetected." ¶174. Even media observed that "Crane also deserves to lose his job for presiding over corruption on a breathtaking scale during eight years atop the parent company of Commonwealth Edison" that was directed at "seeking state legislation essential to *Exelon's* business strategy." ¶169. Media added "[t]his was no penny-ante kickback scheme" and it "took place not merely on Crane's watch but under his nose," adding that Crane "serves as a ComEd director, responsible for monitoring top utility execs." *Id.*; *see, e.g.*, *Braskem*, 246 F. Supp. 3d at 764 (stating "scienter can be based on a pleading of recklessness" and in doing so "a plaintiff may rely on allegations that defendants 'knew facts or had access to information suggesting that their public statements were not accurate' or 'failed to check information they had a duty to monitor'"). At this stage, Crane cannot refute these allegations by relying on an investigation by the company he controls because it did not purport to exonerate him or even claim he was a subject of that investigation.[17] ¶168. Moreover, while Crane made Pramaggiore the

---

[17] Crane's direct involvement, financial motive, and the importance of lobbying as reflected by analysts questions at each conference call distinguish this case from cases finding the fraud was limited to lower-level

- 27 -

scapegoat, her spokesperson made clear (while denying wrongdoing) that Pramaggiore did not act alone, stating that "'she and other **current** and former ComEd **and Exelon** executives received, evaluated and granted many requests to provide appropriate and valuable services to the companies.'" ¶168. Since Pramaggiore reported directly to Crane and Dominguez reported directly to her, the most plausible inference is she was referring to Crane and Dominguez. *Id*; ¶218.

### c. Dominguez

In addition to Pramaggiore's statement, the indictments of Pramaggiore (to whom Dominguez reported) and Marquez (who reported to Dominguez) support an inference that he, at a minimum, recklessly disregarded the bribery scheme. ¶¶168, 217-218; *supra* n.1. Moreover, Dominguez personally donated to the "big bucks" fundraisers for Public Official A, directed ComEd to make donations for the benefit of Public Official A (in his role as CEO of ComEd), supervised and publicly defended the Company's lobbyists, "spearheaded" the lobbying campaigns, headed up the lobbying and legislative strategies for much of the period of the bribery scheme, and was a member of the ComEd Board and ComEd's CEO during the suspicious appointment of Ochoa. ¶¶181-185, 188-192. Further support for an inference of his reckless disregard of the bribery scheme is his admission that "[t]here are no excuses for **our** conduct." ¶172. While he has not been criminally charged, this is a civil case with a lower burden and all inferences must be drawn in favor of Plaintiff. *Tellabs III*, 513 F.3d at 705.

### d. Von Hoene

Defendant Von Hoene was "viewed within the company as Crane's right-hand man and an architect of the legislative and regulatory strategies key to Exelon's earnings growth" during the time the bribery scheme was ongoing, he spoke publicly about the legislation, and passage of the

---

employees. *See, e.g.*, *Cognizant*, 2018 WL 3772675, at *27 (inferring "rogue members of senior management perpetuated misconduct and concealed their actions from" the CEO in absence of allegations specific to CEO and because the fraud related to a non-core operation that analysts did not inquire about).

- 28 -

favorable FEJA legislation was viewed as one of his "signature accomplishments," as he was "viewed as an important player in Exelon's ongoing efforts to win more assistance in Illinois for nukes that aren't subsidized." ¶¶184(a), 185. Von Hoene made donations, attended a dinner with Public Official A and the corrupt lobbyists implicated in the scheme, and attended McClain's (the primary lobbyist facilitating the scheme and close personal friend of Public Official A) retirement party where he told McClain that he had "'saved us more than hundreds of millions.'" ¶¶183, 184(a). Von Hoene was involved from the very beginning of the scheme, for example, touting in 2011 that EIMA had passed with support of "all four of the legislative leaders" and confidently predicting an override of the governor's expected veto, despite knowing that Exelon and ComEd historically had a poor relationship with Public Official A. ¶¶185-186. Thus, Von Hoene's direct responsibilities for lobbying and ties to Public Official A and the lobbyists in the scheme are additional support for a strong inference of his scienter.

### 3. Corporate Scienter Is Adequately Alleged

Defendants concede ComEd's "wrongdoing" and do not dispute ComEd's scienter. *See* Def. Br. at 1, 13; *Luellen v. City of E. Chi.*, 350 F.3d 604, 612 n.4 (7th Cir. 2003) (holding arguments not raised in opening brief are waived); *Cognizant*, 2018 WL 3772675, at *31-*34 (noting under Seventh Circuit approach corporate scienter could be attributed from "unnamed members of senior management" given "the breadth and duration of the alleged bribery scheme, the importance of SEZ licenses to the company"). Moreover, the admission in the DPA that Pramaggiore participated in the bribery scheme is sufficient. *See, e.g.*, *Akorn*, 240 F. Supp. 3d at 821 (holding that pleading executives' scienter established corporate scienter). As to Exelon, the DPA admissions about Pramaggiore, who was a high-ranking Exelon executive, establish corporate scienter, as do the scienter allegations of its other executives, Crane and Von Hoene. *See id.*; *Tellabs II*, 513 F. 3d at 710 (stating that "it is possible to draw a strong inference of corporate scienter" from "the

- 29 -

individuals who concocted and disseminated the fraud" whether or not they are named defendants); §III.C.1.2.[18] Further, ComEd's scienter can be attributed to Exelon, since ComEd is Exelon's largest and most important utility, ComEd admitted to being at the center of the scheme, and Exelon executives led ComEd's Board and controlled its operations. *See Grupo Televisa*, 368 F. Supp. 3d at 722 (finding "a subsidiary's . . . scienter may be imputed to the parent company . . . , particularly where the subsidiary is at the center of the alleged fraud").

