**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| JOSHUA FLYNN, Individually and on Behalf of All Others Similarly Situated | ) ) ) | |
| | ) | No. 19 C 8209 |
| *Plaintiff*, | ) ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| EXELON CORPORATION et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, representing himself and a class of similarly situated persons, brings claims detailing violations of federal securities laws against the following individuals and entities: Exelon Corporation ("Exelon") and its controlled subsidiary the Commonwealth Edison Company ("ComEd"); Exelon's Chief Executive Officer Christopher M. Crane; Exelon's Chief Strategy Officer ("CSO"), William A. Von Hoene, Jr.; Exelon's former CEO of Exelon Utilities, Anne R. Pramaggiore; and ComEd's CEO, Joseph Dominguez. The putative class comprises all purchasers of Exelon common stock between February 8, 2019 and October 31, 2019 alleging Defendants made a series of false and misleading statements that concealed an eight-year bribery scheme. These false and misleading statements caused Exelon's common stock to trade at artificially inflated prices and, when the bribery scheme was uncovered, Exelon's stock price declined dramatically and investors suffered billions of dollars in market losses. All Defendants now move to dismiss. (Dkts. 73, 75). Because the Plaintiff has adequately pleaded a violation of federal securities law, the Motions to Dismiss are denied.

1

## BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). The following factual allegations are taken from Flynn's Amended Complaint (Dkt. 65) and are assumed true for purposes of this motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

This case arises because Exelon and its subsidiary ComEd (together "the Company") allegedly engaged in an eight-year bribery scheme in order to influence Illinois lawmakers to enact legislation favorable to Exelon, resulting in hundreds of millions of dollars in additional revenue to Exelon. (Dkt. 65 ¶ 2). Exelon is one of the largest electric companies in the United States. (*Id.* ¶ 3). ComEd is a controlled subsidiary of Exelon responsible for delivering electricity to customers in northern Illinois. (Dkt. 65 ¶¶ 24, 34–35). This securities class action is brought on behalf of all purchasers of Exelon common stock between February 8, 2019 and October 31, 2019 (the "Class Period"). (*Id.* ¶ 1).

The Company operates in a highly-regulated industry and depends upon the continual passage of favorable legislation, including from the Illinois General Assembly, which passes legislation that impacts the rates ComEd can charge its customers and whether Exelon's nuclear power plants in Illinois can receive subsidies. (*Id.* ¶¶ 5, 36–44). Before the alleged bribery scheme, the Company faced opposition from Public Official A, who "torpedoed a rate hike" for ComEd. (*Id.* ¶¶ 6, 48). To solve the opposition, ComEd allegedly began bribing Public Official A through more than $1.3 million in payments to his "political allies" to "influence and reward Public Official A's efforts . . . to assist ComEd with respect to legislation concerning ComEd and its business."

(*Id.* ¶ 56). The bribery scheme lasted from 2011 into 2019 and allegedly included payments to a law firm favored by Public Official A, hiring interns from Public Official A's ward, and appointing a board member to ComEd's Board to please Public Official A. (*Id*. ¶¶ 57–71). In exchange, the Company received passage of favorable legislation that provided benefits "greater than $150,000,000," including the Energy Infrastructure Modernization Act ("EIMA") and Future Energy Jobs Act ("FEJA"), which would provide Exelon up to $2.35 billion in government-authorized subsidies and further rate increases. (*Id.* ¶¶ 8, 72–86).

Between July and October 2019, Exelon and ComEd disclosed that they had received two grand jury subpoenas from the U.S. Attorney's Office for the Northern District of Illinois and that the SEC was investigating their lobbying activities. (*Id.* ¶¶ 116–119, 144, 154). On July 16, 2020, ComEd entered into the Deferred Prosecution Agreement ("DPA") with the United States Attorney for the Northern District of Illinois. (*Id.* at 1). In the DPA, ComEd admitted that, from 2011 to 2019, it made certain payments to "political allies" of "Public Official A" in order to "influence" him to "assist" ComEd "with respect to legislation concerning ComEd and its business." (*Id.* ¶ 7). On July 17, 2020, Exelon and ComEd filed a Form 8-K disclosing that ComEd had entered into the DPA. (*Id.* ¶ 163). The Form 8-K stated "[u]nder the DPA, the USAO will file a single charge alleging that ComEd improperly gave and offered to give jobs, vendor subcontracts, and payments associated with those jobs and subcontracts for the benefit of the Speaker of the Illinois House of Representatives and the Speaker's associates, with the intent to influence the Speaker's action regarding legislation affecting ComEd's interests." (*Id*.). The DPA was agreed to "pursuant to authority granted by the Board of Directors of Exelon" and the DPA admittedly contained "true and accurate" facts. (*Id.* ¶ 164). The DPA bound ComEd to pay $200 million and institute remedial policies and practices including compliance testing, training, internal reporting, and

