**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| JOSHUA FLYNN, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>EXELON CORPORATION et al.,<br><br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.: 1:19-cv-08209

Honorable Virginia M. Kendall

**EXELON AND COMED DEFENDANTS' ANSWER AND**
**DEFENSES TO THE COMPLAINT**

Defendants Exelon Corporation ("Exelon"), Commonwealth Edison Company ("ComEd"), Christopher M. Crane, William A. Von Hoene, Jr., and Joseph Dominguez (collectively, the "Exelon and ComEd Defendants"), by and through their undersigned counsel, hereby file the Exelon and ComEd Defendants' Answer and Defenses to Lead Plaintiff's Complaint for Violations of the Federal Securities Laws, dated September 1, 2020 (Dkt. No. 65) (the "Complaint"), filed by Lead Plaintiff Local 295 IBT Employer Group Pension Trust Fund ("Plaintiff") in the above-captioned action (the "Action").

This Answer is based on the Exelon and ComEd Defendants' investigation to date, and they reserve the right to amend this Answer as their investigation continues and during the course of litigation. This Answer restates the allegations in the Complaint (including its footnotes) solely for the convenience of the Court and the parties. Unless specifically stated otherwise, the Exelon and ComEd Defendants' answer to any footnote from a paragraph within the Complaint is included within the answer to the paragraph that contained the footnote. Any allegation not expressly admitted is denied. Further, the headings and prefatory material in the

Complaint are not substantive allegations to which an answer is required; to the extent that these items are intended as substantive allegations, the Exelon and ComEd Defendants deny them.

## ANSWER

For their Answer, the Exelon and ComEd Defendants state as follows:

### INTRODUCTION

1.      This securities class action is brought on behalf of all purchasers of Exelon common stock between February 8, 2019 and October 31, 2019, inclusive (the "Class Period"). The claims are alleged against two entities and four individual defendants: (1) Exelon; (2) ComEd; (3) Exelon's Chief Executive Officer ("CEO"), Christopher M. Crane ("Crane"); (4) Exelon's Chief Strategy Officer ("CSO"), William A. Von Hoene, Jr. ("Von Hoene"); (5) Exelon's former CEO of Exelon Utilities, Anne R. Pramaggiore ("Pramaggiore"); and (6) ComEd's CEO, Joseph Dominguez ("Dominguez") (collectively, "Defendants"). The claims assert violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

**ANSWER:** Paragraph 1 contains a description of this litigation and Plaintiff's claims to which no response is required. To the extent a response is required, the Exelon and ComEd Defendants deny Paragraph 1, except admit that Plaintiff asserts a claim under Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder against Exelon and ComEd, and claims under Section 10(b), Rule 10b-5, and Section 20(a) against Mr. Crane, Mr. Von Hoene, Ms. Anne R. Pramaggiore, and Mr. Dominguez.

2.      This case arises because the Company engaged in an eight-year bribery scheme in order to influence Illinois lawmakers to enact legislation favorable to Exelon, resulting in hundreds of millions of dollars in additional revenue to Exelon. As the Company has now admitted through the DPA entered in the *ComEd Criminal Action*, the bribery scheme was executed by "senior executives" and included making more than $1.3 million in indirect payments to designees of the Speaker of the Illinois House of Representatives, referred to in the DPA and herein as "Public Official A." During the Class Period, Defendants made false and misleading statements that concealed the bribery scheme and instead touted the Company's commitment to ethical conduct and legitimate lobbying activities, claimed the Company had never paid bribes, and emphasized the additional revenues and benefits obtained as a result of the passage of the favorable legislation. The false and misleading statements caused Exelon's common stock to trade at artificially inflated prices. When the bribery scheme was uncovered and the truth was revealed, the artificial inflation was removed from the stock, Exelon's stock price declined dramatically, and investors suffered billions of dollars in market losses.

**ANSWER:** Deny Paragraph 2, except admit that ComEd entered into a Deferred Prosecution Agreement with the U.S. Attorney's Office for the Northern District of Illinois, filed on July 17, 2020 (the "DPA"), and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

3. Exelon is one of the largest electric companies in the United States. It is a holding company that operates through two groups of subsidiaries: (i) "Exelon Generation" operates electric power plants around the country, and (ii) "Exelon Utilities" is a collection of six regulated utility companies that deliver electricity to homes and businesses in particular regions. Exelon Generation operates six nuclear power plants in Illinois. ComEd, a controlled subsidiary of Exelon, is the largest of the utility companies within Exelon Utilities and is responsible for delivering electricity to customers in northern Illinois.

**ANSWER:** Deny Paragraph 3, except admit that Exelon is a leading competitive energy provider; that Exelon Utilities is comprised of six utilities that serve customers across Delaware, Illinois, Maryland, New Jersey, Pennsylvania, and the District of Columbia; that Exelon Generation operates six nuclear power plants in Illinois; and that ComEd is a subsidiary of Exelon Corporation and provides electric service to customers across northern Illinois.

4. With more than 4 million customers, ComEd is Exelon's largest and most important utility company. For example, in 2018, ComEd reported $664 million in net income, representing more than 30% of Exelon's total reported net income for that year. Exelon is a publicly-traded company and filer with the SEC and, although ComEd is owned by Exelon and does not have publicly-traded stock, it does issue debt securities to the public, so it is also an SEC filer.

**ANSWER:** Deny Paragraph 4, except admit that ComEd provides electric delivery service to more than 4 million customers, that in 2018 ComEd reported $664 million in net income which comprises approximately 33% of Exelon's net income for 2018, that Exelon is a publicly traded company, and that Exelon and ComEd submit filings with the SEC.

5. Exelon and ComEd operate in a highly-regulated industry that is dependent upon the continual passage of favorable legislation. For example, in their SEC filings, Exelon and ComEd have emphasized that "[s]ubstantially all aspects of [their] businesses" are subject to comprehensive government regulation and legislation. The Company has acknowledged that the businesses are "profoundly affected by decisions of elected and appointed officials." As such, the Company has repeatedly disclosed in political contributions reports that "[i]ssues vital to

Exelon's ability to recognize value for its stakeholders" are decided in "state legislatures and local forums across the country." Most significant to this case, the legislative branch of Illinois, known as the Illinois General Assembly, considers and passes legislation that directly impacts ComEd's and Exelon Generation's profitability (and therefore Exelon's overall profitability). Illinois legislation impacts profitability, for example, because it impacts the rates ComEd can charge its customers and determines whether Exelon Generation's six Illinois nuclear power plants can receive valuable subsidies authorized by the government.

**ANSWER:** Deny Paragraph 5, except admit that Exelon and ComEd operate in a regulated industry, that Exelon and ComEd have filed documents with the SEC, that Exelon has released Political Contributions Reports, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 5, and respectfully refer the Court to Exelon's and ComEd's public filings, Exelon's Political Contributions Reports, and the DPA for a complete and accurate statement of their contents.

6. Given the significance of Illinois legislation to the Company's profitability, Exelon and ComEd had been engaged in considerable lobbying efforts, such as hiring outside lobbyists in Illinois and employing internal lobbyists dedicated to Illinois legislation. However, for years leading up to 2011, the Company had a poor relationship with Public Official A and its lobbying efforts were failing. For example, Public Official A reportedly rejected a proposed rate hike for ComEd in 2003 and, in 2006, wrote a letter requesting that the Governor call a special session to consider legislation that would freeze ComEd rates for several years. In the letter, Public Official A claimed that rate increases would "turn already record earnings and profits" for ComEd "into exorbitant gains for their executives and shareholders – at the expense of working families, senior citizens and those on fixed incomes."

**ANSWER:** Deny Paragraph 6, except admit that Exelon and ComEd engage in lobbying, that Michael J. Madigan wrote a public letter to then-Governor Rod Blagojevich on or about October 2, 2006, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 6, and respectfully refer the Court to the DPA and the letter for a complete and accurate statement of their contents.

7. Then, in 2011, the Company changed strategy, and began to bribe Public Official A. As admitted in the DPA "[f]rom in or around 2011 through in or around 2019, in an effort to influence and reward Public Official A's efforts . . . to assist ComEd with respect to legislation concerning ComEd and its business," ComEd funneled payments through intermediaries to "political allies and individuals who performed political work for Public Official A." ComEd disguised these payments as being for "jobs [or] vendor subcontracts," but the "political allies

4

and workers performed little or no work that they were purportedly hired to perform." In total, the Company admitted that from 2011 into 2019, the "indirect payments made to Public Official A's associates – who performed little or no work for ComEd – totaled approximately $1,324,500." In addition, at Public Official A's request, ComEd appointed an associate of Public Official A to the ComEd Board of Directors, and ComEd also retained a law firm favored by Public Official A and set up an internship program that hired interns from Public Official A's ward, all "with the intent to influence and reward Public Official A in connection with [his] official duties."

**ANSWER:** Deny Paragraph 7, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

8. In exchange for the bribes, the DPA notes that the Company received the passage of favorable legislation, providing ComEd with "***greater than*** $150,000,000." In addition to the $150 million or more that was obtained as a result of ComEd rate increases from the favorable legislation that Exelon was able to get passed, that legislation also provided for Exelon Generation to receive up to another $2.35 billion over ten years in government-authorized subsidies to benefit its financially troubled nuclear power plants.

**ANSWER:** Deny Paragraph 8, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

9. The financial benefits of Exelon's shift in strategy from legitimate lobbying to the illegal bribery scheme that was concealed from investors were immediate and dramatic. For example, Defendant Von Hoene stated in 2014, "We were in bad stead with the speaker [Public Official A] for a long time. ***We've managed to crawl out of that hole***." Media also noted the reversal and referred to Exelon's "high-octane lobbying operation that made it the most influential company in Springfield, [Illinois]" and referred to the outside lobbyists retained by Exelon and ComEd as a "powerhouse list of influencers at the state Capitol." More specifically, the Company obtained passage of several laws that provided substantial economic benefits after beginning the bribery scheme in 2011.

**ANSWER:** Deny Paragraph 9, except admit that the *Chicago Tribune* published an article on or about August 15, 2014, that *Crain's Chicago Business* ("*Crain's*") published an article on or about October 24, 2019, that *WBEZ Chicago* published an article on or about November 14, 2019, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 9, and respectfully refer the Court to the articles and the DPA for a complete and accurate statement of their contents.

10. First, in 2011, ComEd won approval of the Energy Infrastructure Modernization Act ("EIMA"), which provided for beneficial rate increases. That victory flipped Illinois from what financial analysts described as "one of the most difficult regulatory environments in the country" to "one of the better ones in the U.S." More specifically, EIMA replaced a contentious and unpredictable process ComEd had engaged in with the Illinois Commerce Commission ("ICC") when requesting rate adjustments with a "formula rate" system that essentially put rate-setting on cruise control, providing for predictable and repeated profits. In addition, EIMA authorized ComEd to spend $2.6 billion on infrastructure improvements to ComEd's "grid" – the system of power lines and other components that delivers electricity to consumers. This was significant because ComEd's authorized rates are based, in part, on providing a return on its assets, so the larger its asset base, the more it could profit. The bribery scheme was so successful that even though consumer advocates and the ICC opposed EIMA, the Illinois General Assembly voted not just to enact the law, but also to override Governor Patrick Quinn's veto. In 2015, the Illinois General Assembly extended EIMA's formula rates through 2019. Defendant Pramaggiore would later describe EIMA as a "game-changer for ComEd."

**ANSWER:** Deny Paragraph 10, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about unspecified financial analysts, and admit that the Energy Infrastructure Modernization Act ("EIMA") was passed in 2011 over then-Governor Pat Quinn's veto and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 10, and respectfully refer the Court to the DPA and EIMA for a complete and accurate statement of their contents.

11. Second, on December 1, 2016, the Illinois General Assembly voted to pass the Future Energy Jobs Act ("FEJA"), which provided for subsidies as well as further rate increases. More specifically, FEJA provided Exelon with up to $2.35 billion in subsidies over ten years to "bailout" two failing Illinois nuclear plants. These payments would come in the form of up to $235 million in annual zero-emission credits ("ZECs") paid to Exelon Generation for generating zero-emission power from nuclear plants, the cost of which are passed through to ComEd's customers. FEJA also authorized ComEd to again increase its rate base, which further increased its profits, and extended the EIMA formula rates to 2022. Media and politicians commented on Exelon's powerful legislative influence, as FEJA was passed on the final day of the Illinois General Assembly's fall legislative session even though the Illinois General Assembly had not yet voted on a budget for 2017. At that time, one Illinois representative – presumably unaware of the bribery scheme that enabled Exelon to flex such power – questioned why the legislature was even discussing "a multibillion-dollar corporate bailout for one of the most profitable energy companies in the state" at such a time. In addition, financial analysts have emphasized the positive financial impact from EIMA and FEJA and stated they were "impressed with the lobbying success [Exelon] has had."

6

**ANSWER:** Deny Paragraph 11, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about unspecified legislators and financial analysts, and admit that the Future Energy Jobs Act ("FEJA") was passed in 2016 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 11, and respectfully refer the Court to the DPA and FEJA for a complete and accurate statement of their contents.

12.     The financial benefits from the bribery scheme, as reflected in the passage of EIMA and FEJA, have been exceptional for Exelon and ComEd. In addition to the massive subsidies under FEJA to Exelon Generation, under EIMA's formula rates, ComEd's electricity delivery rates have increased more than 30% from 2013 to 2019 and its net income has increased 176%, from $249 million in 2013 to $688 million in 2019. Exelon's financial performance, enhanced by its legislative successes, made it a highly-attractive investment. However, unbeknownst to investors, Exelon's legislative successes, and the financial benefits it derived therefrom, were illusory and exposed the Company to massive financial risks because they were obtained through the illegal bribery scheme. Investors were unaware of this reality because, throughout the Class Period, Defendants made false and misleading statements that concealed the bribery scheme and attributed the legislative victories to legitimate lobbying activities. For example, Defendants claimed they were engaging in legitimate and legal lobbying efforts, such as "*working with the coalitions as hard as we can to have something . . . that the legislature supports*" and presenting such support when they "*met with the leadership of both the House and Senate, talking about what we need to do and them showing their support*." Defendants concealed their bribery scheme and reinforced their purported legitimate lobbying activities by claiming they were "*committed to conducting [their] business with government agencies and officials with the highest ethical standards*" and they "*never . . . offer . . . any form of payment or incentive intended to improperly influence a decision*."

**ANSWER:** Deny Paragraph 12, except deny knowledge or information sufficient to form a belief as to the truth of certain unattributed quotations, and admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 12, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

13.     However, the bribery scheme was eventually uncovered, and the Company agreed to pay a $200 million criminal penalty as part of entering into the DPA and admitting the bribery scheme took place from 2011 into 2019. In addition to the $200 million payment, proposed new favorable legislation, which was initially expected to pass in the spring or fall of 2019, has not advanced after the disclosure of the bribery scheme.

**ANSWER:** Deny Paragraph 13, except admit that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

14.     As a result of Defendants' false and misleading statements, Exelon's stock price traded at artificially inflated prices, reaching as high as $50 per share during the Class Period. As the truth was revealed, Exelon's stock price dropped, causing significant investor losses. For example, after market close on July 18, 2019, the *Chicago Tribune* published a report disclosing that the FBI had "raided" the home of one of the Company's most important outside lobbyists, Michael McClain ("McClain"), who was a longtime friend of Public Official A. On this news, Exelon's stock price declined, erasing more than $1 billion in market capitalization. Seven days later, on July 24, 2019, the *Chicago Tribune* reported that it obtained records showing that outside ComEd lobbyists, including McClain, had sent a total of $10,000 worth of checks to a former aide to Public Official A. On this news, Exelon common stock declined again to trade at approximately $45.48 per share, eliminating another $850 million in market capitalization. However, Exelon's stock remained artificially inflated, as Defendants continued to make false and misleading statements that mitigated the negative impact of the disclosures of investigations into politicians and outside ComEd lobbyists and concealed the bribery scheme by omitting to disclose the underlying conduct and the Company's and its senior executives role in the bribery scheme.

**ANSWER:**   Deny Paragraph 14, except admit that the *Chicago Tribune* published reports and/or articles on or about July 18, 2019 and July 24, 2019, and respectfully refer the Court to the reports and/or articles for a complete and accurate statement of their contents.

15.     As further example, just days after Exelon and ComEd disclosed the receipt of a (second) grand jury subpoena from the U.S. Attorney's Office for the Northern District of Illinois, on October 15, 2019, Exelon and ComEd revealed that Defendant Pramaggiore was leaving the Company, "effective immediately." The next morning, the *Chicago Tribune* reported that "[a] source with knowledge of the investigation told the Tribune that Pramaggiore is one focus of the ongoing federal probe." Financial analysts reported on October 16, 2019, that:

> The sudden departure of Pramaggiore after EXC [Exelon] disclosed receiving a second subpoena from the U.S. Attorney's office six days ago cannot be interpreted in any other way [than] being directly related to each other, meaning the risk that ComEd/EXC are not just being asked to supply information to the investigation but could also be under scrutiny for criminal behavior is now heightened.

Following this news, Exelon's stock price fell approximately $2 per share, eliminating nearly $3 billion in market capitalization.

**ANSWER:**   Deny Paragraph 15, except admit that on October 4, 2019 Exelon and ComEd received a grand jury subpoena from the U.S. Attorney's Office for the Northern District of Illinois, that on October 15, 2019 Ms. Pramaggiore announced her decision to retire from her positions and the board of ComEd, and that the *Chicago Tribune* published an article on or about

8

October 16, 2019, and respectfully refer the Court to the article and Exelon's and ComEd's public filings for a complete and accurate statement of their contents.

16.     Finally, on <u>October 31, 2019</u>, Exelon and ComEd disclosed that, in addition to the investigation by the U.S. Attorney's office, "the SEC notified Exelon and ComEd that it has also opened an investigation into their lobbying activities." Exelon's stock declined more than $1 per share, eliminating another $1 billion in market capitalization.

**ANSWER:** Deny Paragraph 16, except admit that Exelon and ComEd filed a Form 10-Q, dated October 31, 2019, and respectfully refer the Court to the Form 10-Q for a complete and accurate statement of its contents.

17.     The Company ultimately resolved the investigation by admitting the bribery scheme and agreeing to pay a $200 million criminal penalty under the DPA with the U.S. Attorney's Office for the Northern District of Illinois.

**ANSWER:** Deny Paragraph 17, except admit that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

**JURISDICTION AND VENUE**

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

**ANSWER:** Paragraph 18 contains a characterization of Plaintiff's claims in this Action, to which no response is required.  To the extent a response is required, the Exelon and ComEd Defendants deny Paragraph 18.

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act, 15 U.S.C. §78aa.

**ANSWER:** Paragraph 19 purports to state a legal conclusion, to which no response is required.  To the extent a response is required, the Exelon and ComEd Defendants admit that this Court has jurisdiction over this Action, but otherwise deny Paragraph 19.

20.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b)-(c), and §27 of the Exchange Act, 15 U.S.C. §78aa. Exelon is headquartered in this district, Defendants conduct

business in this district, and a significant portion of Defendants' activities took place in this district.

**ANSWER:** Paragraph 20 purports to state a legal conclusion, to which no response is required. To the extent a response is required, the Exelon and ComEd Defendants admit that venue is proper in this Court in this Action, that Exelon is headquartered in Illinois, and that ComEd provides services in Illinois, but otherwise deny Paragraph 20.

21. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**ANSWER:** Paragraph 21 purports to state a legal conclusion, to which no response is required. To the extent a response is required, the Exelon and ComEd Defendants deny Paragraph 21.

## PARTIES

22. Plaintiff Local 295 IBT Employer Group Pension Trust Fund purchased shares of Exelon common stock during the Class Period and was damaged thereby. *See* ECF No. 27-2.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22, except deny that Plaintiff Local 295 IBT Employer Group Pension Trust Fund was damaged by any purchase of shares of Exelon common stock.

23. Defendant Exelon is a Pennsylvania corporation with its principal executive offices in Chicago, Illinois. Exelon's common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol "EXC." Prior to September 25, 2019, Exelon common stock traded on the New York Stock Exchange ("NYSE") under the same ticker symbol.

**ANSWER:** Admit Paragraph 23.

24. Defendant ComEd is an Illinois corporation with its principal executive offices in Chicago, Illinois. As set forth in ComEd's SEC filings, ComEd is "a controlled subsidiary of Exelon," with Exelon owning more than 99.9% of ComEd's outstanding stock. As such, Exelon and its Board of Directors fulfill several management and oversight functions for ComEd.

10

**ANSWER:** Deny Paragraph 24, except admit that ComEd is an Illinois corporation with its principal executive offices in Chicago, Illinois and that ComEd is a subsidiary of Exelon.

25. Defendant Pramaggiore served as CEO of Exelon Utilities, and Senior Executive Vice President of Exelon starting in 2018. Pramaggiore also served as Vice Chairman of the Board of ComEd starting in 2012. On October 15, 2019, Pramaggiore abruptly retired from all positions. Previously, Pramaggiore served as CEO of ComEd from 2012 to 2018 and as President of ComEd from 2009 to 2018.

**ANSWER:** Deny Paragraph 25, except admit that Ms. Pramaggiore served as CEO of Exelon Utilities and Senior Executive Vice President of Exelon starting in 2018, that Ms. Pramaggiore also served as Vice Chairman of the Board of ComEd starting in 2012, that on or about October 15, 2019 Ms. Pramaggiore announced her decision to retire from her positions and the board of ComEd, and that Ms. Pramaggiore served as CEO of ComEd from 2012 to 2018 and as President of ComEd from 2009 to 2018.

26. Defendant Crane has served as CEO and a Director of Exelon, and Chairman of the Board of ComEd, since 2012. He has also served as President of Exelon since 2008.

**ANSWER:** Admit Paragraph 26.

27. Defendant Von Hoene has served as Senior Executive Vice President and CSO of Exelon since 2012. Von Hoene has served as an Executive Vice President of Exelon since 2008.

**ANSWER:** Admit that Mr. Von Hoene served as Senior Executive Vice President and CSO of Exelon between 2012 and 2021 and as an Executive Vice President between 2008 and 2021.

28. Defendant Dominguez has served as CEO and a Director of ComEd since 2018. Previously, Dominguez served as Exelon's Senior or Executive Vice President of Governmental and Regulatory Affairs and Public Policy from 2012 to 2018.

**ANSWER:** Admit Paragraph 28.

29. Defendants Crane, Von Hoene, Pramaggiore, and Dominguez are collectively referred to herein as the "Individual Defendants."

11

**ANSWER:** Paragraph 29 consists of defined terms that will be used later in the Complaint, to which no response is required.

## FACTUAL BACKGROUND

**The Electricity Distribution Industry**

30. By way of background, electricity is created by generators powered most commonly by nuclear reactions, the burning of coal, or natural gas. These generators are the central components of power plants located throughout the country.

**ANSWER:** Deny Paragraph 30, except admit that electricity can be created by generators powered by nuclear reactions, the burning of coal, or natural gas and that generators are components of power plants.

31. The electricity is delivered to consumers over a system called the "grid," consisting of power lines, transformers, and other facilities. Because the startup costs of building out and developing grids is very expensive, and it was not feasible to have multiple companies attempting to build out duplicative grids for the same areas, utility companies were authorized by state governments to operate as monopolies for the areas they served. To prevent these companies from misusing their monopoly status, state governments passed laws that created "public utility commissions" or "PUCs," which regulated the electricity prices charged by utility companies.

**ANSWER:** Deny Paragraph 31, except admit that electricity is delivered to consumers over a system that can be referred to as the "grid" and that certain state governments created regulators often referred to as "public utility commissions" to regulate electric and other utilities.

32. Over time, local utilities have connected their grids in order to distribute electricity over longer distances from larger, more centralized power plants. This means that although electricity continues to be delivered to consumers by local electric utility companies operating their own portions of the grid, the electricity may be generated at a large centralized power plant located in another city or state and owned by a different company.

**ANSWER:** Deny Paragraph 32, except admit that local utilities have connected their grids and that electricity delivered to consumers may be generated at power plants located in another city or state and owned by a different company.

33. To ensure that electricity is being reliably transferred when needed, many regions have established regional transmission organizations ("RTOs") that manage and operate the

interconnected grid of various utility companies. In addition to managing the grid's operations, RTOs are responsible for creating competitive wholesale electricity markets that manage supply and demand. RTOs buy electricity from the electric generation companies through auctions conducted throughout each day and resell the electricity to the member utility companies. In addition to these "energy market" auctions, many RTOs conduct annual "capacity market" auctions, in which generators provide bid prices to stand ready to supply additional power when needed. Utility companies typically purchase "capacity" to avoid electricity shortages in times of peak demand.

**ANSWER:** Deny Paragraph 33, except admit that regional transmission organizations ("RTOs") exist in some regions and participate in the purchase and sale of electricity.

**Exelon and ComEd's Profits and "Rate Base"**

34.     Headquartered in Illinois, Exelon is a utility services holding company that does business in the United States and Canada. As noted, Exelon operates primarily through two sets of subsidiaries: "Generation" and "Utilities." Exelon Generation is one of the largest electric generation companies in the United States, producing electricity through nuclear, fossil fuel (*e.g.*, natural gas and oil), and renewable (*e.g.*, wind) power plants. Exelon Generation sells electricity directly to retail customers, such as large corporations, and to wholesaler RTOs.

**ANSWER:** Deny Paragraph 34, except admit that Exelon is headquartered in Illinois and that its subsidiaries are energy providers that do business in the United States and Canada, that Exelon conducts business through its Generation and Utilities subsidiaries, that Exelon Generation generates energy through various means, including through nuclear, natural gas and oil, and wind sources, and that Exelon Generation sells electricity directly to retail customers, such as large corporations, and in wholesale markets operated and managed by RTOs under regulation by the Federal Energy Regulatory Commission, where such sales are allowed by law.

35.     ComEd is Exelon's utility company that services northern Illinois. ComEd is Exelon's largest utility company and accounted for more than 30% of Exelon's total 2018 net income of $2.01 billion. ComEd's 2018 net income exceeded any other Exelon subsidiary by more than $200 million:

Exelon Companies' 2018 Net Income (millions)[1]



**ANSWER:** Deny Paragraph 35, except admit that ComEd provides electric service across northern Illinois, that in 2018 ComEd reported $664 million in net income, which comprises approximately 33% of Exelon's net income for 2018, and that Exelon Utilities' six utilities are BGE, ComEd, PECO, Atlantic City Electric, Delmarva Power, and Pepco.

36. ComEd does not profit from marking up the cost of electricity it sells. Because utilities are state-authorized monopolies, PUCs require utility companies to resell electricity at the same price paid to RTOs in the wholesale markets. ComEd, for example, has stated that it "buys electricity in the competitive wholesale market . . . and passes it through to customers at cost" such that "ComEd does not earn any profit on the electricity supply."

**ANSWER:** Deny Paragraph 36, except admit that ComEd is required to resell certain electricity at a price determined by a state regulated auction process that is based in part on the

---

[1] ACE, DPL, Pepco, BGE, and PECO are the remaining utility companies making up Exelon Utilities.

same price paid in RTO operated markets and that, because ComEd does not mark up the cost of

electricity it sells, it does not profit from such activity.

37.     Instead, ComEd and other utility companies profit from an additional **delivery** service rate charged to customers, which is usually set by PUCs at an amount that allows the utility company to receive a specified return on its investments. The larger the utility company's investment or assets, referred to as the "rate base," the higher the profit. Thus, utility companies are incentivized to spend money to build infrastructure and increase their rate base. To make sure that utility companies do not overspend on needless infrastructure to secure larger profits, PUCs have typically reviewed proposed improvements to ensure that they are justified and prudent.

