# EXHIBIT A

Bloomberg Law News 2023-08-01T17:13:28748066556-04:00

# Big Law Rates Topping $2,000 Leave Value 'In Eye of Beholder'

By Roy Strom 2022-06-09T05:30:11000-04:00

*Welcome back to the Big Law Business column on the changing legal marketplace written by me, Roy Strom . Today, we look at a new threshold for lawyers' billing rates and why it's so difficult to put a price on high-powered attorneys. Sign up to receive this column in your inbox on Thursday mornings. Programming note: Big Law Business will be off next week.*

Some of the nation's top law firms are charging more than $2,000 an hour, setting a new pinnacle after a two-year burst in demand.

Partners at Hogan Lovells and Latham & Watkins have crossed the threshold, according to court documents in bankruptcy cases filed within the past year.

Other firms came close to the mark, billing more than $1,900, according to the documents. They include Kirkland & Ellis, Simpson Thacher & Bartlett, Boies Schiller Flexner, and Sidley Austin.

Simpson Thacher & Bartlett litigator Bryce Friedman, who helps big-name clients out of jams, especially when they're accused of fraud, charges $1,965 every 60 minutes, according to a court document.

In need of a former acting US Solicitor General? Hogan Lovells partner Neal Katyal bills time at $2,465 an hour. Want to hire famous litigator David Boies? That'll cost $1,950 an hour (at least). Reuters was first to report their fees.

Eye-watering rates are nothing new for Big Law firms, which typically ask clients to pay higher prices at least once a year, regardless of broader market conditions.

"Value is in the eye of the beholder," said John O'Connor, a San Francisco-based expert on legal fees. "The perceived value of a good lawyer can reach into the multi-billions of dollars."

**Bloomberg Law**®

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Kirkland & Ellis declined to comment on its billing rates. None of the other firms responded to requests to comment.

## Charge It Up

Big Law firms are crossing the $2,000-an-hour threshold after two years of surging rates driven by an increase in demand for lawyers.

| Firm | Highest Billing Rate |
| --- | --- |
| Hogan Lovells | $2,465 |
| Latham & Watkins | $2,075 |
| Kirkland & Ellis | $1,995 |
| Simpson Thacher & Bartlett | $1,965 |
| Boies Schiller Flexner | $1,950 |
| Sidley Austin | $1,900 |

Source: Court documents

Bloomberg Law

Law firms have been more successful raising rates than most other businesses over the past 15 years.

Law firm rates rose by roughly 40 percent from 2007 to 2020, or just short of 3 percent per year, Thomson Reuters Peer Monitor data show. US inflation rose by about 28% during that time.

The 100 largest law firms in the past two years achieved their largest rate increases in more than a decade, Peer Monitor says. The rates surged more than 6% in 2020 and grew another 5.6% through November of last year. Neither level had been breached since 2008.

The price hikes occurred during a once-in-a-decade surge in demand for law services, which propelled profits at firms to new levels. Fourteen law firms reported average profits per equity partner in 2021 over $5 million, according to data from The American Lawyer. That was up from six the previous year.

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Big Law Rates Topping $2,000 Leave Value 'In Eye of Beholder'

The highest-performing firms, where lawyers charge the highest prices, have outperformed their smaller peers. Firms with leading practices in markets such as mergers and acquisitions, capital markets, and real estate were forced to turn away work at some points during the pandemic-fueled surge.

Firms receive relatively tepid pushback from their giant corporate clients, especially when advising on bet-the-company litigation or billion-dollar deals.

The portion of bills law firms collected—a sign of how willingly clients pay full-freight—rose during the previous two years after drifting lower following the Great Financial Crisis. Collection rates last year breached 90% for the first time since 2009, Peer Monitor data show.

Professional rules prohibit lawyers from charging "unconscionable" or "unreasonable" rates. But that doesn't preclude clients from paying any price they perceive as valuable, said Jacqueline Vinaccia, a San Diego-based lawyer who testifies on lawyer fee disputes.

Lawyers' fees are usually only contested when they will be paid by a third party.

That happened recently with Hogan Lovells' Katyal, whose nearly $2,500 an hour fee was contested in May by a US trustee overseeing a bankruptcy case involving a Johnson & Johnson unit facing claims its talc-based powders caused cancer.

The trustee, who protects the financial interests of bankruptcy estates, argued Katyal's fee was more than $1,000 an hour higher than rates charged by lawyers in the same case at Jones Day and Skadden Arps Slate Meagher & Flom.

A hearing on the trustee's objection is scheduled for next week. Hogan Lovells did not respond to a request for comment on the objection.

Vinaccia said the firm's options will be to reduce its fee, withdraw from the case, or argue the levy is reasonable, most likely based on Katyal's extensive experience arguing appeals.

Still, the hourly rate shows just how valuable the most prestigious lawyers' time can be—even compared to their highly compensated competitors.



© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

"If the argument is that Jones Day and Skadden Arps are less expensive, then you're already talking about the cream of the crop, the top-of-the-barrel law firms," Vinaccia said. "I can't imagine a case in which I might argue those two firms are more reasonable than the rates I'm dealing with."

# Worth Your Time

**On Cravath:** Cravath Swaine & Moore is heading to Washington, opening its first new office since 1973 by hiring former heads of the U.S. Securities and Exchange Commission and Federal Deposit Insurance Corporation. Meghan Tribe reports the move comes as Big Law firms are looking to add federal government expertise as clients face more regulatory scrutiny.

**On Big Law Promotions:** It's rare that associates get promotions to partner in June, but Camille Vasquez is now a Brown Rudnick partner after she shot to fame representing Johnny Depp in his defamation trial against ex-wife Amber Heard.

**On Working From Home:** I spoke this week with Quinn Emanuel's John Quinn about why he thinks law firm life is never going back to the office-first culture that was upset by the pandemic. Listen to the podcast here.

**That's it for this week! Thanks for reading and please send me your thoughts, critiques, and tips.**

To contact the reporter on this story: Roy Strom in Chicago at rstrom@bloomberglaw.com

To contact the editors responsible for this story: Chris Opfer at copfer@bloomberglaw.com; John Hughes at jhughes@bloombergindustry.com

© 2023 Bloomberg Industry Group, Inc. All Rights Reserved. Terms of Service

Big Law Rates Topping $2,000 Leave Value 'In Eye of Beholder'

## Related Articles

Overworked Big Law Can't Find Enough Lawyers With Demand Surging

Never Underestimate Big Law's Ability to Raise Billing Rates

## Related Documents

Trustee's Objection

# EXHIBIT B

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE E. JAFFE PENSION PLAN, On Behalf of Itself and All Others Similarly Situated, | ) ) ) | Lead Case No. 02-C-5893 (Consolidated) |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | Honorable Jorge L. Alonso |
| vs. | ) ) | |
| HOUSEHOLD INTERNATIONAL, INC., et al., | ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## FINAL JUDGMENT AND ORDER OF DISMISSAL WITH PREJUDICE

1180802_1

This matter came before the Court pursuant to the Order Preliminarily Approving Settlement and Providing for Notice ("Order") dated June 24, 2016, on the application of the parties for approval of the settlement set forth in the Stipulation of Settlement dated as of June 17, 2016 (the "Stipulation"). Due and adequate notice having been given to the Class as required in said Order, and the Court having considered all papers filed and proceedings had herein and otherwise being fully informed in the premises and good cause appearing therefore, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that:

1. This Judgment incorporates by reference the definitions in the Stipulation, and all terms used herein shall have the same meanings as set forth in the Stipulation, unless otherwise set forth herein.

2. This Court has jurisdiction over the subject matter of the Litigation and over all parties to the Litigation, including all Members of the Class.

3. Pursuant to Federal Rule of Civil Procedure 23, the Court hereby approves the settlement set forth in the Stipulation and finds that:

(a) said Stipulation and the settlement contained therein, are, in all respects, fair, reasonable, and adequate and in the best interest of the Class;

(b) there was no collusion in connection with the Stipulation;

(c) the Stipulation was the product of informed, arm's-length negotiations among competent, able counsel; and

(d) the record is sufficiently developed and complete to have enabled the Plaintiffs and the Defendants to have adequately evaluated and considered their positions.

4. Accordingly, the Court authorizes and directs implementation and performance of all the terms and provisions of the Stipulation, as well as the terms and provisions hereof. Except as to any individual claim of those Persons (identified in Exhibit 1 attached hereto) who have validly and timely requested exclusion from the Class, the Court hereby dismisses the Litigation and all Released Claims of the Class with prejudice. The Settling Parties are to bear their own costs, except as and to the extent provided in the Stipulation and herein.

- 1 -

1180802_1

- 2 -

5.      Upon the Effective Date, the Plaintiffs shall, and each of the Class Members shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Persons, whether or not such Class Member executed and delivered the Proof of Claim form or shares in the Settlement Fund. Claims to enforce the terms of the Stipulation are not released.

6.      All Class Members are hereby forever barred and enjoined from prosecuting any of the Released Claims against any of the Released Persons.

7.      Upon the Effective Date, each of the Released Persons shall be deemed to have, and by operation of this Judgment shall have, fully, finally, and forever released, relinquished, and discharged Plaintiffs, each and all of the Class Members, and Plaintiffs' counsel from all claims (including Unknown Claims) arising out of, relating to, or in connection with the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims. Claims to enforce the terms of the Stipulation are not released.

8.      The Notice of Proposed Settlement of Class Action given to the Class was the best notice practicable under the circumstances, including the individual notice to all Members of the Class who could be identified through reasonable effort. Said notice provided the best notice practicable under the circumstances of those proceedings and of the matters set forth therein, including the proposed settlement set forth in the Stipulation, to all Persons entitled to such notice, and said notice fully satisfied the requirements of Federal Rule of Civil Procedure 23 and the requirements of due process.

9.      Any Plan of Allocation submitted by Lead Counsel or any order entered regarding any attorneys' fee and expense application shall in no way disturb or affect this Final Judgment and shall be considered separate from this Final Judgment.

10.      Neither the Stipulation nor the settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Stipulation or the settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity of any Released Claim, or of any wrongdoing or liability of the Defendants or their respective Related Parties, or (b) is or

1180802_1

may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Defendants or their respective Related Parties in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. The Defendants and/or their respective Related Parties may file the Stipulation and/or this Judgment from this action in any other action that may be brought against them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

11. Without affecting the finality of this Judgment in any way, this Court hereby retains continuing jurisdiction over: (a) implementation of this settlement and any award or distribution of the Settlement Fund, including interest earned thereon; (b) disposition of the Settlement Fund; (c) hearing and determining applications for attorneys' fees, interest, and expenses in the Litigation and any dispute related to the allocation of attorneys' fees; and (d) all parties hereto for the purpose of construing, enforcing, and administering the Stipulation.

12. The Court finds that during the course of the Litigation, the Settling Parties and their respective counsel at all times complied with the requirements of Federal Rule of Civil Procedure 11.

13. In the event that the settlement does not become effective in accordance with the terms of the Stipulation, or the Effective Date does not occur, or in the event that the Settlement Fund, or any portion thereof, is returned to the Defendants' insurers, then this Judgment shall be rendered null and void to the extent provided by and in accordance with the Stipulation and shall be vacated and, in such event, all orders entered and releases delivered in connection herewith shall be null and void to the extent provided by and in accordance with the Stipulation.

14. Without further order of the Court, the Settling Parties may agree to reasonable extensions of time to carry out any of the provisions of the Stipulation.

IT IS SO ORDERED.

11/10/16

_____

Jorge L. Alonso
United States District Judge

- 3 -

1180802_1

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ROEI AZAR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 1:19-cv-07665 |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) | Judge Matthew F. Kennelly |
| GRUBHUB INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

AMENDED ORDER AWARDING ATTORNEYS' FEES AND EXPENSES AND AWARDS
TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)

This matter came before the Court for hearing on January 12, 2023 (the "Settlement Hearing") on Lead Counsel's motion for an award of attorneys' fees and payment of expenses. ECF 105-106. The Court having considered all matters submitted to it at the Settlement Hearing and otherwise; and it appearing that notice of the Settlement Hearing substantially in the form approved by the Court was mailed to all Class Members who could be identified with reasonable effort, and that a summary notice of the hearing substantially in the form approved by the Court was published in *The Wall Street Journal* and was transmitted over *Business Wire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the award of attorneys' fees and expenses, requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      This Order incorporates by reference the definitions in the Stipulation of Settlement, dated October 7, 2022, ECF 94 (the "Stipulation"), and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2.      The Court has jurisdiction to enter this Order and over the subject matter of the Litigation and all parties to the Litigation, including all Class Members.

3.      Notice of Lead Counsel's motion for an award of attorneys' fees and payment of expenses was given to all Class Members who could be identified with reasonable effort. The form and method of notifying the Class of the motion satisfied the notice requirements of Rule 23 of the Federal Rules of Civil Procedure, Section 21D(a)(7) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(7), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"); constituted the best notice practicable under the circumstances; and constituted due, adequate, and sufficient notice to all Persons entitled thereto.

4.      Lead Counsel is hereby awarded attorneys' fees of 30% of the Settlement Amount, plus interest at the same rate earned by the Settlement Fund, and payment of litigation expenses in

- 1 -

the amount of $236,867.32, plus accrued interest, which sums the Court finds to be fair and reasonable.

5. Lead Plaintiff City of Pontiac Reestablished General Employees' Retirement System is awarded $1,000 and City of Pontiac Police & Fire Retirement System is awarded $1,000, from the Settlement Fund, pursuant to 15 U.S.C. §78u-4(a)(7), related to their representation of the Class.

6. The award of attorneys' fees and expenses may be paid to Lead Counsel from the Settlement Fund immediately upon entry of this Order, subject to the terms, conditions, and obligations of the Stipulation, which terms, conditions, and obligations are incorporated herein.

7. In making this award of attorneys' fees and expenses to be paid from the Settlement Fund, the Court has analyzed the factors considered within the Seventh Circuit and found that:

(a) The Settlement has created a fund of $42,000,000 in cash, pursuant to the terms of the Stipulation, and Class Members who submit acceptable Proofs of Claim will benefit from the Settlement created by the efforts of Lead Counsel;

(b) The fee sought by Lead Counsel has been reviewed and approved as reasonable by the Lead Plaintiff, who was directly involved in the prosecution and resolution of the Litigation and who has substantial interest in ensuring that any fees paid to counsel are duly earned and not excessive;

(c) The amount of attorneys' fees awarded are fair and reasonable and are consistent with fee awards approved in cases within the Seventh Circuit with similar recoveries;

(d) Lead Counsel has conducted the Litigation and achieved the Settlement with skill, perseverance, and diligent advocacy and is highly experienced in the field of securities class action litigation;

(e) Lead Counsel expended substantial time and effort pursuing the Litigation on behalf of the Class;

(f)     Lead Counsel undertook the Litigation on a contingent basis, and has received no compensation during the Litigation, and any fee and expense award has been contingent on the result achieved;

(g)     The claims against the Defendants involve complex factual and legal issues and, in the absence of settlement, would involve lengthy proceedings whose resolution would be uncertain;

(h)     The efforts of Lead Counsel resulted in an all-cash settlement at a stage in the proceedings that will permit Class Members to benefit from the recovery without further delay or expense; and

(i)     over 77,500 copies of the Notice were mailed to potential Class Members and nominees stating that Lead Counsel would apply for attorneys' fees in an amount not to exceed 30% of the Settlement Amount and expenses in an amount not to exceed $265,000, plus interest on such fees and expenses, and there were no objections to the requested attorneys' fees and expenses.

8.     Any appeal or any challenge affecting this Court's approval regarding any of the attorneys' fees and expense applications shall in no way disturb or affect the finality of the Judgment.

9.     In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

10.     There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

IT IS SO ORDERED.