### D.     Control Person Liability Under §20(a) Is Adequately Pled

Since a §10(b) violation has been adequately alleged so too have the control person claims under §20(a). *See* ¶251; *In re Spiegel, Inc. Sec. Litig.,* 382 F. Supp. 2d 989, 1029 (N.D. Ill. 2004) (Pallmeyer, J.). Only Pramaggiore claims that she did not control Exelon's statements but she ignores the allegations regarding her senior position. ¶¶25, 218, 251; *see also Spiegel*, 382 F. Supp. 2d at 1029 (upholding §20(a) claims against defendants in variety of positions because determination of "'whether an individual defendant is a "controlling person" under §20(a) is a question of fact that cannot be determined at the pleading stage'").

## IV.     CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.

DATED:  January 20, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
BRIAN E. COCHRAN (IL Bar # 6329016)
FRANK A. RICHTER (IL Bar # 6310011)
GINA BUSCHATZKE (IL Bar # 6332510)

---

[18] Pramaggiore's position as one of Exelon's top senior executives distinguishes this case from *Pugh v. Tribune Co.*, 521 F. 3d 686, 698 (7th Cir. 2008) where the subsidiary employee who executed the scheme was "***not*** an executive officer" of the parent. Defendants' other cases are also inapposite. *See Chill v. Gen. Elec. Co.*, 101 F. 3d 263, 265, 268 (2d. Cir. 1996) (finding scienter not alleged as to parent where subsidiary employee carried out scheme for personal benefit); *Albert Fadem Tr. v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1012 (S.D. Ohio 2004) (finding scienter not alleged as to parent where misconduct was limited to lower level employees of subsidiary and neither the "[parent] nor [subsidiary] management was involved").

4834-8468-8854.v1

- 31 -

s/ James E. Barz
JAMES E. BARZ

200 South Wacker Drive, 31st
Floor Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
jbarz@rgrdlaw.com
bcochran@rgrdlaw.com
frichter@rgrdlaw.com
gbuschatzke@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 31 -

4834-8468-8854.v1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 20, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ James E. Barz
JAMES E. BARZ

ROBBINS GELLER RUDMAN
    & DOWD LLP
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)

E-mail: jbarz@rgrdlaw.com

4834-8468-8854.v1

Case: 1:19-cv-08209 Document #: 85 Filed: 01/20/21 Page 41 of 43 PageID #:2640

# Mailing Information for a Case 1:19-cv-08209 Flynn v. Exelon Corporation et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Stefan Howard Atkinson**
  stefan.atkinson@kirkland.com

- **James E Barz**
  jbarz@rgrdlaw.com,cbarrett@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Evelyn Blacklock**
  Evelyn.Blacklock@kirkland.com

- **Gina Buschatzke**
  gbuschatzke@rgrdlaw.com

- **Brian E. Cochran**
  BCochran@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com,lhoeksema@cohenmilstein.com,efilings@cohenmilstein.com

- **Sandra C Goldstein**
  sandra.goldstein@kirkland.com,sandra-goldstein-3843@ecf.pacerpro.com,kenymanagingclerk@kirkland.com,michelle.denny@kirkland.com

- **David Andrew Gordon**
  dgordon@sidley.com,efilingnotice@sidley.com,david-gordon-4155@ecf.pacerpro.com,jwheeler@Sidley.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Kyla Jackson**
  Kyla.Jackson@kirkland.com

- **Scott R. Lassar**
  slassar@sidley.com,efilingnotice@sidley.com,scott-lassar-4695@ecf.pacerpro.com

- **Jeremy Alan Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Louis Carey Ludwig**
  lcludwig@pomlaw.com,kgutierrez@labaton.com

- **Carl V. Malmstrom**
  malmstrom@whafh.com

- **Francis P. Mcconville**
  fmcconville@labaton.com,lpina@labaton.com,9849246420@filings.docketbird.com,electroniccasefiling@labaton.com

- **Jaran Ryal Moten**
  jaran.moten@kirkland.com

- **Danielle S. Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Frank Anthony Richter**
  frichter@rgrdlaw.com

- **Jared Matthew Schneider**
  jschneider@pomlaw.com

- **Mark E. Schneider**
  mark.schneider@kirkland.com

- **Jennifer Martin Wheeler**
  jwheeler@sidley.com,jennifer-4277@ecf.pacerpro.com,efilingnotice@sidley.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)