discipline, and also required ComEd to cooperate with, and provide periodic reports to, the federal prosecutor. (*Id.* ¶ 165). The DPA states "certain senior executives and agents of ComEd" were "aware of the[] payments from their inception until they were discontinued in or around 2019," were "aware of the purpose of these payments . . . namely, that they were intended to influence and reward Public Official A in connection with Public Official A's official duties and to advance ComEd's business interests," and had "designed the[] payment arrangements in part to conceal the size of payments made to Public Official A's associates." (*Id.* ¶ 57). The DPA specifically identified Fidel Marquez, Jr., ComEd's former Executive Vice President for Legislative and External Affairs, and Defendant Pramaggiore as being two senior executives involved in the scheme. (*Id.* ¶ 57).

Plaintiff alleges that Defendants made false and misleading statements, engaged in a scheme to deceive the market, and undertook a course of conduct that artificially inflated the price of Exelon common stock and operated as a fraud on Class Period purchasers of Exelon common stock by misrepresenting and concealing the illegal bribery scheme. (*Id.* ¶ 221). They further concealed from the Class that Exelon's and ComEd's Illinois legislative successes (and the benefits from those successes) were illusory and the result of the bribery scheme, exposing the Company to substantial risk of criminal penalties and diminished legislative and public reputation. (*Id.*). Defendants' false and misleading statements had their intended effect and directly and proximately caused Exelon common stock to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of $50.95 per share. (*Id.* ¶¶ 222–23). When Plaintiff and other members of the Class purchased their Exelon common stock, the true value of such common stock was substantially lower than the prices actually paid. (*Id.*). Plaintiff and other members of the Class relied to their detriment on Defendants' materially false and misleading statements, as well

as the adverse, undisclosed information known to Defendants, on such statements and documents, and the integrity of the market, purchasing their Exelon common stock at artificially inflated prices during the Class Period. (*Id.* ¶ 224). Had Plaintiff and other members of the Class known the truth, they would not have taken such actions. (*Id.*). When Defendants' misrepresentations and omissions were revealed through the series of partial disclosures beginning on July 18, 2019 and continuing through October 31, 2019, the price of Exelon common stock fell dramatically, causing substantial losses to investors. (*Id.* ¶ 225). As a result of their purchases of Exelon common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiff and other members of the Class suffered economic loss under the federal securities laws. (*Id.* ¶ 232).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Olson v. Champaign Cty.*, 784 F.3d 1093, 1099 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). This means that the plaintiff must "give enough details about the subject-matter of the case to present a story that holds together." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)).

## DISCUSSION

Defendant Pramaggiore filed an individual Motion to Dismiss (Dkt. 75) while Defendants Von Hoene, Crane, Dominguez, Exelon Corporation, and ComEd filed a joint Motion to Dismiss. (Dkt. 73). However, the arguments across all Defendants' motions are essentially the same: that Plaintiff failed to plead with the requisite particularity sufficient to state a claim under federal securities law.

To state a claim for federal securities fraud, a complaint must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 598 (7th Cir. 2019) (citing *Pugh v. Tribune Co*., 521 F.3d 686, 693 (7th Cir. 2008)). Securities fraud claims must satisfy Fed. R. Civ. P. 9(b)'s particularity standard which requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." This generally means "describing the 'who, what, when, where, and how' of the fraud." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011); *see also Cornielsen*, 916 F.3d at 598 (citing *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990)). The purpose of this particularity requirement is "to discourage a 'sue first, ask questions later' philosophy." *Cornielsen*, 916 F.3d at 598 (citing *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co*., 631 F.3d 436, 441 (7th Cir. 2011). "Greater precomplaint investigation is warranted in fraud cases…because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual), ... because fraud is frequently charged irresponsibly by people who have suffered a loss and want to find someone

to blame for it, ... and because charges of fraud (and also mistake, the other charge that Rule 9(b) requires be pleaded with particularity) frequently ask courts in effect to rewrite the parties' contract or otherwise disrupt established relationships." *Id.* (citing *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999)).

In addition, § 21D(b)(2) of the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires complaints alleging securities fraud "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Any complaint alleging a material misstatement or omission must also "specify each statement alleged to have been misleading" and the "reason or reasons why the statement is misleading." *Id.* § 78u-4(b)(1).