**ANSWER:**  Deny Paragraph 37, except admit that ComEd charges a delivery service rate

that is set by the ICC.

**Compliance Was Critical to the Company's Highly-Regulated Business**

38.     While all businesses are subject to laws, Exelon's revenues were directly impacted by legislation that impacted the rates ComEd could charge or the subsidies Exelon Generation might receive. Exelon has repeatedly acknowledged that because of its dependence upon favorable legislation, it was critical that Exelon have robust compliance programs and maintain a reputation of integrity worthy of favorable treatment by legislatures, regulators, and policymakers. For example, Exelon and ComEd's combined annual report on Form 10-K for the period ending December 31, 2018 ("2018 Form 10-K") attached as Exhibit 14 and incorporated by reference the "Exelon Corporation Code of Business Conduct" (the "Exhibit 14 Code of Conduct"). In a "Message from the CEO," the Exhibit 14 Code of Conduct emphasized that "individuals and institutions have invested billions of dollars in our business with the expectation that we will honestly and productively use this capital to profitably operate our Company and increase shareholder value," and "[w]e will be successful if we operate our Company, employ our people and finance our business in accordance with the highest ethical standards and with the law. We will destroy shareholder value if we do not." The message added, "[o]ur Company's success depends on each of us living up to these standards."

**ANSWER:**  Deny Paragraph 38, except admit that legislation affects Exelon's business

and that Exelon and ComEd filed an annual report on Form 10-K for the period ending

December 31, 2018, and respectfully refer the Court to the Form 10-K for a complete and

accurate statement of its contents.

39.     The Exhibit 14 Code of Conduct stated that it applied to all Exelon "directors, officers and employees," as well as all Exelon "subsidiaries" and all "[t]hird parties . . . such as consultants." The Exhibit 14 Code of Conduct also assured investors that Exelon had robust compliance systems in place, for example, stating that all "non-represented employees [(*e.g.*, non-union)] must complete each year a certification of compliance questionnaire. A completed

certification questionnaire is a condition of employment for all non-represented employees." It made clear that anyone who "[a]uthorizes or participates in actions [that] violate the law or this Code" or who "[f]ails to complete or falsely completes a certification of compliance," may be subject to discipline, including "termination [of employment]" or referral "to law enforcement for criminal prosecution." In addition, the Exelon Corporation Code of Business Conduct ("Company Code of Conduct") published on Exelon's website, likewise acknowledged that illegal conduct, such as paying bribes, would have a negative impact on the ability to secure favorable legislation in the future.[2] Specifically, the Company Code of Conduct stated, "Bribes or kickbacks of any kind, whether involving commercial partners or government agents or officials, are unethical and violate our core values and the Code. They are also illegal." Emphasizing the point, the Company Code of Conduct stated:

> A BRIBE occurs when someone gives or promises another person something of value to obtain an undue business advantage. Examples of bribery include,

> \*     \*     \*

> Providing something of value for the benefit of a public official in a position to make a decision that could benefit the company.

> \*     \*     \*

> Bribes and kickbacks of any kind are unethical, illegal and violate our core values and the Code.

**ANSWER:** Deny Paragraph 39, except admit that Exelon attached a Code of Business Conduct as Exhibit 14 to certain Forms 10-K, including for the period ending December 31, 2018, and that Exelon's Code of Business Conduct was available on its website, and respectfully refer the Court to the 2018 Form 10-K and Exelon's Code of Business Conduct for a complete and accurate statement of their contents.

40.     As admitted in the DPA, the Company Code of Conduct also "required employees and agents to (a) '[k]eep accurate and complete records so all payments are honestly detailed and company funds are not used for unlawful purposes'; (b) [c]onduct due diligence on all potential agents, consultants or other business partners'; and (c) '[n]ever use a third party to make payments or offers that could be improper.'"

---

[2]     The Company Code of Conduct was adopted by the Exelon Board after the Exhibit 14 Code of Conduct, but Exelon continues to attach the Exhibit 14 Code of Conduct to its annual reports. *See also infra* ¶103.

**ANSWER:** Deny Paragraph 40, except admit that ComEd entered into the DPA and that Exelon had a Code of Business Conduct and respectfully refer the Court to the DPA and Exelon's Code of Business Conduct for a complete and accurate statement of their contents.

41. Exelon further acknowledged the importance of maintaining a reputation for honest dealings with government actors by creating a set of guidelines specific to political gifts called the Corporate Political Contributions Guidelines ("Contributions Guidelines"), which were published on the Company website and accompanied by semi-annual reports purporting to publicly disclose all political contributions. The "Limitations" section of the Contributions Guidelines stated that "Political Contributions shall comply with all applicable laws and regulations related to ethics in government, lobbying, and political contributions." The Contributions Guidelines defined "Political Contribution" as including "any gift or other transfer of money" or "or any provision of services" to "any candidate for election to public office" or to any "political party."

**ANSWER:** Deny Paragraph 41, except admit that Exelon had Corporate Political Contributions Guidelines and that it released Political Contributions Reports, and respectfully refer the Court to the Corporate Political Contributions Guidelines and the Political Contributions Reports for a complete and accurate statement of their contents.

**Influencing Public Official A Was Critical to Passing Favorable Legislation**

42. The Company depended on favorable legislation in Illinois to ensure profitability, including laws that provided for increased ComEd rates and infrastructure spending. In filings with the SEC, Exelon and ComEd have made clear the impact of legislation on their profitability, stating, "[f]undamental changes in regulations or other adverse legislative actions affecting the [companies'] businesses would require changes in their business planning models and operations and could negatively impact their respective consolidated financial statements." Additional Company disclosures state that Exelon and ComEd are "profoundly affected by decisions of elected and appointed . . . officials" and their success "depends on sound public policies." For ComEd and Exelon Generation, the laws considered and passed by the Illinois General Assembly have a particularly significant impact.

**ANSWER:** Deny Paragraph 42, except admit that laws passed by the Illinois General Assembly have an impact on ComEd and Exelon Generation and that Exelon has filed documents with the SEC, and respectfully refer the Court to the documents for a complete and accurate statements of their contents.

17

43. In Illinois, ComEd is regulated by the ICC, but the Illinois General Assembly can establish the process by which the ICC sets or approves rates and the evidence ComEd is required to present to obtain approval, and it can also set ComEd's rate of return on its investments and authorize infrastructure spending by ComEd, which increases ComEd's rate base. As the Company admitted in the DPA, the Illinois General Assembly "has routinely considered bills and passed legislation that has had a substantial impact on ComEd's operations and profitability, including legislation that affects the regulatory process ComEd uses to determine the rates ComEd charges its customers for the delivery of electricity."

**ANSWER:** Deny Paragraph 43, except admit that ComEd is regulated by the ICC, that laws passed by the Illinois General Assembly have an impact on ComEd, and that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

44. The Illinois General Assembly can also pass legislation directly impacting Exelon Generation's operations, such as encouraging clean energy by authorizing subsidies to Exelon for nuclear plants operating at low or zero emission levels.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44, except admit that the Illinois General Assembly can pass legislation that may impact Exelon Generation's operations.

45. In the Illinois General Assembly, Public Official A serves as the Speaker of the House and is also the Chairman of the Democratic party of Illinois. Public Official A maintains a vast network of influence in Illinois state and city government. Both the *Chicago Tribune* and *Chicago Sun-Times* have deemed Public Official A "the most powerful politician" in Illinois, and *Chicago Magazine* dubbed him the "King of Illinois." He has served as House Speaker for 35 years and is the longest serving member of the House of Representatives. Former Exelon CEO John Rowe (retired in 2012) recently told *Crain's Chicago Business* ("*Crain's*") that Public Official A "'is immensely powerful. For the 22 years I have been in Chicago, the most powerful person in the state.'" As both House Speaker and head of the Illinois Democratic Party, Public Official A was reportedly able to influence the makeup of legislative committees, how lawmakers vote, and when, if ever, bills get voted on. For example, according to *Chicago Magazine*, Public Official A "is famous for reading every bill and every line of the state's $34 billion budget. Nothing gets passed without his blessing."

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45, except admit that the *Chicago Tribune*, *Chicago Sun-Times*, *Chicago Magazine*, and *Crain's* published articles that refer to Public Official A and that ComEd

entered into the DPA, which addresses certain of the matters alleged in Paragraph 45, and respectfully refer the Court to the DPA and the articles for a complete and accurate statement of their contents.

46.     The Company admitted in the DPA that "Public Official A was able to exercise control over what measures were called for a vote in the House of Representatives and had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd."

**ANSWER:**  Deny Paragraph 46, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

**Prior to the Bribery Scheme, Exelon and ComEd's Legitimate Lobbying Efforts Were Failing**

47.     Following the codes of ethics and conduct, Exelon and ComEd's lobbying strategies had to rely on traditional lobbying efforts, such as "researching and analyzing legislation or regulatory proposals"; "monitoring and reporting on developments; attending congressional or regulatory hearings"; "working with coalitions interested in the same issues"; and "educating government officials."[3] But, employing those tactics proved unsuccessful in Illinois as Exelon and ComEd had little success in securing passage of favorable legislation.

**ANSWER:**  Deny Paragraph 47, except admit that Exelon maintained a Code of Business Conduct and Corporate Political Contributions Guidelines, that the Association of Government Relations Professionals has a page on its website titled "What is Lobbying?," and respectfully refer the Court to those documents and webpage for a complete and accurate statement of their contents.

48.     Notably, in the early 2000s, the Company had fallen into disfavor with Public Official A. According *Crain's*, Public Official A "torpedoed a rate hike" proposed by ComEd in 2003, which started "four years of cold and hot warfare" between Public Official A and Exelon's then-CEO, John Rowe. The *Chicago Tribune* also reported that in 2003, Public Official A claimed ComEd was being deceptive about its desire to increase rates, telling members of a House Committee, "I don't think they told us the truth." As noted, on October 2, 2006, Public Official A wrote a letter to the Illinois Governor, stating that expected rate increases of 25% or

---

[3]     *See What is Lobbying?*, Association of Government Relations Professionals, http://grprofessionals.org/about-lobbying/what-is-lobbying (last accessed September 7, 2020).

more for ComEd and other utilities would "turn already record earnings and profits into exorbitant gains for their executives and shareholders – at the expense of working families, senior citizens and those on fixed incomes" and sought to "keep the current rate freeze in effect until 2010."

**ANSWER:** Deny Paragraph 48, except admit that *Crain's* published an article on or about December 20, 2019, that the *Chicago Tribune* published an article on or about November 20, 2003, and that Michael J. Madigan wrote a letter to then-Governor Blagojevich on or about October 2, 2006, and respectfully refer the Court to the articles and the letter for a complete and accurate statement of their contents.

49.     In 2007, according to *Crain's*, ComEd was finally able to secure a rate increase, but only because of "rock-solid backing" from the then Illinois Senate President. In 2008, however, the Senate President announced he was retiring, which meant that the Company's political ally in Illinois state government would soon be gone.

**ANSWER:** Deny Paragraph 49, except admit that in 2008 the then-Illinois Senate President announced that he was retiring and that *Crain's* published an article on or about December 20, 2019, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

50.     Thereafter, it became a priority for Exelon and ComEd to convert Public Official A and his allies from opponents to supporters. At an investor conference in March 2009, for example, then-CEO of ComEd Frank Clark said that "sometimes I envy" the CEO of Exelon's Pennsylvania utility subsidiary who "has a luxury of a [different] regulatory climate and a political climate." On an earnings call in April 2010, Mr. Clark again referenced the challenging regulatory atmosphere in Illinois, noting that "[t]he Illinois regulatory climate is directly related to the Illinois political climate, which is as it has been for the last decade at an interesting state."

**ANSWER:** Deny Paragraph 50, except admit that Frank Clark participated in a March 10, 2009 Exelon Investor Conference and April 23, 2010 earnings call and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 50, and respectfully refer the Court to the DPA and the transcripts of the conference and earnings call for complete and accurate statements of their contents.

20

51. The Company again confirmed its inability to get traction with the Illinois legislature through its lobbying efforts when it announced the swift defeat of one of its proposals in mid-2010. On May 4, 2010, the Company announced that it had submitted to Illinois state leaders a proposal for new energy legislation addressing power rates and infrastructure investments. About 24 hours later, the Company declared the proposed legislation dead, stating: "We acknowledge and respect the concerns many public officials have and will move on." When questioned about the announcement and abrupt withdrawal of the proposed legislation during an earnings call the following week, Defendant Von Hoene admitted their lobbying efforts had failed, explaining: "We put together that package. We socialized it very carefully with all the stakeholders, regulatory and legislative, before it surfaced last week. It did not carry the day and when it became apparent that there wouldn't be sufficient political support for it we withdrew the proposal."

**ANSWER:** Deny Paragraph 51, except deny knowledge or information sufficient to form a belief as to whether Mr. Von Hoene made the quoted statement, admit that in 2010 ComEd issued a "Statement from ComEd regarding Public/Private Partnership," and respectfully refer the Court to the statement for a complete and accurate statement of its contents.

**Exelon and ComEd Shifted to an Illegal Bribery Strategy in Illinois**

52. According to the DPA, the bribery scheme began in 2011. At that time, Exelon and ComEd's goal of securing Public Official A's support became critical as they again sought to enact major legislation in Illinois. ComEd faced what financial analysts described as "one of the most challenging regulatory environments in the U.S.," which included "a decade of utility rate caps [and] contentious regulatory relationships." More specifically, under the Illinois regulatory framework, ComEd would present its rate requests to the ICC, which would then conduct contentious hearings in which it would analyze and challenge the reasonableness of each piece of ComEd's requested rate of return, its rate base, and its expenses. The ICC approved rates far below ComEd's requests, prompting appeals and battles before administrative law judges and in Illinois courts. For example, for 2010, ComEd requested rates to satisfy a revenue requirement of $343 million, but the ICC approved just $143 million.

**ANSWER:** Deny Paragraph 52, except deny knowledge or information sufficient to form a belief as to the truth of statements about unspecified financial analysts, and admit that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

53. As a result of the legislative failure in 2010, ComEd worked to develop EIMA, which was introduced to the Illinois General Assembly in February 2011. Defendant Von Hoene stated that EIMA was "introduced in Illinois with our support and with our help in constructing it." Passage of EIMA would substantially benefit ComEd in two ways.

21

**ANSWER:** Deny Paragraph 53, except deny knowledge or information sufficient to form a belief as to whether Mr. Von Hoene made the quoted statement, and admit that EIMA was introduced to the Illinois General Assembly in February 2011 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 53, and respectfully refer the Court to the DPA for a complete and accurate statements of its contents.

54.     First, it would provide for a new rate formula process (called "formula rates") that would essentially put electric rates on cruise control, guaranteeing ComEd market-based returns on its infrastructure investments and reducing regulators' authority over the rate-making process. ComEd would be guaranteed to earn a specific return on its investment under the new formula approach, which would also include a "true-up" process such that if ComEd's rates fell short of ComEd's expenses in one year, the rates would climb that much more the next year to make ComEd whole. Second, EIMA would authorize ComEd to spend – and therefore increase its rate base – $2.6 billion on grid infrastructure improvements.

**ANSWER:** Deny Paragraph 54, and respectfully refer the Court to EIMA for a complete and accurate statement of its contents.

55.     EIMA faced significant opposition from consumer advocate groups and politicians accusing the legislation of being designed to ensure ComEd profits at the expense of increased rates for Illinois consumers. For example, AARP issued a release stating that EIMA would allow ComEd "to impose nearly automatic rate hikes and secure company profits with virtually no regulatory oversight," which would "tak[e] the voice of the consumer out of the ratemaking process and paving the way for even higher profit[s]."

**ANSWER:** Deny Paragraph 55, except admit that the AARP Illinois issued a release, and respectfully refer the Court to the release for a complete and accurate statement of its contents.

56.     Thus, in 2011, ComEd commenced what would continue on as an eight-year bribery scheme through which it made more than $1.3 million in improper payments to associates of Public Official A. As admitted in the DPA:

> From in or around 2011 through in or around 2019, in an effort to influence and reward Public Official A's efforts, as Speaker of the Illinois House of Representatives, to assist ComEd with respect to legislation concerning ComEd and its business, ComEd arranged for various associates of Public Official A's, including [his] political allies and individuals who performed political work for Public Official A, to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd, even in instances where

22

certain political allies and workers performed little or no work that they were purportedly hired to perform.

**ANSWER:** Deny Paragraph 56, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statements of its contents.

57.     The DPA states that "certain senior executives and agents of ComEd" were "aware of the[] payments from their inception until they were discontinued in or around 2019," were "aware of the purpose of these payments . . . namely, that they were intended to influence and reward Public Official A in connection with Public Official A's official duties and to advance ComEd's business interests," and had "designed the[] payment arrangements in part to conceal the size of payments made to Public Official A's associates." The DPA specifically identified Defendant Pramaggiore and Fidel Marquez, Jr. ("Marquez"), ComEd's former Executive Vice President for Legislative and External Affairs, as being two senior executives involved in the scheme. As media has reported, Pramaggiore is the person referred to as "CEO-1" and Marquez is the person referred to as "Senior Executive 1," in the DPA.[4]

**ANSWER:** Deny Paragraph 57, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statements of its contents.

58.     The bribery scheme also involved three of Exelon's most influential and important outside lobbyists – McClain, Jay Doherty ("Doherty"), and John Hooker ("Hooker"):

a.      As discussed, McClain is an Illinois lobbyist who served as a member of the Illinois House of Representatives with Public Official A from 1972 to 1982, at which time he began his lobbying career. McClain was Exelon and ComEd's most important lobbyist. He was one of Public Official A's "closest confidants" and a member of his "inner circle," serving as a "vitally important sounding board and strategist for the speaker." As reported by the *Chicago Tribune*, "[a]fter he became a lobbyist in the early 1980s, McClain often could be found camped out in front of [Public Official A's] third-floor Capitol office. McClain, who frequently dined with [Public Official A] at his favorite Italian restaurant in Springfield, provided [Public Official A] with a sounding board on legislative and political strategy." The *Chicago Tribune* reported that McClain "was a point man in the discussions about major ComEd and parent company Exelon legislation for

---

[4]     The DPA describes CEO-1 as the CEO of ComEd between 2012 and 2018, and a senior executive at Exelon Utilities from June 2018 to October 2019, which coincides with Pramaggiore's time as CEO of ComEd and CEO of Exelon Utilities. The DPA describes Senior Executive 1 as the Executive Vice President of Legislative and External Affairs from 2012 to September 2019, which coincides with Marquez's time in that role.

decades." McClain is referred to as "Individual A" in the DPA, which states that McClain has "a close personal relationship with Public Official A."[5]

b.      Doherty was another key outside lobbyist for ComEd. Described by *WBEZ Chicago* as "[o]ne of ComEd's biggest lobbyists," Doherty was the president of the City Club of Chicago, a public affairs nonprofit that often hosts events for politicians. Doherty was registered as a ComEd lobbyist for all eight years of the bribery scheme, during which time ComEd reportedly paid Doherty more than $3.1 million. Doherty is referred to as "Consultant 1" in the DPA, and his company is referred to as "Company 1."[6]

c.      Hooker was Marquez's predecessor and another key lobbyist for Exelon and ComEd. For nearly the entire period of the bribery scheme, from 2012 to 2019, Hooker served as an external lobbyist for ComEd. Hooker is referred to as "Lobbyist 1" in the DPA.[7]

**ANSWER:** Deny Paragraph 58, except deny knowledge or information sufficient to form a belief as to the truth of unattributed statements concerning McClain, and admit that the *Chicago Tribune* published articles on or about July 18, 2019 and November 21, 2019, that *WBEZ Chicago* published an article on or about November 14, 2019, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 58, and respectfully refer the Court to the DPA and the articles for a complete and accurate statement of their contents.

59.      The bribery scheme included having Public Official A, through McClain, identify associates of Public Official A to receive payments. Thereafter, Pramaggiore and Marquez would approve the payments, Doherty would contract with the associates as subcontractors to his company, and then Doherty would submit invoices to ComEd that would appear as payments for "legislative issues" or "legislative risk management activities," a substantial portion of which

---

[5]      Media has also determined McClain to be Individual A since Individual A is described in the DPA as having served in the Illinois House of Representatives for ten years starting in 1972 and as a ComEd lobbyist until 2019, which coincides with McClain's time as an Illinois Representative and ComEd lobbyist.

[6]      The DPA describes Consultant 1 as the owner of Company 1, which performed consulting services for ComEd until 2019. The *Chicago Sun-Times* and other media outlets have reported that Consultant 1 was Doherty and Company 1 was Doherty's consulting company.

[7]      The DPA describes Lobbyist 1 as ComEd's Executive Vice President of Legislative and External Affairs from 2009 until his retirement in 2012, which media confirmed refers to Hooker as it coincides with Hooker's time in that role and his retirement.

would be passed through as compensation to Public Official A's associates despite the fact they did little or no work for ComEd. In addition to Doherty's company, ComEd utilized additional third-party vendors to funnel the more than $1.3 million in payments to Public Official A's associates who did little or no work for ComEd.

**ANSWER:** Deny Paragraph 59, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 59, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

60. The DPA details an example of the bribery, stating that in May 2018, "Public Official A, through [McClain], asked [Pramaggiore] to hire a political ally of Public Official A who was retiring from the Chicago City Council at the end of the month ('Associate 3')." Media has reported that Associate 3 is former Alderman Michael Zalewski ("Zalewski") – a longtime ally of Public Official A and the father-in-law of the Chairperson of the ICC. According to the DPA, "[Pramaggiore], in coordination with [Marquez] and [Doherty], agreed that ComEd would pay [Zalewski] approximately $5,000 a month indirectly as a subcontractor through [Doherty's company]." The DPA adds that "[Pramaggiore] also agreed that Public Official A – rather than an officer or employee of ComEd or [Doherty's company] – would advise [Zalewski] of this new arrangement." Federal agents later conducted a search warrant of Zalewski's residence, which further corroborated media accounts that he was Associate 3.

**ANSWER:** Deny Paragraph 60, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

61. In the DPA, the Company has admitted that the payments were not legitimate but "were intended to influence and reward Public Official A in connection with the advancement and passage of legislation favorable to ComEd in the Illinois General Assembly." The DPA refers to conversations in 2018 and 2019 among lobbyists and ComEd executives explaining that associates of Public Official A were being paid by ComEd for improper purposes, for example, because: (i) an associate was "'one of the top three precinct captains'" for Public Official A "who also 'trains people how to go door to door . . . so just to give you an idea how important the guy is,'" (ii) the associates were "former ward committeemen and aldermen" and paying them "was a 'favor,'" (iii) "Public Official A came to us. It's just that simple," and (iv) ComEd's "'money comes from Springfield'" and it was necessary "'to keep [Public Official A] happy,'" which is "'worth it, because you'd hear otherwise.'"

**ANSWER:** Deny Paragraph 61, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statements of its contents.

62. The DPA also details a conversation between McClain and Marquez in which McClain advises Marquez, "'don't put anything in writing' . . . because 'all it can do is hurt ya.'" The DPA included another conversation between Doherty and Marquez in which Doherty admits

the associates of Public Official A did no work by saying they were paid by ComEd to "'keep their mouth shut'" and admitting "'[b]ut do they do anything for me on a day to day basis? No.'"

**ANSWER:** Deny Paragraph 62, except admit that ComEd entered into the DPA and

respectfully refer the Court to the DPA for a complete and accurate statements of its contents.

63.     As another example of their efforts to conceal the true purpose of the bribery payments as detailed in the DPA, in March 2019, McClain and ComEd personnel "participated in a meeting during which they discussed [Doherty's company's] contract and why the indirect payments to Public Official A's associates made under the guise of that contract should be continued for another year." ComEd thereafter renewed the contract. And, in a conversation about the renewal, Hooker told McClain, "'it's uh, unmentioned, but you know, that which is understood need not be mentioned,'" to which McClain responded, "'Right. Exactly. Exactly.'"

**ANSWER:** Deny Paragraph 63, except admit that ComEd entered into the DPA and

respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

64.     In addition to the more than $1.3 million in payments, the Company admitted in the DPA that ComEd retained a law firm, and provided that firm with thousands of hours of billable work, at the behest of Public Official A, stating:

> In or around 2011, ComEd agreed to retain Law Firm A, and entered into a contract pursuant to which ComEd agreed to provide Law Firm A with a minimum of 850 hours of attorney work per year. This contract was entered into with Law Firm A, in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties and because personnel and agents of ComEd understood that giving this contract to Law Firm A was important to Public Official A.

**ANSWER:** Deny Paragraph 64, except admit that ComEd entered into the DPA and

respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

65.     In 2016, ComEd sought to reduce the hours provided to Law Firm A as part of its contract renegotiation. However, according to the DPA, on January 20, 2016 McClain directed Pramaggiore to continue the payments stating, "'I am sure you know how valuable [an attorney associated with Law Firm A] is to our Friend [Public Official A] I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Public Official A]. Our Friend [Public Official A] will call me and then I will call you. Is this a drill we must go through?'" Pramaggiore responded, "'Sorry. No one informed me. I am on this.'" Pramaggiore then "tasked a ComEd employee" who was working on "obtaining legislative approval of FEJA, to ensure that Law Firm A's contract was renewed." The contract was renewed, albeit with an undisclosed number of lower hours.

**ANSWER:**  Deny Paragraph 65, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

66.      According to the DPA, Public Official A – through McClain – also requested that Pramaggiore secure the appointment of one of Public Official A's associates, Juan Ochoa ("Ochoa"), to ComEd's Board of Directors. In May 2018, "in response to internal company opposition to the appointment" of Ochoa, Pramaggiore instead offered to "arrange[] for [Ochoa] to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year." McClain told Pramaggiore that "Public Official A would appreciate if [Pramaggiore] would 'keep pressing' for the appointment of [Ochoa], and [Pramaggiore] agreed to do so." Then, in September 2018, the DPA states that Pramaggiore assured McClain that she "was continuing to advocate for the appointment of [Ochoa] made at Public Official A's request because 'You take good care of me and so does our friend [Public Official A] and I will do the best that I can to, to take care of you.'"

**ANSWER:**  Deny Paragraph 66, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

67.      Confirming that the bribery scheme continued well into 2019, on April 25, 2019, Pramaggiore sent McClain a text message stating, "'Just sent out Board approval to appoint [Ochoa] to ComEd Board.'" ComEd disclosed the appointment of Ochoa the next day. As stated in the DPA, "no one at ComEd or Exelon recruited [Ochoa] to serve as a director, and ComEd did not interview or vet other outside candidates for the vacant board seat. ComEd appointed [Ochoa], in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties."

**ANSWER:**  Deny Paragraph 67, except admit that ComEd entered into the DPA and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

68.      As yet another example of the bribery scheme, ComEd set up an internship program that hired certain interns to gain favor with Public Official A. Specifically, starting no later than 2013 and continuing into 2019, ComEd's internship program "would accept a specified target number of students who primarily resided" in Public Official A's ward "and that were recommended to ComEd by associates of Public Official A." ComEd made these hires, "in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties."

**ANSWER:**  Deny Paragraph 68, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 68, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

69.     In addition to the $1.3 million in payments to associates of Public Official A, retention and payment of thousands of billable hours to Law Firm A, appointment of Ochoa to the ComEd Board of Directors, and adoption of the internship program that are all set forth in the DPA, media has reported that the Company went to "unusual lengths" to influence Public Official A by hosting fundraising events for his campaign and party. For example, a December 6, 2019 *Crain's* article reported that, "[f]or at least five years, the utility [ComEd] and its top execs have hosted an unusual big-bucks fundraiser for [Public Official A], who was key to enacting the company's Springfield agenda." The article detailed that every fall since at least around 2014, Exelon and ComEd had hosted an annual event for Public Official A that raised more than $100,000 every year.