DATED:   1/12/2023

_____
THE HONORABLE MATTHEW F. KENNELLY
UNITED STATES DISTRICT JUDGE

- 3 -

# EXHIBIT D

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WALGREEN CO. et al.,<br><br>Defendants. | Civil Action No. 1:15-cv-3187<br><br>Honorable Sharon Johnson Coleman |

**ORDER AWARDING ATTORNEYS' FEES AND**
**LITIGATION EXPENSES**

This matter is before the Court on Class Counsel's motion for an award of attorneys' fees and Litigation Expenses. The Court having considered all matters submitted to it; and it appearing that notice substantially in the form approved by the Court, which advised of Class Counsel's request for an award of attorneys' fees and Litigation Expenses, was mailed to all Class Members who or which could be identified with reasonable effort, and that a summary notice substantially in the form approved by the Court was published in *Investor's Business Daily* and transmitted over *PR Newswire* pursuant to the specifications of the Court; and the Court having considered and determined the fairness and reasonableness of the attorneys' fees and Litigation Expenses requested,

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. This Order incorporates by reference the definitions in the Stipulation and Agreement of Settlement dated as of June 23, 2022 (Doc. 505) ("Stipulation") and all capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Stipulation.

2. The Court has jurisdiction to enter this Order and over the subject matter of the Action and all Parties to the Action, including all Class Members.

3.      Notice of Class Counsel's motion for an award of attorneys' fees and Litigation Expenses was given to all Class Members who or which could be identified with reasonable effort. The form and method of notifying the Class of the motion for an award of attorneys' fees and Litigation Expenses satisfied the requirements of Rule 23 of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, as amended, and all other applicable law and rules, constituted the best notice practicable under the circumstances, and constituted due and sufficient notice to all persons and entities entitled thereto.

4.      Plaintiff's Counsel are hereby awarded attorneys' fees in the amount of 27.5% of the Settlement Fund and $2,250,420.62 in payment of Plaintiff's Counsel's Litigation Expenses, plus interest (which fees and expenses shall be paid from the Settlement Fund), which sums the Court finds to be fair and reasonable. Class Counsel shall allocate the attorneys' fees awarded between Plaintiff's Counsel in a manner which, it, in good faith, believes reflects the contributions of such counsel to the institution, prosecution, and settlement of the Action.

5.      In making this award of attorneys' fees and payment of Litigation Expenses from the Settlement Fund, the Court has considered and found that:

(a)      The Settlement has created a fund of $105,000,000 in cash that has been funded into escrow pursuant to the terms of the Stipulation, and that numerous Class Members who submit acceptable Claim Forms will benefit from the Settlement that occurred because of the efforts of Plaintiff's Counsel;

(b)      The fee sought has been reviewed and approved as reasonable by Class Representative, a sophisticated institutional investor that actively supervised the Action;

2

(c) A total of 278,052 Postcard Notices and 4,990 Notice Packets (i.e., the Settlement Notice and Claim Form) were mailed to potential Class Members and Nominees stating that Class Counsel would apply for an award of attorneys' fees in an amount not to exceed 27.5% of the Settlement Fund and for payment of Litigation Expenses in an amount not to exceed $2,600,000, and no objections to the requested attorneys' fees and Litigation Expenses have been received;

(d) Plaintiff's Counsel conducted the litigation and achieved the Settlement with skill, perseverance, and diligent advocacy;

(e) The Action raised a number of complex issues;

(f) Had Class Counsel not achieved the Settlement there would remain a significant risk that Class Representative and the other members of the Class may have recovered less or nothing from Defendants;

(g) Plaintiff's Counsel devoted over 56,000 hours, with a lodestar value of $29,591,935.75, to achieve the Settlement; and

(h) The amount of attorneys' fees awarded and expenses to be paid from the Settlement Fund are fair and reasonable and consistent with awards in similar cases.

6. Class Representative Industriens Pensionsforsikring A/S is hereby awarded $32,960 from the Settlement Fund as reimbursement for its reasonable costs and expenses directly related to its representation of the Class.

7. Any appeal or any challenge affecting this Court's approval regarding any attorneys' fees and expense application shall in no way disturb or affect the finality of the Judgment.

8.    In the event that the Settlement is terminated or the Effective Date of the Settlement otherwise fails to occur, this Order shall be rendered null and void to the extent provided by the Stipulation.

9.    There is no just reason for delay in the entry of this Order, and immediate entry by the Clerk of the Court is expressly directed.

SO ORDERED this 11th day of October, 2022.

_____
The Honorable Sharon Johnson Coleman
United States District Judge

4

# EXHIBIT E

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LAWRENCE H. GRESS, on behalf of himself and others similarly situated,

    Plaintiff,

    v.

COMMONWEALTH EDISON COMPANY, an Illinois corporation; JOHN DOES 1-100,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:_____

Judge _____

## CLASS ACTION COMPLAINT

1.      Plaintiff, Lawrence H. Gress ("Gress"), by and through his attorneys, KENT MAYNARD & ASSOCIATES LLC and LEONARDMEYER LLP, and on behalf of himself and all electricity consumers in the service territory of Commonwealth Edison Company ("ComEd"), during the time period after passage of the Energy Infrastructure Modernization Act (220 ILCS 5/16-107.5, 16-108.5, 16-108.6, 16-108.7 and 16-111.SB) (the "Smart Grid Act" or "EIMA").("the Time Period") who paid delivery services charges to ComEd, alleges as follows as his Complaint against Defendants, ComEd and John Does 1 through 100:

**NATURE OF THE CASE**

2.      Plaintiff brings this action, individually and on behalf of a Class consisting of all electricity consumers located in the service territory of ComEd ("the Territory") who, during the Time Period, paid delivery services charges to ComEd, in order to recover damages for ComEd's

violation of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. §§ 1961 through 1968 (2006)) ("RICO").

3.      The ComEd service territory at issue in this case ("Territory") consists of approximately 11,411 square miles in Northern Illinois, stretching from the Wisconsin border on the north, as far south as Pontiac, Illinois, and from the Indiana border west to the Mississippi River.

4.      Recently, it has been revealed that ComEd was infiltrated and induced to commit serial violations of RICO, and to otherwise engage in fraud, most notably by corruptly hiring connected "lobbyists" at the behest of Michael J. Madigan ("Madigan"), the Speaker of the Illinois House of Representatives and an elected member of that body.

5.      At all times pertinent hereto, the bribes were paid by ComEd in various forms to corruptly induce the Illinois General Assembly to approve various legislative initiatives that benefitted ComEd and wrongfully deprived ComEd ratepayers of property by artificially increasing their costs of electricity.

6.      Defendant ComEd, with its headquarters and principal place of business located in Chicago, is the largest utility company in Illinois.

7.      ComEd has been, and continues to be, subject to extensive regulation by the State of Illinois, including the General Assembly.

8.      In performing regulatory oversight of ComEd, the Illinois General Assembly routinely considered bills and passed legislation that had a substantial positive impact on ComEd's operations and profitability, including legislation that affected the regulatory process used to determine the rates ComEd may charge customers for the delivery of electricity.

9. One enactment that affected the regulatory process used to determine the rates ComEd may charge customers for the delivery of electricity was passed in 2011, the Energy Infrastructure Modernization Act (220 ILCS 5/16-107.5, 16-108.5, 16-108.6, 16-108.7 and 16-111.SB) (the "Smart Grid Act" or "EIMA").

10. The Smart Grid Act allowed, for the first time, electric utilities, including ComEd, to use a formulaic rate-setting process, where rate increases were made automatically, subject to the approval of the Illinois Commerce Commission (the "ICC"), as distinct from the traditional rate-making proceedings before the ICC.

11. For the first time, ComEd was permitted to file its capital plans under formula rate updates that gave the ICC little power to alter them, beyond reviewing the capital spending after the fact for impropriety or waste.

12. The Smart Grid Act exacted an intolerable price for some technological upgrades because it effectively relegated the ICC to "rubber-stamping" rate increases of ComEd *after* they had been made.

13. Not surprisingly, without meaningful ICC oversight, the Smart Grid Act resulted in substantially higher rates paid for electricity by consumers in ComEd's Territory.

14. On or about December 5, 2012, the ICC found that ComEd had violated the Smart Meter Deployment Order by unilaterally delaying its deployment of Smart Meter Infrastructure, including the installation of smart meters. *See* Order on Rehearing, ICC Docket No. 12-0298, December 5, 2012, pg. 33.

15. ComEd's unilateral decision to delay deployment of Smart Meter Infrastructure, in open defiance of the ICC's Smart Meter Deployment Order, damaged ComEd customers in the

Territory by $182,000,000. *See* ICC Docket No. 12-0298, testimony Mr. A. Trump, ComEd Exh. 17.0 REV, at pg. 11, lines 230-36.

16.     However, the delay-related damage done to ComEd ratepayers in the Territory was dwarfed by the damage done to them by the automatic rate increases ushered in by the Smart Grid Act, which enactment was procured corruptly by bribing Madigan and his associates.

17.     ComEd maintained a continuing interest in advancing legislation in the Illinois General Assembly favorable to its interests in the Territory, and opposing legislation that was not consistent with its operational and financial success – all to the detriment of the Plaintiff Class Members in this action.

18.     As Speaker of the House of Representatives, Madigan was able to select, or not, the measures called for a vote in the Illinois House of Representatives.

19.     Madigan also exercised substantial influence and control over fellow lawmakers concerning legislation, including legislation affecting ComEd.

20.     Beginning no later than 2011, with the corruptly-induced passage of the Smart Grid Act, and continuing through in or around 2019, in the Northern District of Illinois and elsewhere, ComEd corruptly gave, offered, and agreed to give things of value, namely, jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts, for the benefit of Madigan and his hand-picked associates, with the intent to influence and reward Madigan, as an agent of the State of Illinois, a State government that during each of the twelve-month calendar years from 2011 to 2019, received federal benefits in excess of $10,000, in connection with any business, transaction, and series of transactions of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(2).

21.     Beginning no later than 2011 and continuing through 2019, ComEd, along with its members and "lobbyists," created and conducted, in collaboration with Madigan, his hand-picked associates, and other public officials, a racketeering conspiracy that corruptly used bribery to create a "money machine" that would automatically generate millions of dollars in revenue for ComEd, revenue that would result in unmerited tributes paid to the Defendants.

22.     Plaintiff brings this action against Defendants, individually and on behalf of a Class, for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.§§1961 *et seq.*, in particular, §§1962(c),(d); and 1964, which violations were committed by perpetrating a scheme through an enterprise specifically designed to defraud Plaintiff and the Class out of millions of dollars in rate increases that were corruptly and wrongfully assessed as a direct and proximate result of bribes paid to public officials.

23.     The Plaintiff Class consists of persons who paid higher electricity rates after the passage of the Smart Grid Act was procured through bribes paid to public officials in various forms, including, without limitation, bribes paid directly or indirectly to Madigan or for his benefit.

24.     The relief sought herein includes the disgorgement by ComEd and the persons bribed by ComEd, directly and indirectly, of the marginal cost of electrical services paid by ComEd customers after the Smart Grid Act was corruptly passed as a remedy for the damages caused by Defendants' violations of 18 U.S.C. §§1962(c) and (d) and 1964.

25.     Defendants have violated 18 U.S.C. §§1962(c) and (d) and 1964 by actively participating in the association-in-fact enterprise conducted by Defendants to corrupt with bribes paid to public officials directly or indirectly, including Madigan, who agreed to act as a champion of legislation favorable to ComEd in the Illinois General Assembly in exchange for bribes and things of value.

## JURISDICTION AND VENUE

26.     The subject matter jurisdiction of this Court is conferred and invoked pursuant to 28 §1331, and the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 §961, *et seq.* (specifically 18 U.S.C. §1964(c)).

27.     This Court also has jurisdiction over this action as a class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant," and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs. *See* 28 U.S.C. §§1332(d)(2) and (6).

28.     Venue is proper in this judicial district under 18 U.S.C. §1965(a) and 28 U.S.C. §1391(a), (b), and (c) because a substantial part of the events and omissions giving rise to this action occurred in the Northern District of Illinois and because Defendants transacted business in this district.

## PARTIES

29.     Plaintiff, LAWRENCE H. GRESS, is an individual who was, at times relevant hereto, a citizen of Illinois, whose address and service location is 1125 61st Street, Downers Grove, IL 60516. At all relevant times, Mr. Gress resided in ComEd's Territory.

30.     Plaintiff GRESS and the Class Members are persons who resided in ComEd's Territory and who purchased electricity from ComEd at rates that increased after the passage of the Smart Grid Act. This enactment owes its existence to bribes paid directly or indirectly to Madigan and other public officials.

31.     Plaintiff GRESS and the Class Members have residences, businesses, or other facilities located in ComEd's Territory during the time period relevant to this action, they received

electricity delivery service from ComEd, and they are persons who paid the increases in electricity rates set automatically to incept by the Smart Grid Act. The majority of the Class Members are residents of Cook County, Illinois.

32.     Defendant COMED is a public utility regulated by the ICC pursuant to the Illinois Public Utility Act, 220 ILCS 5/3-105; 220 ILCS 5/1-102, *et seq*. ComEd has monopoly control of the delivery of electricity to all residential, business and governmental customers in the Territory. During all relevant time periods, ComEd provided electricity delivery services to approximately 3.8 million customer accounts across Northern Illinois, which includes about 70% of the population of the State of Illinois.

33.     COMED's principal place of business is located at 440 South LaSalle Street, Chicago, Cook County, Illinois. COMED is a wholly-owned subsidiary of Exelon Corporation ("Exelon"), a company whose stock is publicly traded. DOES EXELON NEED TO BE NAMED TOO???

34.     Madigan is a citizen and resident of the State of Illinois and this District, who was, at all relevant times, the Speaker of the House in the Illinois General Assembly. Beginning in at least January 2011, he solicited and received bribes and other things of value, directly and indirectly, to ensure the passage of the Smart Grid Act, an Act that increased electricity costs to ComEd customers for no countervailing benefit.

35.     Defendants, JOHN DOES 1-100, are citizens and residents of the State of Illinois, who were members of the network of "lobbyists" who paid and received bribes, directly and indirectly, to influence the Illinois General Assembly to pass legislation that favored ComEd and disfavored ComEd customers – the Class Members. The specific identities of these individuals is presently unknown.

-7-

**THE RICO ENTERPRISE**

36. The RICO "Enterprise" for purpose of this action is an association-in-fact of ComEd executives, employees, and "lobbyists" as well as Madigan and other current and former public officials in the General Assembly and other governmental entities with oversight authority over ComEd.

37. Defendants and their above-referenced co-conspirators conducted or actively participated in the conduct of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

38. Alternatively, Defendants, their co-conspirators, and other Enterprise participants identified herein, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d).

39. The actions of Defendants, their co-conspirators, and other Enterprise participants were in furtherance of the Enterprise and in violation of 18 U.S.C. §1962(d).

40. The Enterprise was distinct from, and had an ongoing existence distinct from, that of Defendant ComEd, and acts through its members and the other Defendants.

41. More specifically, participants in the Enterprise included:

    a.     <u>MICHAEL J. MADIGAN</u>: the Speaker of the House in the Illinois General Assembly who, in that capacity, used his position to solicit bribes, directly and indirectly, from ComEd and various ComEd "lobbyists" in exchange for procuring legislation that would permit ComEd to increase rates charged to ComEd customers and thus enrich ComEd managers whose compensation was based on apparent profitability and ComEd "lobbyists."

     b.     <u>JOHN DOES 1-100</u>: participated in the scheme by, *inter alia*, acting as purported ComEd "lobbyists" as a means of giving things of value, directly or indirectly, to corrupt public officials in the performance of their duty and to induce Madigan and other public officials to influence or approve by legislative enactments that generated benefits to members of the conspiracy, to the detriment of the Plaintiffs.

42.    Various other persons, firms, organizations, corporations and business entities, have participated as co-conspirators in the violations and conduct alleged herein and performed acts in furtherance of the conspiracy described herein.