First, Plaintiff alleges that all Defendants—Exelon, ComEd, Pramaggiore, Dominguez, Crane, and Von Hoene—violated § 10(b) of the Exchange Act and SEC Rule 10b-5 by engaging in misconduct that artificially inflated the price of Exelon's stock and maintained the artificially inflated prices, caused Plaintiff and Class Members to purchase the stock at artificially inflated prices, and then concealed ComEd and Exelon's true condition from the investing public by making misleading and false statements. Second, Plaintiff seeks to hold Exelon, Crane, Pramaggiore, Von Hoene, and Dominguez individually liable under § 20(a) of the Exchange Act as "controlling persons" of Exelon and ComEd.

## I.    Whether the Complaint Alleges False Statements with Particularity Attributable to Defendants

Defendants argue Plaintiff failed to attribute the allegedly false statements to each Defendant with particularity. To hold an individual defendant liable for a statement, a plaintiff must allege that the defendant was the "maker" of the statement—i.e., had "ultimate authority over

7

the statement, including its content and whether and how to communicate it." *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–42 (2011).

To satisfy Rule 9(b)'s particularity standard, a complaint must "state 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Cornielsen*, 916 F.3d at 599 (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (internal quotation marks omitted)). As a result, "[a] complaint that attributes misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient." *Sears*, 912 F.2d at 893. The Court will look at the allegations pertaining to each Defendant in turn.

### A. Von Hoene

Defendant Von Hoene has served as Senior Executive Vice President and CSO of Exelon since 2012 and as an Executive Vice President of Exelon since 2008. (Dkt. 65 ¶ 27). Plaintiff alleges that on an August 1, 2019 conference call a third-party analyst asked Von Hoene about the efforts to advance CEPA or similar legislation and whether, "since this news from a few weeks ago came out about the subpoena, has there been any—have these talks continued?" (*Id.* ¶ 118(c)). Defendant Von Hoene responded: "The activity that has started and continued for a number of months on advancing the clean energy legislation among the coalition . . . We're meeting regularly, we're doing the stakeholder outreach, we're trying to craft a package and educate members of legislature and the tendency of the grand jury and subpoenas [sic] had no impact on the level of activity or the intensity of the activity in that regard." (*Id.*). Defendants acknowledge Von Hoene is specifically attributed as the maker of one class-period statement, yet argue the statement is not actionable because it "concerned the effect of the subpoenas on legislation unrelated to ComEd." (Dkt. 74 at 4). The Court surmises that Defendants are claiming the statement is immaterial, but

such an argument is waived as underdeveloped.[1] *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (holding that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived"). Plaintiff is clear about the who, when, why, and where of Von Hoene's allegedly false statement, and therefore has pled with sufficient particularity. *See Cornielsen*, 916 F.3d at 599.

### B. Crane

Defendant Crane has served as CEO and a Director of Exelon, and Chairman of the Board of ComEd, since 2012 and as President of Exelon since 2008. (Dkt. 65 ¶ 26). Defendants acknowledge Plaintiff alleges numerous false statements attributable to Crane. *See id.* ¶¶ 102, 104(a), (e), 106, 11(a)–(c), 112(a)–(c), 116, 118(a)–(b), 119(a)–(b), (e)–(f). However, Defendants claim "Crane…was the maker only of statements about Exelon, not statements about ComEd." (Dkt. 74 at 4–5). Defendants do not provide support that Crane needed to provide statements about both Exelon and ComEd either in their initial Motion or in their Reply in order to be held liable under § 10(b). Defendants have only proffered this conclusory statement without additional clarification about why they believe this to be important. To the extent that Defendants wish to dismiss Crane, they have already admitted that Crane was the maker of one statement and the Court denies dismissal on this ground.

---

[1] The Court would hesitate to dismiss on materiality because, for the purposes of § 10(b), nonpublic information is considered "material" if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *SEC v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013) (citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). This determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id.* (citing *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). "Only if the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law." *Id.*

### C. Dominguez

Defendant Dominguez served as Exelon's Senior or Executive Vice President of Governmental and Regulatory Affairs and Public Policy from 2012 to 2018 and served as CEO and a Director of ComEd since 2018. (Dkt. 65 ¶ 28). Defendants acknowledge Dominguez was the maker of several false statements. (*See id*. ¶¶ 104(d)–(e), 112(c), (f), 116, 119(a)–(b)). However, similar to their position with respect to Crane, Defendants argue that Dominguez "who signed SEC reports on behalf of ComEd, was the maker only of statements about ComEd, not Exelon. (Dkt. 74 at 5). Again, such an argument is unsupported. The Court denies dismissal of Dominguez because Plaintiff has specifically alleged that Dominguez was the maker of several false statements, as Defendants acknowledge.