**ANSWER:** Deny Paragraph 69, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations about "media," and admit that ComEd entered into the DPA and that *Crain's* published an article on or about December 6, 2019, and respectfully refer the Court to the DPA and the article for a complete and accurate statement of their contents.

70.     Rather than constituting legal fundraising events to advance general political interests, the efforts appear to be part of the bribery scheme, given all of the other bribes set forth in the DPA and the Company's admitted intent to influence Public Official A. In addition, the *Crain's* article noted that Exelon and ComEd did not host similar events for other Illinois politicians. The article stated, for example, that while "ComEd regularly raised money for and donated to other legislative leaders, those efforts were nothing of the magnitude on display for [Public Official A], several sources familiar with its lobbying and fundraising operation tell [*Crain's*]." The article quoted a spokesperson for the House Republican leader as stating, "[t]hey don't do any type of event for [the House Republican leader]." In a later article, *Crain's* reported that the fundraisers were "considered by some company associates to be a command performance."[8]

**ANSWER:** Deny Paragraph 70, except admit that ComEd entered into the DPA and that *Crain's* published articles on or about December 6, 2019 and Decemer 20, 2019, and respectfully refer the Court to the DPA and the article for a complete and accurate statement of their contents.

71.     Moreover, the events involved the same individuals – Pramaggiore and McClain – at the center of the payments, retention of Law Firm A, and appointment of Ochoa. According to *Crain's*, "[Chris] Crane, as well as former top Exelon exec Anne Pramaggiore and . . . Mike

---

[8]     *Merriam Webster* dictionary defines "command performance" as "a special performance of a concert, play, etc., that is done at the request of an important person (such as a king)."

28

McClain, a former House majority leader turned lobbyist" attended the annual events. The article explained that "'the reception line was typically Anne [Pramaggiore] and [Public Official A]'" and "'[l]ater, Chris [Crane] and [Public Official A] would get up and talk.'"

**ANSWER:** Deny Paragraph 71, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 71, and that *Crain's* published an article on or about December 6, 2019, and respectfully refer the Court to the DPA and the article for a complete and accurate statement of their contents.

**Exelon and ComEd Secure Passage of EIMA Through the Bribery Strategy**

72.     Exelon and ComEd's bribery strategy paid significant dividends. In May 2011, the Illinois House of Representatives passed EIMA by majority vote. However, the Bill required Senate approval and ratification by then-Governor Quinn, who opposed it. The Illinois Senate voted to enact EIMA in August 2011. But on September 12, 2011, Governor Quinn vetoed EIMA, stating that the utility companies were "trying to dramatically change the rules to guarantee annual rate increases." He stated that "[t]he bill before me strips away vital oversight and allows these utilities to benefit from unnecessary costs, higher corporate profits, and inherently flawed performance standards," and that he would "not support a measure that contains sweetheart deals for big utilities."

**ANSWER:** Deny Paragraph 72, except admit that the Illinois House of Representatives passed EIMA in May 2011, that the Illinois Senate voted to enact EIMA in August 2011, that then-Governor Quinn vetoed EIMA in or around September 2011, and that then-Governor Quinn made certain statements to the members of the Illinois Senate, 97th General Assembly, on or about September 12, 2011, and respectfully refer the Court to a transcript of those statements for a complete and accurate statement of their contents.

73.     Shortly after the veto, Defendant Crane reassured investors during an earnings call in September 2011 that Exelon and ComEd were working to gather the votes necessary to override the Governor's veto. In doing so, Crane claimed that the success of the legislation turned on traditional lobbying efforts like stakeholder support, noting that "we think it should pass the test of the consumer advocate" and touting that the proposed law "started out about modernization and it turned into a job[s] bill that kind of resonated and that's the real desire of Springfield now is let's make the investment, guarantee us the return, but also get some folks to work." In truth, as later admitted in the DPA, the bribery scheme facilitated the passage of EIMA.

**ANSWER:** Deny Paragraph 73, except admit that Mr. Crane made statements during a September 20, 2011 Exelon Conference Presentation and that ComEd entered into the DPA, and respectfully refer the Court to the DPA and conference transcript for a complete and accurate statement of their contents.

74. On October 26, 2011, the Illinois General Assembly, with a super-majority vote, overrode the Governor's veto of EIMA, which became effective immediately. As discussed, EIMA authorized ComEd to spend $2.6 billion in grid infrastructure investments over a decade and overhauled the rate making process in favor of ComEd.

**ANSWER:** Deny Paragraph 74, except admit that in or around October 2011, the Illinois General Assembly voted to override the governor's veto of EIMA, and respectfully refer the Court to EIMA for a complete and accurate statement of its contents.

75. Analysts following Exelon saw EIMA as a major win for the Company and a stark contrast to its past failures. For example, in an October 27, 2011 report, analysts from Bank of America stated that while ComEd had "historically faced one of the most difficult regulatory environments in the country in recent years," with the passage of EIMA, "we see the regulatory environment in IL about to be transformed into one of the better ones in the U.S." In a report the same day, analysts from Deutsche Bank increased part of their valuation model for ComEd upward by 5% because of the benefits ComEd would reap from EIMA, noting that "[t]his could still be conservative, as the passage of the new legislation may yet add upside to our 2013 [estimates] when we learn more details." Similarly, analysts from Morningstar Equity Research issued a report on October 28, 2011, stating that "the new ratemaking structure should allow significant rate base and earnings growth for the utilities. ComEd committed to $2.6 billion of new investment during the next 10 years, representing the potential for a 30% increase in its rate base."

**ANSWER:** Deny Paragraph 75, except admit that Bank of America and Deutsche Bank published reports on or about October 27, 2011 and that Morningstar Equity Research published a report on or about October 28, 2011, and respectfully refer the Court to the reports for a complete and accurate statement of their contents.

76. After EIMA was enacted, the ICC and ComEd disputed its interpretation, resulting in the ICC reportedly reducing a 2012 ComEd rate request by approximately $100 million. ComEd again sought support from the Illinois General Assembly, and a new bill clarifying EIMA in favor of ComEd was introduced. During a May 1, 2013 conference call, Exelon's then CFO said the bill would "increase operating revenues approximately $25 million and $65 million in 2013 and 2014." The bill passed both houses, but was again vetoed by

30

Governor Quinn, who stated that he "cannot support legislation that puts the profits of big electric utilities ahead of the families and businesses of Illinois." In an email obtained pursuant to a FOIA request with the Illinois House of Representatives, on May 5, 2013, McClain forwarded the Governor's statement to Public Official A's chief of staff with the subject, "FW: To Provide . . . We Must Override!" The Illinois General Assembly voted to override the veto on May 22, 2013. In a call with analysts a week later, Defendant Crane touted the Company's ability to push EIMA and the clarifying legislation through, stating, "In Illinois, we've worked with the state legislature to come up with . . . a newly structured formula rate. We had that pass. There were some issues that we had to deal with at the Commission level. We had to go back to the legislature. We were able to fix that."

**ANSWER:** Deny Paragraph 76, except deny knowledge or information sufficient to form a belief as to the truth of the alleged statements made by then-Governor Quinn or emails between McClain and Public Official A's chief of staff, and admit that Senate Bill 9 was passed by both houses of the Illinois General Assembly but was vetoed by then-Governor Quinn on or about May 6, 2013, that the Illinois General Assembly voted to override that veto on or about May 22, 2013, that Exelon's then-CFO made statements during an earnings call on or about May 1, 2013, that the ICC issued decisions regarding EIMA, and that Mr. Crane made statements at the 2013 Sanford C. Bernstein Strategic Decisions Conference on or about May 30, 2013, and respectfully refer the Court to the transcripts of the earnings call and conference and to the ICC's decisions for a complete and accurate statement of their contents.

77.     EIMA was scheduled to sunset in 2017, at which time ComEd's formula rates and investment commitment would end unless extended by the Illinois General Assembly. The Illinois General Assembly voted to extend EIMA, and on April 3, 2015, then-Governor Bruce Rauner signed the bill into law, extending the EIMA sunset from 2017 to 2019.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77, except admit that the Illinois General Assembly voted to extend EIMA and that on or about April 3, 2015 then-Governor Rauner signed the bill into law.

78.     During an August 10, 2016 earnings call, Defendant Pramaggiore called EIMA "a game-changer for ComEd." She highlighted the $2.6 billion investment authorized by EIMA, and noted that "we were able to persuade policymakers" that the investment "required a regulatory model different from the volatile model that we had been living with for a number of years[,] [s]o we designed a formula rate that provides greater predictability, as well as timely

31

cost recovery." She added that "of the approximately $4.2 billion of rate base growth at ComEd over the next five years, 100% will be recovered through existing formula and rider mechanisms that have served us well over the past 4.5 years."

**ANSWER:** Deny Paragraph 78, except admit that Exelon held an Analyst/Investor Day call on or about August 10, 2016, and respectfully refer the Court to the transcript of the call for a complete and accurate statement of its contents.

**Exelon and ComEd Secure Passage of FEJA Through the Bribery Strategy**

79.     In 2015, Exelon disclosed that two of its Illinois nuclear power plants were unprofitable and would be shut down unless the Illinois General Assembly passed a legislative bailout that would allow Exelon to profit. Thus, with what Crane described as the "very strong support from the leadership of the legislature," Exelon developed a new bill. This bill sought payment of clean energy subsidies for the nuclear plants, referred to as annual "Zero Emission Credits" or "ZECs." Exelon promoted the bill as saving thousands of jobs for workers at the plants and also advancing Illinois' efforts to reduce its carbon emissions.

**ANSWER:** Deny Paragraph 79, except admit that Exelon held an earnings call on or about February 3, 2016, and respectfully refer the Court to the transcript of the call for a complete and accurate statement of its contents.

80.     Like EIMA, Exelon's proposal was met with significant opposition. For example, a May 27, 2016 article in the *Chicago Tribune* noted that critics believed Exelon's threat to close the facilities was "unreasonable, given the overall profitability of the company, which cleared $2.27 billion [in 2015]." Ultimately, the *Chicago Tribune* noted that lawmakers "have shown little appetite to entertain the complex, wide-ranging bill," as they were more occupied with passing a hotly-contested 2017 budget.

**ANSWER:** Deny Paragraph 80, except admit that the *Chicago Tribune* published an article on or about May 27, 2016, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

81.     Nevertheless, on December 1, 2016, the final day of the legislature's fall session, FEJA was passed by the House of Representatives. At the time, Illinois still had no annual budget in place. One representative asked during a discussion of the bill, "'[w]hat are we doing, you guys? What are we doing listening to this bill? . . . We don't have a budget and our so-called stopgap budget is just weeks away from expiring. Instead, we are talking about a multibillion-dollar corporate bailout for one of the most profitable companies in the state. And how are we going to finance this? This is going to be financed on the back of the rate payers.'" Later, looking

back at December 1, 2016, another Illinois representative said, "'[t]he whole day was bad. It was dirty, and I felt like I needed a shower driving home.'"

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81, except admit that in or around December 2016, FEJA was passed by the Illinois House of Representatives.

82.     On December 7, 2016, FEJA was signed into law. Among other items, the main provisions of the bill provided Exelon a rate-payer bailout of up to $2.35 billion, or $235 million annually for ten years, which would keep Exelon's two failing nuclear plants operating at least through 2027. The bailout took the form of ZECs paid to Exelon Generation for generating power by nuclear plants, the cost of which were passed through to ComEd's customers, resulting in a potentially $4-per-month increase to utility bills.

**ANSWER:** Deny Paragraph 82, except admit that FEJA was signed into law on or about December 7, 2016, and respectfully refer the Court to FEJA for a complete and accurate statement of its contents.

83.     In addition to the subsidies to Exelon Generation, FEJA provided additional rate increase benefits to ComEd. More specifically, FEJA extended the sunset date for the formula rates for another three years, through 2022 and authorized ComEd to earn a return on up to around $350 million in "energy efficiency" improvements. Analysts noted that before FEJA, ComEd "invest[ed] $200-$250M a year in energy efficiency but [wa]s not provided any return on the investment."

**ANSWER:** Deny Paragraph 83, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations about "analysts," and respectfully refer the Court to FEJA for a complete and accurate statement of its contents.

84.     As with EIMA, Defendants attributed the passage of FEJA to legitimate lobbying activities like coalition building and stakeholder support. For example, during an earnings call in October 2016 shortly before FEJA's passage, Defendant Pramaggiore said that "[w]e have pulled together a coalition to come in with an agreed bill as much as possible and we are in the process of putting that together now." Similarly, during an earnings call in February 2017, Defendant Crane said that FEJA (along with another law passed in a different state) showed that "[w]e're able to work with a wide range of stakeholders in both states to enact programs that compensate these plan[t]s for their environmental attributes." However, as admitted in the DPA, the bribery scheme facilitated the passage of FEJA.

33

**ANSWER:** Deny Paragraph 84, except admit that Exelon held earnings calls on or about October 26, 2016 and February 8, 2017 and that ComEd entered into the DPA, and respectfully refer the Court to the transcripts of the earning calls and the DPA for a complete and accurate statement of their contents.

85. Not long after the enactment of FEJA, Exelon reportedly invited close to 1,000 supporters to a celebration. According to a November 22, 2019 *Crain's* article, "[a] few dozen superstars were invited to a special dinner downstairs, featuring Anne Pramaggiore, . . . [Public Official A] and someone they had in common – ComEd lobbyist Mike McClain, a longtime close ally and friend of [Public Official A]."

**ANSWER:** Deny Paragraph 85, except admit that *Crain's* published an article on or about November 22, 2019 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 85, and respectfully refer the Court to the article and the DPA for a complete and accurate statement of their contents.

86. The financial benefits to Exelon and ComEd from their legislative efforts came quickly. Since 2016, ComEd's net income has nearly doubled, going from $378 million in 2016 to $688 million in 2019, and Exelon's net income has nearly tripled, going from $1.13 billion in 2016 to $2.9 billion in 2019.

**ANSWER:** Deny Paragraph 86, except admit that ComEd's net income was approximately $378 million in 2016 and approximately $688 million in 2019.

**Exelon and ComEd's Efforts to Secure Favorable Legislation Through the Bribery Scheme in 2019**

87. As discussed, Exelon, ComEd, and their executives knew that the disclosure of illegal or unethical behavior would "destroy shareholder value." Leading up to and continuing during the Class Period, Exelon and ComEd sought the passage of additional legislation, and the renewal of a key government contract, that would directly enhance profitability.

**ANSWER:** Deny Paragraph 87, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 87, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

88. First, Exelon sought another bailout of Illinois nuclear power plants. On May 24, 2018, Exelon issued a release announcing that one of the plants (Dresden) did not have its price

34

bids accepted in the annual RTO capacity auction, and that only a small portion of another plant's (Byron) bids were accepted. Exelon stated that the "results underscore the urgent need for policy reforms . . . to properly value the resilient, zero-emissions power provided by nuclear plants." Exelon later disclosed that Dresden, Byron, and a third Illinois nuclear plant (Braidwood) were showing "increased signs of economic distress" and may need to be shutdown unless legislation was enacted.

**ANSWER:** Deny Paragraph 88, except admit that Exelon issued a release on or about May 24, 2018, and respectfully refer the Court to the release for a complete and accurate statement of its contents.

89.     Defendants advocated for legislation to bail out the Illinois nuclear power plants. In February 2019, the Clean Energy Progress Act ("CEPA"), which Exelon supported, was introduced in the Illinois House of Representatives. CEPA would require ComEd (through Illinois regulators) to buy its "capacity" through Exelon's nuclear plants,[9] meaning the plants would go from selling little to no capacity in the RTO auction to selling all of its capacity to ComEd, providing the struggling nuclear plants hundreds of millions of dollars in revenue. ComEd, in turn, would pass the increased costs on to the ratepayers.

**ANSWER:** Deny Paragraph 89, except admit that the Clean Energy Progress Act ("CEPA") was introduced in the Illinois House of Representatives in or around February 2019, and respectfully refer the Court to CEPA for a complete and accurate statement of its contents.

90.     Second, Defendants advocated for legislation to provide for a ten-year extension on the EIMA formula rates, which were set to sunset in 2022. On February 15, 2019, House Bill 3152 was introduced to the Illinois General Assembly, providing for the extension of the formula rates to 2032.

**ANSWER:** Deny Paragraph 90, except admit that House Bill 3152 was introduced to the Illinois General Assembly on or about February 15, 2019, and respectfully refer the Court to House Bill 3152 for a complete and accurate statement of its contents.

91.     Third, in addition to legislation, ComEd's franchise agreement with the City of Chicago, which allowed ComEd to access the city's roads, sidewalks, and airspace, was set to expire for the first time in nearly 30 years. The rare renewal opportunity made it possible for Chicago to consider increasing the franchise fee or even taking over electricity delivery in

---

[9]     The process for buying capacity outside of the RTO is referred to fixed resource requirement, or "FRR."

Chicago. As such, Defendants were engaged in negotiations with the City of Chicago during the Class Period.

**ANSWER:** Deny Paragraph 91, except admit that ComEd had an agreement with the City of Chicago, and respectfully refer the Court to that agreement for a complete and accurate statement of its contents.

### DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

92. Defendants concealed the bribery scheme during the Class Period by making a series of false and misleading statements.

**ANSWER:** Deny Paragraph 92.

**February 2019 False and Misleading Statements in Documents Published on Exelon's Website**

93. The Class Period begins on <u>February 8, 2019</u>. On that date, the Company hosted a conference call to discuss its fourth quarter 2018 ("4Q18") financial results. After market close, Exelon and ComEd each separately filed the same combined 2018 Form 10-K (defined above, ¶38), which was signed by Crane, Pramaggiore, and Dominguez.[10] As set forth below, on February 8, 2019, Defendants made false and misleading statements during the conference call, in the 2018 Form 10-K, and in documents published on Exelon's website.

**ANSWER:** Deny Paragraph 93, except admit that Exelon hosted its fourth quarter 2018 earnings call on or about February 8, 2019 and that Exelon and ComEd filed an annual report on Form 10-K for the period ending December 31, 2018, and respectfully refer the Court to the transcript of the earnings call and the 2018 Form 10-K for a complete and accurate statement of their contents.

94. With regard to documents published on the website, the 2018 Form 10-K filed by Exelon and ComEd and signed by Crane, Pramaggiore, and Dominguez directed investors to the

---

[10] Defendant Pramaggiore signed the 2018 Form 10-K through power of attorney. Specifically, Defendant Dominguez signed as "Attorney-in-Fact, on behalf of . . . Anne R. Pramaggiore," and an attached Power of Attorney signed by Defendant Pramaggiore stated "I, Anne R. Pramaggiore, do hereby appoint Joseph Dominguez . . . attorney for me and in my name and on my behalf to sign the annual Securities and Exchange Commission report on Form 10-K for 2018 of Commonwealth Edison Company, together with any amendments thereto, to be filed with the Securities and Exchange Commission. . . ."

Company Code of Conduct (defined above, ¶39) published on Exelon's website.[11] The Company Code of Conduct was published on the Exelon website on February 8, 2019 and on every subsequent day of the Class Period.[12]

**ANSWER:** Deny Paragraph 94, except admit that Exelon and ComEd filed an annual report on Form 10-K for the period ending December 31, 2018 and that Exelon's Code of Business Conduct was available on Exelon's website, and respectfully refer the Court to the 2018 Form 10-K and Exelon's Code of Business Conduct for a complete and accurate statement of their contents.

95.     The Company Code of Conduct was approved by the Exelon Board of Directors, including Defendant Crane, and began with a "Leadership Message" from Defendant Crane. The "Leadership Message" claimed: "This is no poster on the wall. Our Code is an active and vibrant part of our everyday business: how we act, how we make decisions, how we treat our partners and colleagues, how we relate to the communities where we each live and work." The Company Code of Conduct stated that it applied to essentially everyone associated with the Company including: "directors, officers and employees," Exelon "subsidiaries," "[t]hird parties such as consultants," and added that "[a]ll non-represented [*e.g.*, non-union] employees and members of the Board of Directors must complete a certification of compliance questionnaire each year."

**ANSWER:** Deny Paragraph 95, except admit that Exelon has a Code of Business Conduct, and respectfully refer the Court to Exelon's Code of Business Conduct for a complete and accurate statement of its contents.

96.     Under the heading, "Disciplinary Action," the Company Code of Conduct emphasized that "[t]he Code is of the utmost importance to the company and violations will not be tolerated. Accordingly, the Code will be appropriately enforced, regardless of the seniority, role or location of those involved in misconduct," and anyone who "[a]uthorizes or participates in actions that violate the Code or law" or who "[f]ails to complete or falsely completes a

---

[11]    The 2018 Form 10-K stated "[t]he Code of Business Conduct is filed as Exhibit 14 to this report and is available on Exelon's website at www.exeloncorp.com." Thus, Defendants directed investors to both versions of their Code of Conduct since the version attached as Exhibit 14 was slightly different than the version on the website.

[12]    The Company's Code of Business Conduct is available at https://www.exeloncorp.com/company/Documents/Exelon%20Code%20of%20Business%20Conduct.pdf. When accessed on September 1, 2020, Exelon's website indicated that the Company Code of Conduct was last updated on the website on "May 6, 2016." In addition to in the 2018 Form 10-K, Exelon and ComEd repeatedly directed investors to the Company Code of Conduct in other SEC filings, such as proxy reports, prior to and during the Class Period.

37

certification of compliance," may be subject to "[t]ermination of employment" or "[r]eferral to law enforcement." Reflecting the Company's recognition that compliance with the Company Code of Conduct was important to investors, it stated, "[a] waiver of any provision of the Code will be made only in exceptional circumstances for substantial cause" and "any waiver of a provision in the Code for any director or executive officer will be disclosed to shareholders."

**ANSWER:** Deny Paragraph 96, except admit that Exelon has a Code of Business Conduct, and respectfully refer the Court to Exelon's Code of Business Conduct for a complete and accurate statement of its contents.

97.     In addition, the Company Code of Conduct contained the following false and misleading statements:

> a.      "***We never*** request, ***offer*** or accept ***any form of payment or incentive intended to improperly influence a decision***."[13]

> b.      "Exelon . . . advocates for legislation we believe will enhance value for our customers, communities, employees and shareholders. ***Those of us who have contact with legislators***, regulators, executive branch officials or their staffs ***may be involved in lobbying, and must take care to comply with the laws applicable to these activities***."

> c.      "What's Expected . . . ***Never use a third party to make payments or offers that could be improper***."

**ANSWER:** Deny Paragraph 97, except admit that Exelon has a Code of Business Conduct, and respectfully refer the Court to Exelon's Code of Business Conduct for a complete and accurate statement of its contents.

98.     Also on Exelon's website on February 8, 2019, and every subsequent day of the Class Period, Exelon published its Contributions Guidelines (defined above, ¶41),[14] which contained the following false and misleading statements:

> a.      "***No Political Contribution should be made or committed under any condition requiring confidentiality or otherwise limiting public disclosure***."

---

[13]   Bold and italics are used to identify the particular statements alleged to be false and misleading herein.

[14]   The Corporate Political Contributions Guidelines are available at https://www.exeloncorp.com/company/Documents/dwnld_contributionguidelines.pdf. When accessed on September 1, 2020, Exelon's website indicated that the Contributions Guidelines were last updated on the website on "September 14, 2016."

38

b.   "***No Political Contribution will be given in anticipation of, in recognition of, or in return for any Official Act***."

**ANSWER:**  Deny Paragraph 98, except admit that Exelon has Political Contributions Guidelines, and respectfully refer the Court to the Political Contributions Guidelines for a complete and accurate statement of their contents.

99.     Also on Exelon's website on February 8, 2019, and every subsequent day of the Class Period, Exelon published its Political Contributions Report for the period of January 1, 2018-June 30, 2018 (the "1H 2018 Contributions Report").[15] The 1H 2018 Contributions Report contained the following false and misleading statements:

a.   "***Exelon's political contributions during the reporting period were all made in accordance with its Corporate Political Contributions Guidelines***."

b.   "***This report includes a listing of Exelon's political contributions for the above noted reporting period***."

**ANSWER:**  Deny Paragraph 99, except admit that Exelon's Political Contributions Report was available on its website, and respectfully refer the Court to the Political Contributions Report for a complete and accurate statement of its contents.

100.     The statements set forth in ¶¶97-99 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

a.   Defendants Exelon's, ComEd's, Crane's, Pramaggiore's, and Dominguez's statements that they "never" paid or offered a bribe and that some of them were engaged in "lobbying," and Exelon's statement that all political contributions made during the period were in accordance with its guidelines and therefore had not made any in anticipation or recognition of any Official Act, were false and misleading because Defendants omitted to disclose the Company had changed strategy from legal lobbying to an eight-year and ongoing illegal bribery scheme, in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation, including: (i) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (ii) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (iii) hosting and participating in fundraisers for Public Official A with the expectation of

---

[15]   The 1H 2018 Contributions Report is available at https://www.exeloncorp.com/company/Documents/2018%20-%20Jan-June%20Political%20Contributions.pdf. When accessed on September 1, 2020, Exelon's website indicated that the 1H 2018 Contributions Report was last updated on the website on "January 17, 2019."

influencing passage of favorable legislation; and (iv) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A.

b.   Defendants Exelon's, ComEd's, Crane's, Pramaggiore's, and Dominguez's statements that it was "expected" that the Company and its employees "[n]ever use a third party to make payments or offers that could be improper" was false and misleading because Defendants omitted to disclose the Company had changed strategy from legal lobbying to an eight-year and ongoing illegal bribery scheme, in which ComEd and senior executives were making $1.3 million in illegal payments through third parties.

c.   Defendant Exelon's statements that all political contributions had been listed and none were made under condition of confidentiality were false and misleading because Exelon omitted to disclose the Company had changed strategy from legal lobbying to an eight-year and ongoing illegal bribery scheme, in which ComEd and senior executives were making undisclosed and confidential political contributions through bribes to Public Official A to secure favorable Illinois legislation, including: (i) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (ii) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (iii) hosting and participating in fundraisers for Public Official A with the expectation of influencing passage of favorable legislation; and (iv) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A.

**ANSWER:** Deny Paragraph 100, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 100, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

**February 2019 False and Misleading Statements in Conference Call and Form 10-K**

101.   On February 8, 2019, the Company hosted an earnings call to discuss its 4Q18 results. Crane and Pramaggiore attended on behalf of the Company and Crane made another false and misleading statement.

**ANSWER:** Deny Paragraph 101, except admit that on or about February 8, 2019, Exelon hosted an earnings call for the fourth quarter of 2018 and that Mr. Crane and Ms. Pramaggiore attended the call, and respectfully refer the Court to the transcript of the earnings call for a complete and accurate statement of its contents.

102.   Specifically, in response to an analyst question about "any update on sort of efforts to engage the legislature in Illinois, coalition building, et cetera?" Crane responded:

40

*As you can imagine, we work within the coalitions within the state on what's needed to continue to advance the environmental stakeholders, the customers in sound investment. So we have our folks communicating in those coalitions and communicating with the legislative folks*. Premature to say what it looks like at the end of the day. But they're at the beginning of the sausage-making right now. And we'll continue to have productive conversations.