## CLASS ALLEGATIONS

43.    Plaintiff, Mr. Gress, brings this action under the Rules of Civil Procedure, for himself and as the representative of a class of similarly situated plaintiffs, defined as:

> All persons who paid money to ComEd for electricity delivered to them by ComEd at rates that increased after the passage of the Smart Grid Act was procured through fraud, bribery, and public corruption.

44.    Prosecution of this case by way of a class action is a superior method of resolving these claims, as the average amount at issue here is relatively small.

45.    Any individual Class Member's out-of-pocket and opportunity costs of challenging a fee increase is substantially greater than the cost of the wrongfully assessed fees.

46.    Total damages suffered by the Plaintiff Class Members are sizable; the incremental cost of electricity paid by ComEd customers after the passage of the Smart Grid Act is many millions of dollars.

47.    Upon information and belief, the total damages suffered by the Plaintiff Class exceeds $150,000.00 ($150 million).

48.     The class of Plaintiffs in this class is so numerous that joining them individually would be impracticable.

49.     Upon information and belief, the Plaintiff Class may exceed 100,000 members, who can be readily ascertained by digital records generated and maintained in the ordinary course of business by the various RLC providers and Defendant ComEd.

50.     The claim of the named Plaintiff is typical of those of all members of the proposed Plaintiff Class, as required by Rule 23(a)(3), in that they too paid increased electricity rates that were corruptly and wrongfully induced at higher costs as a direct and proximate result of bribes paid directly or indirectly to Madigan to improperly influence him the General Assembly.

51.     Numerous questions of law and fact exist are common to the Plaintiff and the Class. The answers to these common questions are significant and will substantially advance the adjudication and resolution of this case, and predominate over any questions that may affect only individual Class members, thereby satisfying Rule 23(a)(2) and 23(b)(3).

52.     These common question/common answer issues include:

a.     Whether ComEd misrepresented and concealed material information in its mailings to and filings with the Illinois Commerce Commission (ICC) concerning ComEd's justification for automatic rate increases after the Smart Grid Act was passed;

b.     Whether Defendants used or caused to be used the Unites States mail to convey to Class Members electric bills that they knew were based on data falsified or legislative enactments procured through public corruption and honest services fraud as distinct from any *bona fide* concern about improving customer service;

c.     Whether  ComEd engaged in a fraudulent and/or deceptive scheme to deceive ICC, citizens of Illinois, and the Illinois General Assembly as to the

true nature and purpose of the Smart Grid Act, and concealed the fact that the EIMA had been corruptly induced because of bribes, improper bullying and influence over ICC, and a desire to generate profits and, not to promote improved electrical service in northern Illinois;

d.    Whether Defendants engaged in a pattern and practice of disseminating materially false information, misrepresentations, omissions, and concealment regarding Defendants' support of the EIMA, including the false claim that the EIMA would benefit customers, instead of steadily increasing their electricity costs;

e.    Whether Defendants engaged in public corruption and the exchange of bribes in connection with the enactment of the EIMA;

f.    Whether the foregoing conduct continues to the present;

g.    Whether Defendants' conduct injured Class members in their businesses or property within the meaning of the RICO statute;

h.    Whether the Defendants violated and conspired with each other and others to violate RICO by the conduct of an association-in-fact Enterprise, through a pattern of racketeering activity involving bribery of public officials, honest services fraud, and mail and wire fraud;

i.    Whether Class members are entitled to compensatory damages and if so, the nature and extent of such damages; and

j.    Whether Class members are entitled to treble damages under Civil RICO.

53.    Plaintiff, like all of the Class members, has been damaged by Defendants' misconduct, in that, among other things, he has suffered the consequences of paying rate increases procured through fraud, as set forth in the Definition of Class.

54.     The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a common thread of fraud, deceit, and other misconduct resulting in injury to Plaintiffs and Class Members.

55.     Plaintiff will fairly and adequately represent and protect the interests of Class members, as required by Rule 23(a)(4).

56.     Plaintiff and his counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.

57.     Neither Plaintiff nor his counsel has any interest adverse to the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).

59.     Absent a class action, most Class members would certainly find the cost of litigating their claims to be prohibitive, and would thus have no effective access to the courts or remedy at law.

60.     The class treatment of common questions of law and fact is thus superior to multiple individual actions or piecemeal litigation inasmuch as common questions of law and fact substantially predominate over any questions of law or fact unique to individual Class Members.

61.     The named Plaintiff will fully and adequately represent the interests of all members of the Plaintiff Class, and the damages suffered by the named Plaintiff, and the manner in which he was harmed, are wholly typical of the members of the Class.

62.     The named Plaintiff is represented by trial counsel, experienced and competent in all areas of law relating to this Complaint, who are prepared to fully and adequately prosecute this action on behalf of their clients and on behalf of all members of the Plaintiff Class, as Class Counsel.

63.     Plaintiffs anticipate that administration of this Class, however numerous, will proceed smoothly, aided by the fact that the Defendants have maintained detailed and comprehensive electronic records identifying all Class Members to whom they issued Violation Notices, as well as the date, time, and location of the infraction alleged in the Violation Notice.

64.     Plaintiffs seek the certification of a Class under their civil RICO claims, asserted for violations of 18 U.S.C. §1962(c) and 1962(d) under 1964(c) in this Complaint. All questions of law and fact are common to the civil RICO counts and predominate over individual questions. This case also presents common issues of fact and law that are each appropriate for issue-class certification under Rule 23 (c)(4), and the management of this action may be facilitated through the certification of additional subclasses under Rule 23(c)(5), if necessary and appropriate.

65.     The EIMA rate increases were procured not out of any concern about improved customer service, but rather as a direct result of greed and public corruption, and as a direct and proximate result of bribes paid directly or indirectly to Madigan and his purported "lobbyists" and cronies.

66.     Defendants should not be permitted to retain the tainted monetary fruits generated by their criminal conspiracy.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

67.     Efforts by ComEd and its parent company Exelon (collectively "ComEd") to curry favor in the Illinois General Assembly and with Speaker Madigan began in earnest after 2003, the year the General Assembly had rejected a rate hike that John Rowe, then CEO of Exelon, claimed was critically needed to complete the acquisition of troubled downstate utility company Illinois Power.

68. It was then publicly known that Madigan was withholding his support for ComEd's efforts.

69. ComEd intensified its efforts to increase its influence in the Illinois General Assembly and to improve its relationship with Madigan, in order to ensure favorable treatment of proposed rate hikes and bailouts related to two nuclear power plants located in Illinois in Clinton and the near the Quad Cities.

70. Madigan and other legislators in Springfield made it clear that, if ComEd wanted the General Assembly to support rate hikes, ComEd would have to start "playing ball" with Madigan and other key legislators.

71. Thereafter, direct and indirect payments of money and other things of value to Madigan and other influential legislators attributable to ComEd steadily increased as ComEd hired numerous politically-connected "lobbyists" to curry favor and act as bagmen for secret payments.

72. In 2011, ComEd's efforts first bore substantial fruit.

73. In 2011, the Illinois General Assembly effectively pushed aside the usual case-by-case regulatory hurdles for rate increases and pre-approved future rate hikes subject to a predetermined schedule.

74. In addition, the Illinois General Assembly gave its blessing to a $2 billion ratepayer-financed bailout of struggling nuclear power plants.

75. After 2011, ComEd continued "playing ball" with Madigan, among others, by making politically-motivated hires.

76. One of the politically-connected hires by ComEd made in exchange for favorable government actions in the General Assembly occurred in 2012.

77.     In 2012, Angie Sandoval ("Angie"), one of Senator Martin Sandoval's three children, was in need of a job.

78.     Sandoval, whose own rise to power had been fueled by corrupt hiring, made ComEd an offer that it could not refuse: hire Angie.

79.     ComEd was only too happy to oblige.

80.     In 2012, during Anna Pramaggiore's tenure as ComEd CEO, Angie went to work at ComEd, where she remains employed.

81.     Madigan and his fellow-racketeers have used their power as public officials to line their own pockets by infiltrating and corrupting both public and private enterprises subject to his power and selling secret and unlawful indulgences to the highest bidder.

82.     Long after the EIMA was passed in 2011, ComEd relied on ComEd to continue increasing ComEd's revenues by corrupting public officials.

83.     During the many years he has served as Speaker of the House in the Illinois General Assembly, Madigan has amassed considerable power, and had the power inherent in his position as Speaker to retard or push forward legislation that impacted ComEd's "bottom line."

84.     Madigan has, at all relevant times, wielded substantial oversight authority over ComEd.

85.     In the exercise of his authority over ComEd and its publicly-traded parent company, Exelon, Madigan had the discretion to support or oppose rate hikes and bailouts for ComEd.

86.     Madigan used his power as a public official to line his own pockets, directly or indirectly, by infiltrating and corrupting both public and private enterprises subject to his power and selling secret and unlawful indulgences to the highest bidder.

87.     On July 17, 2020, John R. Lausch Jr., the United States Attorney for the Northern District of Illinois, filed a one-count criminal Information against ComEd.

88.     Count I of the Information states:

[Michael J. Madigan] was the Speaker of the House of Representatives and an elected member of that body. As Speaker of the House of Representatives, [Madigan] was able to exercise control over what measures were called for a vote in the House of Representatives. [Madigan] also exercised substantial influence and control over fellow lawmakers concerning legislation, including legislation affecting ComEd. 2. Beginning no later than in or around 2011, and continuing through in or around 2019, in the Northern District of Illinois, Eastern Division, and elsewhere, [ComEd], defendant herein, corruptly gave, offered, and agreed to give things of value, namely, jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts, for the benefit of [Madigan] and [Madigan]'s associates, with intent to influence and reward [Madigan], as an agent of the State of Illinois, a State government that during each of the twelve-month calendar years from 2011 to 2019, received federal benefits in excess of $10,000, in connection with any business, transaction, and series of transactions of $5,000 or more of the State of Illinois, namely, legislation affecting ComEd and its business [i]n violation of Title 18, United States Code, Section 666(a)(2).

89.     On July 17, 2020, ComEd announced that it had entered into a Deferred Prosecution Agreement pursuant to which it agreed to pay a two-hundred million dollar ($200,000,000.00) fine and admitted and stipulated to the following facts, which are incorporated and alleged herein in support of the claims pled on behalf of the proposed class.

90.      ComEd is the largest utility company in Illinois. It employs over 6,000 individuals and delivers electricity to approximately 70% of Illinois's population.

91.     It is a majority-owned subsidiary of Exelon Corporation and operates from its headquarters located in Chicago.

92.     As a utility, ComEd is subject to extensive regulation by the State of Illinois.

93.     The State of Illinois regulates the rates that ComEd may charge its customers, as well as the rate of return ComEd may realize from its business operations.

94. The legislative branch of the State of Illinois, known as the Illinois General Assembly, has routinely considered bills and has passed legislation that has had a substantial impact on ComEd's operations and profitability, including legislation that affects the regulatory process ComEd uses to determine the rates ComEd charges its customers for the delivery of electricity.

95. In order for legislation to become law, it must be passed by both houses of the Illinois General Assembly—the Illinois House of Representatives and the Illinois Senate.

96. For example, in 2011, the General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA").

97. EIMA provided for a regulatory process through which ComEd was able to more reliably determine rates it could charge customers and, in turn, determine how much money it was able to generate from its operations to cover, among other things, costs for grid-infrastructure improvements.

98. The passage of EIMA, therefore, helped improve ComEd's financial stability.

99. The Illinois House of Representatives passed EIMA in or around May 2011, and by the Illinois Senate in or around August 2011. EIMA was then vetoed by the Governor of the State of Illinois.

100. Thereafter, in or around October 2011, both houses of the Illinois General Assembly voted to override the Governor's veto. In 2016, the General Assembly passed the Future Energy Jobs Act ("FEJA"), which provided for a renewal of the regulatory process that was beneficial to ComEd.

101. Since the passage of FEJA, ComEd has had a continuing interest in advancing legislation in the General Assembly favorable to its interests, and opposing legislation that was not consistent with its operational and financial success.

102. Public Official A is the Speaker of the Illinois House of Representatives and the longest-serving member of the House of Representatives. ComEd understood that, as Speaker of the House of Representatives, Public Official A was able to exercise control over what measures were called for a vote in the House of Representatives and had substantial influence and control over fellow lawmakers concerning legislation, including legislation that affected ComEd. Public Official A was an agent of the State of Illinois, a State government that, during each of the twelve-month calendar years from 2011 to 2019, received federal benefits in excess of $10,000.

103. Individual A served in the Illinois House of Representatives for approximately ten years, beginning in 1972.

104. After Individual A's service in the Illinois House of Representatives, Individual A served as a lobbyist and/or consultant for ComEd until 2019.

105. During that time, Individual A made known to ComEd that Individual A had a close personal relationship with Public Official A.

106. CEO-1 was the chief executive officer of ComEd between in and around March 2012 and May 2018. From June 1, 2018, to October 15, 2019.

107. CEO-1 served as a senior executive at Exelon Utilities and had oversight authority over ComEd's operations.

108. Senior Executive 1 served as ComEd's senior vice president for legislative and external affairs from in or around March 2012 until in or around September 2019.

-18-

109. Lobbyist 1 served as ComEd's executive vice president of legislative and external affairs from in and around 2009 until Lobbyist 1's retirement in and around 2012.

110. From 2012 to 2019, Lobbyist 1 served as an external lobbyist for ComEd.

111. Consultant 1 was the owner of Company 1, which performed consulting services for ComEd until in and around 2019.

112. From in or around 2011 through in or around 2019, in an effort to influence and reward Public Official A's efforts, as Speaker of the Illinois House of Representatives, to assist ComEd with respect to legislation concerning ComEd and its business, ComEd arranged for various associates of Public Official A, including Public Official A's political allies and individuals who performed political work for Public Official A, to obtain jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts from ComEd, even in instances where certain political allies and workers performed little or no work that they were purportedly hired to perform for ComEd.

113. Beginning no later than in or around 2011, Public Official A and Individual A sought to obtain from ComEd jobs, vendor subcontracts, and monetary payments associated with those jobs and subcontracts for various associates of Public Official A, such as precinct captains who operated within Public Official A's legislative district.

114. In or around 2011, Individual A and Lobbyist 1 developed a plan to direct money to two of Public Official A's associates ("Associate 1" and "Associate 2") by having ComEd pay them indirectly as subcontractors to Consultant 1.

115. Payments to Associate 1 and Associate 2, as well as later payments to other subcontracted associates of Public Official A, continued until in or around 2019, even though those associates did little or no work during that period.

116.    Consultant 1 agreed in 2011 that Public Official A's associates would be identified as subcontractors under Consultant 1's contract and that ComEd's payments to Consultant 1 would be increased to cover payments to those subcontractors.

117.    Between in or around 2011 and 2019, Consultant 1 executed written contracts and submitted invoices to ComEd that made it falsely appear that the payments made to Company 1 were all in return for Consultant 1's advice on "legislative issues" and "legislative risk management activities," and other similar matters, when in fact a portion of the compensation paid to Company 1 was intended for ultimate payment to Public Official A's associates, who in fact did little or no work for ComEd. Consultant 1 and Company 1 did little, if anything, to direct or supervise the activities of Public Official A's associates, even though they were subcontracted under and received payments through Company 1.

118.    Moreover, because they were paid indirectly through Company 1, the payments to Public Official A's associates over the course of approximately eight years were not reflected in the vendor payment system used by ComEd, and as a result, despite that Public Official A's associates were subcontracted under and receiving payments through Company 1, no such payments were identifiable in ComEd's vendor payment system.

119.    Certain senior executives and agents of ComEd were aware of these payments from their inception until they were discontinued in or around 2019.

120.    For example, in or around May 2018, Public Official A, through Individual A, asked CEO-1 to hire a political ally of Public Official A who was retiring from the Chicago City Council at the end of the month ("Associate 3").