### D. Exelon and ComEd

Defendants claim that "Plaintiff identifies statements in SEC reports and earnings calls that had nothing to do with ComEd, and then repeatedly cites such statements as though they concerned ComEd—by lumping Exelon and ComEd together as 'the Company' and treating statements about Exelon or its subsidiaries as though they were made by ComEd. (*See, e.g*., Compl. ¶ 112(a) (1Q19 10-Q stating that Exelon and ExGen (but not ComEd) were "working with legislators and stakeholders" to pass the CEPA, legislation not even mentioned in the DPA); *id.* ¶ 111(b) (earnings call statement that Exelon was "negotiating" bills that would affect various subsidiaries). Even the two isolated instances Defendants cite from the Complaint do not exemplify the inappropriate group pleading. In fact, Defendants' proffered examples show Plaintiff has clearly alleged which entity was engaging in what allegedly fraudulent behavior. This conforms with the precepts of *Janus* that "…attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the

party to whom it is attributed." 564 U.S. at 142–43. Plaintiff was clear about which entity and which individual made certain statements. Defendants conclusory arguments to the contrary do not show otherwise.

Defendants claim the conflation of entities matters because "Plaintiff's entire theory of liability is that the challenged statements were misleading because they did not disclose the conduct admitted in the DPA—but only ComEd made admissions in the DPA." (Dkt. 90 at 20). However, this misconstrues the Complaint. The Complaint states that "[o]n July 17, 2020, Exelon and ComEd filed a Form 8-K disclosing that ComEd had entered into the DPA. The Form 8-K stated, 'Under the DPA, the USAO will file a single charge alleging that ComEd improperly gave and offered to give jobs, vendor subcontracts, and payments associated with those jobs and subcontracts for the benefit of the Speaker of the Illinois House of Representatives and the Speaker's associates, with the intent to influence the Speaker's action regarding legislation affecting ComEd's interests.'" (Dkt. 65 ¶ 163). The Complaint goes on to note

> …ComEd is a controlled subsidiary of Exelon, and Exelon also filed the Form 8-K attaching the DPA as an exhibit. The DPA stated that it was agreed to "pursuant to authority granted by the Board of Directors of Exelon." Thus, the DPA provided admissions on behalf of ComEd and Exelon (i.e., the Company). More specifically, the DPA stated the Company agreed that "the facts alleged in the Information and described in the Statement of Facts are true and accurate."

(*Id.* ¶ 164). Defendants' cited authority, *Dow Corning Corp. v. BB&T Corp.*, No. 09-5637, 2010 WL 4860354 (D.N.J. Nov. 23, 2010), does not support their arguments because Plaintiff is not bringing claims against Exelon only as the corporate parent of ComEd, but because Exelon also made allegedly false and misleading statements. The Court denies dismissal based on this claim.

### E. Pramaggiore

Defendant Pramaggiore acknowledges Plaintiff specifically alleged statements attributable to her but claims they are non-actionable because: 1) she did not make statements in the Form 10-K other than those specifically regarding ComEd, not Exelon; 2) the Complaint fails to plead facts that any statements relating to ComEd in the Form 10-K are false or misleading; 3) she did not make the statements in the Code of Conduct; and 4) Plaintiff's allegations regarding the August 2019 conference call do not satisfy the requirements of the PSLRA.

Pramaggiore argues she only made statements in the Form 10-K that relate specifically to ComEd, not Exelon. Again, the import of this argument is unclear. If Pramaggiore argues she can only be held liable for ComEd, and not Exelon, it would still not lead to dismissing her as a Defendant unless the statements she made on ComEd's behalf were otherwise deficient. As it is, "[n]othing in *Janus* undid the long-standing rule that '[a] corporation is liable for statements by employees who have apparent authority to make them.'" *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) (citations omitted).

Importantly, Pramaggiore does not dispute she had authority to make statements on behalf of ComEd, who is also a named Defendant here and is a subsidiary of Exelon. Pramaggiore also argues that she is not the maker of the statements in Exelon's Code of Conduct, which was incorporated as an exhibit to the 2018 Form 10-K. Pramaggiore is correct that she cannot be held liable for these statements as nothing in the Code of Conduct could be construed to hold her as the ultimate authority over these statements. *Glickenhaus & Co.*, 787 F.3d at 426. But Plaintiff also does not even attempt to attribute the Code of Conduct to Pramaggiore. Plaintiff acknowledges "the Company Code of Conduct was approved by the Exelon Board of Directors, including Defendant Crane, and began with a "Leadership Message" from Defendant Crane." (*See* Dkt. 65