**ANSWER:** Deny Paragraph 102, except admit that Exelon hosted an earnings call on or about February 8, 2019, and respectfully refer the Court to the transcript of the earnings call for a complete and accurate statement of its contents.

103.    In addition, the 2018 Form 10-K signed by Crane, Pramaggiore, and Dominguez and filed by Exelon and ComEd attached the Exhibit 14 Code of Conduct, which contained the following false and misleading statements:

a.    In the section, "Government Business," it stated, "*Exelon is committed to conducting its business with government agencies and officials consistent with the highest ethical standards and in compliance with the applicable laws.*"

b.    In the section, "Lobbying," it stated:

Exelon is subject to regulation at various levels of government, and is profoundly affected by decisions of elected and appointed government officials. *Exelon is* therefore *engaged with and actively lobbies* such *government officials in the policymaking process in support of Exelon's business interests on various issues. It is important to our success that advocacy on behalf of Exelon be consistent, coordinated and focused on both our short-term and long-term interests*. No Exelon personnel may engage in lobbying activities on behalf of the Company, testify or provide comments before any legislative committees for Exelon, or accept an appointment to an advisory or study group established by a legislative body or administrative agency on behalf of Exelon without first obtaining the approval of Government and Regulatory Affairs or the Legal Department. Government and Regulatory Affairs will also help ensure compliance with all lobbying registration, reporting, and disclosure requirements. *All Exelon lobbyists are expected to follow both the letter and spirit of the lobbying laws and to maintain the highest standards of professional integrity*.

**ANSWER:** Deny Paragraph 103, except admit that Exelon and ComEd filed an annual report on Form 10-K for the period ending December 31, 2018, and respectfully refer the Court to the 2018 Form 10-K for a complete and accurate statement of its contents.

41

104.    In addition, the 2018 Form 10-K also contained the following false and misleading statements regarding the Company's lobbying activities, the benefits and revenues from favorable legislation, and the Company's risk factors:

a.    The 2018 Form 10-K purported to describe Exelon's legitimate lobbying efforts, stating:

Generation's Dresden, Byron, and Braidwood nuclear plants in Illinois are also showing increased signs of economic distress, which could lead to an early retirement, in a market that does not currently compensate them for their unique contribution . . . . **Exelon continues to work with stakeholders on state policy solutions**, while also advocating for broader market reforms at the regional and federal level [("State Policy Solutions Statement")].

b.    The 2018 Form 10-K also emphasized the financial benefits of FEJA, stating:

**Pursuant to FEJA, . . . Generation's Clinton Unit 1, Quad Cities Unit 1 and Quad Cities Unit 2 nuclear plants were selected as the winning bidders through the IPA's ZEC procurement event. Generation** executed the required ZEC procurement contracts with Illinois utilities, including ComEd, effective January 26, 2018 and **began recognizing revenue, with compensation for the sale of ZECs retroactive to the June 1, 2017 effective date of FEJA**. During the year ended December 31, 2018, **Generation recognized** revenue of $373 million, of which **$150 million related to ZECs generated from June 1, 2017 through December 31, 2017**.

c.    The 2018 Form 10-K highlighted additional financial benefits of FEJA, stating:

On December 7, 2016, **Illinois FEJA** was signed into law by the Governor of Illinois and **included a ZES that now provides compensation to Clinton and Quad Cities for the carbon-free attributes of their production through 2027. With the passage of the Illinois ZES in December 2016, Generation reversed its June 2016 decision to permanently cease generation operations at the Clinton and Quad Cities nuclear generating plants**. Clinton and Quad Cities are currently licensed to operate through 2026 and 2032, respectively.

d.    And the 2018 Form 10-K further touted additional financial benefits of FEJA, stating: "**FEJA allows ComEd to defer energy efficiency costs . . . as a separate regulatory asset that is recovered through the energy efficiency formula rate over the weighted average useful life**, as approved by the ICC, of the related energy efficiency measures."

e.    In "ITEM 1A. Risk Factors," the 2018 Form 10-K purported to disclose risks while omitting the bribery scheme, stating:

42

> *The Registrants [including Exelon and ComEd] have large consumer customer bases and as a result could be the subject of public criticism focused on the operability of their assets and infrastructure and quality of their service. Adverse publicity of this nature could render legislatures and other governing bodies, public service commissions and other regulatory authorities, and government officials less likely to view energy companies such as Exelon and its subsidiaries in a favorable light, and could cause Exelon and its subsidiaries to be susceptible to less favorable legislative and regulatory outcomes, as well as increased regulatory oversight and more stringent legislative or regulatory requirements* (e.g. disallowances of costs, lower ROEs). The imposition of any of the foregoing could have a material negative impact on the Registrants' business or consolidated financial statements [("Operability Risk Statement")].

**ANSWER:** Deny Paragraph 104, except admit that Exelon and ComEd filed an annual report on Form 10-K for the period ending December 31, 2018, and respectfully refer the Court to the 2018 Form 10-K for a complete and accurate statement of its contents.

105. The statements set forth in ¶¶102-104 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

a. Defendants Exelon's, ComEd's, Crane's, Pramaggiore's, and Dominguez's statements purporting to describe the Company as being engaged solely in legitimate lobbying activities such as claiming they "work within the coalitions within the state . . . to advance the environmental stakeholders, the customers in sound investment," that Exelon was committed to engaging with government officials in compliance with laws and the "highest ethical standards," and that Exelon is "engaged with and actively lobbies . . . government officials" in a "consistent, coordinated" manner that was "focused on both our short-term and long-term interests" were false and misleading because Defendants omitted to disclose they had changed strategy from legal lobbying to an eight-year and ongoing illegal bribery scheme, in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation, including: (i) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (ii) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (iii) hosting and participating in fundraisers for Public Official A with the expectation of influencing passage of favorable legislation; and (iv) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A.

b. Defendants Exelon's, ComEd's, Crane's, Pramaggiore's, and Dominguez's statements regarding the source of the Company's financial benefits, including its nuclear plants being "winning bidders" and having increased revenues and clean

energy subsidies under FEJA, which allowed Exelon to "reverse[] its June 2016 decision to permanently cease generation operations," and ComEd being allowed to "defer" and "recover[]" additional costs under FEJA, were false and misleading because Defendants omitted to disclose that those benefits were not obtained through legitimate lobbying activities that resulted in the passage of FEJA, rather, the passage of FEJA was the result, in significant part, of the eight-year and ongoing bribery scheme, which rendered such financial benefits illusory and subjected the Company to massive fines.

c.      Defendants Exelon's, ComEd's, Crane's, Pramaggiore's, and Dominguez's statements regarding the legislative risks the Company faced from "public criticism" concerning their "operability" or "quality of their service" that could lead to "less favorable legislative and regulatory outcomes" were false and misleading because while disclosing those minor risks, they concealed the much larger risks of adverse legislative and regulatory outcomes, as well as fines of hundreds of millions of dollars that they were facing, as the result of the eight-year and ongoing bribery scheme.

**ANSWER:** Deny Paragraph 105, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 105, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

**March 2019 False and Misleading Statements**

106.    On March 20, 2019, Exelon filed its annual Proxy Statement on Schedule 14A ("Exelon 2019 Proxy Statement"), which was solicited to shareholders "on behalf of the Board of Directors" (including Crane) and quoted Defendant Crane. The Exelon 2019 Proxy Statement again directed investors to the *Company Code of Conduct* on the website. On that date, Exelon also had published on its website its *Political Contributions Guidelines* and *Political Contributions Report*.

**ANSWER:** Deny Paragraph 106, except admit that Exelon filed a 2019 annual Proxy Statement on Schedule 14A and that Exelon's Political Contributions Guidelines and Political Contributions Reports are available on its website, and respectfully refer the Court to the Proxy Statement, the Political Contributions Guidelines, and the Political Contributions Report for a complete and accurate statement of their contents.

107.    Exelon's statements in documents published on the website, and Exelon and Crane's statements in the Company Code of Conduct referred to in the Exelon 2019 Proxy Statement, included the same false and misleading statements from the *Company Code of*

44

*Conduct, Political Contributions Guidelines* and *Political Contributions Report* set forth in ¶¶97-99, which were false and misleading for the reasons set forth in ¶¶100(a)-(c).

**ANSWER:** Deny Paragraph 107.

**April 2019 False and Misleading Statements**

108. On April 26, 2019, ComEd filed its annual Proxy Statement on Schedule 14C ("ComEd 2019 Proxy Statement"), which directed investors to the *Company Code of Conduct* on the website, which the ComEd Proxy Statement said "is the code of conduct applicable to ComEd." On the same date, Exelon also had published on its website its *Political Contributions Guidelines* and *Political Contributions Report*.

**ANSWER:** Deny Paragraph 108, except admit that ComEd filed its annual Proxy Statement on Schedule 14C on or about April 26, 2019, and respectfully refer the Court to that Proxy Statement for a complete and accurate statement of its contents.

109. Exelon's statements in documents published on the website, and Exelon's, ComEd's, and Crane's statements in the Company Code of Conduct referred to in the ComEd 2019 Proxy Statement, included the same false and misleading statements from the *Company Code of Conduct, Political Contributions Guidelines* and *Political Contributions Report* set forth in ¶¶97-99, which were false and misleading for the reasons set forth in ¶¶100(a)-(c).

**ANSWER:** Deny Paragraph 109.

**May 2019 False and Misleading Statements**

110. On May 2, 2019, the Company hosted a conference call to discuss its first quarter 2019 ("1Q19") results and filed its Form 10-Q for the same period. On the same date, Exelon also had published on its website its *Company Code of Conduct*, *Political Contributions Guidelines* and *Political Contributions Report*. Defendants made false and misleading statements on the Exelon website, in the 1Q19 Form 10-Q, and on the conference call.

**ANSWER:** Deny Paragraph 110, except admit that Exelon hosted an earnings call on May 2, 2019, that Exelon filed a Form 10-Q for the first quarter of 2019, and that Exelon's Code of Business Conduct, Political Contributions Guidelines, and Political Contributions Report were available on Exelon's website, and respectfully refer the Court to these documents for a complete and accurate statement of their contents.

111. Crane attended the May 2, 2019 conference call on behalf of the Company and made the following false and misleading statements:

a. In discussing Exelon's efforts to pass additional favorable legislation, Crane said:

In Illinois, *legislation was introduced that would require the Illinois Power Authority to procure clean capacity for ComEd customers using the fixed resource requirement* mechanism that is currently in the PJM tariff. In addition to supporting of course truly clean energy future, in Illinois the legislation would also ensure that consumers pay less than they do today.

*The concept of the FRR has a wide support and has been endorsed by the Illinois hub – the Clean Jobs Coalition and organized labor. Another piece of legislation has been introduced into Illinois to extend the formula rate* – ComEd's formula rate provides tangible benefits to the consumers as well as certainty we need to make investments and improve reliability and resiliency in customer service while keeping the bills affordable. . . .

It's a busy legislative season as Governor Pritzker and the General Assembly tackle Illinois' significant budget problems. However, *we are optimistic these 2 priorities can get done this year*.

b. During the question and answer portion of the call, an analyst requested a "little more detail on the status of the bills that relate to energy policy in Illinois," to which Crane responded:

Our bill for the FRR, there's one that's a path to 100, and then there is one that's the clean jobs coalition. *So we're in the process right now of negotiating with the all the bills so we can come together and provide the legislature with a coalition that agrees on many things right now*. Just working through the details. We hope to be done. *Meetings are constant. I've met with the leadership of both the House and Senate, talking about what we need to do and them showing their support for us going forward. So we're just going to keep working on it as we always do*. If it's not done in the regular session because of the other priorities, we will have it positioned to move through during the veto session. That's the Generation bill.

The other bill in Illinois that will affect Exelon is *the extension of the ComEd formula rate for 10 years. That bill is proceeding. We've been able to work with stakeholders to gain support and recognition*.

c. Later in the call, Defendant Crane was again asked about whether the legislation could pass in the Spring session, and he responded:

*We're working with the coalitions as hard as we can to have something presentable to the – that the legislature supports to move in the Spring*. But what I've cautioned in our roadshows and on the calls previously, there is a very aggressive legislative agenda in Illinois this Spring. *We*

*need to be ready to be able to tell our story, communicate and have that coalition that we're building, endorsing where we're heading.* But we need to be realistic. We do think if it doesn't happen in the Spring, we'll be ready to move it in the veto session in the fall.

**ANSWER:** Deny Paragraph 111, except admit that Exelon hosted an earnings call on or about May 2, 2019, and respectfully refer the Court to the transcript of the earnings call for a complete and accurate statement of its contents.

112. On <u>May 2, 2019</u>, Exelon and ComEd also each separately filed the same combined quarterly report on Form 10-Q for the period ended March 31, 2019 ("1Q19 Form 10-Q"). The 1Q19 Form 10-Q was signed by Crane and Dominguez and contained the following false and misleading statements:

a. The 1Q19 Form 10-Q described Exelon's purportedly legitimate lobbying efforts to secure passage of CEPA, stating:

On March 14, 2019, the Clean Energy Progress Act was introduced in the Illinois General Assembly to preserve Illinois' clean energy choices arising from FEJA and empower the IPA to conduct capacity procurements outside of PJM's base residual auction process ***Exelon and Generation are working with legislators and stakeholders*** and cannot predict the outcome or the potential financial impact, if any, on Exelon or Generation [("CEPA Lobbying Statement")].

b. The 1Q19 Form 10-Q repeated the ***State Policy Solutions Statement*** set forth in ¶104(a).

c. The 1Q19 Form 10-Q incorporated the Operability Risk Statement set forth above in ¶104(e), saying "***the Registrants' risk factors were consistent with the risk factors described in the Registrants' combined 2018 Form 10-K in ITEM 1A. RISK FACTORS***."

d. The 1Q19 Form 10-Q emphasized the financial benefits of FEJA, stating:

***Pursuant to FEJA, Generation's Clinton Unit 1, Quad Cities Unit 1 and Quad Cities Unit 2 nuclear plants were selected as the winning bidders through the IPA's ZEC procurement event. Generation*** executed the ZEC procurement contracts with Illinois utilities, including ComEd, effective January 26, 2018 and ***began recognizing revenue with compensation for the sale of ZECs retroactive to the June 1, 2017 effective date of FEJA***. During the three months ended March 31, 2018, ***Generation recognized $150 million of revenue related to ZECs generated from June 1, 2017 through December 31, 2017***.

47

e.     The 1Q19 Form 10-Q also stated that, "*[u]nder FEJA*, energy efficiency revenue varies from year to year based upon fluctuations in the underlying costs, investments being recovered, and allowed ROE. *Energy efficiency revenue increased during the three months ended March 31, 2019* as compared to the same period in 2018, primarily due to the impact of higher rate base."

f.     The 1Q19 Form 10-Q further stated that, "*[o]n April 26, 2019, the Board of Directors of ComEd appointed Mr. Juan Ochoa to the Board to fill a vacancy created by an expansion of the size of the Board*."

**ANSWER:**  Deny Paragraph 112, except admit that Exelon and ComEd filed a quarterly report on Form 10-Q for the period ending March 31, 2019, and respectfully refer the Court to the Form 10-Q for a complete and accurate statement of its contents.

113.     On May 8, 2019, Exelon posted to its website its updated Political Contributions Report to disclose its second half of 2018 political contributions (for the period of July 1, 2018 – December 31, 2018) (the "2H 2018 Contributions Report").[16] The 2H 2018 Contributions Report contained the same false and misleading statements as the 1H 2018 *Political Contributions Report* set forth in ¶99. Also on that day, Exelon had published on its website its *Company Code of Conduct* and *Political Contributions Guidelines*.

**ANSWER:**  Deny Paragraph 113, except admit that Exelon's Code of Business Conduct, Political Contributions Guidelines, and Political Contributions Report were available on its website, and respectfully refer the Court to these documents for a complete and accurate statement of their contents.

114.     The statements set forth in ¶¶110-113 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

a.     Defendants Exelon's and Crane's statements in the *Company Code of Conduct*, and Defendant Exelon's statements in the *Political Contributions Guidelines* and *Political Contributions Reports* were false and misleading for the reasons set forth in ¶¶100(a)-(c).

b.     Defendant Crane's statements purporting to describe the Company as being engaged solely in legitimate lobbying in order to pass additional favorable

[16]   The   2H   2018   Contributions   Report   is   available   at   https://www.exeloncorp.com/company/ Documents/2018%20Political%20Contributions%20July%20through%20December.pdf. When last accessed on September 1, 2020, Exelon's website indicates that the 2H 2018 Contributions Report was last updated on the website on "May 7, 2019."

legislation in 2019, such as stating the legislation had "wide support," they were "negotiating" to build "a coalition" of support, they had "met with the leadership of the both the House and Senate," were "working with legislators," and were "going to keep working on it as we always do," as well as Defendants Exelon's, ComEd's, Crane's, and Dominguez's statements in the Form 10-Q describing the Company as engaged in legitimate lobbying, were false and misleading because they omitted to disclose the Company had changed strategy from legal lobbying to an eight-year and ongoing illegal bribery scheme in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation, including: (i) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (ii) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (iii) hosting and participating in fundraisers for Public Official A with the expectation of influencing passage of favorable legislation; (iv) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A; and (v) just appointing an associate of Public Official A to ComEd's Board of Directors at the request of Public Official A.

c.     Defendants Exelon's, ComEd's, Crane's, and Dominguez's statement emphasizing the financial benefits "pursuant to FEJA" and the statement touting that "revenue increased during the three months ended March 31, 2019" from FEJA were false and misleading for the reasons set forth in ¶105(b).

d.     Defendants Exelon's, ComEd's, Crane's, and Dominguez's *Operability Risks Statement* was false and misleading for the same reasons set forth in ¶105(c).

e.     Defendants Exelon's, ComEd's, Crane's, and Dominguez's statement that Ochoa was appointed to the ComEd Board "to fill a vacancy created by an expansion of the size of the Board" was false and misleading because it omitted to disclose that the board was expanded, and a vacancy created, in order to appoint Ochoa to the ComEd Board at the request of and in order to influence Public Official A as part of the Company's eight-year and ongoing bribery scheme.

**ANSWER:** Deny Paragraph 114, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 114, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

**July and August 2019 False and Misleading Statements**

115.    On July 12, 2019, *WBEZ Chicago* reported that "[f]ederal agents recently executed a search warrant on the Southwest Side home of retired Chicago Ald. Michael Zalewski, and sources familiar with the investigation say they were seeking records regarding [Public Official A]." The raid was conducted "[a]round the same time [federal agents] raided the home of Kevin Quinn," a former aide and "operative" to Public Official A. According to *WBEZ*

*Chicago*, the federal probe "center[ed] on efforts to get work for Zalewski at ComEd and the interactions between [Public Official A], Zalewski and longtime ComEd lobbyist and [Public Official A] confidant Michael McClain, according to three sources familiar with the federal investigation." The article noted that Zalewski was not listed as a ComEd lobbyist, and when contacted by the reporters, McClain stated, "'[t]here's nothing against the law about asking for a job.'" The *WBEZ Chicago* article further reported that Exelon and ComEd had received a grand jury subpoena for records related to the investigation and stated that "[t]he ongoing corruption investigation into Chicago and Illinois government is being led by . . . the U.S. attorney for the Northern District of Illinois."

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 115, except admit that *WBEZ Chicago* published a report on or about July 12, 2019, and respectfully refer the Court to that report for a complete and accurate statement of its contents.

116. On July 15, 2019, Exelon and ComEd each separately filed a combined Current Report on Form 8-K stating that Exelon and ComEd "*received a grand jury subpoena* from the U.S. Attorney's Office for the Northern District of Illinois *requiring production of information concerning their lobbying activities in the State of Illinois*. The Companies have pledged to cooperate fully and are cooperating fully with the U.S. Attorney's Office in expeditiously providing the requested information."

**ANSWER:** Deny Paragraph 116, except admit that Exelon and ComEd separately filed a report on Form 8-K on or about July 15, 2019, and respectfully refer the Court to the Form 8-K for a complete and accurate statement of its contents.

117. On August 1, 2019, the Company hosted a conference call to discuss its second quarter 2019 ("2Q19") results and filed its Form 10-Q for the same period. Defendants made false and misleading statements during the conference call, in the Form 10-Q, and in the documents published on Exelon's website.

**ANSWER:** Deny Paragraph 117, except admit that Exelon hosted an earnings call on or about August 1, 2019 and that Exelon filed a Form 10-Q for the second quarter of 2019, and respectfully refer the Court to the transcript of the earnings call and the Form 10-Q for a complete and accurate statement of their contents.

118. Crane, Von Hoene, and Pramaggiore attended the August 1, 2019 conference call on behalf of the Company and made the following false and misleading statements:

50

a.     Defendant Crane stated:

[W]e've received numerous questions from our investors about the subpoena in Illinois from the U.S. Attorney's Office. *We* are cooperating fully and provided all – *are providing all information requested by the U.S. Attorney's Office*. We simply can't comment further on the investigation, and we are not going to speculate on whether it may affect legislative efforts in the – Illinois this fall. What we do know about this fall session is there are a number of stakeholders who want to see clean energy legislation enacted.

Illinois lags behind other progressive states on clean energy policy. *Passing the clean energy legislation is a priority for many stakeholders, include -- in Illinois, including the Citizens Utility Board, [Labor], the Clean Jobs Coalition and the Renewable Community*. These stakeholders want to greatly expand their renewable penetration so the state will be able to achieve the 100% clean energy target by 2030. [Senior Vice President] *Kathleen [Barron] and her team are working with the stakeholders to help crack the legislation -- the legislative package and the -- inform members of general assembly on the benefits of this legislation*.

b.     During the question and answer portion of the call, an analyst asked about the "broad coalition" supporting CEPA or similar legislation "as we get into the veto session and whether you think that the state policymakers understand the implications . . . and the need to take back control of the market." Crane responded: "*As you can imagine, we have a significant communications drive with the legislative and the administration on the situation and we are prepared to present them with a coalition*, I'll let Kathleen [Barron] describe who she's working with "[17]

c.     Another analyst asked about the efforts to advance CEPA or similar legislation and whether "since this news from a few weeks ago came out about the subpoena, has there been any – have these talks continued?" Defendant Von Hoene responded:

*The activity that has started and continued for a number of months on advancing the clean energy legislation among the coalition We're meeting regularly, we're doing the stakeholder outreach, we're trying to craft a package and educate members of legislature and the tendency of the grand jury and subpoenas [sic] had no impact on the level of activity or the intensity of the activity in that regard*.

---

[17]   Kathleen Barron then identified "a number of stakeholders that are very focused on getting clean energy legislation enacted in Illinois," including "folks in the environmental community," the "renewable developers," the "Consumer Advocate," and the "labor community."

d. When asked about "some background of your franchise agreement in Chicago," Defendant Pramaggiore responded:

[T]he expiration date is the end December of 2020. The city needs to give us, in its indication by the end of the year, as to whether they want to maintain status quo, renegotiate or terminate the franchise agreement. So we'll know by the end of the year. But we're in discussions with them. *We started to have discussions around that. We understand what their priorities are and they are, I think, priorities are very much aligned with ours*. They want to see more clean energy in the city of Chicago and they are concerned about vulnerable population in particular in terms of pricing, and those are all – *those are both strong strategic elements of our focus going forward at all our utilities*. But that's the status right now.

**ANSWER:** Deny Paragraph 118, except admit that Exelon hosted an earnings call on or about August 1, 2019, which was attended by Mr. Crane, Mr. Von Hoene, and Ms. Pramaggiore, and respectfully refer the Court to the transcript of the earnings call for a complete and accurate statement of its contents.

119. On August 1, 2019, Exelon and ComEd separately filed the same combined quarterly report on form 10-Q for the period ended June 30, 2019 ("2Q19 Form 10-Q"), which was signed by Defendants Crane and Dominguez and contained the following false and misleading statements:

a. The 2Q19 Form 10-Q stated that "*Exelon and ComEd received a grand jury subpoena* from the U.S. Attorney's Office for the Northern District of Illinois *requiring production of information concerning their lobbying activities in the State of Illinois*. Exelon and ComEd have pledged to cooperate fully and are cooperating fully with the U.S. Attorney's Office in expeditiously providing the requested information."

b. The 2Q19 Form 10-Q incorporated the *Operability Risk Statement* set forth in ¶104(e), saying "*the Registrants' risk factors were consistent with the risk factors described in the Registrants' combined 2018 Form 10-K in ITEM 1A. RISK FACTORS*."

c. The 2Q19 Form 10-Q emphasized the financial benefits of FEJA, stating:

*Pursuant to FEJA, . . . Generation's Clinton Unit 1, Quad Cities Unit 1 and Quad Cities Unit 2 nuclear plants were selected as the winning bidders through the IPA's ZEC procurement event. Generation executed the ZEC procurement contracts with Illinois utilities, including ComEd, effective January 26, 2018 and began recognizing revenue with compensation for the sale of ZECs retroactive to the June 1, 2017*

*effective date of FEJA. During the first quarter 2018, Generation recognized $150 million of revenue related to ZECs generated from June 1, 2017 through December 31, 2017*.

d.    The 2Q19 Form 10-Q also stated that, "*[u]nder FEJA*, energy efficiency revenue varies from year to year based upon fluctuations in the underlying costs, investments being recovered, and allowed ROE. *Energy efficiency revenue increased during the three and six months ended June 30, 2019* as compared to the same period in 2018, primarily due to the impact of higher rate base."

e.    The 2Q19 Form 10-Q repeated the *State Policy Solution Statement* set forth in ¶104(a).

f.    The 2Q19 Form 10-Q also repeated the same *CEPA Lobbying Statement* set forth in ¶112(a).

**ANSWER:** Deny Paragraph 119, except admit that Exelon and ComEd filed a Form 10-Q on or about June 30, 2019, and respectfully refer the Court to the Form 10-Q for a complete and accurate statement of its contents.

120.    On July 12, 2019 and August 1, 2019, Exelon had published on its website the same false and misleading statements from the Company Code of Conduct, Political Contributions Guidelines and Political Contributions Reports set forth in ¶¶97-99.

**ANSWER:** Deny Paragraph 120, except admit that Exelon's Code of Business Conduct, Political Contributions Guidelines, and Political Contributions Reports were available on its website, and respectfully refer the Court to those documents for a complete and accurate statement of their contents.

121.    The statements set forth in ¶¶116-120 above were false and misleading when made. The true facts, which were then known to or recklessly disregarded by Defendants, were:

a.    Defendants Exelon's, ComEd's, Crane's, Dominguez's, and Von Hoene's statements suggesting Exelon and ComEd were merely subpoenaed as witnesses by saying they were subpoenaed to "provid[e] . . . information" and for the "production of information," and the receipt of the subpoena "had no impact on the level" of the Company's lobbying activity, and its "risk factors" remained "consistent with the risk factors" in the "combined 2018 Form 10-K," were false and misleading because they omitted to disclose that (i) the Company and senior executives were at substantial risk of criminal penalties (and under investigation) due to their bribery scheme; and (ii) the Company had made a strategic decision to change strategy from legal lobbying to an eight-year illegal bribery scheme, in

which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation, including: (a) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (b) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (c) hosting and participating in fundraisers for Public Official A with the expectation of influencing passage of favorable legislation; (d) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A; and (e) recently appointing an associate of Public Official A to ComEd's Board of Directors at the request of Public Official A.

b.  Defendants Exelon's, ComEd's, Crane's, Dominguez's, and Von Hoene's statements purporting to describe legitimate lobbying activities, such as claiming they had "a significant communications drive with the legislative [sic]," and they were "working with legislators" on proposed favorable legislation, "working with the stakeholders to help crack the legislation," "prepar[ing] to present [legislators] with a coalition," engaging in activity "for a number of months on advancing the clean energy legislation among the coalition," "meeting regularly," and "trying to craft a package and educate members of legislature," were false and misleading because they omitted to disclose the Company had changed strategy from legal lobbying to an eight-year illegal bribery scheme, in which ComEd and senior executives had been bribing Public Official A to secure favorable Illinois legislation, including: (i) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (ii) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (iii) hosting and participating in fundraisers for Public Official A with the expectation of influencing passage of favorable legislation; (iv) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A; and (v) recently appointing an associate of Public Official A to ComEd's Board of Directors at the request of Public Official A.

c.  Defendants Exelon's, ComEd's, Crane's, and Dominguez's statement emphasizing the financial benefits "pursuant to FEJA" and the statement touting that "revenue increased during the three months ended March 31, 2019" from FEJA were false and misleading for the reasons set forth in ¶105(b).

d.  Defendants Exelon's, ComEd's, Crane's, and Dominguez's *Operability Risk Statement* was false and misleading for the same reasons set forth in ¶105(c).

e.  Defendants Exelon's and Crane's statements in the *Company Code of Conduct, Political Contributions Guidelines*, and *Political Contributions Reports* were false and misleading for the reasons set forth in ¶¶100(a)-(c).