121. CEO-1, in coordination with Senior Executive 1 and Consultant 1, agreed that ComEd would pay Associate 3 approximately $5,000 a month indirectly as a subcontractor through Company 1.

122. At the time CEO-1 approved this arrangement, CEO A-6 1 was aware that there were other associates of Public Official A that were paid indirectly as subcontractors through Company 1, which CEO-1 referred to as the "roster." CEO-1 also agreed that Public Official A—rather than an officer or employee of ComEd or Company 1—would advise Associate 3 of this new arrangement.

123. In or around June 2018, Company 1's contract was revised to include extra funding for the purpose of paying Associate 3.

124. In seeking to justify the extra funding, Consultant 1 claimed falsely that an additional fee of $5,000 a month was necessary under Company 1's contract, in part because of Company 1's "expanded role with Cook County Board president's office and Cook County Commissioners and Department Heads," when in fact the additional $5,000 a month in compensation was intended for payment to Associate 3.

125. ComEd approved of the additional payments to Company 1, knowing they were intended for Associate 3.

126. Certain senior executives and agents of ComEd were also aware of the purpose of these payments to Public Official A's associates, namely, that they were intended to influence and reward Public Official A in connection with Public Official A's official duties and to advance ComEd's business interests.

127.    For example, on or about May 16, 2018, Individual A explained to Senior Executive 1 why certain individuals were being paid indirectly through Company 1, by making reference to their utility to Public Official A's political operation.

128.    Individual A identified Associate 1, one of the several individuals on Company 1's payroll, as "one of the top three precinct captains" who also "trains people how to go door to door so just to give you an idea how important the guy is."

129.    On or about February 7, 2019, Individual A advised Senior Executive 1 about how to present information within ComEd concerning the renewal of Company 1's contract for 2019.

130.    In the conversation, Individual A advised Senior Executive 1 that, "I would say to you don't put anything in writing," explaining later in the conversation because "all it can do is hurt ya." Individual A further advised Senior Executive 1 that, if asked by a ComEd official why Company 1 was being paid, Senior Executive 1 should explain that the associates of Public Official A were former ward committeemen and aldermen, that it was a "favor," and that it would be up to Consultant 1 to prove that Public Official A's associates performed work, not ComEd.

131.    On or about February 11, 2019, Individual A had a conversation with Lobbyist 1, who by that time had retired from ComEd, but had continued to serve as a paid external lobbyist to ComEd.

132.    In discussing how the renewal of Company 1's contract—which included significant payments to Company 1 to account for indirect payments to Public Official A's associates—should be communicated internally, Individual A said, "We had to hire these guys because [Public Official A] came to us.

133.    It's just that simple." Lobbyist 1 agreed, and added, "It's, it's clean for all of us."

134.    On or about February 13, 2019, Consultant 1 advised Senior Executive 1 that Associate 1 and Associate 2 had been made "subcontractors" of Company 1 at the request of Lobbyist 1 and that Associate 3 was also currently being paid as a "subcontractor."

135.    Consultant 1 emphasized that he had told no one of the arrangement per instructions previously given to Consultant 1, and cautioned Senior Executive 1 that ComEd should not tamper with the arrangement because "your money comes from Springfield," and that Consultant 1 had "every reason to believe" that Individual A had spoken to Public Official A about the retention of Public Official A's associates, and knew Lobbyist 1 had done so.

136.    Consultant 1 added that Public Official A's associates "keep their mouth shut, and, you know, so.

137.    But, do they do anything for me on a day to day basis? No." Consultant 1 explained that these payments were made "to keep [Public Official A] happy, I think it's worth it because you'd hear otherwise."

138.    On or about March 5, 2019, Individual A and ComEd personnel participated in a meeting during which they discussed Company 1's contract and why the indirect payments to Public Official A's associates made under the guise of that contract should be continued for another year.

139.    During that meeting, Individual A explained that for decades, Public Official A had named individuals to be ComEd employees, such as meter readers, as part of an "old-fashioned patronage system."

140.    In response, a ComEd employee acknowledged that such hires could be a "chip" used by ComEd.

-23-

141. On or about March 6, 2019, Individual A and Lobbyist 1 discussed the renewal of Company 1's contract.

142. During the conversation, Lobbyist 1 explained that "with the [Consultant 1] stuff, you got a little leg up," to which Individual A agreed.

143. Lobbyist 1 later added, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned." Individual A responded, "Right. Exactly. Exactly."

144. Between in and around 2011 and 2019, indirect payments made to Public Official A's associates—who performed little or no work for ComEd—totaled approximately $1,324,500.

145. These indirect payments were made not only through Company 1 but through other additional third-party vendors.

146. As with Company 1, these other third-party vendors entered into contracts with ComEd that noted that the payments made to these vendors by ComEd were for consulting and related services when in truth, a substantial portion of the money paid to these vendors was intended for Public Official A's associates, who did little or no work for ComEd.

147. These payments, like those made indirectly through Company 1, were intended to influence and reward Public Official A in connection with the advancement and passage of legislation favorable to ComEd in the Illinois General Assembly.

148. Prior to ComEd's discovery of the federal law enforcement investigation, Public Official A's and Individual A's approval was sought by ComEd before payments to certain of Public Official A's associates were discontinued, even though these individuals performed little or no work for ComEd.

149. As with the payments made to Public Official A's associates through Company 1, despite that Public Official A's associates were subcontracted under and receiving payments

through these third-party vendors, no such payments were identifiable in ComEd's vendor payment system.

150. Certain former ComEd executives designed these payment arrangements in part to conceal the size of payments made to Public Official A's associates and to assist ComEd in denying responsibility for oversight of Public Official A's associates, who performed little or no work for ComEd.

151. Appointment of Board Member 1 as Member of the Board of Directors at the Request of Public Official A Beginning in or around 2017, Public Official A sought the appointment of an associate to the ComEd Board of Directors (hereinafter referred to as "Board Member 1").

152. Public Official A's request was communicated by Individual A to CEO-1.

153. In or around May 2018, in response to internal company opposition to the appointment of Board Member 1, CEO-1 asked Individual A if Public Official A would be satisfied if CEO-1 arranged for Board Member 1 to receive a part-time job that paid an equivalent amount of money to a board member position, namely, $78,000 a year.

154. Individual A told CEO-1 that Public Official A would appreciate if CEO-1 would "keep pressing" for the appointment of Board Member 1, and CEO-1 agreed to do so.

155. In or around September 2018, CEO-1 (who by this time had been promoted to an executive position within Exelon Utilities, in which capacity CEO-1 maintained oversight authority over ComEd) assured Individual A that CEO-1 was continuing to advocate for the appointment of Board Member 1 made at Public Official A's request because "You take good care of me, and so does our friend [Public Official A] and I will do the best that I can to, to take care of you."

-25-

156. On or about April 25, 2019, CEO-1 advised Individual A by text message, "Just sent out Board approval to appoint [Board Member 1] to ComEd Board."

157. The following day, April 26, 2019, ComEd filed a notice with the United States Securities and Exchange Commission stating that Board Member 1 had served as a director of ComEd since April 2019.

158. Although ComEd and Exelon conducted due diligence on Board Member 1 and ultimately determined he was qualified for a Board position, no one at ComEd or Exelon recruited Board Member 1 to serve as a director, and ComEd did not interview or vet other outside candidates for the vacant board seat.

159. ComEd appointed Board Member 1, in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties.

160. Retention of Law Firm A In or around 2011, ComEd agreed to retain Law Firm A and entered into a contract pursuant to which ComEd agreed to provide Law Firm A with a minimum of 850 hours of attorney work per year.

161. This contract was entered into with Law Firm A, in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties and because personnel and agents of ComEd understood that giving this contract to Law Firm A was important to Public Official A.

162. In 2016, Law Firm A's contract was up for renewal.

163. As part of renewal discussions, personnel within ComEd sought to reduce the hours of legal work they provided to Law Firm A from the 850 hours specified in the 2011 retention agreement because ComEd paid only for hours worked and there was not enough appropriate legal work to give to Law Firm A to fill 850 annual hours.

164. Thereafter, an attorney associated with Law Firm a [Lawyer A] complained to Individual A about ComEd's effort to reduce the amount of work provided to Law Firm A.

165. On or about January 20, 2016, Individual A contacted CEO-1 and wrote, "I am sure you know how valuable [Lawyer A] is to our Friend [Public Official A]," and then went on to write, "I know the drill and so do you.

166. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend [Public Official A].

167. Our Friend [Public Official A] will call me and then I will call you.

168. Is this a drill we must go through?" CEO-1 replied in writing, "Sorry. No one informed me. I am on this."

169. Thereafter, CEO-1 tasked a ComEd employee, who was assigned as a "project manager" to assist with the project of obtaining legislative approval of FEJA, to ensure that Law Firm A's contract was renewed.

170. The project manager had no oversight authority over ComEd's legal department and was not otherwise involved in deciding what legal professionals the legal department retained.

171. The project manager was assigned the task of ensuring Law Firm A's contract was renewed because the work provided to Law Firm A was, in part, designed to influence and reward Public Official A in connection with Public Official A's official duties, including the promotion and passage of FEJA.

172. ComEd agreed in or around June 2016 to renew Law Firm A's contract with substantially reduced annual hours.

173. Beginning no later than 2013, and continuing until in or around 2019, ComEd operated an internship program.

-27-

174. As part of the program, ComEd would accept a specified target number of students who primarily resided in a Chicago ward that Public Official A was associated with ("Public Official A's Ward") and that were recommended to ComEd by associates of Public Official A, including Individual A.

175. ComEd hired students from Public Official A's Ward, in part, with the intent to influence and reward Public Official A in connection with Public Official A's official duties.

176. Benefit to ComEd Between in or around 2011 and in or around 2019, during the same time frame that ComEd was making payments to Public Official A's associates, and extending other benefits for the purpose of influencing and rewarding Public Official A, ComEd was also seeking Public Official A's support for legislation that was beneficial to ComEd, including EIMA and FEJA, that would ensure a continued favorable rate structure for ComEd.

177. ComEd acknowledges that the reasonably foreseeable anticipated benefits to ComEd of such legislation exceeded $150,000,000.

## COUNT I
## VIOLATION OF 18 U.S.C. §1962(C)

178. Plaintiffs incorporate by reference all preceding paragraphs.

179. Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by . . . any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."

180. Defendants and their co-conspirators, as identified herein, are "persons" within the meaning of 18 U.S.C. § 1961(3), who conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

181.     The Enterprise was engaged in, and the activities of the Enterprise affect, interstate commerce, as citizens of other states are among the Class members.

182.     Instrumentalities and channels that serve as media for the movement of goods and persons in interstate commerce may operate within a particular State as a link in a chain or system of conduits through which interstate commerce moves and, as such, need not extend across State lines.

183.      Furthermore, and in any case, a substantial part of the acts described herein, including the predicate acts of mailing and acts of various Enterprise participants, affected interstate commerce.

### **The Enterprise**

184.     The association-in-fact Enterprise consists of Defendant ComEd, as well as Madigan, along with the other unnamed Defendant Jane Does, as well as any of Defendants' officers, employees, and agents, among others, who  participated in the scheme.

185.     The Defendants created, controlled, and conducted the Enterprise to develop and effectuate every aspect of the scheme, as alleged above.

186.     The conduct of Defendants was intended to increase ComEd revenues not to benefit ComEd per se, but rather to trigger incentive compensation payments to various ComEd executives, whose compensation was tied to the profitability of ComEd.

187.     Defendants created and/or used this association-in-fact Enterprise – an ongoing organization functioning as a continuing unit – as a separate entity and tool to effectuate the pattern of racketeering activity that damaged the Class by subjecting electricity rates to automatic increases on the demonstrably false pretense that they were needed to promote the public good as distinct from sheer greed.

188. The Defendants exercised ongoing and continuous control over the Enterprise, and participated in the operation or management of the affairs of the Enterprise, through the following instrumentalities:

a. asserting direct control over false, deceptive, and misleading information disseminated to the Illinois General Assembly regarding legislation or potentially affecting ComEd;

b. asserting direct control over the creation and operation of the elaborate scheme used to create a small army of "Lobbyists" and conceal the bribes that induced Madigan's support of ComEd and its corruptly-induced automatic rate hikes;

c. placing employees and/or agents in positions of authority and control in the Enterprise; and

d. mailing documents containing misrepresentations and omissions (including fee statements for corruptly-induced rate increases) to the Class.

189. From its inception, the Enterprise had a clear decision-making hierarchy or structure, with ComEd, acting principally through Madigan, positioned at the top.

190. ComEd paid its "Lobbyists," not as true employees, but rather as co-conspirators, intent on helping the Enterprise succeed in promoting the "money machine" ComEd had created and concealed, by misrepresentations and omissions, the corrupt source of ComEd's success.

191. Though ComEd, Madigan, among others, exercised control over the Enterprise, all of the Enterprise's members are distinct from the Enterprise and its activity, and each exercised control over distinct functions of the Enterprise.

-30-

192. The persons and entities comprising the Enterprise associated together for the common purpose of allowing ComEd to subvert and corrupt the operation of ICC and the General Assembly to promote and "protect" its ComEd money machine from any threat, including ICC actions that might tend to reduce ComEd's profitability and incentive compensation payouts to members and beneficiaries of the RICO Enterprise.

193. The "Lobbyist" network corruptly developed by Madigan and the other Defendants, was designed to be invulnerable to regulation by ICC or legislative action, and to conceal the bribery of public officials, all as part of the scheme to defraud the Plaintiff and Class, reducing ComEd to a passive instrument of Defendants' racketeering activity, and together, constituting an alternative "enterprise" as that term is defined in 18 U.S.C. § 1961(4).

## **Pattern of Racketeering**

194. This Complaint details the ongoing pattern of racketeering based on facts that are now known to Plaintiff and his counsel.

195. It is filed without the benefit of discovery, which will almost certainly uncover many more predicate acts and further demonstrate the breadth and scope of the Enterprise's racketeering.

196. The Enterprise - with ComEd at the hub, acting through Madigan and Pramagiorre, engaged in a pattern of racketeering activity.

197. From no later than 2011and at least through 2019, Defendants and the Enterprise, as well as others known or unknown, being persons employed by and associated with ComEd and the other Defendants identified herein, engaged in activities that affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the

affairs of the Enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts, as set forth herein.

198. The foregoing pattern of racketeering activity is distinct from the Enterprise itself, which does not solely engage in the above-described acts.

199. Defendants have conducted and participated in the affairs of the Enterprise through a pattern of racketeering activity that includes predicate acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1346 (deprivation of honest services through bribes and kickbacks) through the aforementioned actions.

200. In implementing the fraudulent scheme, Defendants were aware that the ICC and the Illinois General Assembly depended on the honesty of ComEd and the other Defendants honestly to represent the basis for their rate hikes.

201. As detailed above, the fraudulent scheme consisted of, *inter alia*: using mail fraud to enable ComEd (a) to obtain, exert, and deliberately misrepresent the Enterprise's corrupt control over ComEd; and (b) suppress and conceal the level of such control and support from the Illinois General Assembly and the citizens of the State of Illinois.

202. The unlawful predicate acts of racketeering activity committed by Defendants had a common purpose, were related, and had continuity. From its inception, the Defendants' scheme depended upon concealing the breadth of ComEd's bribery of public officials.

203. The Enterprise used the mail to create, execute and manage their scheme, acting in violation of 18 U.S.C. § 1341.

204. The predicate acts committed by the Enterprise were and are similar, continuous, and related.

-32-

205.    ComEd's bribes to Madigan and "Lobbyists" were substantial and spanned multiple years.

206.    Conscious of the wrongfulness of its racketeering conduct, Defendants actively concealed from the Illinois General Assembly and others the true source of ComEd's increasing profitability after 2011.