¶ 95). As the Plaintiff states, "the claims in this case are not based on who 'approved' the Code of Conduct, they are based upon the misleading statements made by, among others, Pramaggiore and Dominguez who signed SEC filings directing investors to the Code of Conduct that was attached and published on the Company website." (Dkt. 85 at 21). Plaintiff does not wish to hold Pramaggiore liable for the misleading statements in the Code of Conduct but rather her statements in the Form 10-K that were misleading, in part, because it references the Code of Conduct.[2]

Pramaggiore next argues Plaintiff fails to plead facts that any statements relating to ComEd in the Form 10-K are false or misleading and that Plaintiff's allegations regarding the August 2019 conference call do not satisfy the requirements of the PSLRA. The Complaint details a number of statements made in the Form 10-K, signed by Pramaggiore, that are false or misleading regarding the Company's lobbying activities, the benefits and revenues from favorable legislation, and the Company's risk factor. (*See* Dkt. 65 ¶¶ 104–05). Pramaggiore claims these allegations are deficient because they are accurate. But it is inappropriate at the motion to dismiss stage to resolve questions of fact. At the pleading stage, the relevant question for deciding whether a statement is misleading is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*") (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)), *rev'd on other grounds by Tellabs, Inc v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ("*Tellabs II*"); *see also Ross v. Career Educ. Corp.*, No. 12-cv-00276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012) (noting "statements, even if literally true, could still be misleading to investors depending on the context and manner of their presentation"); *City of Lakeland Emps. Pension Plan v. Baxter Int'l Inc.*, No. 10 C 6016, 2012 WL 607578, at *2 (N.D.

---

[2] As discussed further below, even if Plaintiff cannot hold Pramaggiore liable for the Code of Conduct, it still is a viable basis for a § 10-b claim based on the actions of other Defendants.

Ill. Jan. 23, 2012) ("The complaint clearly sets forth who made the allegedly misleading statements, what the statements were and when and how they were conveyed. It is not the function of this Court at the pleading stage to determine whether the statements were in fact false or misleading").

For the allegations supporting the Exchange Act claim, the PSLRA requires that the complaint specify each allegedly misleading statement, the reasons why it is misleading, and, if based on information and belief, what specific facts support that information and belief. *See* 15 U.S.C. § 78u–4(b)(1). Plaintiffs must "support with particularity ... the falsity of the statement of fact or the omission." *Tellabs I*, 437 F.3d at 595. Plaintiff met this requirement as he describes over several paragraphs in his Complaint why the statements were false and misleading when made. (See Dkt. 65 ¶ 105). The Court need not resolve whether the statements were actually false; it is enough that Plaintiff has described with particularity why he believes the statement to be misleading.

Lastly, Pramaggiore argues Plaintiff's allegations regarding the August 2019 conference call do not satisfy the requirements of the PSLRA. On this conference call, Pramaggiore allegedly discussed some background of ComEd's franchise agreement in Chicago. (Dkt. 65 ¶ 118(d)). Pramaggiore stated:

> We started to have discussions around that. We understand what their priorities are and they are, I think, priorities are very much aligned with ours. They want to see more clean energy in the city of Chicago and they are concerned about vulnerable population in particular in terms of pricing, and those are all – those are both strong strategic elements of our focus going forward at all our utilities. But that's the status right now.

(*Id.*). The Complaint does not detail how these statements are misleading and Plaintiff does not discuss these statements in his Response. To the extent that Plaintiff wishes to hold Pramaggiore

liable for these statements, they are dismissed for failure to comply with the pleading requirements of the PSLRA.

## II. Whether Defendants Were Under a Duty to Disclose

Defendants collectively argue they were not under a general duty to disclose. *See Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995) ("Mere silence about even material information is not fraudulent absent a duty to speak."). First, as to whether Defendants had a duty to disclose the bribery scheme, for Plaintiff to state a § 10(b) claim, the Complaint must adequately plead that Defendants made a statement that—absent disclosure of the bribery scheme—was "'misleading as to a material fact.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238(1988)) (emphasis omitted). That is because Defendants "did not have a freestanding legal duty to disclose the bribery scandal, no matter how unseemly the scandal was and no matter how significant the scandal would have been to the market." *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 752, 759-61 (S.D.N.Y. 2017). Federal securities law "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc.*, 563 U.S. at 44. Accordingly, "[d]isclosure of... information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Lopez v. Ctpartners Exec. Search Inc.*, 173 F.Supp.3d 12, 23 (S.D.N.Y. 2016) (quoting *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)). An omission is therefore actionable only when disclosure of the information in question is "necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)) (ellipses in original).