**ANSWER:** Deny Paragraph 121, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 121, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

**Analyst Reaction to the False and Misleading Statements**

122. Analysts reacted positively to the false and misleading statements touting, for example, the Company's risks as being unchanged and its purported legitimate and successful lobbying, financial benefits of favorable legislation, efforts to secure additional favorable legislation, and purported stringent legal and ethical compliance during the Class Period.

**ANSWER:** Deny Paragraph 122.

123. For example, on June 11, 2019, analysts from Credit Suisse issued a report reiterating their positive outlook for Exelon stock and stating that proposed "[b]eneficial Illinois legislation," which they estimated would provide "~250M of annual capacity revenues," was "continu[ing] to be debated, although the concept is generally accepted by most parties," suggesting it was likely to pass. Similarly, on June 27, 2019, analysts from Macquarie Research issued a report also reiterating their "[o]utperform" rating for Exelon stock and stating that "[t]he IL Legislature should approve the FRR option . . . in November during the veto session."

**ANSWER:** Deny Paragraph 123, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about "analysts from Macquarie Research," admit that Credit Suisse published a report on or about June 11, 2019, and respectfully refer the Court to the report for a complete and accurate statement of its contents.

124. Even after disclosures regarding the federal investigation involving ComEd's outside lobbyists and Public Official A (*see* ¶¶115-116, 138-143), Defendants' false and misleading statements regarding the grand jury subpoena and the Company's risks and lobbying efforts successfully mitigated the negative disclosures. For example, on August 13, 2019, analysts from Credit Suisse issued a report again reiterating their positive views on Exelon. The analysts believed Exelon was not at risk, stating, for example, "[w]e see support for the Clean Energy Progress Act (CEPA) unbowed despite a US Attorney Grand Jury and FBI investigation *into* [the] Illinois House Speaker [Public Official A]." Rather than targeting Exelon or ComEd or its employees, analysts noted that the media had "reported a federal investigation *into* associates of [Public Official A] who have allegedly taken sizeable payments from [external] ComEd lobbyists."

**ANSWER:** Deny Paragraph 124, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations about "analysts," and admit that Credit

Suisse published a report on or about August 13, 2019, and respectfully refer the Court to the report for a complete and accurate statement of its contents.

125.     As a further example, on August 27, 2019, analysts from Morgan Stanley issued a report stating that they had increased their price target for Exelon from $56 to $60. The analysts continued to believe the Company was not the target of the investigation and therefore it would not impact its ability to obtain passage of favorable legislation, stating that the increased price target was based on "our view that this legislation in IL [CEPA] is likely to be enacted" and it is valued at "$4/share." The analysts made only passing reference to "a federal investigation *into a utility lobbyist* in Illinois," which they described as merely a "potential overhang[]."

**ANSWER:** Deny Paragraph 125, except admit that Morgan Stanley issued a report on or about August 27, 2019, and respectfully refer the Court to the report for a complete and accurate statement of its contents.

## EXELON'S AND COMED'S CLASS PERIOD SEC FILINGS FAILED TO DISCLOSE REQUIRED INFORMATION

126.     In addition to making false and misleading statements, Defendants failed to disclose mandatory material information in the annual report and quarterly reports filed with the SEC during the Class Period.

**ANSWER:** Deny Paragraph 126.

127.     Item 7 of SEC Regulation S-K required that Exelon's and ComEd's annual reports on Form 10-K and quarterly reports on Form 10-Q contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). According to the SEC, MD&A is intended to "'give investors an opportunity to look at the [Company] through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the [Company's] prospects for the future.'"

**ANSWER:** Paragraph 127 contains legal conclusions to which no response is required. To the extent a response is required, the Exelon and ComEd Defendants deny Paragraph 127, except admit that the SEC has issued guidance regarding Form 10-K and Form 10-Q, and respectfully refer the court to SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures for a complete and accurate statement of its contents.

56

128.    Pursuant to Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303"), Exelon's and ComEd's Form 10-K and Form 10-Qs were required to "[d]escribe any known trends or uncertainties that have had or that [the Company] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). Item 303 also required Exelon's and ComEd's Form 10-K and Form 10-Qs to disclose events that would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i)-(ii).

a.    In violation of Item 303, the 2018 Form 10-K signed by Crane, Pramaggiore, and Dominguez, and the 1Q19 Form 10-Q and 2Q19 Form 10-Q signed by Crane and Dominguez, failed to disclose material trends, events, and uncertainties known to management that were reasonably expected to have a material adverse effect on the Company's resources and results of operations, namely that: the Company faced substantial risk of criminal penalties due to the Company's changed strategy from legal lobbying to an eight-year illegal and undisclosed bribery scheme, in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation, including: (i) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (ii) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (iii) hosting and participating in fundraisers for Public Official A with the expectation of influencing passage of favorable legislation; (iv) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A; and (v) appointing an associate of Public Official A to ComEd's Board of Directors at the request of Public Official A.

**ANSWER:**  Deny Paragraph 128, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 128, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

129.    These known trends, events, or uncertainties were reasonably likely to have a material unfavorable impact on Exelon's and ComEd's revenue and net income from continuing operations by compromising the approval of proposed and future favorable legislation and/or subjecting Exelon or ComEd to substantial fines or other penalties, as reflected in the $200 million penalty the Company agreed to pay as part of the DPA.

**ANSWER:**  Deny Paragraph 129.

130.    Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), specifically required Exelon's and ComEd's Form 10-K and Form 10-Qs to provide "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky." In violation of Item 105, the 2018 Form 10-K signed by Crane, Pramaggiore, and

Dominguez, and the 1Q19 Form 10-Q and 2Q19 Form 10-Q signed by Crane and Dominguez, failed to discuss the following significant factors that made investment in Exelon risky: that Exelon and ComEd faced substantial risk of criminal penalties, and substantial risk that proposed and future favorable legislation would be compromised, due to the Company's changed strategy from legal lobbying to an eight-year illegal and undisclosed bribery scheme, in which ComEd and senior executives were bribing Public Official A to secure favorable Illinois legislation, including: (i) indirectly making undisclosed payments of more than $1.3 million to associates of Public Official A, who did little or no work for ComEd; (ii) hiring and guaranteeing thousands of hours to a law firm that was valuable and important to Public Official A; (iii) hosting and participating in fundraisers for Public Official A with the expectation of influencing passage of favorable legislation; (iv) hiring interns that were from Public Official A's ward and recommended by associates of Public Official A; and (v) appointing an associate of Public Official A to ComEd's Board of Directors at the request of Public Official A.

**ANSWER:** Deny Paragraph 130, except admit that ComEd entered into the DPA, which

addresses certain of the matters alleged in Paragraph 130, and respectfully refer the Court to the

DPA for a complete and accurate statement of its contents.

131. Rather than disclose these factors, Defendants provided false and misleading risk factors that concealed the true risks of investment in Exelon. *See* ¶¶104(e), 105(c), 112(c), 119(b).

**ANSWER:** Deny Paragraph 131.

132. Demonstrating that the stated risk factors were inadequate under Item 105 during the Class Period, Exelon and ComEd added the following risk factors for the first time after the Class Period ended, on February 11, 2020, in their annual report on Form 10-K for the period ending December 31, 2019: "The outcome of the U.S. Attorney's Office . . . investigations cannot be predicted and could subject Exelon and ComEd to criminal or civil penalties, sanctions or other remedial measures," and "[a]ny of the foregoing, as well as the appearance of non-compliance with anti-corruption and anti-bribery laws, could have an adverse impact on Exelon's and ComEd's reputation or relationship with regulatory and legislative authorities."

**ANSWER:** Deny Paragraph 132, except admit that Exelon and ComEd filed an annual

report on Form 10-K for the period ending December 31, 2019, and respectfully refer the Court

to the Form 10-K for a complete and accurate statement of its contents.

133. Generally accepted accounting principles ("GAAP"), and specifically Financial Accounting Standards Board ("FASB"), Accounting Standards Codification ("ASC") 450 ("ASC 450"), *Contingencies*, also required disclosures in the 2Q19 Form 10-Q signed by Crane and Dominguez regarding the Company's bribery scheme and potential loss exposure stemming from civil, criminal, and financial penalties and consequences due to the misconduct. More

specifically, ASC 450 requires disclosure in the footnotes to the financial statements for material loss contingencies and/or significant risk and uncertainties.[18]

**ANSWER:** Deny Paragraph 133 and respectfully refer the Court to Accounting Standards Codification ("ASC") 450 for a complete and accurate statement of its contents.

134.    Under ASC 450, disclosing a loss contingency is required when there is more than a remote chance that a loss will be incurred. The threshold for *disclosure* of a loss contingency (as opposed to a higher threshold for the accrual of a loss contingency) is very low – ASC 450 requires disclosure only when the loss is "[r]easonably possible," which is defined as, "[t]he chance of the future event or events occurring is more than remote but less than likely." Under ASC 450, the disclosure shall indicate the nature of the contingency and an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

**ANSWER:** Deny Paragraph 134 and respectfully refer the Court to ASC 450 for a complete and accurate statement of its contents.

135.    ASC 450 specifically addresses the disclosure of "pending or threatened litigation," stating that when "determining whether accrual and/or disclosure is required with respect to pending or threatened litigation," companies must consider: (i) "[t]he period in which the underlying cause (i.e., the cause for action) of the pending or threatened litigation or of the actual or possible claim or assessment occurred"; (ii) "[t]he degree of probability of an unfavorable outcome"; and (iii) "[t]he ability to make a reasonable estimate of the amount of loss." ASC 450 adds that:

> With respect to unasserted claims and assessments, an enterprise must determine the degree of probability that a suit may be filed or a claim or assessment may be asserted and the possibility of an unfavorable outcome [A]n investigation of an enterprise by a governmental agency, if enforcement proceedings have been or are likely to be instituted, is often followed by private claims for redress, and the probability of their assertion and the possibility of loss should be considered in each case.

**ANSWER:** Deny Paragraph 135 and respectfully refer the Court to ASC 450 for a complete and accurate statement of its contents.

136.    Here, the Company's bribery scheme spanned eight years and included more than $1.3 million in bribes, the retention of a law firm, the appointment of a board member, and

---

[18]    ASC 450 (formerly Statement of Financial Accounting Standards No. 5, Accounting for Contingencies) defines a loss contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to [a] possible loss to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."

hosting fundraisers, all of which were intended to influence Public Official A. The bribery scheme resulted in financial benefits to the Company that exceeded $150 million as a result of rate increases by ComEd, as well as subsidies to be paid up to $2.35 billion to Exelon Generation. The bribery payments, which the Company has admitted were carried out with the intent to influence and reward Public Official A in his official capacity, were unlawful, and the Company was clearly on notice of the criminal investigation as of the filing of the 2Q19 Form 10-Q. By that time, the Company had received a subpoena (¶116); established a Board committee in connection with the subpoena (¶144); had been advised of the nature of the criminal investigation (¶210); was aware of the raid of the home of and had cut ties with the main outside lobbyist involved in the bribery scheme (¶¶138, 204); was aware of the raid of the house of Kevin Quinn and payments made by outside ComEd lobbyists to Kevin Quinn (¶¶115, 140); and was aware of the raid of the home of Zalewski – Associate 3 in the DPA – regarding "efforts to get work for Zalewski at ComEd and the interactions between [Public Official A], Zalewski and . . . McClain" (¶115). The civil, financial, and potentially criminal consequences for the illegal behavior made a future loss "more than remote," thus satisfying the standard for disclosure under ASC 450.

**ANSWER:** Deny Paragraph 136, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 136, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

## THE TRUTH BEGINS TO EMERGE

137.    The truth about the Company's bribery scheme emerged over the course of a series of disclosures, causing declines in the price of Exelon common stock.

**ANSWER:** Deny Paragraph 137.

**July 2019 Disclosures**

138.    After market close on July 18, 2019, the *Chicago Tribune* published a report disclosing that "[t]he FBI ha[d] raided" the home of McClain, one of Exelon and ComEd's top lobbyists, in "mid-May" pursuant to a search warrant, which can only be obtained if federal law enforcement "convince[s] a judge there is probable cause to believe a crime has been committed and that evidence of that crime exists in the home." The article reiterated that McClain was a long-time lobbyist for ComEd and reported that "McClain was a point man in the discussions about major ComEd and parent company Exelon legislation for decades. He retired as a lobbyist shortly after the passage of legislation in December 2016 [FEJA] that raised electricity rates on Illinois residents and businesses to help bail out a pair of Exelon's nuclear power plants."

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 138, except admit that the *Chicago Tribune* published a report on or

about July 18, 2019, and respectfully refer the Court to that report for a complete and accurate

statement of its contents.

139.    After the news on July 18, 2019, the price of Exelon common stock declined from $48.76 per share on July 18, 2019 to $47.57 per share on July 19, 2019, eliminating more than $1 billion in market capitalization for Exelon. Exelon's 2.4% common stock price decline was four times larger than the modest 0.6% decline in the S&P 500 Index on the same day.

**ANSWER:**  Deny Paragraph 139.

140.    On <u>July 24, 2019</u>, the *Chicago Tribune* reported that, according to "[r]ecords obtained by the Tribune," $10,000 worth of checks were sent to Quinn, a "former top [Public Official A] lieutenant" and that "[t]he checks came from accounts linked to five current or former lobbyists for utility giant ComEd, including . . . McClain." the *Chicago Tribune* article further reported, "[t]he FBI is looking at the checks as part of an ongoing investigation, a source with knowledge of the probe told the Tribune." The article detailed the following payments made from lobbyists connected to ComEd:

- Four $1,000 checks dated September 2018, January 2019, February 2019, and March 2019 to Kevin Quinn from the firm of John Bradley, a former state representative and "now a registered lobbyist for ComEd."

- Two $1,000 checks dated January 2019 to Kevin Quinn from Cornerstone Government Affairs, where "ComEd is a Cornerstone client."

- One $1,000 check dated December 2018 to Kevin Quinn from the lobbying firm of Tom Cullen, a former Public Official A political director and "a former ComEd lobbyist."

- One $2,000 check dated January 2019 to Kevin Quinn from the lobbying firm of Michael Alvarez, "a City Hall lobbyist for ComEd."

- One $1,000 check dated January 2019 to Kevin Quinn from Michael McClain. Another $1,000 check was sent to Kevin Quinn from an unnamed businessman, with "McClain" written in the memo line.

**ANSWER:**  Deny information or knowledge sufficient to form a belief as to the truth of

the allegations in Paragraph 140, except admit that the *Chicago Tribune* published an article on

or about July 24, 2019 and that ComEd entered into the DPA, which addresses certain of the

matters alleged in Paragraph 140, and respectfully refer the Court to the article and the DPA for a

complete and accurate statement of their contents.

141. The same morning, July 24, 2019, *Crain's* published an article that discussed the payments similar to the report published by the *Chicago Tribune* and also discussed the connection between political contributions to Public Official A and the financial benefits of Exelon and ComEd's legislative successes:

> ComEd and its parent company, Exelon, are perhaps the most politically potent business interests in Illinois. Both donate substantial sums to political campaigns and have employed many former lawmakers and others close to [Public Official A] as lobbyists and consultants.

> In recent years, [Public Official A] has provided immense help to Exelon, first by shepherding through ComEd's $2.6 billion smart-grid law in 2011 over the veto of Democratic Gov. Pat Quinn. That act has led to substantial rate hikes to finance ComEd's grid modernization program and a regulatory rate-setting system that enables the utility to change rates annually via a formula with limited regulatory oversight.

> In 2016 [Public Official A] helped usher through a ratepayer-funded bailout for two nuclear plants Exelon had threatened to close. That was one of the only measures [Public Official A] and Republican Gov. Bruce Rauner agreed on during Rauner's single term. The bailout provides Exelon with more than $200 million in additional revenue each year and costs the average Illinoisan an extra $2 or so per month on their electric bill.

**ANSWER:** Deny Paragraph 141, except admit that *Crain's* published an article on or about July 24, 2019 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 141, and respectfully refer the Court to the article and the DPA for a complete and accurate statement of their contents.

142. After the news on July 24, 2019, the price of Exelon common stock fell from a close of $46.36 on July 23, 2019 to a close of $45.48 on July 24, 2019, eliminating more than $850 million in market capitalization for Exelon, even on a day when the S&P 500 Index increased.

**ANSWER:** Deny Paragraph 142.

143. Although the July 2019 disclosures partially revealed misconduct and an investigation connected to certain of the Company's outside lobbyists and Public Official A, Defendants' false and misleading statements continued to conceal the bribery scheme, the scope and extent of the misconduct, the direct involvement of the Company and its senior executives, and that the Company was facing a criminal investigation that exposed it to significant criminal penalties and substantial risks to its legislative agenda.

**ANSWER:** Deny Paragraph 143.

**October 2019 Disclosures**

144. On October 4, 2019, ComEd filed a Form 8-K with the SEC disclosing that Marquez had retired two days earlier. On October 9, 2019, Exelon and ComEd filed a Form 8-K with the SEC stating that Exelon and ComEd had "received a second grand jury subpoena from the U.S. Attorney's Office for the Northern District of Illinois that requires production of records of any communications with certain individuals and entities, including Illinois State Senator Martin Sandoval." It also disclosed that "[o]n June 21, 2019, the Exelon Corporation Board formed a Special Oversight Committee, consisting solely of independent directors, to oversee [Exelon and ComEd's] cooperation and compliance with the subpoena, any further action taken by the U.S. Attorney and any resulting actions that may be required or recommended."

**ANSWER:** Admit that Exelon and ComEd filed Forms 8-K on or about October 4, 2019 and October 9, 2019, and respectfully refer the Court to the Forms 8-K for a complete and accurate statement of their contents.

145. After market close on October 15, 2019, Exelon issued a press release announcing the sudden "retirement" of Pramaggiore from both her role as the CEO of Exelon Utilities and as Vice Chairman of the ComEd Board of Directors, "effectively immediately." The next day, October 16, 2019, the *Chicago Tribune* published a report titled, "Exelon Utilities CEO Anne Pramaggiore abruptly retires amid federal probe into Illinois lobbying," which stated that the "announcement of Pramaggiore's retirement came less than a week after Exelon and ComEd acknowledged they had received a second subpoena" from federal investigators.

**ANSWER:** Deny Paragraph 145, except admit that Exelon issued a press release on or about October 15, 2019 and that the *Chicago Tribune* published an article on or about October 16, 2019, and respectfully refer the Court to these documents for a complete and accurate statement of their contents.

146. The *Chicago Tribune* also reported "[a] source with knowledge of the investigation told the Tribune that Pramaggiore is one focus of the ongoing federal probe" and that Pramaggiore declined an interview request "through a spokesman at a crisis communications firm." The article added, "Pramaggiore, who also was senior executive vice president, was a key player in ComEd's success over the years in Springfield. Exelon and ComEd employ one of the largest lobbying contingents at the Capitol and historically are among the biggest campaign contributors to state lawmakers."

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 146, except admit that the *Chicago Tribune* published an article on

or about October 16, 2019, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

147. Analysts following Exelon quickly reacted to the news:

a. On October 16, 2019, analysts from Evercore ISI issued a report stating that they were "concerned about exposure to an ongoing federal criminal investigation into political corruption in IL." In addition, the analysts now highlighted the direct risk to the Company from the investigation, stating, "[t]he sudden departure of Pramaggiore after EXC [Exelon] disclosed receiving a second subpoena from the U.S. Attorney's office six days ago cannot be interpreted in any other way [than] being directly related to each other, meaning the risk that ComEd/EXC are not just being asked to supply information to the investigation but could also be under scrutiny for criminal behavior is now heightened." The analysts added that "[i]nvestors should also note that ComEd's franchise agreement with the city of Chicago is set to expire at YE '20 and needs to be renewed, which poses another risk."

b. On October 16, 2019, analysts from Morningstar Equity Research issued a report titled, "Exelon Utilities: Abrupt Executive Departure Turns Investor Focus to Federal Probe." The analysts reported that Pramaggiore "abruptly resigned Oct. 15" and noted that "[d]uring her tenure, [Pramaggiore] played a key role in lobbying for key regulatory changes in the state, among them the 2011 smart-grid law that supported nearly $3 billion in grid modernization capital investments." The analysts expressed "concern" about Pramaggiore's departure and similarly noted the risk to Exelon from the investigation, adding, "Pramaggiore's abrupt departure suggests her resignation was due to her time at ComEd," and "Exelon's exposure to both political and regulatory damage from the federal corruption probe may be higher than previously believed and could be a huge setback given the recent improvement in Illinois' regulatory environment."

c. On October 16, 2019, *SPG Global* published an article titled "Exelon Utilities CEO resigns as Illinois lobbying probe intensifies." The article reported that "Mizuho Securities on Oct. 16 issued a research report stating that if Exelon lobbyists or executives are indicted, legislative proposals to compensate nuclear plants and extend Commonwealth Edison's formula rate plan would likely not be adopted in the regular session in January 2020."

d. On October 17, 2019, analysts from Morgan Stanley issued a report stating that "[y]esterday, following the news about Pramaggiore's early retirement the night before, EXC's stock underperformed the group by 5%" and stated that "the resignation of two senior ComEd executives in a short period of time, coincident in time with the federal investigation of various persons in Illinois, is in our view concerning." In outlining the risks associated with the federal investigation, the analysts highlighted that potential damage could include "a degradation in the relationship between the company and legislators and regulators in Illinois." The

analysts noted that Exelon was seeking 2019 legislation that would allow its nuclear plants to enter into long-term capacity contracts that "would add $4/share in value," but noted that was at risk because "[i]t is possible that an unfavorable outcome of the of the federal investigation" could "reduce or eliminate the chances of such legislation passing." Moreover, the analysts said, "there is a possibility of the legislature passing an extension of the current utility rate construct, in which an unfavorable investigation outcome could have a similar 'chilling effect' on such legislation."

**ANSWER:** Deny Paragraph 147, except deny knowledge or information necessary to form a belief as to the truth of unspecified allegations of "analysts," and admit that Evercore ISI published a report on or about October 16, 2019, that Morningstar Equity Research published a report on or about October 16, 2019, that SPG Global published a report on or about October 16, 2019, and that Morgan Stanley published a report on or about October 16, 2019, and respectfully refer the Court to those reports for a complete and accurate statement of their contents.

148.    After the news on October 15-17, 2019, the price of Exelon common stock declined from $47.06 per share on October 15, 2019 to $44.91 per share on October 16, 2019 and to $44.06 per share on October 17, 2019, eliminating approximately $2.9 billion in market capitalization, even though the S&P 500 Index experienced a net increase between October 15 to October 17, 2019.

**ANSWER:** Deny Paragraph 148.

149.    On October 18, 2019, analysts from SunTrust Robinson Humphrey cut their price target by 8%, noting that "[t]he legal issues in IL have created uncertainty around the following: (1) the potential passage of new legislation that EXC [Exelon] has been supporting; (2) the IL legislative change to Com Ed [sic] formula rates . . . ; and (3) the passage of Zero Emission Credit (ZEC) legislation in IL in 2016."

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 149, except admit that Sun Trust Robinson Humphrey published a report on or about October 18, 2019, and respectfully refer the Court to the report for a complete and accurate statement of its contents.

150.    Investigative journalists continued to confirm that ComEd and its employees were targeted in the investigation in the following days. For example, on October 18, 2019, *WBEZ Chicago* published an article titled, "Source Feds Focus On Clout Hires at ComEd, Leader of Chicago's City Club." The article stated that "[f]ederal investigators are looking into allegations

65

that Commonwealth Edison hired multiple politically connected employees and consultants in exchange for favorable government actions, including electricity rate increases, WBEZ has learned. A source involved in the investigation said authorities believe many of the clout hires at the state's largest electric utility got paid but did little or no work, and some of them have ties to [Public Official A]." The article added that "agents investigating those hires are also probing the role played by Jay Doherty, a longtime lobbyist for ComEd and president of the City Club of Chicago, the source said."

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 150, except admit that *WBEZ Chicago* published an article on or about October 18, 2019 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 150, and respectfully refer the Court to the article and the DPA for a complete and accurate statement of their contents.

151.    *WBEZ Chicago* noted that "ComEd depends on Springfield lawmakers and regulators for permission to increase electricity rates for its more than 4 million Illinois customers" and highlighted the departures of Pramaggiore and Marquez, as well as the departure of "John Hooker [as an external] lobbyist [for] ComEd." The article noted the negative impact on Exelon's stock price from the revelation that the Company's employees were under investigation, stating, "[t]he federal probe and Pramaggiore's exit this week already had shaken investor confidence in Exelon – and caused a dip in the company's stock price. The Chicago based company, which trades on the NASDAQ exchange, fell 2 percent Thursday [October 17, 2019] to a little over $44 a share. That was its lowest level since December."

**ANSWER:** Deny Paragraph 151, except admit that *WBEZ Chicago* published an article on or about October 18, 2019, and respectfully refer the Court to that article for a complete and accurate statement of its contents.

152.    The following week, on October 21, 2019, the *Chicago Tribune* reported that a subpoena and search warrant had been executed at the City Club of Chicago, where Doherty was President. The article reported that the subpoena and search warrant were "executed in mid-May, [and] requested information about several ComEd officials, including Anne Pramaggiore, a source said." The article added that "[t]wo other longtime ComEd lobbyists – John Hooker and Fidel Marquez – are also named in the subpoena and search warrant, a source said."

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 152, except admit that the *Chicago Tribune* published an article on

66

or about October 21, 2019, and respectfully refer the Court to that article for a complete and accurate statement of its contents.

153. On October 24, 2019, *Crain's* published an article again discussing the financial risk of the new legislation not passing, saying that "[i]f a legal cloud hovering over Exelon persists, state legislation bailing out more of the company's nuclear power plants and extending highly generous regulatory treatment for its Commonwealth Edison utility isn't likely to pass when state lawmakers reconvene next year, either." *Crain's* noted that "[a]ny threat to Exelon's legislative clout worries Wall Street. The Oct. 15 retirement of Anne Pramaggiore, CEO of Exelon's regulated electric utilities, sent Exelon stock tumbling more than 6 percent." The article added that the investigation might make the Governor less likely to support the legislation: "In a statement, a spokeswoman makes it clear that the subpoenas got Pritzker's attention. 'Given the current federal investigation, it's more important than ever to ensure that the public has confidence in any energy proposals that move through the legislature.'"