207.    This consistent message - denying the breadth of its true corruption with the pretense that it was motivated by a desire to promote public safety - illustrates how the predicate acts of mail fraud were similar, continuous, and related.

208.    The scheme was calculated to ensure that Plaintiffs and the Class would suffer as Defendants artificially increased the profitability of ComEd to trigger incentive compensation payouts.

209.    The targets of the Enterprise and the ultimate victims of Defendants' scheme and predicate acts of mail fraud number in the many thousands, as discovery will reveal.

210.    Each fraudulent mailing of a fee statement issued by ComEd for increased electricity costs procured through fraud, and public corruption constitutes an act of "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

211.    Collectively, these violations, occurring over several years, are a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

212.    Each activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.

213.    All predicate acts committed by Defendants, and the Enterprise are related and were committed with a common scheme in mind: to bilk Illinois citizens out of electricity fee increases

generated by bribing public officials and conceal those bribes and public corruption to ensure that the automatic fee increases would continue to generate mountains of cash.

214. Defendants' conduct of the Enterprise was designed to, and succeeded in, defrauding the Illinois General Assembly and in ultimately depriving Plaintiffs and the Class of millions of dollars in electricity fee increases corruptly collected by ComEd and its catamites.

**COUNT II**
**VIOLATION OF 18 U.S.C. §1962(D) BY**
**CONSPIRING TO VIOLATE 18 U.S.C. §1962(C)**

215. Plaintiffs incorporate by reference all preceding paragraphs.

216. Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

217. Defendants violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprise described previously through a pattern of racketeering activity. Defendants, co-conspirators, and Enterprise participants agreed to join the conspiracy, agreed to commit and did commit the acts described herein, and knew that these acts were part of a pattern of racketeering activity.

218. Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiffs and the Class of money.

219. The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that Defendant, co-conspirators, and Enterprise participants not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of

RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

220.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and the Class have been and are continuing to be injured in their business or property, as set forth more fully above.

## JURY DEMAND

Plaintiffs demand trial by jury on all claims.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all Class Members, respectfully request that this Court enter judgment in his favor and against Defendants and enter an Order:

A.    Authorizing, directing, and supervising the conduct of early and expedited discovery on the allegations of this Complaint;

B.    Awarding Plaintiffs and the Class treble (three times) their actual damages on their RICO claims, together with costs and reasonable attorneys' fees;

C.    Awarding Plaintiffs and the Class their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees; and

D.    Awarding Plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

Dated this 28th day of July 2020.

Respectfully submitted,

LAWRENCE H. GRESS, on behalf of himself and others similarly situated,

| | |
|---|---|
| **By:/S/Kent Maynard, Jr.**<br>Kent Maynard, Jr.<br><br>**KENT MAYNARD & ASSOCIATES LLC**<br>53 W. Jackson Blvd., Suite 1240<br>Chicago, Illinois 60604<br>312.423.6586<br>312.878.1553 FAX | **By: /S/Michael I. Leonard**<br>Michael I. Leonard<br><br>**LEONARDMEYER LLP**<br>120 N. LaSalle Street<br>20th Floor<br>Chicago, Illinois 60602<br>312.380.6559<br>312.264.0671 FAX |

# EXHIBIT F

Stephen M. Rummage (Admitted *Pro Hac Vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, WA 98101
Telephone: (206) 757-8136
Facsimile: (206) 757-7136
steverummage@dwt.com

Allison A. Davis (CA State Bar No. 139203)
Kelly M. Gorton (CA State Bar No. 300978)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone: (415) 276-6500
Facsimile: (415) 276-4880
allisondavis@dwt.com
kellygorton@dwt.com

*Attorneys for Defendant Ramesh Balwani*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ROBERT COLMAN and HILARY TAUBMAN-DYE, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiffs,<br><br>     vs.<br><br>THERANOS, INC., ELIZABETH HOLMES, and RAMESH BALWANI,<br><br>                    Defendants. | Case No.  5:16-cv-06822-NC<br><br>**STIPULATION AND  ORDER:**<br><br>**(1) DISMISSING CASE UNDER FED. R. CIV. P. 41(a)(1)(A)(ii);**<br><br>**(2) PROVIDING FOR CONTINUED JURISDICTION FOR LIMITED PURPOSES; AND**<br><br>**(3) AMENDING PROTECTIVE ORDER**<br><br>Hon. Nathanael Cousins |

The parties to this action, through their undersigned counsel of record, hereby

STIPULATE AND AGREE as follows:

-1-
STIPULATION FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 41(a)(1)(A)(ii), ETC.
Case No. 5:16-cv-06822-NC

4813-0054-7693v.2 0103509-000004

1. The above-captioned action shall be dismissed in its entirety with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii). Plaintiffs and Defendants shall each bear her, his, or its own attorneys' fees and costs.

2. The parties agree that they shall complete the process of redesignations contemplated by the Joint Status Report Re: Meet and Confer on Redesignations of Confidentiality [ECF 305], filed with the Court on June 29, 2018. The parties further agree that the Court should retain jurisdiction with respect to any disputes arising out of that process.

3. Paragraph 15 of the Protective Order [ECF 62], entered by the Court on April 14, 2017, requires the return or destruction of all Protected Material, i.e., material marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," within sixty (60) days of the final disposition of this action, subject to counsel's right to retain an archival copy of certain materials even if they contain Protected Material. The parties jointly request that the Court, through approval of this Stipulation, amend Paragraph 15 of the Protective Order to (a) require the return or destruction of all Protected Material within six (6) months of the entry of this Stipulation and Order and (b) clarify that counsel's right to retain an archival copy of deposition transcripts, as provided in Paragraph 15, subsumes the right to retain an archival copy of audio and/or video of any deposition.

IT IS SO STIPULATED.

Dated: July 20, 2018

By: /s/ Stephen M. Rummage
Stephen M. Rummage (admitted *pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101-3045
Telephone: (206) 622-3150
steverummage@dwt.com

Allison A. Davis (139203)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, CA 94111
Telephone: +1 415 276 6500
Facsimile: +1 415 276 4880
allisondavis@dwt.com

*Attorneys for Defendant Ramesh Balwani*

- 2 -

STIPULATION FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 41(a)(1)(A)(ii), ETC.
Case No. 5:16-cv-06822-NC

4813-0054-7693v.2 0103509-000004

By: /s/  Michael A. Mugmon

Michael A. Mugmon (251958)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Telephone: +1 650 858 6000
Facsimile: +1 650 858 6100
michael.mugmon@wilmerhale.com

Christopher Davies (admitted *pro hac vice*)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
Telephone: +1 202 663 6000
Facsimile: +1 202 663 6363
christopher.davies@wilmerhale.com

Timothy Perla (admitted *pro hac vice*)
Robert K. Smith (admitted *pro hac vice*)
Jessica Lewis (SBN 302467)
WILMER CUTLER PICKERING
    HALE AND DORR LLP
60 State Street
Boston, MA 02109
Telephone: +1 617 526 6000
Facsimile: +1 617 526 5000
timothy.perla@wilmerhale.com
robert.smith@wilmerhale.com
jessica.lewis@wilmerhale.com

*Attorneys for Defendant Theranos, Inc.*

By: /s/ Kathleen Goodhart

Kathleen Goodhart (165659)
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: +1 415 693 2012
Facsimile: +1 415 693 2222
kgoodhart@cooley.com

Stephen C. Neal (170085)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Telephone: +1 650 843 5000
Facsimile: +1 650 849 7400
nealsc@cooley.com

*Attorneys for Defendant Elizabeth Holmes*

- 3 -

STIPULATION FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 41(a)(1)(A)(ii), ETC.
Case No. 5:16-cv-06822-NC

4813-0054-7693v.2 0103509-000004

By: /s/ Reed R. Kathrein

Reed R. Kathrein (139304)
Peter E. Borkon (212596)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: +1 510 725 3000
Facsimile: +1 510 725 3001
reed@hbsslaw.com
peterb@hbsslaw.com

Steve Berman (admitted *pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: +1 206 623 7292
Facsimile: +1 206 623 0594
steve@hbsslaw.com

*Attorneys for Plaintiffs and Proposed Lead Counsel
for the Class*

By: /s/ Jason A. Forge

Jason A. Forge (181542)
ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
jforge@rgrdlaw.com

Paul J. Geller (admitted *pro hac vice*)
ROBBINS GELLER RUDMAN & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: (561) 750-3000
Facsimile: (561) 750-3364
pgeller@rdrdlaw.com

Dennis J. Herman (220163)
ROBBINS GELLER RUDMAN & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: (415) 228-4545
Facsimile: (415) 288-4534
dennish@rgrdlaw.com

*Additional Counsel for Plaintiffs*

- 4 -

STIPULATION FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 41(a)(1)(A)(ii), ETC.
Case No. 5:16-cv-06822-NC

4813-0054-7693v.2 0103509-000004

## ORDER

### PURSUANT TO STIPULATION, IT IS SO ORDERED.

1.      The above-captioned action is dismissed in its entirety with prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii), each side to bear her, his, or its own attorneys' fees and costs.

2.      The parties shall complete the process of redesignations contemplated by the Joint Status Report Re: Meet and Confer on Redesignations of Confidentiality [ECF 305].  The Court retains jurisdiction with respect to any disputes arising out of that process.

3.      Paragraph 15 of the Protective Order [ECF 62] is hereby amended to

(a) require the return or destruction of all materials marked "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" within six (6) months of the entry of this Order rather than sixty (60) days as originally provided in the Protective Order, and

(b) clarify that counsel's right to retain an archival copy of deposition transcripts, as provided in Paragraph 15 of the Protective Order, subsumes the right to retain an archival copy of audio and/or video of any deposition.

Dated: July 20, 2018                                _____



Hon. Nathanael Cousins
United States Magistrate Judge

- 5 -

STIPULATION FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 41(a)(1)(A)(ii), ETC.
Case No. 5:16-cv-06822-NC

4813-0054-7693v.2 0103509-000004

**SIGNATURE ATTESTATION**

I am the ECF User whose identification and password are being used to file the foregoing Stipulation and [Proposed] Order. In compliance with Local Rule 5-1(i)(3), I hereby attest that the other signatories have concurred in this filing.

Dated: July 20, 2018

DAVIS WRIGHT TREMAINE LLP

By: /s/ Stephen M. Rummage
    Stephen M. Rummage

- 6 -

STIPULATION FOR DISMISSAL PURSUANT TO FED. R. CIV. P. 41(a)(1)(A)(ii), ETC.
Case No. 5:16-cv-06822-NC

4813-0054-7693v.2 0103509-000004

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINDA WONG, Individually and on Behalf ) No. 12 C 3102
of All Others Similarly Situated,        )
                                          )
                  Plaintiff,              )
                                          )
        v.                                )
                                          )
ACCRETIVE HEALTH, INC., et al.,          ) April 30, 2014
                                          ) Chicago, Illinois
                                          ) 1:40 p.m.
                  Defendants.             ) Fairness Hearing

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

APPEARANCES:

For the Plaintiff:          ROBBINS GELLER RUDMAN & DOWD  LLP
                            200 South Wacker Drive
                            Suite 3100
                            Chicago, Illinois  60606
                            BY:  MR. JAMES E. BARZ

                            ROBBINS GELLER RUDMAN & DOWD LLP
                            655 W. Broadway
                            Suite 1900
                            San Diego, California  92101
                            BY:  MS. ELLEN GUSIKOFF STEWART

For the Defendants:         KIRKLAND & ELLIS LLP
                            300 North LaSalle Street
                            Chicago, Illinois  60654
                            BY:  MR. LEONID FELLER

TRACEY DANA McCULLOUGH, CSR, RPR
Official Court Reporter
219 South Dearborn Street
Room 1426
Chicago, Illinois  60604
(312) 435-5570

THE CLERK:  12 C 3102, Wong versus Accretive Health.

MR. BARZ:  Good afternoon, Your Honor.  Jim Barz on behalf of the plaintiffs.

MS. STEWART:  Good afternoon, Your Honor.  Ellen Gusikoff Stewart on behalf of the plaintiffs.

MR. FELLER:  And good afternoon, Your Honor.  Leonid Feller on behalf of Accretive Health and the individual defendants.

THE COURT:  All right.  Thank you for your patience.  I had my other important parties that I had to deal with.  And we are here on a fairness hearing.  The Court has had an opportunity to review the proposed judgment and the attendant documents and order.  Anything else to present to the Court on this issue?  And is there an objector here?  I understand there was an objection.

MS. STEWART:  Your Honor, thank you.  We're happy to stand on our papers.  And there was an objector, and I just want to update the Court and let the Court know that we have asked that the Court overrule that objection.  And ask certainly that the Court rule with respect to his objection to the plan of allocation and to the fee, that the Court find that Mr. Hayes has no standing.  We have now confirmed with the claims administrator that Mr. Hayes never submitted a claim form in this matter, and so he has no injury.  He has no interest in either of the plan of allocation or the fee.  He

does have standing obviously as a class member to object to the settlement.

But for the reasons that we have stated in our reply brief and the defendants stated in their brief, that objection ought to be overruled on the merits. But we would ask that the Court find that with respect to the plan of allocation and to the extent he objects to the fee, that the Court find he has no standing.

THE COURT: And unless I hear different and considering Mr. Hayes isn't here, the Court will grant that motion.

MS. STEWART: Thank you, Your Honor.

THE COURT: All right. And based on the Court's review of the papers unless there's something else to present to Court, the Court will --

MR. BARZ: One more thing, Your Honor. There is a split of authority in this district about legal research, Lexis and Westlaw.

THE COURT: As to the payments.

MR. BARZ: So some judges have allowed it as a recoverable fee. Other judges, for example, in a case that this firm, our firm handled and myself personally before Judge St. Eve and Motorola, she said that those sort of go into your legal fees and they're not separately recoverable. So we wanted to bring that to your attention. We've asked for a fee

recovery -- oh, separate from fees, but the expenses. We've asked for 30 percent of a fee. We have asked for expenses of $63,911.14. Within that is a category that we call legal research and financial research. We think financial research is recoverable. It's separate, but we just put them lumped together, and that was $3,448.40. So some Courts have approved it.

THE COURT: Do you have what it would be separately?

MR. BARZ: If you take it out -- yes. The Lexis fee is $2,034.83. And the financial research I'm told is $1,167.61. Combined those are $3,448.40, which is set out in my declaration as an exhibit.

THE COURT: All right. Thank you for --

MR. BARZ: And we've got -- I just filed -- I just did a settlement last week before Judge Darrah. And I noted that. And in that approval we -- do we have a copy of that?

MS. STEWART: That order hasn't been signed.

MR. BARZ: No, but the final.

MS. STEWART: Oh. I have a copy of the fee brief, but I don't have a copy --

MR. BARZ: Okay. So you'll see, Your Honor, I'm one of the counsel in that case with some other counsel. And this was actually -- so this is the Ross versus Career Education case, and it's case 12 C 276, and it's document No. 119. And I'm going to tender up a copy to the Court to supplement our

filings in this case with this split of authority. And you'll see it's footnote 8 on page 14 of that brief where we sort of lay out the split of authority.

THE COURT: All right.

MR. BARZ: If I could tender a copy of that to Your Honor.

(Document tendered.)

THE COURT: All right. No objection to the Court receiving it?

MR. FELLER: No objection.

THE COURT: All right.

MR. BARZ: And so we don't have any further argument on it, Your Honor. You know, whatever Your Honor decides, we'll live with. We just wanted to highlight that issue for the Court.

THE COURT: And what I want to do is I haven't had for a little while any attorney's fees. I want to make sure I'm consistent. I think I'm pretty sure about what I've done, but I want to make sure that I am consistent. All right. And so I'll make the ruling when I enter the orders later. Other than that, the orders will be entered.

MS. STEWART: Okay.

MR. BARZ: Okay. Great. But when you say as to the fees, you're talking about the 30 percent we've suggested or the expenses?