Plaintiff argues as an initial matter that Items 105 and 303 of SEC Regulation S-K impose a duty to disclose any regulatory noncompliance. Item 303, which sets forth disclosure

requirements for Forms 8-K and 10-Q, requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Item 105 requires disclosure of "the most significant factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105.

As Plaintiff points out, although the Seventh Circuit has yet to rule on the issue, a line of recent cases held that Items 105 and 303 of SEC Regulation S-K impose a duty to disclose any regulatory noncompliance in its SEC forms. *See Twin Master Fund, Ltd. v. Akorn, Inc*., No. 19 C 3648, Case No. 19 C 4651, 2020 WL 564222, at *6–7 (N.D. Ill. Feb. 5, 2020) (acknowledging that the Seventh Circuit has not yet ruled on the issue, analyzing the circuit split, and ultimately upholding § 10(b) claim where "silence regarding [the company's] regulatory noncompliance in its Forms 8-K and 10-Q violated Item 303's duty to disclose" because "noncompliance with FDA data integrity standards was a 'known trend'" that could "have 'reasonably' been expected to materially impact [the company's] revenues by compromising the approval of their [regulatory] applications or subjecting them to FDA fines or other sanctions"); *Holwill v. AbbVie Inc*., No. 1:18-cv-06790, 2020 WL 5235005, at *3 (N.D. Ill. Sept. 1, 2020) (upholding § 10(b) claim based on Item 105 and Item 303 violations with regard to concealed kickback scheme).

Here, Plaintiff specifically alleged how Defendants plausibly had a duty to disclose under Items 105 and 305:

> In violation of Item 105, the 2018 Form 10-K signed by Crane, Pramaggiore, and Dominguez, and the 1Q19 Form 10-Q and 2Q19 Form 10-Q signed by Crane and Dominguez, failed to discuss the following significant factors that made investment in Exelon risky: that Exelon and ComEd faced substantial risk of criminal penalties, and substantial risk that proposed and future favorable legislation would be compromised, due to the Company's changed strategy from legal lobbying to an eight-year illegal and undisclosed bribery scheme, in which

ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation

(Dkt. 65 ¶ 130). Plaintiff further alleges that:

In violation of Item 303, the 2018 Form 10-K signed by Crane, Pramaggiore, and Dominguez, and the 1Q19 Form 10-Q and 2Q19 Form 10-Q signed by Crane and Dominguez, failed to disclose material trends, events, and uncertainties known to management that were reasonably expected to have a material adverse effect on the Company's resources and results of operations, namely that: the Company faced substantial risk of criminal penalties due to the Company's changed strategy from legal lobbying to an eight-year illegal and undisclosed bribery scheme, in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation.

(*Id.* ¶ 128). Plaintiff sufficiently alleged that Defendants had a duty to disclose their alleged bribery scheme under Items 105 and 303 and that they failed to do so.

Defendants also argue Plaintiff's allegations regarding risk factors, lobbying activities, the passage of the FEJA legislation, statements about government investigations, statements about political contributions, and statements about the Code of Conduct did not impose a duty to disclose the alleged bribery scheme. While Defendants characterize their arguments about these topics as pertaining to a duty to disclose, the crux of their arguments is that the relevant statements were not misleading or inaccurate. But again, at the motion to dismiss stage, the relevant question for deciding whether a statement is misleading is "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission. *Tellabs I*, 437 F.3d at 595 (citations omitted). Plaintiff thoroughly laid out why these statements were misleading due to the omission of the bribery scheme throughout the Complaint. "If one speaks, he must speak the whole truth," and here, Defendants made statements that were misleading in light of the alleged bribery scheme. *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). Defendants' arguments that Plaintiff "argues that because ComEd later admitted certain activity in the DPA, all Defendants were required, months or years earlier, to accuse themselves of

wrongdoing that had not yet been determined to be wrongdoing" is equally misguided. (Dkt. 74 at 8). Plaintiff is not arguing Defendants were required to accuse themselves of wrongdoing; Plaintiff pleads throughout the Complaint that Defendants were making misleading statements and engaging in fraudulent behavior because they were aware of the bribery scheme but representing otherwise. The statements, in other words, were incorrect when they were made. *See e.g. Carpenters Pension Tr. Fund for N. Cal. v. Allstate Corp.*, No. 16 C 10510, 2018 WL 1071442, at *6 (N.D. Ill. Feb. 27, 2018) (rejecting "'fraud by hindsight'" argument).