**ANSWER:** Deny Paragraph 153, except admit that *Crain's* published an article on or about October 24, 2019, and respectfully refer the Court to that article for a complete and accurate statement of its contents.

154. On October 31, 2019, Exelon and ComEd each separately filed the same combined quarterly report on Form 10-Q for the quarter ending September 30, 2019 ("3Q19 Form 10-Q"). The 3Q19 Form 10-Q disclosed that, in addition to the subpoenas from the U.S. Attorney's Office for the Northern District of Illinois, "[o]n October 22, 2019, the SEC notified Exelon and ComEd that it has also opened an investigation into their lobbying activities. Exelon and ComEd have cooperated fully and intend to continue to cooperate fully and expeditiously with the U.S. Attorney's Office and the SEC. Exelon and ComEd cannot predict the outcome of the subpoenas or the SEC investigation."

**ANSWER:** Deny Paragraph 154, except admit that Exelon and ComEd filed a quarterly report on Form 10-Q for the quarter ending September 30, 2019, and respectfully refer the Court to the Form 10-Q for a complete and accurate statement of its contents.

155. Also on October 31, 2019, the Company hosted a conference call to discuss its 3Q 2019 results, during which Defendant Dominguez acknowledged their practices would need to change in light of the investigation stating "certainly, we'll have learnings as a consequence of it." In the same call, Defendant Crane acknowledged the financial impact if the legislation did not pass, which could require Exelon to close its Illinois nuclear plants stating, "[w]e're working on legislation that would either secure the other 4 sites in the state through the FRR process or we'll shut those plants down." He later added, "[i]f, for some reason, we don't garner support as a coalition in a large group of stakeholders to go forward with the legislation, by what we see in the market forwards today, plants will start to shut down. That's the reality if something doesn't happen in the spring."

67

**ANSWER:** Deny Paragraph 155, except admit that Exelon hosted an earnings call on or about October 31, 2019, which was attended by Messrs. Dominguez and Crane, and respectfully refer the Court to the transcript of the call for a complete and accurate statement of its contents.

156. In response to Crane's perceived threat to close the plants and cost state jobs, the Governor's office responded: "'If companies under a federal microscope believe it's appropriate to make threats to get their way, they need to recalibrate their thinking and how they deal with this administration. The governor's priority is to work with principled stakeholders on clean energy legislation that is above reproach.'"

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 156, except admit that the quoted language has been attributed to a spokesperson for the Governor, including in an article published by *WBEZ Chicago* on or about October 31, 2019, and respectfully refer the Court to that article for a complete and accurate statement of its contents.

157. Later in the day, *Crain's* published an article titled, "Another federal probe of Exelon: This time, it's the SEC," which noted that the SEC investigation "may not be confined to Illinois." In addition, referencing the Governor's office's statement, the *Crain's* article stated that "[t]he investigations of the company were noted by a spokeswoman for Gov. J.B. Pritzker, who responded negatively to [Defendant] Crane's threat issued on the earnings call that Exelon would close four Illinois nuclear plants if the state doesn't pass legislation in the spring to provide more ratepayer money to the financially pressured facilities."

**ANSWER:** Deny information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph 157, except admit that *Crain's* published an article titled "Another federal probe of Exelon: This time, it's the SEC" and refer the Court to that article for a complete and accurate statement of its contents.

158. After the news on October 31, 2019, the price of Exelon's common stock declined from a close of $46.66 on October 30, 2019 to a close of $45.49 on October 31, 2019, eliminating more than $1 billion of market capitalization on a day when the S&P 500 Index remained relatively flat.

**ANSWER:** Deny Paragraph 158.

159. On October 31, 2019, analysts from SunTrust Robinson Humphrey issued a report titled, "Reducing 2019-2020 Estimates." The report stated that "the Illinois investigation related

to the company's lobbying activities in the state remains an overhang. In addition to the grand jury subpoenas from the US Attorney's office in Illinois, the company disclosed that the SEC has also opened up an investigation."

**ANSWER:** Deny Paragraph 159, except admit that SunTrust Robinson Humphrey issued a report on or about October 31, 2019, and respectfully refer the Court to the report for a complete and accurate statement of its contents.

160. Confirming the negative financial impact of the investigation into the bribery scheme, on November 6, 2019, *Energy News* reported that the "federal probe is widely seen to have torpedoed the bill's chances in a six-day veto session concluding next week, and cast doubt on its chances in next year's regular session."

**ANSWER:** Deny Paragraph 160, except admit that *Energy News* issued a report on or about November 6, 2019, and respectfully refer the Court to the report for a complete and accurate statement of its contents.

## POST CLASS-PERIOD EVENTS

161. On February 11, 2020, Exelon and ComEd each separately filed the same combined annual report on Form 10-K for the year ending December 31, 2019 ("2019 Form 10-K"). Unlike Exelon's and ComEd's filings during the Class Period, which failed to disclose the risks of the bribery scheme and criminal investigation, the 2019 Form 10-K warned investors that the criminal investigation "could subject Exelon and ComEd to criminal or civil penalties, sanctions or other remedial measures." In addition, it also warned investors for the first time that such investigations, penalties, and sanctions, or even "the appearance of non-compliance with anti-corruption and anti-bribery laws, could have an adverse impact on Exelon's and ComEd's reputation or relationship with regulatory and legislative authorities, customers and other stakeholders, as well as their consolidated financial statements."

**ANSWER:** Deny Paragraph 161, except admit that Exelon and ComEd filed an annual report on Form 10-K for the year ending December 31, 2019, and respectfully refer the Court to the 2019 Form 10-K for a complete and accurate statement of its contents.

162. On March 2, 2020, *Crain's* published an article titled, "Pritzker recruits former utility nemesis for help on state energy bill," which reported that the Illinois Governor had hired a former ICC chairman "to advise on legislation to advance more clean-energy development in Illinois." The article explained that the former chairman had led then-Governor Quinn's efforts to veto EIMA in 2011 and that his hiring "gives Pritzker some credibility in his pledge that the comprehensive energy bill he wants the Legislature to take up this spring won't be a sop to the formerly clout-heavy ComEd and its parent, Chicago-based Exelon. ComEd is under the

69

microscope over its lobbying tactics and allegations of favor-trading and improper hiring in a wide-ranging federal probe of corruption in Springfield and local governments around Illinois."

**ANSWER:** Deny Paragraph 162, except admit that *Crain's* published an article on or about March 2, 2020, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

163.    On July 17, 2020, Exelon and ComEd filed a Form 8-K disclosing that ComEd had entered into the DPA. The Form 8-K stated, "Under the DPA, the USAO will file a single charge alleging that ComEd improperly gave and offered to give jobs, vendor subcontracts, and payments associated with those jobs and subcontracts for the benefit of the Speaker of the Illinois House of Representatives and the Speaker's associates, with the intent to influence the Speaker's action regarding legislation affecting ComEd's interests."

**ANSWER:** Admit Paragraph 163 and respectfully refer the Court to the Form 8-K for a complete and accurate statement of its contents.

164.    As noted, ComEd is a controlled subsidiary of Exelon, and Exelon also filed the Form 8-K attaching the DPA as an exhibit. The DPA stated that it was agreed to "pursuant to authority granted by the Board of Directors of Exelon." Thus, the DPA provided admissions on behalf of ComEd and Exelon (*i.e.,* the Company). More specifically, the DPA stated the Company agreed that "the facts alleged in the Information and described in the Statement of Facts are true and accurate."

**ANSWER:** Paragraph 164 contains legal conclusions to which no response is required. To the extent a response is a required, the Exelon and ComEd Defendants deny Paragraph 164, except admit that ComEd is a subsidiary of Exelon, that Exelon filed a Form 8-K attaching the DPA as an exhibit, and that ComEd entered into the DPA, and respectfully refer the Court to the Form 8-K and the DPA for a complete and accurate statement of their contents.

165.    The DPA was signed by Exelon's Executive Vice President for Compliance and Audit, who attested that he had "carefully reviewed the terms of this Agreement with the Exelon Corporation . . . Board of Directors," that he had "caused outside counsel for ComEd and Exelon to advise the Exelon Board of Directors fully of the rights of ComEd, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement," and that he "voluntarily agree[d], on behalf of ComEd, to each of its terms." The DPA bound ComEd to pay $200 million and institute remedial policies and practices including compliance testing, training, internal reporting, and discipline, and also required ComEd to cooperate with, and provide periodic reports to, the federal prosecutors.

70

**ANSWER:** Deny Paragraph 165, except admit that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

166.    Pursuant to the DPA, on July 17, 2020, the U.S. Attorney's Office for the Northern District of Illinois filed an Information charging ComEd with bribery in violation of 18 U.S.C. §666(a)(2). Reflecting the admitted facts in the DPA, the Information charged that ComEd "corruptly gave, offered, and agreed to give things of value, namely, jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts, for the benefit of Public Official A and Public Official A's associates, with the intent to influence and reward Public Official A, as an agent of the State of Illinois."

**ANSWER:** Admit Paragraph 166 and respectfully refer the Court to the Information and the DPA for a complete and accurate statement of their contents.

167.    In an Exelon release issued on July 17, 2020, Defendant Crane stated that Exelon had conducted an investigation, and "[w]e concluded from the investigation that a small number of senior ComEd employees and outside contractors orchestrated this misconduct, and they no longer work for the company." Further confirming that Defendant Pramaggiore's and Marquez's "retirements" were actually terminations, the *Chicago Sun-Times* reported later that day that, during an interview, Crane stated, "'We have taken all the corrective actions that we can against anybody that was orchestrating this. They are no longer with ComEd.'"

**ANSWER:** Deny Paragraph 167, except admit that Exelon published a press release on or about July 17, 2020 and that the *Chicago Sun-Times* published an article on or about July 17, 2020, and respectfully refer the Court to these documents for a complete and accurate statement of their contents.

168.    Notably, Defendant Crane never said whether his conduct was the subject of the Company investigation, which appeared to focus on those reporting to him. Moreover, the article reported that Pramaggiore, who Crane was clearly referring to as an individual that "orchestrated" the "misconduct" and no longer worked for the Company, pushed back on any notion that she or any ComEd employees acted unilaterally or without knowledge of Exelon's or ComEd's senior executives. Pramaggiore reported directly to Crane and a spokesperson for her issued a statement to the media addressing the allegations of bribery payments, saying, "'During her tenure, she and other current and former ComEd and Exelon executives received, evaluated and granted many requests to provide appropriate and valuable services to the companies, none of which constitute unlawful activity.'"

71

**ANSWER:** Deny Paragraph 168, except admit that the *Chicago Sun-Times* published an article on or about July 17, 2020, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

169. On July 21, 2020, *Crain's* published an article calling for Crane to be removed as CEO, stating that "Crane also deserves to lose his job for presiding over corruption on a breathtaking scale during eight years atop the parent company of Commonwealth Edison. The facts set forth in the deferred prosecution agreement and criminal information unveiled on Friday describe a multiyear bribery campaign by top ComEd officials seeking state legislation essential to Exelon's business strategy." After noting that Pramaggiore "orchestrated the hiring of [Public Official A's] pals as lobbyists and lawyers," the article added, "[t]his was no penny-ante kickback scheme by low-level purchasing agents. The allegations – which ComEd doesn't dispute – outline a continuous campaign of corruption carried out by senior executives, including one of Crane's direct reports. In short, the corruption took place not merely on Crane's watch but under his nose." The article further noted that "[a]s Exelon's largest utility, it couldn't be more important to Crane's goal of building up utility operations" and that Crane "serves as a ComEd director, responsible for monitoring top utility execs."

**ANSWER:** Deny Paragraph 169, except admit that *Crain's* published an article on or about July 21, 2020 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 169, and respectfully refer the Court to the article and the DPA for a complete and accurate statement of its contents.

170. On July 27, 2020, the *Chicago Sun-Times* published an article titled, "To keep franchise, ComEd must reform, Lightfoot warns." The article stated that Chicago Mayor Lori Lightfoot "delivered a shape-up-or-else ultimatum in a letter she emailed to [the] ComEd CEO." The article noted that the letter stated Mayor Lightfoot was "'deeply disturbed'" by ComEd's admissions and that she found "'the company's response thus far to this clearly unethical behavior to be inadequate.'" To renew the franchise, the letter said, "'the City expects the company to implement (1) a comprehensive ethics reform plan that rebuilds trust with the City, its residents and its businesses, and (2) my administration's policy priorities around energy and sustainability, equitable economic development, utility affordability and transparency.'" According to the *Chicago Sun-Times*, the letter demanded "'a significant commitment from the company to right historic wrongs.'"

**ANSWER:** Deny Paragraph 170, except admit that the *Chicago Sun-Times* published an article on or about July 27, 2020 and respectfully refer the Court to the article for a complete and accurate statement of its contents.

171. Two days later, on July 29, 2020, the ICC held a hearing to address ComEd's admitted conduct in the DPA. During the hearing, ICC commissioners emphasized the negative impact the Company's bribery scheme had on its relationships with regulators, stating, for example, that the ICC "must hold ComEd accountable under the Public Utilities Act and all relevant regulatory mechanisms" and that the ICC "will not be rubber-stamping ComEd's ethics policies." In responding to questions from the commissioners about the Company's policy changes following the bribery scheme, Exelon's Executive Vice President of Compliance recognized the pervasiveness of the scheme, saying, "[t]his was a huge mess. We are making some correspondingly huge changes in our compliance controls." He later added, "[w]e realize that there is a significant public trust deficit. There is a – and in some ways, the most important cost to us of this episode."

**ANSWER:** Deny Paragraph 171, except admit that the ICC held a hearing on or about July 29, 2020 and that ComEd entered into the DPA, and respectfully refer the Court to the transcript of the hearing and the DPA for a complete and accurate statement of their contents.

172. Also during the hearing, Defendant Dominguez said that "ComEd has admitted the misconduct" and that "[t]here are no excuses for our conduct." Media reported that a commissioner raised a concern that customers would ultimately pay the $200 million criminal penalty through rate increases, but Defendant Dominguez said the cost would be borne by shareholders. Specifically, Dominguez said it "will be paid from cash Exelon has on hand and will be repaid by ComEd to Exelon as its shareholder out of profits that ComEd otherwise would have earned," the result of which "is that neither the cash nor equity position of ComEd will be changed, and all of the funds will have come from the shareholder, Exelon."

**ANSWER:** Deny Paragraph 172, except admit that the ICC held a hearing on or about July 29, 2020 and that ComEd entered into the DPA, and respectfully refer the Court to the transcript of the hearing and the DPA for a complete and accurate statement of their contents.

173. On August 4, 2020, the Company hosted a conference call to discuss its second quarter 2020 results. In his opening remarks, Crane seemed to acknowledge that investors and legislators had been misled by Defendants' prior statements, stating "We're extremely disappointed in the seriousness of the past misconduct, and we know many stakeholders understandably feel the same disappointment. We have – you have our commitment that we will take every possible step to earn back the confidence and trust we have lost with others. This will not happen overnight and it will be a formidable task, but we are resolved to get there." When asked whether the DPA would impact proposed legislation, Crane answered, "[t]here's an obvious issue that trust has been eroded. Although it's isolated to ComEd, it has effect on all the entities. And so there's been a lot of press reporting and there's been some disappointed stakeholders and is rightfully so. And so our job is to rebuild the trust of those that we serve."

73

**ANSWER:** Deny Paragraph 173, except admit that Exelon held an earnings call on or about August 4, 2020, and respectfully refer the Court to the transcript of the earnings call for a complete and accurate statement of its contents.

174. Crane essentially admitted the Company Code of Conduct had not been followed and that they had not been monitoring compliance, stating, "We apologize for what went on. We had a code of conduct that clearly defined the behaviors, but it wasn't enough. And so we've put controls in place to ensure it will never happen again. And we have to work with stakeholders, not only legislative and elected folks, but our customers and our other stakeholders and the communities that we serve to rebuild that trust." Crane acknowledged the negative impact from the scandal, stating, "[t]his is the most unfortunate thing to happen, not just because of time, it's because of trust. And it's because of a small amount of individuals making decisions that should not have been done, and it shouldn't have gone undetected."

**ANSWER:** Deny Paragraph 174, except admit that Exelon held an earnings call on or about August 4, 2020, and respectfully refer the Court to the transcript of the earnings call for a complete and accurate statement of its contents.

175. On August 4, 2020, the *Chicago Sun-Times* published an article explaining how the investigation hindered the favorable legislation sought by Exelon from passing. The article reported "we are told by legislators and environmental advocates, the Pritzker administration last month quietly and without explanation indefinitely 'paused' the efforts of legislative working groups that were hammering out final details of the bill," adding that "Illinois lawmakers had a chance to pass energy legislation last summer, but put off a vote until spring, likely because they couldn't predict in what direction the federal investigation into ComEd might go. Nobody wanted to sign on to a bill that might later be tainted by a scandal involving high-powered lobbyists." The article also acknowledged that Exelon's inability to continue its bribery scheme lessened its ability to pass favorable legislation, stating, "the scandal has pushed ComEd's vaunted Springfield lobbying operation to the sidelines, meaning lawmakers won't be feeling the usual intense pressure tactics as they attempt to draw up and vote on a progressive new energy bill." In fact, the article reported, "[t]he Illinois Clean Jobs Coalition is expected to announce Wednesday that the draft Clean Energy Jobs Act has been revised to include 'utility accountability rules,' such as ending formula rates, which have allowed companies like ComEd to raise prices without going before the Illinois Commerce Commission. Such rules would seem essential given that many of the reforms to which ComEd has agreed as part of the deferred prosecution agreement involve self-policing."

**ANSWER:** Deny Paragraph 175, except admit that the *Chicago Sun-Times* published an article on or about August 4, 2020, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

## ADDITIONAL SCIENTER ALLEGATIONS

### The Individual Defendants Controlled the Company's Messaging to the Investing Public

176.    In Crane's roles as CEO of Exelon and Chairman of ComEd, Von Hoene's role as CSO of Exelon, Pramaggiore's roles as CEO of Exelon Utilities and Vice Chairman of ComEd, and Dominguez's role as CEO and a Director of ComEd, the Individual Defendants were able to, and did, determine the content of the various SEC filings and other public statements pertaining to Exelon and ComEd during the Class Period. Crane, Pramaggiore, and Dominguez signed Exelon and ComEd's combined annual report filed with the SEC, and Crane and Dominguez signed Exelon and ComEd's combined quarterly reports filed with the SEC. *See* ¶¶103, 112, 119. Crane, Von Hoene, and Pramaggiore attended conference calls and spoke on behalf of the Company prior to and throughout the Class Period. *See* ¶¶51, 73, 78, 84, 101, 111, 118.

**ANSWER:**  Deny Paragraph 176, except admit that between 2018 and 2019, Mr. Crane, Ms. Pramaggiore, and Mr. Dominguez signed certain reports filed with the SEC and that Mr. Crane, Mr. Von Hoene, and Ms. Pramaggiore attended certain conference calls.

177.    Further, the Individual Defendants participated in the drafting, preparation and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the facts supported the statements and there were no material omissions, and they are therefore liable for the misrepresentations and omissions therein.

**ANSWER:**  Deny Paragraph 177.

178.    During their time as directors or senior executive officers of Exelon (Crane, Pramaggiore, and Von Hoene) and ComEd (Crane, Pramaggiore, and Dominquez), the Individual Defendants were privy to confidential and proprietary information concerning Exelon, ComEd, and the companies' legislative agenda, efforts to pass Illinois legislation, and Illinois lobbying activities. Each of them also (i) had access to, *inter alia*, internal corporate documents, conversations with corporate officers, employees, and internal and external lobbyists; (ii) attended management and Board meetings and committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, each of them knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

**ANSWER:**  Deny Paragraph 178.

### The Individual Defendants Were Directly Involved in the Bribery Scheme

179.    A strong inference of scienter is further supported by the Individual Defendants' statements admitting their direct involvement and monitoring of the Company's lobbying efforts

as well as in their participation in the bribery scheme through the hosting of fundraising events for Public Official A.

**ANSWER:** Deny Paragraph 179.

180. ***First***, since at least 2014, Defendants Crane and Pramaggiore personally hosted and participated in the annual campaign fundraising events, described above, with McClain for the benefit of Public Official A. ¶¶69-71. More specifically, the events were reportedly "put together by a combination of ComEd and Exelon," and, in presumably an attempt to increase the pressure upon employees to contribute, the invitations "were worded as being direct from the desk of Exelon CEO Chris Crane." *Crain's* published portions of the 2017 and 2018 invitations, both of which begin with "Chris Crane cordially invites you to a reception." *Crain's* described the events as "command performances" and as Exelon and ComEd going to "unusual lengths" to ingratiate with Public Official A. *Crain's* reported that one source said, "I went because I understood it was part of the process."

**ANSWER:** Deny Paragraph 180, except admit that Exelon and ComEd held an annual fundraising event and that *Crain's* published an article on or about December 6, 2019, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

181. As discussed, Defendant Pramaggiore and Public Official A formed the receiving line at the events, and Defendant Crane and Public Official A spoke at the events, which raised significant funds for Public Official A. According to *Crain's*, "campaign disclosure reports indicate that in weeks surrounding the September 27, 2018 event, Exelon, ComEd, company officials and registered company lobbyists donated at least $59,000 to the Democratic Party of Illinois, with another $37,000 going to [Public Official A's] personal . . . campaign committee." For example, according to campaign disclosure reports, Exelon donated $11,100 to Public Official A's campaign committee and $22,200 to the Democratic Party of Illinois on October 4, 2018. Likewise, ComEd donated $22,200 to the Democratic Party of Illinois on October 26, 2018.

**ANSWER:** Deny Paragraph 181, except admit that Exelon and ComEd held an annual fundraising event and that *Crain's* published an article on or about December 6, 2019, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

182. According to Exelon's Contributions Guidelines, "[t]he Exelon CEO [Crane]" was the only person "authorized to contribute up to $10,000" for Exelon to "candidates and candidate political committees" and up to $50,000 to a political party. Similarly, the "ComEd CEO [Dominguez]" was the only person authorized to make the same contributions for ComEd. For any contributions above those limits, "[t]he Exelon CEO [Crane] and Lead Director must approve" the contribution. Thus, pursuant to those policies, Crane must have authorized the $22,200 payment and $11,100 payment on October 4, 2018, and Dominguez must have authorized the $22,200 payment on October 26, 2018.

**ANSWER:** Deny Paragraph 182, except admit that Exelon has Contributions Guidelines and respectfully refer the Court to the Contributions Guidelines for a complete and accurate statement of their contents.

183. Defendants and key participants in the bribery scheme also made personal contributions in connection with the events. For example, campaign disclosure reports indicate that Crane, Von Hoene, Pramaggiore, Dominguez, and Marquez all donated to the Democratic Party of Illinois just days following the November 20, 2017 event, with Pramaggiore donating $2,000 on November 21, 2017, Dominguez donating $2,000 on November 21, 2017, Marquez donating $2,000 on November 21, 2017, Crane donating $5,000 on November 29, 2017, and Von Hoene donating $2,000 on November 29, 2017.

**ANSWER:** Deny Paragraph 183, except admit the existence of campaign disclosure reports and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 183, and respectfully refer the Court to the DPA and the reports for a complete and accurate statement of their contents.

184. ***Second***, the Individual Defendants have long been directly involved in the Company's efforts to secure the passage of favorable legislation in Illinois, which goes through Public Official A. For example:

a.  According to a June 10, 2020 article by *Crain's*, Defendant Von Hoene was "viewed within the company as Crane's right-hand man and an architect of the legislative and regulatory strategies key to Exelon's earnings growth over the past few years." Among Von Hoene's "signature accomplishments" cited by *Crain's* was the "ratepayer subsidies" (the reported $2-$4 surcharge to customers, (¶¶82, 141) secured through FEJA in Illinois. The article also noted that "Von Hoene is viewed as an important player in Exelon's ongoing efforts to win more assistance in Illinois for nukes that aren't subsidized." Significantly, according to a December 20, 2019 report by *Crain's*, at a "late 2016 party to mark [McClain's] retirement as a lobbyist and to celebrate the passage of [FEJA]," Von Hoene, "according to one person who was there" told McClain that he had "'saved us more than hundreds of millions.'" In addition, in a January 9, 2017 email obtained pursuant to a FOIA request submitted to the Illinois House of Representatives, a ComEd employee sent McClain a spreadsheet showing invitation acceptances for a "Mike Dinner," which McClain forwarded to Public Official A's Chief of Staff, saying, "[h]ere are the acceptances for the January 17th dinner now." Among

those indicated as "attending" were Public Official A, Defendant Von Hoene, Fidel Marquez, and John Hooker.[19]

b. According to a May 8, 2018 *Crain's* article, Defendant Dominguez "spearheaded [Exelon's] successful lobbying campaigns to hike electricity bills in order to subsidize financially ailing nuclear plants in New York and Illinois." Indeed, in his role from 2012 to 2018 as Exelon's Senior Vice President of Governmental and Regulatory Affairs and Public Policy, Dominguez was the head of Exelon's legislative and lobbying strategies. In May 2016, when *Crain's* published an article questioning whether Exelon lobbyists were providing incomplete information to Illinois lawmakers about the state of Exelon's nuclear plans leading up to FEJA, it was Dominguez who spoke directly to and defended the Company's lobbyists' communications: "Asked whether Exelon is being misleading in its lobbying materials, Dominguez says the company's lobbyists make clear that the slide claiming every nuke will suffer losses isn't to be taken literally. 'That's not the context in which we've been presenting that material,' he says. 'We're very clear with lawmakers when we're deriving these numbers.'" And, nine days before the Illinois House of Representatives voted in favor of FEJA, Dominguez spoke to the *Chicago Tribune* about his and the Company's lobbying efforts to get the bill passed, saying, "[t]he next week is going to be about seeing whether we could resolve differences of view on those more controversial elements of the bill and bring more proponents to the bill."

c. As discussed, Defendant Pramaggiore was "a key player in ComEd's success over the years in Springfield" and was credited with playing a significant role in converting Public Official A from an Exelon and ComEd opponent to a supporter and securing the passage of EIMA. ¶¶78, 146. *Crain's* also attributed the Company's legislative wins to her, reporting in May 2018 that "[u]nder Pramaggiore, ComEd also won important benefits in the 2016 state law [FEJA] that subsidized Exelon's Illinois nukes." After her termination in October 2019, the *Chicago Tribune* reported that EIMA and FEJA represented "considerable success[es]" for Exelon and ComEd and that "[t]hose wins took place under Anne Pramaggiore." In addition, reporting by *WBEZ Chicago* in a November 21, 2019 article described her close relationship with McClain and the importance of lobbying at the Company. The article reported: "Pramaggiore had organized a party in McClain's honor in late 2016, shortly after he announced his retirement as a lobbyist, said one source who attended the event and asked for anonymity because they were not authorized to speak publicly about it." The article added that "the private company event for McClain was attended by about 50 people" and "was part of a larger celebration to commemorate passage of Exelon and ComEd's top Springfield priority in 2016, legislation known as [FEJA]."

---

[19] Defendant Dominguez was also listed as invited to the event, but had not yet responded. It appears that Defendant Pramaggiore had a role in sending the invitations since a noted response from an invitee said, "Anne, Thanks for the invitation . . . ."

**ANSWER:** Deny Paragraph 184, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations about an e-mail, and admit that Mr. Dominguez held the title of Senior Vice President of Governmental and Regulatory Affairs and Public Policy, that *Crain's* published articles on or about May 4, 2016, May 8, 2018, December 20, 2019, and June 10, 2020, that the *Chicago Tribune* published an article on or about November 22, 2016, and that *WBEZ Chicago* published a report on or about November 21, 2019, and respectfully refer the Court to those articles and the report for a complete and accurate statement of their contents.