THE COURT: No. No. As to the split in authority as to the computerized computer research versus the financial research.

MR. BARZ: Excellent.

THE COURT: All right. Anything else?

MR. FELLER: No, Your Honor.

MR. BARZ: No.

MS. STEWART: Thank you, Your Honor.

THE COURT: I'll enter the orders this afternoon. Thank you very much.

MR. BARZ: And is the motion for the fees, the 30 percent is that granted, Your Honor?

THE COURT: That's granted.

MR. BARZ: Thank you, Your Honor.

THE COURT: All right. Thank you very much.

MR. BARZ: You have a great afternoon.

THE COURT: You too.

                    CERTIFICATE

I HEREBY CERTIFY that the foregoing is a true, correct and complete transcript of the proceedings had at the hearing of the aforementioned cause on the day and date hereof.


*/s/TRACEY D. McCULLOUGH*                    *May 3, 2014*

Official Court Reporter                    Date
United States District Court
Northern District of Illinois
Eastern Division

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | | |
|---|---|---|
| ROEI AZAR, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Case No.  1:19-cv-07665 |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | Judge Matthew F. Kennelly Magistrate Judge Jeffrey Cole |
| GRUBHUB INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES AND AWARDS TO LEAD PLAINTIFF PURSUANT TO 15 U.S.C. §78u-4(a)(4)

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................1

II. AWARD OF ATTORNEYS' FEES ................................................................3

    A. A Reasonable Percentage of the Fund Recovered Is the Appropriate
        Approach to Awarding Attorneys' Fees in Common Fund Cases ...........................3

    B. The Requested Fee Is Reasonable and Appropriate ................................................5

        1. The 30% Attorneys' Fee Request Is Consistent with Fees Awarded
            in this District ....................................................................................6

        2. Lead Counsel Provided Quality Legal Services that Produced
            Excellent Benefits for the Class ......................................................8

        3. The Requested Attorneys' Fees Are Fair and Reasonable in Light
            of the Contingent Nature of the Representation .............................9

        4. The Stakes of the Litigation Favor a 30% Fee Award ................11

        5. The Reaction of the Class Supports the Requested Award ..........12

        6. Lead Plaintiff Approved the 30% Fee Request ............................12

III. LEAD COUNSEL'S EXPENSES ARE REASONABLE ...............................13

IV. AWARDS TO LEAD PLAINTIFF PURSUANT TO THE PSLRA ................14

V. CONCLUSION ..............................................................................................15

4853-3716-1791.v1

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Abbott v. Lockheed Martin Corp.*,
    2015 WL 4398475 (S.D. Ill. July 17, 2015) ...........................................................................13

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
    2019 WL 4193376 (S.D. Ind. Sept. 4, 2019) ...........................................................................4

*Bristol Cnty. Ret. Sys. v. Allscripts Healthcare Solutions, Inc.*,
    No. 1:12-cv-03297, slip op. (N.D. Ill. July 22, 2015)...............................................................14

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
    2014 WL 12767763 (N.D. Ill. Aug. 5, 2014) ...............................................................6, 10, 15

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
    2014 WL 4950173 (N.D. Ill. July 8, 2014)...............................................................................14

*Gaskill v. Gordon*,
    160 F.3d 361 (7th Cir. 1998) .......................................................................................................4

*George v. Kraft Foods Global, Inc.*,
    2012 WL 13089487 (N.D. Ill. June 26, 2012) .........................................................................14

*Glickenhaus & Co. v. Household Int'l, Inc.*,
    787 F.3d 408 (7th Cir. 2015) .......................................................................................................9

*Hubbard v. BankAtlantic Bancorp, Inc.*,
    688 F.3d 713 (11th Cir. 2012) ...................................................................................................11

*In re Akorn, Inc. Sec. Litig.*,
    2018 WL 2688877 (N.D. Ill. June 5, 2018) ..............................................................................15

*In re Alstom SA Sec. Litig.*,
    741 F. Supp. 2d 469 (S.D.N.Y. 2010).......................................................................................11

*In re Broiler Chicken Antitrust Litig.*,
    2022 WL 6124787 (N.D. Ill. Oct. 7, 2022)............................................................................6, 7

*In re Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) ..............................................................................................13, 14

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    80 F. Supp. 3d 838 (N.D. Ill. 2015) ......................................................................................4, 7

*In re JDS Uniphase Corp. Sec. Litig.*,
    2007 WL 4788556 (N.D. Cal. Nov. 27, 2007) .........................................................................11

4853-3716-1791.v1

*In re Spiegel, Inc. Sec. Litig.*,
    No. 1:02-cv-08946, slip op. (N.D. Ill. Mar. 2, 2007)................................................................6

*In re Sw. Airlines Voucher Litig.*,
    799 F.3d 701 (7th Cir. 2015) ...................................................................................................7

*In re Synthroid Mktg. Litig.*,
    264 F.3d 712 (7th Cir. 2001) ........................................................................................3, 11, 13

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*,
    364 F. Supp. 2d 980 (D. Minn. 2005)......................................................................................11

*Kirchoff v. Flynn*,
    786 F.2d 320 (7th Cir. 1986) ..........................................................................................3, 5, 6

*Lowry v. RTI Surgical Holdings, Inc.*,
    No. 1:20-cv-01939, slip op. (N.D. Ill. Jan. 26, 2022)..............................................................7

*Macovski v. Groupon, Inc.*,
    2022 WL 17256417 (N.D. Ill. Oct. 28, 2022).................................................................. *passim*

*McKinnie v. JP Morgan Chase Bank, N.A.*,
    678 F. Supp. 2d 806 (E.D. Wis. 2009)......................................................................................5

*Redman v. RadioShack Corp.*,
    768 F.3d 622 (7th Cir. 2014) ...................................................................................................7

*Robbins v. Koger Props., Inc.*,
    116 F.3d 1441 (11th Cir. 1997) ..............................................................................................11

*Ronge v. Camping World Holdings, Inc.*,
    No. 1:18-cv-07030, slip op. (N.D. Ill. Aug. 5, 2020) .........................................................6, 14

*Rubinstein v. Gonzalez*,
    No. 1:14-cv-09465, slip op. (N.D. Ill. Oct. 22, 2019)..............................................................7

*Schulte v. Fifth Third Bank*,
    805 F. Supp. 2d 560 (N.D. Ill. 2011) ..........................................................................6, 10, 12

*Silverman v. Motorola, Inc.*,
    2012 WL 1597388 (N.D. Ill. May 7, 2012),
    *aff'd*, 739 F.3d 956 (7th Cir. 2013)..................................................................................4, 8, 14

*Silverman v. Motorola, Inc.*,
    739 F.3d 956 (7th Cir. 2013) ...................................................................................... *passim*

- iii -

**Page**

*St. Lucie Fire Dist. Firefighters Pen. Tr. Fund v. Stericycle, Inc.*,
No. 1:16-cv-07145, slip op. (N.D. Ill. May 19, 2020),
*rev'd on other grounds*, 35 F.4th 555 (7th Cir. 2022) ....................................................7, 8, 14

*St. Lucie Fire Dist. Firefighters Pen. Tr. Fund v. Stericycle, Inc.*,
35 F.4th 555 (7th Cir. 2022)……………………………………………………………..7

*Sutton v. Bernard*,
504 F.3d 688 (7th Cir. 2007) ...................................................................................................3, 11

*Taubenfeld v. Aon Corp.*,
415 F.3d 597 (7th Cir. 2005) ................................................................................................6, 8, 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................................................................5

*Trustees v. Greenough*,
105 U.S. 527 (1881)...................................................................................................................3

*Will v. Gen. Dynamics Corp.*,
2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) ............................................................................3

*Williams v. Rohm & Haas Pension Plan*,
658 F.3d 629 (7th Cir. 2011) .....................................................................................................4

*Wolff v. Cash 4 Titles*,
2012 WL 5290155 (S.D. Fla. Sept. 26, 2012) .......................................................................3, 5

*Wong v. Accretive Health, Inc.*,
2014 WL 7717579 (N.D. Ill. Apr. 30, 2014) .......................................................................6, 14

*Wong v. Accretive Health, Inc.*,
773 F.3d 859 (7th Cir. 2014) .....................................................................................................7

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78u-4(a)(3)(B)..........................................................................................................................13
§78u-4(a)(4) ..................................................................................................................2, 9, 14, 15

**SECONDARY AUTHORITIES**

Janeen McIntosh and Svetlana Starykh,
*Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review*
(NERA Economic Consulting Jan. 25, 2022)............................................................................8

4853-3716-1791.v1

## I.    INTRODUCTION

Lead Counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), has obtained a substantial Settlement[1] consisting of $42 million, plus interest earned thereon.  For the reasons set forth herein and in the accompanying Memorandum of Points and Authorities in Support of Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation ("Settlement Memorandum"), the Settlement is a very favorable result.  It was achieved through Lead Counsel's vigorous litigation of this matter and the skill and effective advocacy of Lead Counsel.  As compensation for its efforts in achieving this result, Lead Counsel seeks an award of attorneys' fees of 30% of the $42 million fund, plus expenses/charges ("expenses") incurred in the prosecution of the Litigation in the amount of $228,889.82, plus interest at the same rate and for the same period as that earned by the Settlement Fund.  As detailed in §II.B.1. below, the 30% fee request, approved by Lead Plaintiff, is consistent with the fees often awarded in comparable securities class action settlements.

The 30% fee requested is warranted in light of the contingent nature of counsel's representation, the efforts of counsel in obtaining this favorable result, and the risks faced in the prosecution and settlement of the Litigation.  Absent the Settlement, and assuming Lead Plaintiff prevailed on Defendants' anticipated motion for summary judgment, the claims against Defendants could have continued for many years through trial and likely appeals.  As a result of Lead Counsel's diligent prosecution of this Litigation, a favorable settlement was achieved that provides Class Members with a substantial cash benefit now, rather than a potential recovery after several years of continued litigation, and eliminates the possibility of no recovery at all or of the costs of litigation

---

[1]    All capitalized terms not otherwise defined herein have the meanings ascribed in the Stipulation of Settlement dated October 7, 2022, ECF 94 (the "Stipulation").  Citations are omitted and emphasis is added unless otherwise noted.

diminishing the recovery. The significant settlement is reflective of counsel's experience, reputation, and skill in prosecuting securities class actions.

Lead Counsel undertook representation of the Class on a contingent fee basis and no payment has been made to date for its services or the litigation expenses it has incurred on behalf of the Class. Faced with complex issues, and opposed by experienced defense counsel, Lead Counsel nevertheless achieved a substantial litigation victory early in the case, as Defendants' motion to dismiss was denied in full, conducted extensive discovery, and succeeded in securing a favorable result for the Class. Lead Counsel believes its reputation as a leader in this field, its diligent efforts, and its dedication to the interests of the Class substantially contributed to obtaining the Settlement. The requested fee is within the range of percentages normally awarded in securities class actions in this Circuit and District, and is the appropriate method of compensating counsel. In addition, Lead Plaintiff was actively involved in the Litigation and has approved the requested fee. *See* accompanying Declaration of Sheldon Albritton in Support of Lead Plaintiff's Motion for Final Approval of Settlement ("Albritton Decl."), ¶8; Declaration of Matthew Nye in Support of Lead Plaintiff's Motion for Final Approval of Settlement ("Nye Decl."), ¶8.

Separately, Lead Plaintiff seeks awards of $1,000 each for the City of Pontiac Reestablished General Employees' Retirement System ("Retirement System") and the City of Pontiac Police & Fire Retirement System ("Police & Fire"), pursuant to 15 U.S.C. §78u-4(a)(4) in connection with its representation of the Class. Lead Plaintiff supports its application with declarations setting forth the basis for the awards, which are substantially lower than awards in recent cases. Lead Plaintiff respectfully requests that the Court approve the requested awards.

For all the reasons set forth herein and in the accompanying declarations, Lead Counsel respectfully submits that the requested attorneys' fees and expenses are fair and reasonable and should be awarded by the Court.

- 2 -

4853-3716-1791.v1

## II.    AWARD OF ATTORNEYS' FEES

### A.    A Reasonable Percentage of the Fund Recovered Is the Appropriate Approach to Awarding Attorneys' Fees in Common Fund Cases

For its efforts in creating a common fund for the benefit of the Class, Lead Counsel seeks as attorneys' fees a reasonable percentage of the fund recovered for the Class. Both the Supreme Court and the Seventh Circuit have long recognized that attorneys who represent a class and aid in the creation of a settlement fund are entitled to compensation for legal services from the settlement fund. Under this "equitable" or "common fund" doctrine established more than a century ago in *Trustees v. Greenough*, 105 U.S. 527, 528 (1881), attorneys who create a common fund for a class are entitled to an award of fees and expenses from that fund as compensation for their work. *See Sutton v. Bernard*, 504 F.3d 688, 691 (7th Cir. 2007).

The "lodestar" method (multiplying reasonable hours by reasonable rates) to assess attorneys' fees is an additional method for assessing an appropriate fee award, and is often used in fee-shifting cases or cases involving statutory fee awards. While it can be used in securities class actions as a cross-check on fee awards, courts have recognized it can create perverse incentives that reward inefficient staffing of cases, discourage early settlement talks, cause unnecessary delay in resolving disputes, and thereby increase the burden on the judicial system. *See, e.g.*, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) (stating the lodestar approach creates the "incentive to run up the billable hours"); *Kirchoff v. Flynn*, 786 F.2d 320, 325 (7th Cir. 1986) (noting in civil rights fee-shifting case the challenge of judicial review of attorney time because the "judge cannot readily see what legal work was reasonably necessary at the time" and that rewarding lawyers for hours billed can create a "conflict of interests").[2]

---

[2] *See also, e.g.*, *Will v. Gen. Dynamics Corp.*, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive."); *Wolff v. Cash 4 Titles*, 2012 WL 5290155, at *6 (S.D. Fla. Sept. 26, 2012) ("'Where

- 3 -

Thus, "[i]n a common fund class action settlement, the Seventh Circuit Court of Appeals uses a percentage of the relief obtained rather than a lodestar or other basis." *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 4193376, at \*3, \*5 (S.D. Ind. Sept. 4, 2019) (noting that while district courts have discretion on the appropriate method for a given case, "the use of a lodestar cross-check is no longer recommended in the Seventh Circuit"); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 637 (7th Cir. 2011) (rejecting objector's appeal and declining to "disturb the district court's assessment of fees" on a percentage-of-the-fund basis); *Gaskill v. Gordon*, 160 F.3d 361, 362 (7th Cir. 1998) (stating that "[w]hen a class suit produces a fund for the class, it is commonplace to award the lawyers for the class a percentage of the fund" and affirming award).

Consistent with this case law, judges in this District routinely award a reasonable percentage-of-the-fund as fees without any regard to lodestar. *See, e.g.*, *Macovski v. Groupon, Inc.*, 2022 WL 17256417, at \*1 (N.D. Ill. Oct. 28, 2022) (Kennelly, J.) (fees awarded as a percentage of the settlement fund); *Silverman v. Motorola, Inc.*, 2012 WL 1597388, at \*4 (N.D. Ill. May 7, 2012) (St. Eve, J.) (stating it was unnecessary to consider lodestar and citing cases), *aff'd*, 739 F.3d 956 (7th Cir. 2013) (affirming percentage award without any discussion of lodestar); *see also In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 80 F. Supp. 3d 838, 844, 849 (N.D. Ill. 2015) (Dow, J.) (finding that the percentage method has "emerged as the favored method for calculating fees in common-fund cases in this district" and stating "the Court sees no utility in considering" counsel's submitted lodestar).

Accordingly, Lead Counsel requests attorneys' fees of 30% of the Settlement Amount.

---

success is a condition precedent to compensation, "hours of time expended" is a nebulous, highly variable standard, of limited significance. One thousand plodding hours may be far less productive than one imaginative, brilliant hour.'").