Defendants also claim the Code of Conduct and Guidelines cannot provide the basis of a misrepresentation claim because they were general claims that did not make representations about the actual state of Exelon's and ComEd's internal operations. Certain business's ethics codes have been held to be nonactionable when they are inherently aspirational or do not imply compliance. *See Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 932 (N.D. Ill. 2011) (business's ethics code requiring Executive Vice President to "diligently look for indications that unethical or illegal conduct has occurred and report it" is inherently aspirational and does not constitute evidence supporting a finding that an individual subject to the code had specific control over transactions at issue); *Desai v. General Growth Properties*, 654 F. Supp. 2d 836, 857–59 (N.D. Ill. 2009) (business's ethics code that prohibited officers and directors from making loans to other officers and directors to avoid potential conflicts of interest, violations of which could result in discipline, did not imply that all directors and officers were in compliance with the code).

However, the Company's Code of Business Conduct contained unqualified statements regarding the Company's conduct. For example, the Code of Conduct claimed:

- "We never request, offer or accept any form of payment or incentive intended to improperly influence a decision." (Dkt. 65 ¶ 97(a)).

- "What's Expected . . . Never use a third party to make payments or offers that could be improper."  (*Id.* ¶ 97(c)).

Exelon's Contributions Guidelines, published on its website during the class period stated that, "[P]olitical contributions during the reporting period were all made in accordance with its Corporate Political Contributions Guidelines" and no contributions were to be made "under any condition requiring confidentiality" or "in return for any Official Act."  (*Id.* ¶¶ 98(a), 99(a)).

Such statements take the Code of Conduct and Corporate Guidelines out of the realm of nonactionable aspirational statements and into the realm of statements regarding the Company's conduct and implies compliance.  *See AbbVie Inc.*, 2020 WL 5235005, at *4 (discussing how defendants' corporate code of conduct which used terms like "we never offer or provide anything of value to healthcare professionals or other individuals to inappropriately influence their medical judgment or purchasing or prescribing practices in favor of an *AbbVie* product" was actionable). The Court denies dismissal for failure to allege a duty to disclose or for failure to describe how the statements were misleading.

## III.    Whether the Complaint Adequately Alleges Scienter

Defendants' last argument is that Plaintiff has failed to adequately allege scienter.  The scienter element refers to the defendant's required state of mind.  *Cornielsen*, 916 F.3d at 601. For Plaintiff's § 10(b) claim, "that state of mind is 'an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'" *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)).  "Recklessness" in this context is defined as "an extreme departure from the standards of ordinary care...to the extent that the danger was either known to the defendant or so obvious that the defendant must have been

aware of it." *City of Livonia Emps.' Ret. Sys. & Local 295/Local 851 v. Boeing C*o., 711 F.3d 754, 756 (7th Cir. 2013) (citations omitted). This definition only requires knowledge of the danger or risk because the latter part of the definition ("danger...so obvious that the defendant must have been aware of it") infers knowledge from the gravity of the risk. *Makor Issues & Rights, Ltd. v. Tellabs Inc.* ("*Tellabs III*"), 513 F.3d 702, 704 (7th Cir. 2008). Yet "[a]lleging that a defendant should have known about fraud is not enough to show that the defendant was reckless." *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020) (emphasis added).

Additionally, the PSLRA requires a plaintiff to "satisfy a heightened standard of plausibility" in pleading scienter. *Kohl's Corp.*, 895 F.3d at 936. A plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "each act or omission alleged to violate this chapter." 15 U.S.C. § 78u-4(b)(2)(A). To meet this "strong inference" standard, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. In determining whether a complaint has met this standard, the Court must account for "plausible, nonculpable explanations for the defendant's conduct" and weigh them against the strength of the inferences in favor of scienter. *Id.* at 323–24; *Pugh*, 521 F.3d at 693.

Defendants first argue Plaintiff has conflated Defendants. This Circuit does not allow group-pleading and, therefore, scienter must be pleaded with regard to "each fact or omission" sufficient to give "rise to a strong inference that the defendant acted with the required state of mind." *Cornielsen*, 916 F.3d at 600 (citations omitted); *see also Tellabs I*, 437 F.3d at 603 (disallowing group pleading in federal securities fraud cases). Defendants fail to provide a single

example of group-pleading from the Complaint and the Court cannot find any. As discussed above, Plaintiff clearly attributed specific statements and actions to individual Defendants and entities.