185. ***Third***, Crane, Von Hoene, Pramaggiore, and Dominguez held themselves out to investors and the market as the persons directly involved in, and most knowledgeable about, the Company's efforts to secure the passage of favorable legislation in Illinois. Their repeated statements leading up to and during the Class Period demonstrate knowledge of the topics on which they spoke, including Exelon and ComEd's Illinois legislative efforts, and how the Company was able to "persuade policymakers" on favorable legislation and "crawl out" of disfavor with Public Official A. *See* ¶¶72-86, 102, 111, 118, 206. In addition, Von Hoene made repeated public statements regarding Exelon's Illinois legislative strategy immediately prior to and after the bribery scheme. During a May 12, 2010 earnings call, reflecting his personal involvement and knowledge in the failed legislative proposal using legitimate lobbying efforts (¶51), Von Hoene stated that the proposal "was done by us by invitation from the highest leadership in the Illinois legislature" and added that "we met with legislative leaders," "[w]e put together [a] package," and "[w]e socialized it very carefully with all the stakeholders, regulatory and legislative." But, as Von Hoene explained, "when it became apparent that there wouldn't be sufficient political support . . . we withdrew the proposal."

**ANSWER:** Deny Paragraph 185, except admit that Exelon held an earnings call on or about May 12, 2010, and respectfully refer the Court to the call transcript for a complete and accurate statement of its contents.

186. Then, after ComEd shifted from legal lobbying activities to begin the illegal bribery scheme, Von Hoene began to brag about the legislative successes that contrasted with the prior failures. For example, during an earnings call on September 6, 2011, Von Hoene touted that EIMA "has passed the House and Senate in Illinois" and "has the support of all four of the legislative leaders." He added that "[w]hile we expect the governor [Quinn] will veto that bill, we are gearing up for an override of that veto and are hopeful that we will be able to – we were very close to a veto-proof vote at the time the bill was passed and are trying to garner extra support for that, for the veto sessions, which are late October and early November." Similarly, in August 2016, Von Hoene praised Pramaggiore's efforts in securing EIMA, stating that "Anne

[Pramaggiore] and her team have done a phenomenal job in getting that legislation [EIMA] passed and also executing on it."

**ANSWER:** Deny Paragraph 186, except admit that Exelon held a call at the Barclays Capital Energy Conference on or about September 6, 2011 and an analyst/investor call on or about August 10, 2016, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 186, and respectfully refer the Court to transcripts of those calls and the DPA for complete and accurate statements of their contents.

187.    The Individual Defendants' direct involvement in raising campaign funds for Public Official A, hosting and participating in events directly with Public Official A and McClain, engaging in and speaking directly about Exelon and ComEd's legislative efforts with Public Official A and the Illinois General Assembly, and appointing a board member with the intent to influence Public Official A (*see infra*) further support a strong inference of scienter.

**ANSWER:** Deny Paragraph 187.

**The Suspicious Appointment of Ochoa to the Board Supports a Strong Inference of Scienter**

188.    Defendants Crane, Pramaggiore, and Dominguez were directly involved in ComEd Board appointments, including Ochoa. In 2012, Crane was appointed Chairman and Pramaggiore was appointed Vice Chairman of the ComEd Board of Directors.

**ANSWER:** Deny Paragraph 188, except admit that in or around 2012, Mr. Crane was appointed Chairman and Ms. Pramaggiore was appointed Vice Chairman of the ComEd Board of Directors, and in those roles they were involved in appointments to the ComEd Board of Directors.

189.    In 2018, Dominguez was also appointed as a Director of ComEd. ComEd's Bylaws provided the Board the power to (i) increase the number of directors on the Board and (ii) fill any vacancy caused by an increase by majority vote.

**ANSWER:** Deny Paragraph 189, except admit that Mr. Dominguez was appointed as a Director of ComEd in 2018 and that ComEd has bylaws, and respectfully refer the Court to those bylaws for a complete and accurate statement of their contents.

190. The DPA admits that, during Defendants Crane's, Pramaggiore's, and Dominguez's time as Chairman, Vice Chairman, and Director on the ComEd Board of Directors, ComEd "appointed [Ochoa]" to the ComEd Board of Directors "in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties," and did so even though "no one at ComEd or Exelon recruited [Ochoa] to serve as a director," there had been "internal company opposition to the appointment of [Ochoa]," and "ComEd did not interview or vet other outside candidates for the vacant board seat." To make the appointment, the ComEd Directors expanded the ComEd Board from eight to nine directors.

**ANSWER:** Deny Paragraph 190, except admit that ComEd entered into the DPA, and

respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

191. Defendant Pramaggiore had tried to bring Ochoa on the board in or around May 2018, but met resistance and offered Ochoa a different position. ¶66. Yet, only a year later, the Board, chaired by Defendant Crane and with Defendants Pramaggiore and Dominguez as Directors, reversed course. As noted in the DPA, they did not look at any other candidates. They also did not fill a vacancy due to any departing Director, but instead expanded the board specifically to create a spot for Ochoa and then appointed him to it. His appointment was unlike any other.

**ANSWER:** Deny Paragraph 191, except admit that ComEd entered into the DPA and

respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

192. Even the description of Ochoa contrasted with ComEd's other board members. ComEd's 2019 Proxy Statement listed the nine ComEd Directors, and, for all except Ochoa, provided an explanation of the value brought to ComEd and its business. For example, the 2019 Proxy Statement highlighted Crane's, Pramaggiore's, and Dominguez's experiences at Exelon and ComEd. With regard to the other directors, it described them as, for example, "very familiar with ComEd's customers," bringing "extensive knowledge of the Chicago economy," having experience "in dealing with many of the same development, land use, and utility and regulatory issues that affect Exelon and its subsidiaries," having "knowledge of the economy of the . . . communities that ComEd serves," or "serv[ing] as general counsel of another electric and gas utility," which provided "knowledge of utility and regulatory issues." But, in stark contrast, the 2019 Proxy Statement provided no explanation of what value Ochoa brought to ComEd and its business, listing only his prior positions. Confirming the lack of business justification for the appointment, as of April 2020, Ochoa was no longer on ComEd's Board and the Board returned to eight directors.

**ANSWER:** Deny Paragraph 192, except admit that ComEd had a 2019 Proxy Statement

and respectfully refer the Court to that Proxy Statement for a complete and accurate statement of

its contents.

**Defendants' Motive Supports a Strong Inference of Scienter**

81

193.    Defendants had reason to conceal the bribery scheme because, as reflected by the events at the end of the Class Period, disclosure of the bribery scheme would have ended the scheme and dramatically reduced the benefits from the passage of the favorable legislation.

**ANSWER:** Deny Paragraph 193.

194.    For example, during the Class Period, Defendants were seeking passage of more favorable legislation that (i) would result in another rate-payer bailout of Exelon's failing Illinois nuclear plants; and (ii) extend the EIMA formula rates to 2032. ¶¶88-90. And they were also seeking renewal of ComEd's franchise agreement with the City of Chicago. ¶91. Exelon had publicly stated during the Class Period that they expected the legislation to be passed in either the spring session or fall session of 2020. ¶111(c). Thus, Defendants were highly incentivized to delay disclosure of the bribery scheme and full extent of criminal investigation until after the legislation was passed, which would secure hundreds of millions of dollars in additional annual revenue. ¶89.

**ANSWER:** Deny Paragraph 194, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 194, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

195.    However, as the bribery scheme was uncovered, the chances of passage dropped significantly. Even as of the date of this filing, neither legislation has passed. To the contrary, opponents have taken the opportunity, as reported by the *Chicago Sun-Times*, "to include 'utility accountability rules' such as ending formula rates, which have allowed companies like ComEd to raise prices without going before the Illinois Commerce Commission." ¶175.

**ANSWER:** Deny Paragraph 195, except admit that neither CEPA nor House Bill 3152 has passed and that the *Chicago Sun-Times* published an article on or about August 4, 2020, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

196.    Without the revenue from CEPA or any other proposed bailout legislation to save Exelon's additional failing nuclear plants (¶¶88, 155), on August 27, 2020, Exelon Generation announced that it "intends to permanently cease generation operations" at its Byron and Dresden locations in the fall of 2021. According to the Company's disclosure filed with the SEC, as a result of these closures, Exelon "will recognize certain one-time charges in 2020 ranging from an estimated $200 million to $300 million," and "decommissioning for Byron may require supplemental cash from Generation of up to $175 million." Also, Exelon estimates the "annual amount and timing of expected incremental non-cash expense items expected to be incurred" range from $575 to $600 million in 2020 and from $1.45 to $1.475 billion in 2021.

82

**ANSWER:** Deny Paragraph 196, except admit that Exelon filed a Form 8-K on or about August 27, 2020, and respectfully refer the Court to that Form 8-K for a complete and accurate statement of its contents.

197. In addition, Exelon and ComEd's executive compensation was tied to the passage of favorable legislation, which was aided by bribery scheme. For example, in discussing executive compensation for 2011, Exelon's Proxy Statement filed on February 22, 2012 (the "2012 Proxy") stated that the "Illinois legislation enacted in 2011 [EIMA, which] supports infrastructure investment and modernization of the ComEd electric grid, reduces regulatory lag, and provides reasonable returns on ComEd's equity for years to come" was one of the top "2011 Performance Highlights." The 2012 Proxy added that compensation to executive officers increased in 2011, which reflected, in part, the "favorable Illinois legislation supporting infrastructure investment, reduced regulatory lag, and providing reasonable returns on ComEd's equity." In 2011, Crane's total compensation increased by 24%, from $4.49 million to $5.56 million, Von Hoene's total compensation increased by 50%, from $1.96 million to $2.93 million, and Pramaggiore's total compensation increased by 90%, from $850,000 to $1.63 million.[20]

**ANSWER:** Deny Paragraph 197, except admit that Exelon filed Proxy Statements, including on or about February 22, 2012 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 197, and respectfully refer the Court to the Proxy Statements and the DPA for a complete and accurate statement of their contents.

198. Similarly, in discussing executive compensation for 2016, Exelon's Proxy Statement filed on March 15, 2017 ("2017 Proxy") identified "2016 Executive Compensation Highlights" that included "IL clean energy regulations and legislation," – *i.e.*, FEJA. Von Hoene's total compensation increased by 50% in 2016, from $4.16 million to $6.18 million, and Pramaggiore's total compensation increased by 20%, from $2.31 million to $2.79 million.[21]

**ANSWER:** Deny Paragraph 198, except admit Exelon filed a Proxy Statement on or about March 15, 2017, and respectfully refer the Court to the Proxy Statement for a complete and accurate recitation of its contents.

---

[20] Total compensation is disclosed each year in the Exelon's and ComEd's proxy reports and includes, for example, salary, bonuses, stock awards, and performance/restricted stock units.

[21] Crane's total compensation had increased from $5.6 million in 2011 to more than $15 million in 2016, although his total compensation decreased slightly in 2016 from 2015 as a result of shareholder concerns that his compensation was excessive.

199.     Since the bribery scheme commenced in 2011, the Individual Defendants have received massive compensation. From 2011 to 2019, Crane's total compensation has been more than $120 million, Von Hoene's total compensation has been more than $40 million, and Pramaggiore's total compensation has been more than $25 million. Just like the passage of favorable legislation was a performance metric that enhanced Defendants' compensation in 2011 and 2016, had Defendants been able to conceal the bribery scheme longer and secure passage of more favorable legislation in 2019 and/or 2020, it likely would have boosted their compensation further.

**ANSWER:**  Deny Paragraph 199, except admit that Exelon's Proxy Statements from

2011 to 2019 provide compensation information, and respectfully refer the Court to those Proxy

Statements for a complete and accurate recitation of their contents.

**The Individual Defendants Closely Monitored Exelon and ComEd's Lobbying Which Was Critical to Their Businesses**

200.     In their roles as CEO of Exelon and Chairman of ComEd (Crane), CSO of Exelon (Von Hoene), CEO of Exelon Utilities and Vice Chairman of ComEd (Pramaggiore), and CEO and a Director of ComEd (Dominguez), the Individual Defendants determined Company strategy and were required to monitor and keep themselves informed on Exelon and ComEd's business and operations, including efforts to secure favorable legislation in the Illinois General Assembly. Moreover, as ComEd Directors, Crane, Pramaggiore, and Dominguez had a duty to manage the business and affairs of ComEd. ComEd's bylaws stated that "[t]he business and affairs of [ComEd] shall be managed by [the] Board of Directors which shall have and may exercise all powers of [ComEd]," including "appoint officers for the conduct of the business of [ComEd], determine their duties and responsibilities and fix their compensation."

**ANSWER:**  Deny Paragraph 200, except admit that ComEd had bylaws and respectfully

refer the Court to those bylaws for a complete and accurate statement of their contents.

201.     As discussed, ComEd accounted for more than 30% of Exelon's 2018 net income, and hundreds of millions of dollars in revenue and subsidies were wholly dependent upon the regular and repeated passage by the Illinois General Assembly of favorable legislation. ¶¶35, 86, 104(b), 112(d). Confirming its critical importance, the Individual Defendants discussed Illinois legislative efforts during quarterly earnings calls leading up to, and throughout the Class Period. ¶¶73, 76, 78, 84, 102, 111(a)-(c), 118(a)-(d). According to media and based upon the history of Exelon's failed efforts prior to the bribery scheme, as compared to its many successes during the scheme, it was clear that to secure favorable legislation in Illinois, it was essential to have the support of Public Official A. *See, e.g.*, ¶¶47-51, 141. Media and Exelon's former CEO referred to Public Official A as the most powerful and important member of the Illinois General Assembly. ¶45.

**ANSWER:** Deny Paragraph 201, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations about "[m]edia," and admit that ComEd accounted for approximately 30% of Exelon's 2018 net income, that matters concerning the Illinois legislature were referenced during certain earnings calls, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 201, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

202. Exelon and ComEd dedicated millions of dollars to Illinois lobbying activities every year, including to retain outside Illinois lobbyists with connections to Public Official A. *Crain's* reported on October 24, 2019 that Exelon has employed "a high-octane lobbying operation that made it the most influential company in Springfield, [Illinois]." *WBEZ Chicago* reported on November 14, 2019 that Exelon and ComEd contracted with "a powerhouse list of influencers at the state Capitol in Springfield [Illinois]," which included "many former aides" to Public Official A and was "rivaled only by a handful of other conglomerates." The article reported that in 2019 alone, state records showed that the lobbying expenses of "ComEd and Exelon Generation lobbyists" had exceeded what "the Illinois Chamber of Commerce, AT&T, the Illinois State Medical Society, Comcast, the Illinois Education Association, Caterpillar and State Farm have spent on lobbying expenses [in 2019] – combined."

**ANSWER:** Deny Paragraph 202, except admit that *Crain's* published an article on or about October 24, 2019, that *WBEZ Chicago* published an article on or about November 14, 2019, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 202, and respectfully refer the Court to the DPA and the articles for a complete and accurate statement of their contents.

203. Exelon and ComEd's "powerhouse" lobbyists included McClain, Doherty, and Hooker, each of whom were involved in the bribery scheme. ¶58(a)-(c). McClain was Exelon and ComEd's most important lobbyist, who media described as a "longtime friend" and "close confidant" of Public Official A. the *Chicago Tribune* has described McClain as "one of the most powerful lobbyists in Springfield," and added that he was "long known as one of the few people [Public Official A] would meet with for dinner after session nights" and "could be seen hanging around [Public Official A's] office, sometimes sitting on a bench in the hallway taking to other lobbyists who sought to pick his brain." Accordingly, the *Chicago Tribune* reported that McClain "was a point man in the discussions about major ComEd and parent company Exelon legislation for decades." An October 18, 2019 article from *WBEZ Chicago* likewise reported that McClain was "a longtime [Public Official A] confidant who was ComEd's most influential lobbyist."

85

**ANSWER:** Deny Paragraph 203, except admit that the *Chicago Tribune* published an article on or about July 18, 2019, that *WBEZ Chicago* published an article on or about October 18, 2019, and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 203, and respectfully refer the Court to the DPA and the articles for a complete and accurate statement of their contents.

204. McClain intended to retire from lobbying in 2015. Reflecting his importance to Exelon, McClain said he extended his career to 2016 in order to see the enactment of FEJA through, telling the *Quincy Herald-Whig* in December 2016 that "'we had the Exelon bill come up, and my friend [Public Official A] was facing some tough times, and so (the retirement) kind of got put on hold.'" Despite McClain's purported retirement in 2016, he was so vital to Exelon and ComEd's legislative strategy that Exelon and ComEd continued to pay him thereafter. For example, apart from the $1.3 million paid to other associates of Public Official A as described in the DPA, according to *WBEZ Chicago*, financial reports filed by ComEd with the ICC showed that ComEd paid McClain $150,00 in 2017 and $211,000 in 2018 for "legal services," even though McClain's law license had reportedly expired. ComEd acknowledged the payments, but told *WBEZ Chicago* they were "mislabeled" and should have been reported as for "consulting services." McClain reportedly continued working for ComEd until May 2019, three years after his purported retirement.

**ANSWER:** Deny Paragraph 204, except deny knowledge or information sufficient to form a belief as to the truth of the allegations about McClain's intentions, and admit that the *Quincy Herald-Whig* published an article on or about December 11, 2016 and that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 204, and respectfully refer the Court to the article and the DPA for a complete and accurate statement of their contents.

205. The Company's shift from legal lobbying to a bribery scheme was particularly significant because it turned Illinois legislation from a negative business trend to a positive and profitable one. Prior to 2011, Exelon and ComEd faced significant opposition to favorable legislation from Public Official A and failed to get rate increases or other legislation through the Illinois General Assembly. ¶¶47-51. But, after engaging in the bribery scheme in 2011 and continuing thereafter, Exelon and ComEd were repeatedly supported by Public Official A and secured highly-favorable legislation that flipped Illinois from one of the most challenging regulatory environments to one of the best and one that provided up to hundreds of millions of dollars in annual revenue to Exelon for its Illinois nuclear power plants. ¶¶72-86.

**ANSWER:** Deny Paragraph 205, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 205, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

206. While the bribery scheme was unknown to the public, media noticed that the legislative failures had turned to successes. For example, the *Chicago Sun-Times* reported that "Pramaggiore was widely credited in 2011 for finally changing [Public Official A] from an avowed opponent to an ally, partly by revamping the company's lobbying strategies. In reality, she didn't act alone. Pramaggiore worked very closely with McClain, who was ComEd's top contract lobbyist, and John Hooker." And, in an August 15, 2014 article, even before the passage of FEJA, the *Chicago Tribune* noted that "Exelon has taken strides to beef up its political might after repairing a long-standing tiff with [the] House Speaker," and quoted Von Hoene as stating, "'[w]e were in bad stead with the speaker for a long time. We've managed to crawl out of that hole.'"

**ANSWER:** Deny Paragraph 206, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations about "the public" and "media," and admit the *Chicago Tribune* published articles on or about August 15, 2014 and October 18, 2019, and respectfully refer the Court to the articles for a complete and accurate statement of their contents.

207. Unbeknownst to investors, the Company "managed to crawl out of that hole" by engaging in a bribery scheme and abandoning its failed attempts at legitimate lobbying activities.

**ANSWER:** Deny Paragraph 207, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 207, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

**Exelon's Failure to Clawback Compensation Supports a Strong Inference of Scienter**

208. Although the agreed upon language of the DPA only identifies Pramaggiore and Marquez, it does not state they were the only senior executives directly involved in the bribery scheme, nor does the DPA claim they concealed their activities from other executives, including Crane, Von Hoene, or Dominguez. Indeed, as detailed herein, they were directly involved.

**ANSWER:** Deny Paragraph 208, except admit that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

209. In 2018, Exelon and ComEd revised their clawback policy to broaden the Company's discretionary ability to clawback incentive compensation from executives. Under the

87

clawback policy, Exelon "may . . . seek to recoup incentive compensation" paid to former executives if they "engaged or participated in misconduct or intentional or reckless acts or omissions or serious neglect of responsibilities that caused or contributed to a significant financial loss or serious reputational harm to Exelon or its subsidiaries." Notwithstanding this, Exelon has not disclosed any attempt to clawback compensation from Pramaggiore and Marquez, which supports an inference that the Company and Crane were aware of such activities and therefore cannot enforce the clawback. To the contrary, despite the misconduct, in addition to 2019 total compensation of $4.3 million, Exelon rewarded Pramaggiore with $7.5 million in retirement benefits.

**ANSWER:** Deny Paragraph 209, except admit that Exelon and ComEd have a clawback policy and that in 2019 Ms. Pramaggiore received compensation and retirement benefits as reflected in Exelon's public filings, and respectfully refer the Court to the public filings and policy for a complete and accurate statement of their contents.

**Defendants' Belated and Misleading Disclosures Regarding the Criminal Investigation Support a Strong Inference of Scienter**

210. Exelon and ComEd received the first grand jury subpoena in the second quarter 2019 and established a board committee, with outside counsel, in connection with the subpoenas in June 2019. ¶¶144, 165. The Company admits in the DPA that, by that time, the Company had been "notified by the government of the nature of the government's investigation." Thus, the creation of the committee and receipt of subpoena suggests that by no later than June 2019, Defendants had been notified of the criminal investigation of Exelon and ComEd for payments made to associates of Public Official A.

**ANSWER:** Deny Paragraph 210, except admit that Exelon and ComEd received a grand jury subpoena in the second quarter of 2019, that Exelon's board formed a committee in connection with the subpoenas in June 2019, and that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

211. In addition, media has reported that in May 2019, the federal government executed search warrants (i) at the home of McClain, (ii) at the business of Doherty, (iii) at the home of Kevin Quinn, a former top lieutenant of Public Official A in connection with thousands of dollars in payments he received from current and former ComEd lobbyists, and (iv) at the home of retired Zalewski – "Associate 3" in the DPA – seeking communications between Zalewski, McClain, and Public Official A concerning employment by Zalewski at ComEd. ¶¶115, 138, 152. As reported after the Class Period, federal authorities were seeking information about Pramaggiore, Marquez, and Hooker. ¶152.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 211, as set forth in the Exelon and ComEd Defendants' responses to Paragraphs 115, 138, and 152.

212. Despite Exelon and ComEd clearly being aware that the investigation was focusing on the Company's bribery scheme, Defendants' disclosures were muted in such a way to imply that that the Company received grand jury subpoenas merely as a witness to investigations into McClain, Zalewski, and Public Official A. As further example, even on August 1, 2019, Defendant Von Hoene claimed that the receipt of the subpoena was having "no impact" on their lobbying activity and intensity, which suggested that they had done nothing improper and nothing needed to change. In addition, the Company did not modify its risk disclosures in its SEC filings and failed to warn of the risk that the Company could be forced to pay substantial criminal penalties until after the Class Period. ¶121(a).

**ANSWER:** Deny Paragraph 212, except admit that Exelon held an earnings call on or about August 1, 2019, and respectfully refer the Court to the transcript of the earnings call and Exelon's and ComEd's public filings for complete and accurate statements of their contents.

**The Pervasiveness of the Bribery Scheme Supports a Strong Inference of Scienter**

213. Exelon and ComEd were failing in their legitimate lobbying efforts to win approval of legislation critical to their business success. *See, e.g.*, ¶¶47-51. Specifically, Public Official A was publicly stating his opposition and rejecting proposals. *See, e.g.*, ¶48. Thereafter, the Company changed its strategy from legal lobbying activities to illegal bribery and engaged in an eight-year scheme to bribe Public Official A, through more than $1.3 million in indirect payments to his associates. Each of the Defendants participated, as discussed herein.

**ANSWER:** Deny Paragraph 213, except admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 213, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

214. The Company has admitted such illegal conduct and entered into the DPA and agreed to pay $200 million in criminal penalties. The bribery scheme set forth in the DPA was multi-faceted, occurred over eight years, was carefully designed to benefit Public Official A and his friends, represented a shift in strategy, and could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of Exelon, including the Individual Defendants.

**ANSWER:** Deny Paragraph 214, except admit that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

215.    More specifically, after legitimate lobbying efforts failed to produce results, the Company altered strategies to bribe Public Official A, which resulted in passage of favorable legislation. The bribery scheme spanned eight years, during which time ComEd paid more than $1.3 million to individuals who performed little or no work for ComEd, appointed a director to ComEd's Board of Directors at the request of Public Official A, retained and paid for thousands of hours of work to Law Firm A (a law firm connected to Public Official A), and created an internship program and hired individuals recommended by representatives of Public Official A. ¶¶52-71. The Company has admitted to the foregoing misconduct and that it was carried out "in an effort to influence and reward Public Official A's efforts, as Speaker of the Illinois House of Representatives, to assist ComEd with respect to legislation concerning ComEd and its business."

ANSWER:    Deny Paragraph 215, except admit that ComEd entered into the DPA, which

addresses certain of the matters alleged in Paragraph 215, and respectfully refer the Court to the

DPA for a complete and accurate statement of its contents.

216.    The bribery scheme was executed at the highest levels of Exelon and ComEd, as admitted by the DPA, which states that "[c]ertain senior executives" of ComEd were "aware of the[] payments from their inception until they were discontinued in or around 2019," and were "aware of the purpose of these payments . . . namely, that they were intended to influence and reward Public Official A in connection with [his] official duties and to advance ComEd's business interests." The agreed sentencing provisions add that "high-level personnel participated in and condoned the offense." Pramaggiore and Marquez are specifically named in the DPA and both of them were terminated around the same time that Exelon and ComEd received a second grand jury subpoena. ¶¶57, 144-145.

ANSWER:    Deny Paragraph 216, except admit that ComEd entered into the DPA, and

respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

217.    Marquez was charged in a one count Information for criminal bribery, with media reporting that the nature of the charges suggest he is cooperating and likely to plead guilty or defer prosecution. The Information alleged, in part, that "[o]n or about July 30, 2018, Marquez caused a payment of $37,500 to be sent to [Doherty & Associates], a substantial portion of which was intended for associates of Public Official A."

ANSWER:    Deny knowledge or information sufficient to form a belief as to the truth of

the allegations in Paragraph 217, except admit that Fidel Marquez, Jr. was charged in a one count

Information and respectfully refer the Court to the Information for a complete and accurate

statement of its contents.

218. Pramaggiore is reportedly under continued investigation, and during the Class Period, she was one of Exelon's five highest-ranking senior executives. She reported directly to Crane and was the head of Exelon Utilities and, as stated in the DPA, had "oversight authority over ComEd's operations." Defendant Dominguez, as CEO of ComEd, reported directly to Pramaggiore and had Marquez reporting directly to him. The DPA details several examples of Pramaggiore's direct participation in the bribery scheme, including:

- In May 2018, "Public Official A, through [McClain], asked [Pramaggiore] to hire [former Alderman Zalewski], a political ally of Public Official A who was retiring from the Chicago City Council at the end of the month," and "[Pramaggiore], in coordination with [Marquez] and [Doherty], agreed that ComEd would pay [Zalewski] approximately $5,000 a month indirectly as a subcontractor through [Doherty's company]."

- Pramaggiore maintained what she referred to as a "roster" of "associates of Public Official A that were paid indirectly as subcontractors through [Doherty's company]."