### B. The Requested Fee Is Reasonable and Appropriate

The Supreme Court has emphasized that private securities actions provide a "'most effective weapon in the enforcement' of securities laws and are 'a necessary supplement to [SEC] action.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318-19 (2007). It is well documented in publicly-available media that large defense firms representing corporations attract talented lawyers with very high compensation, and fee awards should serve to attract equally talented lawyers to take on the risks of contingent fee representation of plaintiffs in class action cases. *See, e.g.*, *Silverman v. Motorola, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (approving fee award and noting that "[t]he greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel"); *Wolff*, 2012 WL 5290155, at *5 ("Mindful of the need to attract counsel of this high caliber, courts have recognized the importance of providing incentives to experienced counsel who take on complex litigation cases on a contingent fee basis so those cases can be prosecuted both efficiently and effectively.").

The percentage-of-the-fund method is intended to mirror the private marketplace for negotiated contingent fee arrangements. *See Kirchoff*, 786 F.2d at 324 ("When the 'prevailing' method of compensating lawyers for 'similar services' is the contingent fee, then the contingent fee is the 'market rate.'"); *see also McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 816 (E.D. Wis. 2009) (stating "[t]he 'percentage of the fee' method is preferable" to the lodestar method "because it more closely replicates the contingency fee market rate for counsel's legal services").

Here, the requested 30% fee appropriately compensates Lead Counsel for the quality of services provided and the risks of obtaining no compensation at all. To date, no Class Member has objected to the fee, and it was approved by Lead Plaintiff. Lead Counsel respectfully requests that the 30% fee be approved.

4853-3716-1791.v1

### 1. The 30% Attorneys' Fee Request Is Consistent with Fees Awarded in this District

The Seventh Circuit has held that, in deciding common fund cases, district courts should "'do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005); *Silverman*, 739 F.3d at 957, 958 (holding that attorneys' fees should "approximate the market rate" and that "[c]ontingent fees compensate lawyers for the risk of nonpayment"). Had this case been litigated on an individual rather than class basis, the customary fee arrangement would be in the range of one-third to 40% of the recovery. *See Kirchoff*, 786 F.2d at 323 (observing that "40% is the customary fee in tort litigation" and noting, with approval, contract providing for one-third contingent fee if litigation settled before trial). Moreover, courts in this District have recognized that in common fund cases, "an award of 33.3% of the settlement fund is within the reasonable range." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 598 (N.D. Ill. 2011) (Dow, J.); *see In re Broiler Chicken Antitrust Litig.*, 2022 WL 6124787, at \*4 (N.D. Ill. Oct. 7, 2022) (Durkin, J.) (awarding 33% noting that "in large cases like this, the only available evidence of the 'market rate' is past awards").

The percentage sought here, 30% of the $42 million Settlement Amount, is consistent with percentages awarded to Robbins Geller in other securities class action cases in this District. *See, e.g.*, *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2014 WL 12767763, at \*1 (N.D. Ill. Aug. 5, 2014) (St. Eve, J.) (awarding Robbins Geller and co-counsel 30% on $60 million settlement); *Wong v. Accretive Health, Inc.*, 2014 WL 7717579, at \*1 (N.D. Ill. Apr. 30, 2014) (Coleman, J.) (awarding Robbins Geller and co-counsel 30% on $14 million settlement).[3]

---

[3] *See also Ronge v. Camping World Holdings, Inc.*, No. 1:18-cv-07030, slip op. at ¶4 (N.D. Ill. Aug. 5, 2020) (Pallmeyer, J.) (awarding 30% of $12.5 million); *In re Spiegel, Inc. Sec. Litig.*, No. 1:02-cv-08946, slip

- 6 -

The 30% fee request is also consistent with fee percentages often awarded in this District to other law firms in securities and other complex class actions. *See, e.g.*, *Groupon*, 2022 WL 17256417, at *1-*2 (awarding 33-1/3% of $13.5 million securities settlement, which "is consistent with the market rate in similarly complex actions litigat[ed] on a wholly contingent basis"); *Broiler Chicken*, 2022 WL 6124787, at *3 (awarding 33% on $181 million antitrust settlement, net of expenses, rejecting "declining fee scale award structures"); *Lowry v. RTI Surgical Holdings, Inc.*, No. 1:20-cv-01939, slip op. at ¶18 (N.D. Ill. Jan. 26, 2022) (Kennelly, J.) (awarding 30% fee of $10.5 million securities settlement); *Rubinstein v. Gonzalez*, No. 1:14-cv-09465, slip op. at ¶1 (N.D. Ill. Oct. 22, 2019) (Dow, J.) (awarding 30% of $16.75 million securities settlement); *Dairy Farmers of Am.*, 80 F. Supp. 3d at 862 (awarding 33% of $46 million antitrust settlement).[4]  Thus, Lead Counsel's request for 30% of the total recovery is fair and reasonable and consistent with the "market rate" based on prior fee awards in this District.[5]

op. at ¶3 (N.D. Ill. Mar. 2, 2007) (Pallmeyer, J.) (awarding 30% of $17.5 million).  Attached hereto as Exhibit A is an appendix of unreported authorities cited herein.

[4]    The securities class action cases cited all awarded fees based on a percentage of the gross settlement amount.  Recently, a court held that, under *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), expenses and notice and administration costs should be deducted from the gross settlement amount and the fee awarded as a percentage of the remainder.  *See, e.g.*, *St. Lucie Fire Dist. Firefighters Pen. Tr. Fund v. Stericycle, Inc.*, No. 1:16-cv-07145, slip op. at 4 (N.D. Ill. May 19, 2020) (Wood, J.), *rev'd on other grounds*, 35 F.4th 555, 559 n.1 (7th Cir. 2022) (noting that district court's decision to deduct costs before awarding percentage fee was "not at issue on appeal").  But *Redman* was a consumer case involving a coupon settlement, and the Seventh Circuit has repeatedly noted concerns regarding assessing the actual recovery in coupon settlements because such cases can have a low claims rate and might provide for any unclaimed funds to revert back to the defendants.  *See Redman*, 768 F.3d at 629-37; *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 708 (7th Cir. 2015).  In contrast, the Seventh Circuit affirmed a percentage fee award in a securities class action based on the aggregate settlement, without any discussion of the need to deduct such expenses.  *See Silverman*, 739 F.3d 956 (affirming fee award of 27.5% of $200 million settlement); *see also Wong v. Accretive Health, Inc.*, 773 F.3d 859, 862 (7th Cir. 2014) (affirming final approval of settlement and noting that district court "awarded attorneys' fees of 30% of the [$14 million] settlement proceeds, or $4.2 million").

[5]    The Seventh Circuit recently remanded a 27.5% fee award in a securities class action. *St. Lucie Fire Dist. Firefighters Pen. Tr. Fund v. Stericycle, Inc.*, 35 F.4th 555, 568 (7th Cir. 2022).  However, that case involved a settlement that was obtained prior to a ruling on a motion to dismiss, that followed large settlements with the government and consumers that "substantially reduced the risk of non-payment" in the securities action, and that involved a Lead Plaintiff that had apparently negotiated a lower fee scale agreement at the outset. *Id.*

- 7 -

### 2. Lead Counsel Provided Quality Legal Services that Produced Excellent Benefits for the Class

In evaluating counsel's fee request, courts may consider the "quality of legal services rendered." *Taubenfeld*, 415 F.3d at 600; *see also Silverman*, 2012 WL 1597388, at *3 (noting that "[t]he representation that Class Counsel provided to the class was significant, both in terms of quality and quantity"). From the outset, Lead Counsel sought to obtain the best possible recovery for the Class. Securities cases are well known to be complex and recovery is far from certain due to the heightened pleading standards, which has resulted in a significant dismissal rate. *See, e.g.*, Settlement Memorandum, Ex. A (Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review*, NERA Economic Consulting (Jan. 25, 2022)) at 14, Fig. 14 (noting that for federal securities class actions filed and resolved between January 2012 and December 2021, where a decision was entered on a motion to dismiss, 56% were granted).

This case required a determined investigation and the skill to respond to a host of legal and factual defenses raised by Defendants in connection with both their motion to dismiss and Lead Plaintiff's class certification motion. During the course of the Litigation, Lead Counsel spent over 8,560 hours of attorney and paraprofessional time investigating the claims, drafting the detailed Complaint, preparing an extensive brief in opposition to Defendants' motion to dismiss (which was denied in full), conducting substantial discovery (including obtaining and analyzing more than two million pages of documents), preparing a thorough brief in support of class certification, defending Lead Plaintiff's expert's deposition and the Rule 30(b)(6) depositions of Lead Plaintiff, and preparing for and participating in two mediation sessions that included the exchange of mediation statements regarding the parties' respective positions on the claims and defenses, and damages. *See*

---

at 561-67. Thus, that case is distinguishable from the facts here and does not overrule or undercut the rationale of the fee awards in the cases cited herein.

4853-3716-1791.v1

accompanying Declaration of James E. Barz in Support of: (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation; and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses and Awards to Lead Plaintiff Pursuant to 15 U.S.C. §78u-4(a)(4) ("Barz Decl."), ¶¶5(a)-(j), 10. During settlement negotiations, Lead Counsel demonstrated its willingness to continue to litigate the claims rather than accept a settlement that was not in the best interest of the Class. Notably, the case did not settle at the first or second mediation, but rather Lead Counsel pressed forward with the litigation and negotiations.

Moreover, given the stakes involved, it can be difficult to settle these cases prior to defendants exhausting all their legal challenges through summary judgment. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (securities action prosecuted by Robbins Geller that was filed in 2002, resulted in jury verdict for plaintiffs in 2009, remanded after appeal and settled in 2016). Not only was Lead Counsel, based on its reputation and willingness to litigate the case as long as necessary, able to secure a (relatively) prompt resolution less than three years after the case was filed, but it was also able to obtain a very good result. The result for the Class is also impressive as a percentage of recoverable damages. *See* Settlement Memorandum, §IV.A.3.b.

This result is all the more impressive given Lead Counsel was opposed in this Litigation by counsel from Kirkland & Ellis LLP, which has a reputation for being a leading defense firm in complex civil cases. In the face of this formidable opposition, Lead Counsel developed its case so as to persuade Defendants to settle the Litigation on terms favorable to the Class. Lead Counsel's skill, expertise, and excellent advocacy in representing the Class is reflected in this favorable result.

### 3. The Requested Attorneys' Fees Are Fair and Reasonable in Light of the Contingent Nature of the Representation

"Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic

- 9 -

counsel." *Silverman*, 739 F.3d at 958.[6] Lead Counsel undertook this Litigation on a contingent fee basis, assuming a significant risk that the Litigation would yield no recovery and leave them uncompensated. Unlike counsel for defendants, who are paid an hourly rate and paid for their expenses on a regular (*e.g.*, monthly) basis, regardless of whether they win or lose, Lead Counsel had no such guarantee of payment, had to wait for any payment while the case was prosecuted for several years, and had to incur unpaid expenses while the case was ongoing. While the outcome here was favorable, there was no guarantee it would be at the time counsel agreed to take the case.

Lead Counsel had to build this case from its investigation without the benefit of any SEC or other government investigation, findings, or settlements. Even though Lead Plaintiff successfully opposed Defendants' motion to dismiss, Lead Plaintiff still faced significant obstacles. Assuming Lead Plaintiff was successful in certifying a class and able to overcome Defendants' motion for summary judgment after costly, additional discovery efforts, it still would have faced risks in proving falsity, materiality, scienter, and loss causation before a jury. *See* Settlement Memorandum §IV.A.3. Moreover, even apart from proving liability, proving damages in securities cases is complex and requires expert testimony to establish the amount – and indeed the existence – of actual damages. *See id.* Here, the damages assessments of the parties' respective experts would be heavily disputed (*see* ECF 82 at 21; Settlement Memorandum, §IV.A.3.b) and the determination of the amount, if any, of damages suffered by the Class at trial would have turned into a "battle of the experts."

There are numerous examples where plaintiffs' counsel in contingent cases such as this, after the expenditure of significant time and expenses, have received no compensation. Securities cases

---

[6]     *See also Schulte*, 805 F. Supp. 2d at 598 ("All contingent fee class action cases involve some degree of risk for plaintiffs' counsel."); *Taubenfeld*, 415 F.3d at 600 (stating courts should consider "the contingent nature of the case" and the fact "that lead counsel was taking on a significant degree of risk of nonpayment"); *Hospira*, 2014 WL 12767763, at *1 ("the contingent nature of the Action favors a fee award of 30%").

- 10 -

have been dismissed at the pleading stage, dismissed on summary judgment, lost at trial, and even reversed after plaintiffs prevailed at trial, as the law is complex and continually evolving. *See, e.g.*, *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 4788556, at \*1 (N.D. Cal. Nov. 27, 2007) (jury verdict for defendants after lengthy trial); *In re Alstom SA Sec. Litig.*, 741 F. Supp. 2d 469, 471-73 (S.D.N.Y. 2010) (claims based on purchases on foreign exchanges eliminated by the "new 'transactional' rule" enunciated by the Supreme Court).[7] Quite simply, "Defendants prevail outright in many securities suits." *Silverman*, 739 F.3d at 958.

Because the fee in this matter was entirely contingent, the only certainty was that Lead Counsel would have to commit to years of work without pay, knowing that there would be no fee without a successful result and that such a result would be realized only after considerable effort and expense. Notably, the case did not settle during the two mediation sessions, as Lead Counsel committed its time and money to the vigorous and successful prosecution of the Litigation for the benefit of the Class. The contingent nature of counsel's representation strongly favors approval of the requested fee. *See, e.g.*, *Sutton*, 504 F.3d at 694 (reversing district court's reduced fee award and stating "[b]ecause the district court failed to provide for the risk of loss, the possibility exists that Counsel, whose only source of a fee was a contingent one, was undercompensated").

### 4. The Stakes of the Litigation Favor a 30% Fee Award

The Court should also consider the "stakes of the case" in assessing a reasonable attorneys' fee. *Synthroid*, 264 F.3d at 721. As in other commercial class actions, the stakes here were high "given the size of the Class, the scale of the challenged activity, the complexity and costs of the legal

---

[7] In fact, "[p]recedent is replete with situations in which attorneys representing a class have devoted substantial resources in terms of time and advanced costs yet have lost the case despite their advocacy." *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 994 (D. Minn. 2005); *see also, e.g.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012) (affirming judgment as a matter of law following jury verdict partially in plaintiffs' favor); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1449 (11th Cir. 1997) (reversal of jury verdict of \$81 million).

4853-3716-1791.v1

proceedings, and the amount of money involved." *Schulte*, 805 F. Supp. 2d at 598. In this high stakes litigation, Lead Counsel successfully obtained a favorable recovery even before the completion of fact discovery. A settlement now is more beneficial to the Class than waiting several more years to obtain a recovery, not only because of the time value of money but also because the increased expenses of continued litigation could have reduced the amount of any available insurance to fund a recovery to the Class. As the litigation advances, the risks can also increase. And, even if Lead Plaintiff prevailed at trial, Defendants would have the opportunity to appeal any judgment obtained, possibly delaying a favorable resolution for years. *See supra*, §II.B.2-3. Lead Counsel undertook this case fully prepared to litigate against these obstacles.

### 5. The Reaction of the Class Supports the Requested Award

Pursuant to this Court's October 14, 2022 Preliminary Approval Order (ECF 99), more than 70,600 copies of the Notice have been mailed to potential Class Members and nominees. Class Members were informed in the Notice that Lead Counsel would apply for attorneys' fees not to exceed 30% of the Settlement Amount, plus expenses in an amount not to exceed $265,000, plus interest earned on both amounts. Class Members were also advised of their right to object to Lead Counsel's fee and expense request and the procedure for doing so. While the deadline to file objections – December 22, 2022 – has not yet passed, to date, no objection to any aspect of the Settlement, including the fee and expense request, has been received. Lead Counsel will address any objections received in its reply brief to be filed on January 5, 2023.