Defendants further argue Plaintiff's allegations as to scienter fail because they are conclusory and fail to establish motive. Plaintiff pled sufficiently as to scienter and his Complaint is replete with specific allegations that give rise to an inference that each Defendant acted with the required state of mind. Plaintiffs pled motive, including that the bribery scheme was worth millions of dollars to the Company and each individual Defendant stood to gain from the scheme. (Dkt. 65 ¶¶ 8, 184(a), 194–98). Other courts have found scienter met where there was a financial motive. *See e.g. AbbVie*, 2020 WL 5235005, at *5 (finding scienter requirement met where the Defendants had a motive to maximize sales and individual defendants' executive to "compensation [being] tied directly to" sales in kickback scheme); *Tellabs II*, 551 U.S. at 326 (stating that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference…"). Additionally, Plaintiff pleads that the individual Defendants oversaw the lobbying activities, participated in fundraisers, had access to internal corporate documents and conversations with officers and employees, reviewed reports on the topics on which they spoke, and made public statements as well as by signing public filings. (Dkt. 65 ¶¶ 176–87, 200–07). "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Tellabs I*, 437 F.3d at 603; *see also Desai*, 654 F. Supp. 2d at 860 ("While a Court cannot 'presume' scienter, a strong inference of scienter may still be credited where 'it is almost inconceivable' that an individual defendant would be unaware of the matters at issue."). Plaintiff has pled that here. Additionally, Plaintiff pleads that Exelon spent

more on lobbying than its peers, Defendants repeatedly acknowledged that legislative successes were essential to business success, the Company acknowledged a historically poor relationship with Public Official A that dramatically improved during the bribery scheme, the financial benefits procured during the bribery scheme were worth hundreds of millions of dollars, that the bribery scheme lasted 8 years, and ComEd was the largest of Exelon's utility companies. (Dkt. 65 ¶¶ 8, 35, 184(a), 194–96, 201–06; 213–20). Other courts have found scienter was met because it is "reasonable to assume top management [was] aware of matters central to that business's operation." *In re CenturyLink Sales Practices & Sec. Litig.*, 403 F. Supp. 3d 712, 731 (D. Minn. 2019)(internal citation omitted); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987–88 (9th Cir. 2008) (finding scienter met when the concealed facts would have a "devastating effect on the corporation's revenue" and "it would be absurd to suggest that top management was unaware of them" and discussing similar cases). Not to mention, Plaintiff has pled specific instances giving rise to an inference of scienter for each of the individual Defendants. (*See* Dkt. 85 at 34–38 for in-depth discussion of allegations of each Defendant).

Plaintiff pled a number of circumstances that give rise to an inference of scienter. Defendants have attempted to isolate the pleadings but "courts must consider the complaint in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs II*, 551 U.S. at 322–23 (emphasis in original). Plaintiff's numerous reasons for scienter presents a cogent and compelling inference of fraudulent intent. The Court denies dismissal for failure to plead scienter.

IV.     **Section 20(a) Claim**

Defendants arguments to dismiss Plaintiff's § 20(a) claim are predicated on the failure of Plaintiff's § 10(b) claim. Section 20(a) states that "[e]very person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person[.]" *Pugh*, 521 F.3d at 693 (citing 15 U.S.C. § 78t(a)). Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws, namely a violation of § 10(b) and Rule 10b–5. *Id.* Since Plaintiff's § 10(b) is proceeding, so too may his § 20(a) claim. *See id.*; *Kohl's Corp.*, 895 F.3d at 936. Defendant Pramaggiore additionally argues that she is not a "controlling person" within the meaning of § 20(a); however, "determination of whether an individual defendant is a 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1029 (N.D. Ill. 2004) (citing *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F.Supp.2d 722, 727 (N.D. Ill. 2003)).

V.     **Motion to Strike**

Plaintiff moves to strike certain of Defendants' arguments contained in their Reply briefs. (Dkt. 92). The Court denies Plaintiff's Motion to Strike as Defendants' Reply briefing did not contain any new, improperly raised arguments. Although, as Plaintiff points out, it is "'well-settled that arguments first made in the reply brief are waived," *Tovar Snow Pros. Inc. v. ACE Am. Ins. Co.*, 20 C 1060, 2020 WL 5658705, at *1–2 (N.D. Ill. Sept. 23, 2020), the arguments that Plaintiff wishes to strike are related to arguments raised in the opening Motions to Dismiss. Defendants had every right to respond to Plaintiff's case law raised in his Response by citing additional law that bolstered their initial arguments.

23

## CONCLUSION

Plaintiff has met the heightened pleading standard for federal securities fraud claims and has adequately alleged a violation of § 10(b) of the Exchange Act and SEC Rule 10b-5, as well as § 20(a) of the Exchange Act.  Therefore, the Motions to Dismiss are largely denied.   (Dkts. 73, 75).  However, Plaintiff's allegations regarding Pramaggiore's statements during the August 2019 conference call do not satisfy the requirements of the PSLRA and therefore these claims are dismissed.   Motion to Strike (Dkt. 92) is denied because Defendants' Reply briefing was appropriate.



Virginia M. Kendall
United States District Judge

Date: April 21, 2021