- After "Public Official A sought the appointment of an associate [Ochoa] to the ComEd Board of Directors," which request "was communicated by [McClain] to [Pramaggiore]," in May 2018, Pramaggiore "asked [McClain] if Public Official A would be satisfied if [she] arranged for [Ochoa] to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year." In response, "[McClain] told [Pramaggiore] that Public Official A would appreciate if [Pramaggiore] would 'keep pressing' for the appointment of [Ochoa], and [Pramaggiore] agreed to do so."

- On April 25, 2019, Pramaggiore informed McClain that Ochoa would be appointed to the Board stating, "'Just sent out Board approval to appoint [Ochoa] to the ComEd Board.'"

**ANSWER:** Deny Paragraph 218, except deny knowledge or information sufficient to form a belief as to whether Ms. Pramaggiore is "under continued investigation," and admit that Ms. Pramaggiore served as CEO of Exelon Utilities during the putative Class Period, that Mr. Dominguez was CEO of ComEd during the putative Class Period, and that ComEd entered into the DPA, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

219. When Pramaggiore agreed to push for a Board position for Ochoa, she wrote to McClain, "'You take good care of me and so does our friend [Public Official A] and I will do the best that I can to, to take care of you.'"

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 219, except admit ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 219, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

220.　In addition, in 2016, Law Firm A sought renewal of its contract, but a dispute arose between Law Firm A and ComEd regarding Law Firm A's request for a minimum of 850 billable hours annually. McClain wrote to Pramaggiore, "'I am sure you know how valuable [Lawyer A] is to our Friend [Public Official A],' and then went on to write, 'I know the drill and so do you. If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Public Official A]. Our Friend [Public Official A] will call me and then I will call you. Is this a drill we must go through?'" In response, Pramaggiore wrote, "'Sorry. No one informed me. I am on this.'"

**ANSWER:** Deny Paragraph 220, except deny knowledge or information sufficient to form a belief as to the truth of the alleged conversations between McClain and Ms. Pramaggiore, and admit that ComEd entered into the DPA, which addresses certain of the matters alleged in Paragraph 218, and respectfully refer the Court to the DPA for a complete and accurate statement of its contents.

## LOSS CAUSATION AND ECONOMIC LOSS

221.　During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Exelon common stock and operated as a fraud or deceit on Class Period purchasers of Exelon common stock by misrepresenting and concealing that the Company had changed strategy from legal lobbying to an eight-year illegal bribery scheme in which ComEd and senior executives were bribing Public Official A to advance favorable Illinois legislation, that Exelon's and ComEd's Illinois legislative successes and the benefits from those successes were illusory and the result of – in significant part – the bribery scheme, and that the Company was at substantial risk of criminal penalties and diminished legislative and public reputation as a result of the bribery scheme.[22]

**ANSWER:** Deny Paragraph 221.

---

[22]　The Class consists of all those who purchased or otherwise acquired the publicly-traded common stock of Exelon during the Class Period and were damaged thereby (the "Class").

222.     Defendants' false and misleading statements had their intended effect and directly and proximately caused Exelon common stock to trade at artificially inflated levels, reaching a Class Period high of $50.95 per share.

**ANSWER:**  Deny Paragraph 222.

223.     As a result of Defendants' fraudulent conduct as alleged herein, the price at which Exelon common stock traded was artificially inflated throughout the Class Period. When Plaintiff and other members of the Class purchased their Exelon common stock, the true value of such common stock was substantially lower than the prices actually paid. As a result of purchasing Exelon common stock during the Class Period at artificially inflated prices, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws, when such artificial inflation dissipated.

**ANSWER:**  Deny Paragraph 223.

224.     As a result of Defendants' materially false and misleading statements, as well as the adverse, undisclosed information known to Defendants, Plaintiff and other members of the Class relied to their detriment on such statements and documents, and/or the integrity of the market, in purchasing their Exelon common stock at artificially inflated prices during the Class Period. Had Plaintiff and other members of the Class known the truth, they would not have taken such actions.

**ANSWER:**  Deny Paragraph 224.

225.     When the misrepresentations and omissions that Defendants had concealed from the market were leaked out and revealed through the series of partial disclosures beginning on July 18, 2019 and continuing through October 31, 2019, the price of Exelon common stock fell dramatically, causing substantial losses to investors.

**ANSWER:**  Deny Paragraph 225.

226.     The corrective impact of the partial disclosures during the Class Period alleged herein, however, was tempered by Defendants' continued concealment of the bribery scheme and investigation (¶¶118-119), which made their statements false and misleading. Defendants' continued misrepresentations maintained the price of Exelon common stock at a level that was inflated by fraud, inducing members of the Class to continue purchasing shares in Exelon even after the partial disclosures.

**ANSWER:**  Deny Paragraph 226.

227.     Partial disclosures began to enter the market after market close on July 18, 2019, when the *Chicago Tribune* published a report disclosing that the FBI had "raided" the home of one of Exelon and ComEd's most important lobbyists, McClain. *See* ¶138. After this news, Exelon's common stock price declined 2.4%, from $48.76 per share to $47.57, erasing more than $1 billion in market capitalization. By comparison, the S&P 500 Index declined only 0.6% and the S&P 500 Utilities Index declined only 1.5% the same day. The partial removal of artificial

inflation from the price of Exelon common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Exelon common stock remained artificially inflated.

**ANSWER:** Deny Paragraph 227, except admit that the *Chicago Tribune* published an article on or about July 18, 2019, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

228. A partial disclosure entered the market on July 24, 2019, when the *Chicago Tribune* published an article regarding $10,000 in checks from current and former outside ComEd lobbyists, including McClain, paid to a former top lieutenant of Public Official A. *See* ¶140. The same morning, a *Crain's* article also reported on the information in the *Chicago Tribune* article and linked ComEd's legislative successes in 2011 and 2016 to Public Official A's support. *See* ¶141. Following the July 24, 2019 news reports, the price of Exelon common stock fell 1.9% from a close of $46.36 on July 23, 2019 to a close of $45.48 on July 24, 2019 on the highest trading volume of any day in the previous four months, eliminating more than $850 million in market capitalization. By comparison, the S&P 500 Index rose 0.5% and the S&P 500 Utilities Index rose 0.1% the same day. The partial removal of artificial inflation from the price of Exelon common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Exelon common stock remained artificially inflated.

**ANSWER:** Deny Paragraph 228, except admit that the *Chicago Tribune* published an article on or about July 24, 2019 and that *Crain's* published an article on or about July 24, 2019, and respectfully refer the Court to those articles for a complete and accurate statement of their contents.

229. Partial disclosures continued to enter the market on October 15-17, 2019. On October 15, 2019, Exelon revealed the sudden departure of Pramaggiore. The next day, October 16, 2019, the *Chicago Tribune* published a report noting the proximity of Pramaggiore's departure to Exelon and ComEd's announcement that federal investigators had issued a second subpoena. The same article also reported that Pramaggiore was a focus of the ongoing federal investigation. Analysts following Exelon quickly issued reports noting concern about Pramaggiore's departure, the investigation of the Company, risks to Exelon and ComEd's legislative agenda, and the risk of fines and penalties. Following the news and information reported on October 15 and 16, 2019, Exelon's common stock price declined on both October 16 and 17, 2019. On October 16, 2019 the common stock price fell 4.6% on an unusually large volume of more than 11.5 million shares from $47.06 to $44.91 on October 16, 2019. By comparison, the S&P 500 Index declined only 0.2% and the S&P 500 Utilities Index rose 0.2% the same day. The decline caused by the partial disclosures continued on October 17, 2019, with Exelon's common stock falling another 1.9% on a volume of over 19 million shares to close at $44.06. By comparison, the S&P 500 Index rose 0.3% and the S&P 500 Utilities Index rose

0.2% the same day. The partial removal of artificial inflation from the price of Exelon common stock would have been greater had the full truth been disclosed. But, because of Defendants' materially false and misleading statements and/or failure to disclose the full truth, the price of Exelon common stock remained artificially inflated.

**ANSWER:** Deny Paragraph 229, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations about "reports" by "[a]nalysts," and admit that Exelon disclosed Ms. Pramaggiore's decision to retire on October 15, 2019 and that the *Chicago Tribune* published an article on or about October 16, 2019, and respectfully refer the Court to the article for a complete and accurate statement of its contents.

230. On October 31, 2019, Exelon revealed that the SEC was also investigating Exelon and ComEd regarding their lobbying activities, and Exelon and media reported on further risks the bribery scheme and investigation posed to the Company's financial condition and legislative agenda. After the news and information reported on October 31, 2019, the price of Exelon common stock declined 2.5% from a close of $46.66 on October 30, 2019 to a close of $45.49 on October 31, 2019, eliminating more than $1 billion of market capitalization. By comparison, the S&P 500 Index declined only 0.3% and the S&P 500 Utilities Index rose 0.5% the same day.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 230, except admit that Exelon disclosed the existence of an SEC investigation on or about October 31, 2019, and respectfully refer the Court to Exelon's public filings for a complete and accurate statement of their contents.

231. The timing and magnitude of the declines in the price of Exelon common stock negates any inference that losses suffered by Plaintiff and other Class members were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. From the close of trading on July 18, 2019 through the close of trading on October 31, 2019, Exelon's stock price fell 6.7% as a result of Defendants' fraud being leaked out and revealed through a series of partial disclosures. By comparison, S&P 500 Index increased 1.4% and the S&P 500 Utilities Index increased 4.9% during the same period.

**ANSWER:** Deny Paragraph 231.

232. As a result of their purchases of Exelon common stock during the Class Period and the subsequent decline in the value of those shares when the truth was revealed to the market, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**ANSWER:** Deny Paragraph 232.

95

## PRESUMPTION OF RELIANCE

233. At all relevant times, the market for Exelon common stock was an efficient market for the following reasons, among others:

a. Exelon common stock met the requirements for listing and was listed and actively traded on the NYSE from the beginning of the Class Period to September 24, 2019, and on the NASDAQ exchange from September 25, 2019 to the end of the Class Period, both highly efficient and automated markets;

b. according to the Company's 1Q19 Form 10-Q, the Company had more than 960 million shares of common stock outstanding as of March 31, 2019, demonstrating a very active and broad market for Exelon common stock;

c. as a regulated issuer, Exelon filed periodic public reports with the SEC;

d. Exelon regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

e. During the Class Period, Exelon was followed by numerous securities analysts employed by major brokerage firms, such as Argus Research, Barclays, Credit Suisse, Deutsche Bank, Evercore ISI, JP Morgan, Morgan Stanley, Morningstar Equity Research, and RBC Capital Markets, who wrote reports that were distributed to the brokerage firms' sales forces and the public.

**ANSWER:** Deny Paragraph 233, except deny knowledge or information sufficient to form a belief as to the truth of unspecified allegations concerning "analysts employed by major brokerage firms," and admit that Exelon was listed and traded on the NYSE from the beginning of the putative Class Period to September 24, 2019 and on NASDAQ from September 25, 2019 to the end of the putative Class Period, that Exelon filed public reports with the SEC, and that Exelon at times communicates with the public through press releases.

234. As a result of the foregoing, the market for Exelon common stock promptly digested current information regarding Exelon from publicly-available sources and reflected such information in Exelon's common stock price. Under these circumstances, a presumption of reliance applies to Plaintiff's purchases of Exelon common stock.

**ANSWER:** Deny Paragraph 234.

235. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because

96

Plaintiff's claims are based, in significant part, on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Exelon's business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material omissions set forth above, that requirement is satisfied here.

**ANSWER:** Deny Paragraph 235.

## NO SAFE HARBOR

236. The false and misleading statements alleged herein were not forward-looking. To the extent any of the alleged false and misleading statements were forward-looking, the federal statutory safe harbor for forward-looking statements under certain circumstances does not apply. Many of the specific statements alleged were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were absent from Exelon's Class Period filings and oral disclaimers.

**ANSWER:** Deny Paragraph 236.

237. Alternatively, to the extent that the statutory safe harbor could apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, the speaker knew that the particular forward-looking statement was false or misleading and the forward-looking statement was authorized and approved by an executive officer of Exelon who knew that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain risks, those disclosures were also false and misleading. *See, e.g.*, ¶104(e).

**ANSWER:** Deny Paragraph 237.

## CLASS ACTION ALLEGATIONS

238. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all purchasers of Exelon common stock during the Class Period. Excluded from the Class are: Defendants, the current and Class Period officers and directors of Exelon or ComEd, the members of the immediate families and the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, and any entity in which such excluded persons have or had a controlling interest.

**ANSWER:** Paragraph 238 purports to state legal conclusions, to which no response is required. To the extent a response is required, the Exelon and ComEd Defendants admit that Plaintiff seeks to bring this Action as a class action, but deny the allegations in Paragraph 238.

239. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Exelon common stock was actively traded on the NYSE and NASDAQ. According to the Company's 1Q19 Form 10-Q, the Company had more than 960 million shares of common stock outstanding as of March 31, 2019. While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the hundreds, if not thousands, and that they are geographically dispersed.

**ANSWER:** Deny Paragraph 239, except deny knowledge or information sufficient to form a belief as to the number of members of the putative class, and admit that Exelon common stock traded on the NYSE from the beginning of the putative Class Period to September 24, 2019 and on NASDAQ from September 25, 2019 to the end of the putative Class Period and that Exelon's Form 10-Q for the first quarter of 2019 disclosed the common stock outstanding as of March 31, 2019, and respectfully refer the Court to Exelon's Form 10-Q for a complete and accurate statement of its contents.

240. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same representations and omissions made by or chargeable to Defendants. Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of Paragraph 240.

241. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

**ANSWER:** Deny knowledge or information sufficient to form a belief as to the truth of Paragraph 241.

242.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by or chargeable to Defendants during the Class Period misrepresented or omitted material facts;

c.    whether the price of Exelon common stock was artificially inflated during the Class Period; and

d.    to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER:**  Deny Paragraph 242.

243.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Class to individually redress the wrongs done to them. Plaintiff is not aware of any difficulty in the management of this action as a class action.

**ANSWER:**  Deny Paragraph 243.

## COUNT I

### For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5
### Against Exelon, ComEd, and the Individual Defendants

244.    Plaintiff incorporates the foregoing paragraphs by reference.

**ANSWER:**  Repeat and reincorporate each and every response to the allegations above,

as if set forth fully herein.

245.    During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**ANSWER:**  Deny Paragraph 245.

246.    Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they:

99

a.    employed devices, schemes, and artifices to defraud;

b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c.    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of Exelon common stock.

**ANSWER:** Deny Paragraph 246.

247.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases of Exelon common stock during the Class Period because, in reliance on the integrity of the market, Plaintiff and other members of the Class paid artificially inflated prices for Exelon common stock and experienced losses when the artificial inflation was released from Exelon common stock as a result of the leakage and disclosure of information and price declines detailed herein. Plaintiff and other members of the Class would not have purchased Exelon common stock at the prices paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' false and misleading statements.

**ANSWER:** Deny Paragraph 247.

248.    By virtue of the foregoing, Exelon, ComEd, and the Individual Defendants have each violated §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

**ANSWER:** Deny Paragraph 248.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Exelon and the Individual Defendants

249.    Plaintiff incorporates the foregoing paragraphs by reference.

**ANSWER:** Repeat and reincorporate each and every response to the allegations above,

as if set forth fully herein.

250.    Exelon acted as a controlling person of ComEd within the meaning of §20(a) of the Exchange Act. In addition, Crane, Pramaggiore, and Von Hoene acted as controlling persons of Exelon, and Crane, Pramaggiore, and Dominguez acted as controlling persons of ComEd within the meaning of §20(a) of the Exchange Act.

**ANSWER:** Deny Paragraph 250.

100

251.     By virtue of ownership and superior position, Exelon had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of ComEd, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. In addition, by virtue of their high-level positions, participation in and/or awareness of Exelon and ComEd's operations and/or intimate knowledge of Exelon and ComEd's disclosures, policies, and lobbying practices, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Exelon (Crane, Pramaggiore, and Von Hoene) and ComEd (Crane, Pramaggiore, and Dominguez), including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Exelon, Crane, Pramaggiore, Dominguez, and Von Hoene were provided with, or had unlimited access to copies of the reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

**ANSWER:**  Deny Paragraph 251.

252.     As set forth above, Exelon and ComEd violated §10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, Defendants Crane, Pramaggiore, and Von Hoene are liable pursuant to §20(a) of the Exchange Act for Exelon's §10(b) violations, and Defendants Exelon, Crane, Pramaggiore, and Dominguez are liable pursuant to §20(a) of the Exchange Act for ComEd's §10(b) violations. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines discussed above, when the artificial inflation was released from the Company's common stock.

**ANSWER:**  Deny Paragraph 252.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and b(3) of the Federal Rules of Civil Procedure and certifying Plaintiff as Class Representative and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees, experts' fees, and other costs and disbursements; and

D.     Awarding such further relief, including any equitable/injunctive relief, as the Court may deem just and proper.

**ANSWER:** Deny that Plaintiff or putative class members are entitled to any judgment, damages, recovery, or relief whatsoever.

## DEMAND FOR JURY

Plaintiff hereby demands a trial by jury.

**ANSWER:** This paragraph contains a description of Plaintiff's demand, to which no response is required.

## DEFENSES

Without admitting any wrongful conduct, and without assuming any burden that they would not otherwise bear, the Exelon and ComEd Defendants assert the following defenses to the Complaint:

## FIRST DEFENSE

1. The Complaint fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

2. Plaintiff fails to plead specific misstatements or omissions or why any misstatement or omission is misleading, or particular facts sufficient to support the allegations asserted on information and belief. 15 U.S.C. § 78u-4(b)(1).

## THIRD DEFENSE

3. Plaintiff's claims are barred by the applicable statutes of repose and/or statutes of limitation.

## FOURTH DEFENSE

4. Plaintiff fails to plead fraud or scienter with the particularity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995. 15 U.S.C. § 78u-4(b)(2).

102

**FIFTH DEFENSE**

5.     Plaintiff's claims fail, in whole or in part, because the Exelon and ComEd Defendants lacked the required fraudulent intent or scienter necessary to establish violations of the securities laws.

**SIXTH DEFENSE**

6.     Plaintiff's claims fail, in whole or in part, because the Exelon and ComEd Defendants did not make any untrue statement of material fact.

**SEVENTH DEFENSE**

7.     Plaintiff's claims are barred, in whole or in part, because the alleged misstatements and omissions were not material to the investment decisions of a reasonable investor in view of, inter alia, the total mix of available information.

**EIGHTH DEFENSE**

8.     Plaintiff's claims are barred, in whole or in part, because certain alleged misstatements contain expressions of opinion that Plaintiff has not alleged, and cannot prove, were not truly held.

**NINTH DEFENSE**

9.     Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any cognizable damages.

**TENTH DEFENSE**

10.     To the extent that any Plaintiff or member of the alleged class incurred any injury or damage as alleged in the Complaint, which is denied, any such injury or damage was caused and brought about by other factors, including, but not limited to, market-wide phenomena, economic factors, and/or the acts, conduct, or omissions of individuals and/or entities other than

the Exelon and ComEd Defendants that intervened between the Exelon and ComEd Defendants' alleged actions and the alleged harm. Accordingly, any recovery should be precluded or diminished in proportion to the amount of fault attributable to other factors.

## ELEVENTH DEFENSE

11.     Plaintiff's claims are barred, in whole or in part, because no act or omission by any of the Exelon and ComEd Defendants was the cause in fact or proximate cause of any damage alleged by Plaintiff.

## TWELFTH DEFENSE

12.     Plaintiff's claims are barred, in whole or in part, because the injuries allegedly sustained were caused by the actions or inactions of parties other than the Exelon and ComEd Defendants, actions or inactions by parties outside the control of the Exelon and ComEd Defendants, and/or economic events that were, likewise, outside the control of the Exelon and ComEd Defendants.  These actions, inactions, and events were intervening or superseding causes of the damages alleged in the Complaint.

## THIRTEENTH DEFENSE

13.     Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## FOURTEENTH DEFENSE

14.     Plaintiff's claims are barred, in whole or in part, by equitable estoppel, waiver, unclean hands, and/or other equitable doctrines.

## FIFTEENTH DEFENSE

15.     Plaintiff's claims are barred, in whole or in part, because, and to the extent that, Plaintiff's loss, if any, was not caused by any alleged misrepresentation or omission by the Exelon and ComEd Defendants.

## SIXTEENTH DEFENSE

16.    Plaintiff's claims fail, in whole or in part, because the Exelon and ComEd Defendants made full and accurate disclosures of all information required to be disclosed by law and did not omit to disclose any statement of fact necessary in order to make the statements made by the Exelon and ComEd Defendants not misleading.

## SEVENTEENTH DEFENSE

17.    Plaintiff's claims are barred, in whole or in part, by the terms, disclaimers, and disclosures in Exelon and ComEd's SEC filings.

## EIGHTEENTH DEFENSE

18.    Plaintiff's claims are barred, in whole or in part, because the Exelon and ComEd Defendants had no duty to disclose, or to cause the disclosure of, the allegedly omitted material information.

## NINETEENTH DEFENSE

19.    Plaintiff's claims are barred, in whole or in part, because some or all of the matters now claimed by Plaintiff to have been omitted from Exelon and ComEd's public disclosures (which the Exelon and ComEd Defendants deny) were fully disclosed by the Exelon and ComEd Defendants or were otherwise known to and entered the securities market through credible sources.

## TWENTIETH DEFENSE

20.    Plaintiff's claims are barred, in whole or in part, because certain of the alleged misstatements are non-actionable statements of puffery.

## TWENTY FIRST DEFENSE

105

21.     Plaintiff's claims fail to the extent that they are based on forward-looking statements that were either accompanied by meaningful cautionary language or made without actual knowledge that those statements were false or misleading. 15 U.S.C. § 78u-5(c).

## TWENTY SECOND DEFENSE

22.     Plaintiff's claims are barred, in whole or in part, under the "bespeaks caution" doctrine.

## TWENTY THIRD DEFENSE

23.     Plaintiff is not entitled to a presumption of reliance and did not reasonably rely on any allegedly misleading statement of material fact when purchasing Exelon's securities.

## TWENTY FOURTH DEFENSE

24.     Plaintiff's claims are barred, in whole or in part, because the Exelon and ComEd Defendants are not liable to Plaintiff for any claims based on alleged misrepresentations or omissions for which Plaintiff and/or its agents, financial representatives, and/or broker-dealers had, in whole or part, actual or constructive knowledge.

## TWENTY FIFTH DEFENSE

25.     Plaintiff's claims are barred, in whole or in part, because the alleged misstatements or omissions did not affect the market price of Exelon's common stock.

## TWENTY SIXTH DEFENSE

26.     Plaintiff's claims are barred, in whole or in part, because Plaintiff purchased Exelon's common stock with actual or constructive knowledge of the risks involved in an investment in Exelon's common stock, and thus assumed the risk that the value of the common stock would decline if such risks materialized.

## TWENTY SEVENTH DEFENSE

27. Plaintiff's claims are barred, in whole or in part, because, and to the extent that, any relief or recovery would unjustly enrich or constitute a windfall to Plaintiff.

## TWENTY EIGHTH DEFENSE

28. Plaintiff's claims are barred, in whole or in part, by the doctrine of collateral estoppel.

## TWENTY NINTH DEFENSE

29. Plaintiff's claims are barred because one or more parties not named in the Complaint may be indispensable parties to this Action, and the Exelon and ComEd Defendants reserve the right to seek the joinder of those parties whose absence from the Action renders it such that complete relief cannot be granted without the missing party.

## THIRTIETH DEFENSE

30. Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to make reasonable efforts to mitigate their alleged injury or damage that would have prevented all or part of any such alleged injury or damage.

## THIRTY FIRST DEFENSE

31. Plaintiff's claims are barred, in whole or in part, because any alleged damages suffered by Plaintiff, which the Exelon and ComEd Defendants deny, are speculative.

## THIRTY SECOND DEFENSE

32. Plaintiff is not entitled to any recovery from the Exelon and ComEd Defendants in excess of the amounts allowed under applicable law.

## THIRTY THIRD DEFENSE

33.     Plaintiff's claims against each of the Exelon and ComEd Defendants fail to the extent that they seek damages exceeding each of the Exelon and ComEd Defendant's proportionate liability.

## THIRTY FOURTH DEFENSE

34.     Plaintiff's claims are barred, in whole or in part, insofar as they are based on alleged conduct that concluded before, or began after, Plaintiff's purchases of Exelon's common stock.

## THIRTY FIFTH DEFENSE

35.     Plaintiff's claims under Section 20(a) of the Exchange Act are barred because Messrs. Crane, Von Hoene, and Dominguez at all times acted in good faith, and did not directly or indirectly induce the alleged acts underlying Plaintiff's claims.

## THIRTY SIXTH DEFENSE

36.     Plaintiff's claims are barred, in whole or in part, because Plaintiff and members of the alleged class, including those who did not purchase Exelon common stock, lack standing to assert federal securities fraud claims against the Exelon and ComEd Defendants.

## THIRTY SEVENTH DEFENSE

37.     Plaintiff cannot satisfy the prerequisites set forth in Rule 23 of the Federal Rules of Civil Procedure to maintain this Action as a class action.

## THIRTY EIGHTH DEFENSE

38.     Plaintiff's claims are barred, in whole or in part, because the Exelon and ComEd Defendants did not employ any device, scheme, or artifice to defraud.

## THIRTY NINTH DEFENSE

39.      Plaintiff's claims are barred, in whole or in part, because the Exelon and ComEd Defendants did not engage in any act, practice, or course of business that operated or would operate as a fraud or deceit.

**FORTIETH DEFENSE**

40.      The Exelon and ComEd Defendants have not knowingly and intentionally waived any applicable additional defenses, and reserve the right to raise any additional defenses not asserted herein of which they become aware at any subsequent stage of this action, including, but not limited to, the right to assert as a defense their reliance on the advice of counsel.  The Exelon and ComEd Defendants further reserve the right to amend their Answer and Defenses accordingly and to delete defenses that they determine are not applicable during the course of discovery.

**<u>PRAYER</u>**

WHEREFORE, the Exelon and ComEd Defendants respectfully request that the Court:

A.      Deny class certification and strike all class allegations from the Complaint;

B.      Render judgment that Plaintiff take nothing by this suit;

C.      Dismiss the Complaint with prejudice;

D.      Award Defendants their costs of court and other fees; and

E.      Grant any other just and proper relief to which the Exelon and ComEd Defendants may be entitled.

109

DATED: June 9, 2021                    Respectfully submitted,

                                       RILEY SAFER HOLMES & CANCILA LLP

                                       */s/ Matthew C. Crowl*_____
                                       Matthew C. Crowl, #6201018
                                       Brian O. Watson, #6304248
                                       70 W. Madison Street, Suite 2900
                                       Chicago, Illinois 60602
                                       Telephone: (312) 471-8700
                                       Facsimile: (312) 471-8701
                                       mcrowl@rshc-law.com
                                       bwatson@rshc-law.com

                                       DAVIS POLK & WARDWELL LLP
                                       James P. Rouhandeh
                                       Edmund Polubinski III
                                       Mari Byrne
                                       450 Lexington Avenue
                                       New York, New York 10017
                                       Telephone: (212) 450-4000
                                       Facsimile: (212) 701-5835
                                       rouhandeh@davispolk.com
                                       edmund.polubinski@davispolk.com
                                       mari.byrne@davispolk.com

                                       *Attorneys for Defendants Exelon
                                       Corporation, Commonwealth Edison
                                       Company, Christopher M. Crane, William A.
                                       Von Hoene, Jr., and Joseph Dominguez*

110

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 9, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to all attorneys of record.

*/s/ Matthew C. Crowl*_____
Matthew C. Crowl