### 6. Lead Plaintiff Approved the 30% Fee Request

Lead Plaintiff, who worked with counsel throughout the Litigation, has approved the 30% fee request. *See* Albritton Decl., ¶8; Nye Decl., ¶8. Unlike consumer and other class action cases where lead plaintiffs may have little or no stake in the litigation, securities fraud cases have unique procedures for appointing as lead plaintiff the movant with the largest financial interest, which serve

- 12 -

to protect class members. *See Silverman*, 739 F.3d at 959 (stating it is "a premise of several rules in the Private Securities Litigation Reform Act" that investors with a large stake in the settlement fund, in "looking out for themselves, help to protect the interests of class members with smaller stakes"); 15 U.S.C. §78u-4(a)(3)(B). Moreover, the Class consists of many sophisticated Class Members who have counsel and incentive to object to the fee award, and the Seventh Circuit has also considered the absence of objection from such class members as supporting the reasonableness of a fee award. *See Silverman*, 739 F.3d at 959 (affirming fee award in securities class action and noting lack of objection by "institutional investors [that] have in-house counsel with fiduciary duties to protect the beneficiaries" and high fee awards could be "worth a complaint to the district judge if the lawyers' cut seems too high"). That Lead Plaintiff, two sophisticated institutional investors, approved the fee request also weighs in favor of its reasonableness. *See Groupon*, 2022 WL 17256417, at *2 ("The fee sought by Lead Counsel has been reviewed and approved as reasonable by the Lead Plaintiff, who oversaw the prosecution and resolution of the Action.").

Accordingly, all of the factors discussed above support the fee award requested by Lead Counsel, and the Court should grant counsel's application.

## III.     LEAD COUNSEL'S EXPENSES ARE REASONABLE

In addition to an award of attorneys' fees, attorneys who create a common fund for the benefit of a class are entitled to payment of reasonable litigation expenses from the fund. *Synthroid*, 264 F.3d at 722; *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992).

Lead Counsel is requesting payment of expenses in the amount of $228,889.82. As set forth in the accompanying Declaration, these expenses were reasonably incurred in the prosecution of this Litigation and are adequately described. *See* Declaration of James E. Barz Filed on Behalf of Robbins Geller Rudman & Dowd LLP in Support of Application for Award of Attorneys' Fees and Expenses, ¶¶6, 7; *Abbott v. Lockheed Martin Corp.*, 2015 WL 4398475, at *4 (S.D. Ill. July 17,

- 13 -

2015) ("It is well established that counsel who create a common fund like this one are entitled to the reimbursement of litigation costs and expenses, which includes such things as expert witness costs; computerized research; court reporters; travel expense; copy, phone and facsimile expenses and mediation.").[8]  Thus, Lead Counsel respectfully requests payment of these reasonable litigation expenses from the Settlement Fund.

## IV.     AWARDS TO LEAD PLAINTIFF PURSUANT TO THE PSLRA

The PSLRA limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but it also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of the class." 15 U.S.C. §78u-4(a)(4).  Pursuant to these provisions, courts in this District have granted awards, for example, reflecting time spent on the litigation based on customary rates.  *See, e.g.*, *City of Sterling Heights Gen. Emps.' Ret. Sys. v.*

---

[8]     Note that judges in this District have split on whether electronic legal research expenses should be awarded or should be considered part of the attorneys' fee award. *Compare Silverman*, 2012 WL 1597388, at *4 (declining to approve legal research expenses) *with George v. Kraft Foods Global, Inc.*, 2012 WL 13089487, at *4 (N.D. Ill. June 26, 2012) (allowing recovery of such expenses).  While initially such costs were considered to be absorbed by rate increases for attorney time in the transition from paper to electronic legal research, more recently cases appear to have continued to approve electronic legal research expenses as an additional expense passed on to clients in the marketplace. *See Wong v. Accretive Health, Inc.*, No. 1:12-cv-03102, Transcript of Proceedings, ECF 85 at 4-5 (N.D. Ill. Apr. 30, 2014) (discussing split); *Accretive*, 2014 WL 7717579 (awarding legal research expenses); *Bristol Cnty. Ret. Sys. v. Allscripts Healthcare Solutions, Inc.*, No. 1:12-cv-03297, ECF 116 at 14-15 (N.D. Ill. June 17, 2015) (memorandum discussing split); *Bristol Cnty. Ret. Sys. v. Allscripts Healthcare Solutions, Inc.*, No. 1:12-cv-03297, slip op. at ¶4 (N.D. Ill. July 22, 2015) (Alonso, J.) (awarding legal research expenses); *Camping World*, No. 1:18-cv-07030, ECF 140 at 13 n.7 (N.D. Ill. July 1, 2020) (memorandum noting split); *Camping World*, slip op. at ¶4 (awarding expenses).  But *see Stericycle*, slip op. at 4 (declining to approve legal research expenses).  This Court has recently approved reimbursement of expenses that included amounts for "Online Research." *See, e.g.*, *Groupon*, No. 1:20-cv-02581, ECF 121, ¶107 (N.D. Ill. Sept. 8, 2022) (counsel including "Online Research" in categories of expenses); *Groupon*, 2022 WL 17256417, at *1 (awarding reimbursement of counsel's expenses).  Allowing recovery of these expenses separate from the fee award is consistent with the Seventh Circuit's directive that fee awards should mimic the market. *See, e.g.*, *Cont'l Ill.*, 962 F.2d at 570 ("[T]he paying, arms' length market reimburses lawyers' LEXIS and WESTLAW expenses.").  In this case, legal research expenses amount to $26,449.37 of the total $228,889.82 in expenses for which an award is being sought.

- 14 -

*Hospira, Inc.*, 2014 WL 4950173 (N.D. Ill. July 8, 2014) (requesting award for estimated employee time and customary rate); *Hospira*, 2014 WL 12767763, at *1 (St. Eve., J.) (awarding more than $25,000 to four institutional representatives). Also pursuant to these provisions, courts in this District have granted awards reflecting time spent on the litigation that could have been spent on other matters without consideration of an hourly rate or the exact time spent. *See, e.g.*, *Groupon*, No. 1:20-cv-02581, ECF 121, ¶107 (N.D. Ill. Sept. 8, 2022) (requesting lead plaintiff award where individual lead plaintiff "contributed time for the benefit of the Settlement Class"); *Groupon*, 2022 WL 17256417, at *2 (awarding $5,000 to lead plaintiff); *In re Akorn, Inc. Sec. Litig.*, No. 1:15-cv-01944, ECF 174-5, ¶7 (N.D. Ill. Feb. 19, 2018) (requesting award under 15 U.S.C. §78u-4(a)(4) for time devoted to the "representation of the Settlement Class" that could have otherwise been dedicated to tennis instructor business); *In re Akorn, Inc. Sec. Litig.*, 2018 WL 2688877, at *4-*5 (N.D. Ill. June 5, 2018) (Feinerman, J.) (awarding $10,000 each to three individual class representatives, $30,000 total).

Here, the Lead Plaintiff Pension Funds have submitted accompanying declarations seeking awards of $1,000 each for the time they dedicated to pursuing the claims. *See* Albritton Decl., ¶9; Nye Decl., ¶9. The requests of $2,000, combined, are well below the $10,000 maximum combined award amount set forth in the Notice, well below the amounts awarded in other cases in this District, and there has been no objection to date.

## V.    CONCLUSION

For all the reasons stated herein, and in the accompanying Settlement Memorandum and declarations, Lead Counsel submits that the Court should approve the fee and expense application. Lead Counsel also submits that Lead Plaintiff's request for awards of $1,000 each for Retirement System and Police & Fire, are reasonable and should be awarded pursuant to 15 U.S.C. §78u-4(a)(4).

4853-3716-1791.v1

DATED: December 8, 2022

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
JAMES E. BARZ (IL Bar # 6255605)
FRANK A. RICHTER (IL Bar # 6310011)

        *s/ James E. Barz*
        JAMES E. BARZ

200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  630/696-4107
jbarz@rgrdlaw.com
frichter@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
ROBERT J. ROBBINS
BAILIE L. HEIKKINEN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
rrobbins@rgrdlaw.com
bheikkinen@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
THEODORE J. PINTAR
BRIAN E. COCHRAN (IL Bar # 6329016)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
tedp@rgrdlaw.com
bcochran@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 16 -

4853-3716-1791.v1

- 17 -

ASHERKELLY
CYNTHIA J. BILLINGS-DUNN
MATTHEW HENZI
25800 Northwestern Highway, Suite 1100
Southfield, MI  48075
Telephone:  248/746-2710
248/747-2809 (fax)
cbdunn@asherkellylaw.com
mhenzi@asherkellylaw.com

Additional Counsel for Lead Plaintiff

# EXHIBIT I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| IN RE AKORN, INC.<br>SECURITIES LITIGATION | Case No. 15-CV-01944<br><br>Hon. Gary Feinerman |

**DECLARATION OF MIKOLAJ SARZYNSKI IN SUPPORT OF FINAL APPROVAL OF THE SETTLEMENT AND REIMBURSEMENT OF CLASS PLAINTIFFS' COSTS**

395221.1 AKORN

I, Mikolaj Sarzynski, hereby declare as follows:

1.      I am a member of Court-appointed Lead Plaintiff Akorn Investor Group ("AIG"), which consists of myself, J.M. Cunniff, Jr., and Elizabeth Cunniff (collectively, "Class Plaintiffs"). I respectfully submit this declaration in support of final approval of the Settlement and reimbursement of Class Plaintiffs' costs.

2.      I am aware of and understand the requirements and responsibilities of a representative plaintiff in a securities class action, including those set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). I have personal knowledge of the matters set forth in this Declaration, as I have both been directly involved in monitoring and overseeing the prosecution of the above-captioned action (the "Action"), as well as the negotiations leading to the Settlement, and I could and would testify competently to these matters.

3.      On August 24, 2015, AIG was appointed Lead Plaintiff in this Action. In fulfillment of my responsibilities as a member of AIG, I have worked closely with Co-Lead Counsel Glancy Prongay & Murray LLP ("GPM") and Pomerantz LLP ("Pomerantz," and together with GPM, "Class Counsel") to obtain a favorable result in this case for the benefit of the Settlement Class.

4.      The specific tasks I performed include but are not limited to:

(a)      regularly communicating with Class Counsel regarding the posture and progress of the case;

(b)      reviewing significant pleadings and memoranda filed by Class Counsel in the litigation, including the 93-page Consolidated Amended Class Action Complaint, the briefing on Defendants' motion to dismiss, and the briefing on the motion for class certification;

(c) reviewing the Court's orders and other litigation-related information obtained from Class Counsel;

(d) reviewing Defendants' document requests with Class Counsel and providing my responses to the document requests;

(e) collecting and producing documents in response to Defendants' document requests;

(f) reviewing Defendants' interrogatories with Lead Counsel and providing my responses to the interrogatories;

(g) preparing for and participating in my deposition;

(h) consulting with Lead Counsel before and during the negotiations that resulted in the proposed Settlement; and

(i) evaluating and approving the proposed Settlement.

5. Based on my involvement throughout the prosecution and resolution of the claims asserted in the Action, I believe that the Settlement provides an excellent recovery for the Settlement Class, particularly in light of the risks of continued litigation. Thus, I believe that the proposed Settlement is fair, reasonable, and adequate to the Settlement Class, and I therefore strongly endorse final approval of the Settlement by the Court.

6. I understand that reimbursement of a class representative's reasonable costs and expenses is authorized under the PSLRA. For this reason, I am seeking reimbursement for the costs and expenses that I incurred relating to my representation of the Settlement Class.

7. The time that I devoted to the representation of the Settlement Class in this Action is time that I otherwise could have dedicated to running my business as a tennis instructor and thus represented a cost to me. Accordingly, I respectfully seek reimbursement in the amount of

$10,000. It is my belief that this request for reimbursement is fair and reasonable given the amount of time I have spent on this litigation.

I declare under penalty of perjury, that the foregoing is true and correct.

Executed this 19th day of February 2018.

By: _/s/ Mikolaj Sarzynski_
     Mikolaj Sarzynski

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

IN RE AKORN, INC.
SECURITIES LITIGATION

Case No. 15-CV-01944

Hon. Gary Feinerman

**DECLARATION OF J.M. CUNNIFF, JR., AND ELIZABETH CUNNIFF
IN SUPPORT OF FINAL APPROVAL OF THE SETTLEMENT AND
<u>REIMBURSEMENT OF CLASS PLAINTIFFS' COSTS</u>**

395218.1 AKORN

We, J.M. Cunniff, Jr., and Elizabeth Cunniff, hereby declare as follows:

1.     We are members of Court-appointed Lead Plaintiff Akorn Investor Group ("AIG"), which consists of ourselves and Mikolaj Sarzynski (collectively, "Class Plaintiffs"). We respectfully submit this declaration in support of final approval of the Settlement and reimbursement of Class Plaintiffs' costs.

2.     We are aware of and understand the requirements and responsibilities of a representative plaintiff in a securities class action, including those set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). We have personal knowledge of the matters set forth in this Declaration, as we have both been directly involved in monitoring and overseeing the prosecution of the above-captioned action (the "Action"), as well as the negotiations leading to the Settlement, and we could and would testify competently to these matters.

3.     On August 24, 2015, AIG was appointed Lead Plaintiff in this Action. In fulfillment of our responsibilities as members of AIG, we have worked closely with Co-Lead Counsel Glancy Prongay & Murray LLP ("GPM") and Pomerantz LLP ("Pomerantz," and together with GPM, "Class Counsel") to obtain a favorable result in this case for the benefit of the Settlement Class.

4.     The specific tasks we performed include but are not limited to:

(a)     regularly communicating with Class Counsel regarding the posture and progress of the case;

(b)     reviewing significant pleadings and memoranda filed by Class Counsel in the litigation, including the 93-page Consolidated Amended Class

Action Complaint, the briefing on Defendants' motion to dismiss, and the briefing on the motion for class certification;

(c)     reviewing the Court's orders and other litigation-related information obtained from Class Counsel;

(d)     reviewing Defendants' document requests with Class Counsel and providing our responses to the document requests;

(e)     collecting and producing documents in response to Defendants' document requests;

(f)     reviewing Defendants' interrogatories with Lead Counsel and providing our responses to the interrogatories;

(g)     preparing for and participating in our depositions;

(h)     consulting with Lead Counsel before and during the negotiations that resulted in the proposed Settlement; and

(i)     evaluating and approving the proposed Settlement.

5.     Based on our involvement throughout the prosecution and resolution of the claims asserted in the Action, we both believe that the Settlement provides an excellent recovery for the Settlement Class, particularly in light of the risks of continued litigation. Thus, we both believe that the proposed Settlement is fair, reasonable, and adequate to the Settlement Class, and we therefore strongly endorse final approval of the Settlement by the Court.

6.     We understand that reimbursement of a class representative's reasonable costs and expenses is authorized under the PSLRA. For this reason, we are seeking reimbursement for the costs and expenses that we incurred relating to our representation of the Settlement Class.

7.     The time that we devoted to the representation of the Settlement Class in this

395218.1 AKORN

Action is time that we otherwise could have dedicated to running our joint business, Power Outage Services Company, LLC, and thus represented a cost to us. Accordingly, we respectfully seek reimbursement in the amount of $10,000 each ($20,000 total). It is our belief that this request for reimbursement is fair and reasonable given the amount of time we have spent on this litigation.

We declare under penalty of perjury, that the foregoing is true and correct.

Executed this 19th day of February 2018.

By: */s/ J.M. Cunniff, Jr.*
J.M. Cunniff, Jr.

Executed this 19th day of February 2018.

By: */s/ Elizabeth Cunniff*
Elizabeth Cunniff